Paul S. Sigelman, SBN 45954
paul@sigelmanlaw.com
SIGELMAN LAW CORPORATION
433 N. Camden Drive, Suite 970
Beverly Hills, California 90210-4426
Tel:  310-278-8011
Fax:  310-278-2254

Ira M. Siegel, SBN 78142
irasiegel@earthlink.net
LAW OFFICES OF IRA M. SIEGEL
433 N. Camden Drive, Suite 970
Beverly Hills, California 90210-4426
Tel:  310-435-7656
Fax:  310-657-2187

Attorneys for Plaintiff
Connie Franconero p/k/a Connie Francis

**UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

| | |
|---|---|
| CONNIE FRANCONERO, p/k/a CONNIE FRANCIS, | CASE NO. CV 12-03382 JGB(AGRx) |
| Plaintiff, | **THIRD AMENDED COMPLAINT** |
| v. | **and** |
| UMG RECORDINGS, INC., | **DEMAND FOR JURY TRIAL** |
| Defendant. | **JESUS G. BERNAL,** United States District Judge |

Plaintiff Connie Franconero p/k/a Connie Francis brings this Third Amended Complaint against Defendant UMG Recordings, Inc. and alleges as follows:

<u>THE PARTIES</u>

1.     Connie Francis ("Francis") is an internationally acclaimed and accomplished recording artist, residing outside the State of California.  Francis is the successor to her previously wholly-owned production company, G.G.C. Productions Corp.  She has recorded over 1,000 compositions, many of which

1  remain currently popular.

2  2.  This action is brought against UMG Recordings, Inc. ("Universal" or

3  "Defendant"), a Delaware corporation with its headquarters in the Santa Monica,

4  California, and conducting its principal business activity in the Central District.

5  On information and belief, Universal is a successor to, or was previously known

6  as, Universal Music Corp., and is a successor to PolyGram Records, Inc., successor

7  to and/or previously named as Polydor Incorporated, and in turn successor to

8  MGM Records Division of Metro-Goldwyn-Mayer, previously named MGM

9  Records, a division of Loew's, Inc. (hereafter collectively the "Company").

10  JURISDICTION AND VENUE

11  3.  This court has jurisdiction pursuant to 28 U.S.C. §1332(d)(2) in that

12  there is complete diversity of citizenship between the parties and the amount in

13  controversy exclusive of interest and costs exceeds $75,000.  Venue lies in this

14  District pursuant to 28 U.S.C. §1391 in that the Company's principle office is

15  located in this District.  Further, on information and belief, Universal's obligations

16  of rendering full accounting and payment of proper royalties due by contract and

17  mutual agreement in course of performance, and the breach by failure to do so,

18  occurred at its business offices in the Central District of California, where all

19  records pertaining to the accounting are maintained.

20  THE AGREEMENTS

21  4.  On about January 3, 1958, Company, through its predecessor, MGM,

22  engaged Francis' professional services by contract (the "1958 Agreement"), a copy

23  of which is attached hereto as **Exhibit 1**.

24  5.  In an agreement dated January 5, 1959, MGM again engaged Francis'

25  professional services by contract (the "1959 Agreement").  A copy of the 1959

26  Agreement is attached hereto as **Exhibit 2**.  The 1959 Agreement was written on

27  MGM stationery.  Section 1 of the 1959 Agreement provides in part,

28  "We [MGM] hereby engage you [Francis] to render services as we

may require in the production of phonograph records, and you hereby accept such engagement and agree to render such services for us for a period commencing January 5, 1959 and terminating January 4, 1992."

The first paragraph of Section 2 of the 1959 Agreement provides in part,

" . . . [A] minimum of sixteen (16) 45rpm record sides, or their equivalent in other speeds, shall be recorded during each year of the term hereof; additional recordings shall be performed by you and recorded by us by mutual agreement between us. Each recording shall be subject to our approval as satisfactory for the manufacture and sale of phonograph records, and upon our request you will re-record any composition until a master record commercially satisfactory shall have been obtained."

The second paragraph of Section 2 of the 1959 Agreement provides in part,

"All compositions to be recorded hereunder, all arrangements and arrangers, and the recordings to be released hereunder shall be mutually agreed upon between us. Subject to the foregoing, during each year of the term hereof, eight (8) 45 rpm records, or their equivalent, containing your performances on both sides thereof as recorded by you hereunder, shall be manufactured and released for sale by us as single records and twelve (12) of the compositions recorded by you for us hereunder shall be manufactured and released for sale by us in the form of a record album."

The introductory paragraph of Section 4 of the 1959 Agreement provides,

"We, and/or our subsidiaries, affiliates and licensees, all have the exclusive right to all the products of your services hereunder, including but not limited to the exclusive right:"

Section 4(a) of the 1959 Agreement provides,

"to manufacture, advertise, sell, lease, license or otherwise use

1    or dispose of, in any or all fields of use, and by any method now or
2    hereafter known, throughout the world, phonograph records, tapes,
3    wire and other reproductions embodying the performances to be
4    recorded hereunder, upon such terms and conditions as we may elect,
5    or, at our discretion, to refrain therefrom."
6    Section 4(b) of the 1959 Agreement provides in part,
7         "to use and publish and to permit others to use and publish your
8         name and photograph; to write and publish articles concerning you for
9         advertising and trade purposes in connection with the sale and
10        exploitation of phonograph records recorded hereunder . . . ."
11   Section 4(c) of the 1959 Agreement provides,
12        "to release, by mutual agreement between us, phonograph
13        records of the compositions performed by you and recorded hereunder
14        on any medium or device now or hereafter known under the name
15        "M-G-M Records", or the primary label which we or our subsidiaries,
16        affiliates and licensees may from time to time elect."
17        6.    The 1959 Agreement was entered into by Francis and MGM after the
18   very successful release of phonograph records bearing Francis' recording of the
19   song "Who's Sorry Now" under the 1958 Agreement.  MGM saw in Francis a
20   super star future, and in fact she became one of MGM's best-selling recording stars
21   of all time.  The 1958 Agreement and the 1959 Agreement are very similar to each
22   other in many terms that were without significance.  After the 1958 Agreement,
23   MGM intended to concede to Francis' mutual control over any business plan not
24   specified within the four corners of the agreement.  MGM agreed to Francis'
25   demand that the two parties arrive at a future "mutual agreement" provision for
26   business outside of the 1959 contract.  Plaintiff is informed and believes the terms
27   of mutual agreement between the parties were not in the standard recording
28   contracts used by MGM for other vocal artists, or in the standard contracts of other

1   recording companies.  Thus, as consideration Francis entering the 1959

2   Agreement, MGM wrote in the document various grants otherwise incompatible

3   with standard form recording agreement of the era.

4          7.     The 1958 Agreement has only one (1) paragraph in its Section 2,

5   where the 1959 Agreement has two (2) paragraphs in its Section 2.  The one

6   paragraph of the 1958 Agreement's Section corresponds to the first paragraph of

7   the 1959 Agreement's Section 2.  However, where the 1958 Agreement provides

8   that "Compositions to be recorded shall be designated by us," the 1959 Agreement

9   does not provide that MGM would designate the compositions to be recorded.

10  Further, the first paragraph of Section 2 of the 1959 Agreement provides that

11  "additional recordings [beyond the minimum] shall be performed by you and

12  recorded by us by mutual agreement between us."  No comparative provision exists

13  in the 1958 Agreement.

14         8.     Where the first paragraph of Section 2 of the 1959 Agreement is either

15  silent on or provides that mutual agreement is required regarding the

16  "compositions" to be recorded, the second paragraph of the 1959 Agreement

17  provides that "the recordings to be released hereunder shall be mutually agreed

18  upon between us."  No comparative provision exists in the 1958 Agreement.

19         9.     Section 4(a) of the 1958 Agreement describes the media on which

20  MGM could exploit the recordings as "phonograph records and other reproductions

21  embodying the performances to be recorded hereunder," while the 1959 Agreement

22  describes such media as "phonograph records, tapes, wire and other reproductions

23  embodying the performances to be recorded hereunder."

24         10.    Section 4(c) of the 1958 Agreement provides that MGM may "release

25  phonograph records of the compositions performed by you and recorded hereunder

26  on any medium or device now or hereafter known."  Section 4(c) of the 1959

27  Agreement included the additional condition "by mutual agreement between us"

28  regarding such release (i.e., MGM may "release, by mutual agreement between us,

1  phonograph records of the compositions performed by you and recorded hereunder
2  on any medium or device now or hereafter known").  No comparative provision
3  exists in the 1958 Agreement.

4      11.    By an agreement written on MGM stationery and dated May 22, 1959
5  (a copy of which is attached hereto as **Exhibit 3**), the 1959 Agreement was
6  amended in a manner which is not believed at this time to affect the instant action.

7      12.    By an agreement written on MGM stationery and entered into by
8  MGM and Francis on about January 5, 1962 (the "1962 Agreement"), a copy of
9  which is attached hereto as **Exhibit 4**, MGM and Francis amended the 1959
10  Agreement by, among other things, extending its term by five years to January 4,
11  1967 and adding the following second paragraph to Section 2 of the 1959
12  Agreement:

13      "To the extent that we have or shall have the right to control the
14      timing of releases in foreign countries by reason of our contractual
15      obligations to licensees and distributors in such foreign countries, you
16      shall have the right to approve the foreign release dates of albums
17      released by us pursuant hereto. We shall endeavor to have our
18      licensees in the following countries or territories, England, France,
19      Italy, Australia, Japan, Hong Kong and West Germany, abide by your
20      recommendations for the timing of the release of your recordings."

21      13.    Before the end of the extended term, MGM and loan-out company
22  G.G.C. Productions Corp., entered into another agreement (the "1966
23  Agreement"), a copy of which is attached hereto as **Exhibit 5**.  G.G.C. Productions
24  Corp. was a loan-out company providing the services of Francis (and Francis is
25  now the successor to G.G.C. Productions Corp.). The 1966 Agreement specified in
26  its Section 4 that, "All of the terms and conditions of the [1959] Agreement [as
27  previously amended] shall be applicable hereto as if fully set forth herein, except
28  as hereby modified...."  The second paragraph of Section 1 of the 1966 Agreement

provided the following definition:

> "'Phonograph records' or 'records' shall mean phonograph records and
> record albums of any r.p.m. and any similar devices for the
> reproduction of sound reproduced on any material which may now or
> hereafter be known, including, but not limited to, discs of wax, vinyl,
> or any other composition, or tape, film or wire."

14.     Hereinafter the 1959-1966 Agreements will be referred to collectively as the 1959 Governing Agreements because all of them include all the provisions of the 1959 Agreement except to the extent expressly modified.

15.     Each of the 1959 Governing Agreements includes at least 3 separate requirements for something to be "mutually agreed upon between us" or some action requiring "mutual agreement between us" that are completely additional to any requirement in the 1958 Agreement.  Further, these "mutual agreement" provisions were inconsistent with many agreements of the industry in that era.

16.     Under the 1959 Governing Agreements, while Francis was to receive 5% of the 90% of the records (i.e., phonograph records, tapes, wire and other reproductions, or, as stated in the 1966 Agreement, phonograph records and record albums of any r.p.m. and any similar devices for the reproduction of sound reproduced on any material which may now or hereafter be known, including, but not limited to, discs of wax, vinyl, or any other composition, or tape, film or wire) sold, there was no stated calculation of royalty payment for recordings sold that were not mechanically manufactured and sold as records by the company or a licensee.  The 1959 Governing Agreements were not, however, silent on an arrangement for other media, including media not then known.  It was separately, explicitly, and in the written 1959 Governing Agreements provided as a condition and promise that both parties were required to arrive at a "mutual agreement" for the release of non-mechanical copies of Francis' recordings.  Specifically, it was intended that for copies to be released by MGM, or by any of its licensees, of

1 Francis' recordings otherwise than on the media described in Section 4(a) of the
2 1959 Agreement or the second paragraph of Section 1 of the 1966 Agreement, that
3 "mutual agreement" must first be reached "between us."  (As set out in  the first
4 sentence of Section 4(c) of the 1959 Agreement.

5    17.  On information and belief, before ever dealing with Francis, MGM
6 had experience in drafting similar contracts that would give MGM unconditional
7 rights to release recordings of a singer by any means whatsoever, and thereby
8 doing so without having to get "mutual agreement."  By way of example, on
9 information and belief, MGM entered agreements in 1947, 1948 and 1949 with
10 superstar singer Hank Williams which provided that,

11    "All recordings and all records and reproductions made therefrom,
12    together with the performances embodied therein, shall be entirely our
13    property, free of any claims whatsoever by you..."
14 No such wording appears in any of the 1959 Governing Agreements.

15    18.  Were the "mutual agreement" condition and promise to conflict with
16 other wording of the contract, because the Company was the sole drafter of the
17 form Agreement, without negotiation as to the wording, to the extent it caused any
18 uncertainty to exist so that the requirement of future mutual agreement governs.
19 Moreover, were there any ambiguity, or equivalence as compared to the other
20 language of the Agreement, the course of performance and contracts after the
21 Agreement was entered confirms a royalty payment by 50% of net revenue.  When
22 the Company licensed the release for distribution and sale by unaffiliated third
23 parties under their own label - such as by motion picture synchronization and
24 internet streaming, which by its nature was not the manufacture, advertising and
25 sale of phonograph records, tapes, wire, and other such reproduction of the records
26 - the course of performance adapted by the Company was 50% of the net amount
27 received from license of the master for Non-Phonograph record use.

28    19.  All promises and obligations of Francis (and/or G.G.C. Productions

Corp.) were performed and completed by her, and the master of her performances was made with commercial satisfaction, so that all terms were met and leaving for the future only the amount of income to be received from a licensed third party distribution and sale on a medium unknown in 1959.

20.　　By Section 6 of the 1966 Agreement, the parties arrived at a 50% royalty deal for certain licensing revenue (i.e., "low cost revenue") obtained by MGM:

> "…with respect to the sale of tapes manufactured by a licensee of MGM, and containing Francis's performances, the royalty to Francis shall be fifty percent (50%) of the net amount received by MGM from such licensee from the sale of such tape, after deducting therefrom MGM's expenses . . . .  In the event that MGM is the manufacturer and distributor of the tapes, the royalty to Francis from sales thereof shall be the same as from the sale of disc records manufactured and distributed by MGM."

21.　　In the mid-1970s Company paid to Francis 50% of Company's receipts from an album produced and distributed by the Sessions Company.

22.　　In the late 1980s Company paid to Francis 50% of Company's receipts from copies of recordings produced and distributed by the Heartland Record Company.

23.　　In January, 1980, loan out company G.G.C. as "Producer," and Universal entered a new contract (hereinafter the "1980 Agreement"), a copy of which is attached hereto as **Exhibit 6**, by which additional compositions were recorded.  While the contract does not specifically reference the 1959 or 1966 contracts, it defined a course of dealing and understanding of the mutual agreement between the parties,

> "Company shall have the right to license the Masters hereunder to non-affiliated third parties for all methods

1  of distribution... Unless otherwise provided for, Company
2  shall credit Producer's royalty account with fifty (50%)
3  per cent of Company's net royalty receipts in respect of each
4  such license pertaining to the Masters hereunder."
5  Furthermore,
6  "Company shall have the right to license the Masters
7  hereunder for non-Phonograph Record use on a flat-fee basis.
8  Company shall credit Producer's royalty account with fifty
9  (50%) per cent of the net amount received by Company
10  under each such license."
11  And even further,
12  "In the event that Company receives income from any
13  commercial usage of the Masters hereunder not specifically
14  provided for in the foregoing, and in the further event that
15  Company's receipts are not already net of a payment
16  made directly to Artist, then Company agrees to pay to
17  Producer fifty (50%) per cent of the net amount received
18  of such income"
19      24.    After the 1980 Agreement, when Company's PolyGram company was
20  entertaining third party deals for Francis's MGM recordings, which deals would
21  provide "low cost" exploitation for PolyGram, it recognized the need of mutual
22  agreement for release through the changed means of distribution, and the
23  reasonableness of a 50% royalty with respect to those recordings.  Therefore, after
24  the 1980 Agreement, PolyGram included the following in a March 16, 1982 letter,
25  a copy of which is attached hereto as **Exhibit 7**, to Francis' manager regarding
26  licensing a 1959 Francis' MGM Recording to a marketing firm (emphasis added):
27      "Columbia Special products would like to include Connie Francis'
28      recording of "Lipstick On Your Collar" in an album package entitled

1         "Wisk Celebrates its 25th Anniversary."

2         * * *

3         "You will, **of course**, receive royalties' equivalent to 50% of the net

4         amount received by us in connection with the above mentioned master

5         recording.

6         "If the above meets with your approval, kindly so indicate by signing

7         the enclosed copy of this letter . . . ."

8     25.    In an April 7, 1983 letter, a copy of which is attached hereto as

9 **Exhibit 8**, to Francis's attorney about a potential licensing deal for production and

10 sales by Suffolk Marketing, Inc. by TV/mail order, Polygram wrote,

11         "For this use Ms. Francis will receive a royalty in the amount of 50%

12         net income received.

13         "If the above meets with your approval, kindly indicate by signing the

14         enclosed copy of this letter . . . ."

15     26.    In a September 16, 1983 letter, a copy of which is attached hereto as

16 **Exhibit 9**, directly to Francis, about a potential licensing deal for Suffolk

17 Marketing to produce and sell 20 of her MGM recordings by broadcast, print and

18 mail order, Polygram wrote,

19         "We will agree, of course, to pay you fifty percent (50%) of our share

20         of ten (10%) percent of the retail selling price, in accordance with

21         your agreement with us," (PolyGram letter September 16, 1983).

22         "If the above meets with your approval, please sign the enclosed copy

23         of this letter . . . ."

24     27.    Presently, the Company pays 50% of net receipts as the royalty due to

25 Francis from third parties that are licensed to provide internet streaming,

26 subscriptions, and ringtones lifted from Connie Francis' performances, although

27 they total an insignificant amount of net receipts from internet sales when

28 compared to internet sales of recordings of Connie Francis songswhich continue to

1    sell throughout a worldwide market, and amount to hundreds of thousands of

2    dollars since 2005.

3        28.    Each of the written statements by Company acknowledges that after

4    the 1980 Agreement, when PolyGram did seek approval, pursuant to the contract

5    obligation of mutual agreement, with respect to licensing the MGM recordings, the

6    expected ("of course") royalty rate was 50% of net revenues.    29.    Plaintiff is

7    informed and believes and thereon alleges that more then 40 years after the 1959

8    Governing Agreements and the ensuing course of performance, the Company

9    granted unaffiliated third party licenses for release copies of Ms. Francis

10   performances from their master for distribution, under their own label, without

11   delivery of any physical product through the new medium of internet transmission

12   for sale by download to consumers.  By the third-party license Agreements

13   Universal does not manufacture the medium or sell the subject compositions, and

14   does not itself suggest a retail list price.

15       30.    Under the 1959 Governing Agreements and/or arrangements entered

16   by Universal, this grant of license provides the third party with use of a master

17   copy for that party to produce and sell by digital medium  permanent downloads.

18   The Company licenses granted to unaffiliated third parties are not a manufacture or

19   sale by Universal.  The title ownership remains with Universal, and by the license

20   the third party makes it own sale on its own behalf to the consumer.  Pursuant to

21   the mutual agreement provisions, and by the course of dealing and understanding,

22   Universal is to render a royalty accounting and payment to Francis of 50% of the

23   net proceeds Universal receives from each such third party.

24                    BREACH OF MUTUAL AGREEMENT OBLIGATION

25       31.    Section 4(c) of the 1959 Agreement requires that mutual agreement be

26   reached between Company and Francis before Company could release copies of

27   any Francis recordings made under the 1959 Governing Agreements by any means

28   or media not described in Section 4(a) of the 1959 Agreement or the second

1   paragraph of Section 1 of the 1966 Agreement.  Nevertheless, the Company has

2   licensed third parties such as Apple iTunes and Amazon to sell and distribute over

3   the Internet digital downloads of such Francis recordings.  The digital downloads

4   transmitted by licensees such as Apple iTunes and Amazon are not material

5   objects.  A physical object only appears when a consumer translates electronic

6   signals into data embedded in a segment of the consumer's own computer memory.

7   Digital downloads are not means or media described in in Section 4(a) of the 1959

8   Agreement or the second paragraph of Section 1 of the 1966 Agreement.

9        32.    Pursuant to licenses obtained from Company, third parties such as

10  Apple iTunes and Amazon have been selling and distributing digital downloads of

11  Francis recordings made under the 1959 Governing Agreements, and continue to

12  do so.

13       33.    The Company in breach of its obligation to obtain mutual agreement

14  from Francis before engaging in Internet distribution of digital downloads, either

15  itself or through licensees such as Apple iTunes and Amazon, never even

16  attempted to do so.  Company never obtained the "mutual agreement" required by

17  Section 4(c) of the 1959 Agreement.

18       34.    Costs incurred by Company in Internet distribution of digital

19  downloads are very low, and almost non-existent when compared to the costs

20  associated with manufacture and distribution of material objects such as

21  phonograph records.

22       35.    Defendant is either liable to Francis for all, that is 100%, of the

23  revenues obtained by Company in its Internet distribution of digital downloads of

24  Francis recordings made under the 1959 Governing Agreements, or alternatively

25  by the course of performance engaged in by Company if a mutual agreement

26  authorizing digital download release of such recordings had been achieved, the

27  royalty rate would have been 50%.

28       36.    Universal has adopted a policy and practice of not paying Francis the

1  50% of receipts from third-party internet companies such as Apple and Amazon,

2  which companies provide more than 80% of all music sales today. Universal

3  instead calculates royalty payments as though they had manufactured and

4  distributed a 45 rpm vinyl phonograph record and sold by the company at their

5  own suggested retail price.

6  <u>UNJUST ENRICHMENT</u>

7  37.    A proper and fair calculation may be accounted for under the rules of

8  unjust enrichment. When Universal grants license to a third party for internet sale,

9  for example to Apple, Inc. for iTunes digital download, the consumer pays 99

10  cents, Apple Inc. retains 29 cents, returning 70 cents to Universal, who then pays

11  the music composer a set amount usually negotiated for less than the copyright rate

12  of 9.1 cents/5 minute song, leaving a remaining balance of approximately 61 cents

13  per download.  The Company has no hard cost or cost expense to absorb returns.

14  By contrast, when the company  manufactured and sold the vinyl records or

15  compact discs, the Company at that time incurred and paid the cost of

16  manufacturing, paid the cost of artwork/printing and descriptive copy notes, paid

17  the cost of packaging, paid the cost of cross-country shipment to retail stores

18  throughout the country, paid the cost of promotion by a national network of

19  salespeople calling upon each retail store, paid the cost of promotion within each

20  retail store, and significantly absorbed the cost of retail store return of any unsold

21  or unwanted inventory. None of those costs exist for internet download. In any

22  event, all these costs were long ago paid out of first receipts on sale of the 45 rpm

23  vinyl phonograph records.  By the Company's unauthorized grant of download

24  licenses to third parties without mutual agreement required by the 1959 Governing

25  Agreements, either all monies received by the Company do not belong to it (or

26  belonging to Francis), or, alternatively by the course of performance, only 50% of

27  the monies received belong to it and the remaining 50% is due to Francis.

28  ///

1   <u>BREACH OF CONTRACT-UNDERREPORTED SALES AND ROYALTIES</u>

2       38.   On information and belief, not all sales by Universal and/or its

3   licenses of copies of Francis' recordings have been reported by Universal to

4   Francis, with a corresponding underpayment of royalties regardless of the rate or

5   rates at which such royalties should have been paid.

6   <u>LITIGATION HOLD</u>

7       39.   Demand is hereby made that Defendants preserve all electronically

8   stored information ("ESI"), as well as documents and tangible things, potentially

9   relevant to the facts and issues plead in this complaint, including by the way of

10   example, correspondence, memoranda, journal entries, accounting on income

11   received and receivable, accounts paid and payable, charges,  cancelled royalty

12   checks, bank statements, check registers, and description of monies received or

13   disbursed, and be prepared to produce such documents and ESI in discovery.  ESI

14   includes by the way of example information electronically, magnetically or

15   optically stored, such as digital communications, word processed documents,

16   calendar and diary entry data, backup and archival files, all as stored on

17   Defendants' computer systems and employee systems, or other media and devices,

18   such as their personal is digital assistants, voice-messaging systems, on-line

19   repositories and cell phones.  It is further demanded that Defendants' management

20   and counsel pursue immediate intervention to prevent loss due to routine

21   operations, to initiate a litigation hold for potentially relevant ESI, and to prevent

22   degradation of the ability to search ESI by electronic means.  Such litigation hold

23   is to secure ESI on office work stations and servers, home and portable systems, to

24   anticipate that employees may seek to delete or destroy information that they

25   regard as confidential or embarrassing, and to secure documents which are

26   required to access, interpret or search relevant ESI, including logs, control sheets,

27   specifications, naming protocols, diagrams, and user ID and password rosters.

28   ///

15<br/>Third Amended Complaint

### FIRST CLAIM FOR RELIEF

[Breach of the 1959 Governing Agreements/Mutual Agreement]

40.     Plaintiff repeats and incorporates herein by reference the allegations in paragraphs 1-39 above of this Third Amended Complaint.

41.     By the 1959 Governing Agreements and the thereafter the ensuing course of performance and mutual understanding between the parties, by license to the non-affiliated third party for internet distribution, the proper calculation of royalty is 50% of net receipts from such third parties.

42.     Defendant has failed to so account and pay the proper royalty due for internet download in breach of the 1959 Governing Agreements, the Mutual Agreement between the parties, and the obligation of good faith and fair dealing. Defendant by its conduct is estopped from asserting the contrary.

43.     Plaintiff has performed all obligations to be performed by her, except insofar as any obligations are not material, or have been waived, or have been discharged, or conditions precedent or concurrent to their performance have failed or not been met, or Defendant's actions or failures to act have prevented performance.

44.     Plaintiff has been damaged in the sum not less than $75,000, all in an amount according to proof which will be offered at trial, together with legal interest thereon.  Plaintiff further demands an accounting by Universal of all transactions involving Plaintiff's recordings to date.

### SECOND CLAIM FOR RELIEF

[Removed from Third Amended Complaint]

### THIRD CLAIM FOR RELIEF

[Money Had and Received Common Count/Unjust Enrichment]

45.     Plaintiff repeats and incorporates herein by reference the allegations

in paragraphs 1-43 above of this Third Amended Complaint.

46.   Defendant became indebted to Plaintiff for royalty money received by Defendant for use or benefit of Plaintiff, and/or by unjust enrichment of Defendant, and thereby became indebted to Plaintiff and obligated to pay to Plaintiff the monies and profits as a result of payments received by Defendant derived from internet downloads and from other sources.

47.   Although demand has been made that Defendant pay over to Plaintiff such monies as have been received from the third-party licensees has been made, Defendant has failed to do so.  Such monies are due together with legal interest thereon.

48.   Plaintiff has been damaged in the sum not less than $75,000, all in an amount according to proof which will be offered at trial, together with legal interest thereon.  Plaintiff further demands an accounting by Universal of all transactions involving Plaintiff's recordings to date.

## FOURTH CLAIM FOR RELIEF
### [Declaratory Relief]

49.   Plaintiff repeats and incorporates herein by reference the allegations in paragraphs 1-43 and 46-47 above of this Third Amended Complaint.

50.   Pursuant to their recording artists Agreements as set forth herein, Universal is obligated to pay the artist a fair percentage of net income which Universal receives from non-affiliated third party licenses for distribution and sale of internet downloads. An actual controversy has now arisen as to Universal's obligation, with respect to which a declaratory judgment should be entered determining the royalty share of the license for download services to be paid to Plaintiff.

## FIFTH CLAIM FOR RELIEF
### [Breach of the 1958 Agreement and the 1959 Governing Agreements]

48.   Plaintiff repeats and incorporates herein by reference the allegations

17
Third Amended Complaint

1  in paragraphs 1-43 and 46-47 above of this Third Amended Complaint.

2       49.    On information and belief, not all sales by Universal and/or its

3  licenses of copies of Francis' recordings have been reported by Universal to

4  Francis, with a corresponding underpayment of royalties regardless of the rate or

5  rates at which such royalties should have been paid.  This has resulted in breaches

6  by Universal of its obligation to pay royalties to Francis under the 1958

7  Agreement, the 1959 Government Agreements, and any other agreements between

8  Company and Francis that cover recordings that are not covered by the 1958

9  Agreement and the 1959 Government Agreements,

10      50.    Francis has been damaged by Universal's breaches during the period

11 beginning from January 1, 2006 and continuing though to the present, as a result of

12 the underpayment of royalties that follows the underreporting of sales, and Francis

13 continues to be damaged, in an amount that will be proven at trial, and which on

14 information and belief exceeds $75,000.00.

15      WHEREFORE, Plaintiff prays for:

16      (a)    Compensatory damages, or share of Defendant's unjust enrichment in

17 an amount which is not yet ascertained but proof of which shall be offered at trial

18 and within the jurisdiction of this Court with Legal interest according to law;

19      (b)    An accounting of all transactions since December 31, 2005,

20 concerning any and all recordings of plaintiffs', and file with this Court and serve

21 on plaintiffs within 30 days of a Court ordered accounting, a report in the detail,

22 manner and form which will comply with the Court Order.

23      (c)    Judgment declaring the rights and obligations of the parties;

24      (d)    Award of costs of suit; and

25      (e)    For such other and further relief as the Court deems just and proper.

26 ///

27 ///

28 ///

1    Respectfully submitted,

2

3    Date:  May 10, 2013                    /s/ Paul Sigelman
                                            Paul S. Sigelman, SBN 45954
4                                           paul@sigelmanlaw.com
                                            SIGELMAN LAW CORPORATION
5                                           433 N. Camden Drive, Suite 970
                                            Beverly Hills, California 90210-4426
6                                           Tel:   310-278-8011
                                            Fax:  310-278-2254
7

8
     Date:  May 10, 2013                    /s/ Ira M. Siegel
9                                           Ira M. Siegel, SBN 78142
                                            irasiegel@earthlink.net
10                                          LAW OFFICES OF IRA M. SIEGEL
                                            433 N. Camden Drive, Suite 970
11                                          Beverly Hills, California 90210-4426
                                            Tel:   310-435-7656
12                                          Fax:  310-657-2187

13                                          Attorneys for Plaintiff
                                            Connie Franconero p/k/a Connie Francis
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## JURY DEMAND

Plaintiff hereby demands trial by jury on all issues so triable.

Date: May 10, 2013      /s/ Paul Sigelman
Paul S. Sigelman, SBN 45954
paul@sigelmanlaw.com
SIGELMAN LAW CORPORATION
433 N. Camden Drive, Suite 970
Beverly Hills, California 90210-4426
Tel:  310-278-8011
Fax:  310-278-2254

Date: May 10, 2013      /s/ Ira M. Siegel
Ira M. Siegel, SBN 78142
irasiegel@earthlink.net
LAW OFFICES OF IRA M. SIEGEL
433 N. Camden Drive, Suite 970
Beverly Hills, California 90210-4426
Tel:  310-435-7656
Fax:  310-657-2187

Attorneys for Plaintiff
Connie Franconero p/k/a Connie Francis

*Exhibit 1*

CONCETTA CORPORATION                                              PA



**M-G-M RECORDS**

A DIVISION OF LOEW'S INCORPORATED

701 SEVENTH AVEN.
NEW YORK 36. NEW YO[ ]

Mr. George Francanegro
Miss Connie Francanegro (p/k/a Connie Francis)
182 Forrest Street
Bellville, N.J.

January 3, 1958

Dear  Mr. Francanegro and Miss Francis:

                    Connie Francis

1. We hereby engage you to render such services as we may require in the production of phonograph records, and you hereby accept such engagement and agree to render such services for us for a period commencing  February 1, 1958  and terminating  January 31, 1959  If for any reason you are unavailable or unable to render the services herein contracted for, this agreement shall, at our election, be deemed extended until you are so available.

2. A minimum of  six  78 r.p.m. record sides or their equivalent shall be recorded during the term hereof; additional recordings shall be performed by you and recorded by us at our election, Compositions to be recorded shall be designated by us and each recording shall be subject to our approval as satisfactory for the manufacture and sale of phonograph records, and upon our request you will re-record any composition until a master record commercially satisfactory shall have been obtained. All recordings shall be made at such studios and times as we may designate.

        Connie Francis
3. You will not, during the term hereof, perform for anyone else for the purpose of making phonograph records and you will not, for a period of five years after the termination of this agreement or any extensions or renewals thereof, perform any musical composition recorded hereunder for anyone else other than us for the purpose of making phonograph records. In the event of a breach by you of the provisions of this paragraph, then in addition to any other right or remedy which we may have by law or otherwise, you shall automatically be deemed to have waived all future royalties which may accrue hereunder after the date of such breach.

4. We and/or our subsidiaries, affiliates and licensees, shall have the exclusive right to all the products of your services hereunder, including but not limited to the exclusive right:

    (a) to manufacture, advertise, sell, lease, license or otherwise use or dispose of in any or all fields of use, and by any method now or hereafter known, throughout the world, phonograph records and other reproductions embodying the performances to be recorded hereunder, upon such terms and conditions as we may elect, or, at our discretion, to refrain therefrom.

    (b) to use and publish and to permit others to use and publish your name and photograph; to write and publish and to permit others to write and publish articles concerning you for advertising and trade purposes in connection with the sale and exploitation of phonograph records recorded hereunder; to use as descriptive of you the phrase "M-G-M Artist" or any other similar or appropriate phrase; and not to use or authorize any direct endorsement by you of any record or performance without your prior consent;

    (c) to release phonograph records of the compositions performed by you and recorded hereunder on any medium or device now or hereafter known under the name "M-G-M Records" and/or any other name, trademark or label which we and/or our subsidiaries, affiliates and licensees may from time to time elect;

    (d) to publicly perform the records and to permit the public performance thereof by means of radio broadcast, television, or by any method now or hereafter known;

    (e) to incorporate from time to time in records to be made hereunder, instrumentations, orchestrations and arrangements owned by you of compositions to be recorded hereunder.

10/15/2001  13:11  9547572000  CONCETTA CORPORATION  PAGE  04

A-2

## Miss Francis's

5.  (a)  We shall pay you for your services to be rendered hereunder and for the rights granted herein, a royalty of FIVE per cent (5%) of the suggested retail list price (exclusive of all taxes) of 90% of all records sold containing on both sides thereof a composition or compositions performed by you and recorded hereunder, manufactured and sold by us or by any subsidiary, affiliate or licensee, and one-half of such royalty for 90% of all records sold embodying such composition or compositions on only one side thereof.

(b)  Royalties for records sold outside of the United States of America may, at our election, be based upon the suggested retail list price (exclusive of all taxes) of such records in the country of manufacture, the United States, England, or the country of sale. Such royalties shall be computed in the national currency of the country to which the list price so elected applies, and as to sales made outside of the United States, shall be paid at the same rate of exchange as we are paid; provided, however, that royalties on records sold outside of the United States shall not be due and payable until payment therefor has been received by us in the United States, and provided further, that if we do not receive payment in United States dollars currently and agree to accept payment in a foreign currency, we may deposit to your credit (and at your expense) in such currency, in a depository elected by us, all payments so received as royalties applicable to this agreement, and shall notify you thereof promptly. Deposit as above stated shall fulfill our obligation hereunder as to record sales to which such royalty payments are applicable.

(c)  We shall specify and pay the costs of your accompaniment (instrumental and vocal), arrangements and copying in respect of recordings made hereunder; and all such costs shall constitute advances and shall be charged against and deducted from your royalties under this or any other agreement between you and us if and when earned. Without limiting the generality of the foregoing, included among costs or payments which shall hereunder constitute advances chargeable against royalties shall be all amounts which are paid by us pursuant to the requirements of any agreements between us and any union representing you or other persons who render services hereunder or in connection with any accompaniment (instrumental and vocal), arrangements and copying for performances hereunder if, whether or not received by you or such persons, such amounts are related to, based upon or computed by reference to union scale payments for services rendered by you or such persons.

(d)  If any of the compositions to be recorded hereunder are included with other compositions or recordings on a so-called long playing or extended play record, then, instead of the above royalties, the royalties payable to you hereunder, with respect to such composition, shall be measured in the proportion that 5% of the suggested retail list price (exclusive of all taxes) of 90% of all such records sold bears to the total number of compositions contained on such record.

(e)  Royalties on records included in albums, jackets, boxes or any other type of package or container, shall be based solely upon the suggested retail list price (exclusive of all taxes) for replacement records.

(f)  In the event any recording produced hereunder shall embody your performance together with the performance of another artist to whom we are obliged to pay a royalty in respect of such recording, the royalty payable to you in respect thereof shall be at 1/2 of the foregoing rates, and 1/2 of the costs of the accompaniment (instrumental and vocal), arrangements and copying in respect of such recording shall be charged against your royalties if and when earned.

(g)  We may discontinue the manufacture and sale of any records made hereunder, when in our sole discretion they are no longer commercially satisfactory or their further sale and manufacture cease to be profitable or advisable.

(h)  We shall advance to you against all royalties due you hereunder, a sum equivalent to AFTRA scale for each composition recorded by Miss Francis, satisfactory to us.

6.  Accountings shall be made to you semi-annually on the first day of May for the period ending the preceding February 28th and on the first day of November for the period ending the preceding August 31st, together with payment of accrued royalties, if any, earned during the preceding half year. All royalty statements and all other accounts rendered by us to you shall be binding upon you and not subject to any objection by you for any reason unless specific objection in writing, stating the basis thereof, is given to us within ninety days from the date rendered.

10/05/2001 13:11 9547572000 CONCETTA CORPORATION PAGE 05

A-3

the services of Miss Francis

7. You expressly agree that your services hereunder are of a special and unique character and that in the event of a breach by you of any term, condition or covenant herein, we shall be entitled to injunctive relief in addition to any other remedies available to us.

8. (a) In the event we are materially hampered, because of any labor controversy or any other cause not entirely within our control, in the recording, manufacture, distribution or sale of records, then for the duration of such contingency we may suspend this agreement. The number of such days of suspension may, at our election, be added to the term hereof and the term of this agreement shall be accordingly extended.

(b) In the event that any license issued to us by the American Federation of Musicians, pursuant to which the services of instrumental musicians who are members of said American Federation of Musicians are engaged for the purpose of our recordings hereunder, is suspended, terminated or revoked with or without cause, you agree that we may terminate and cancel this agreement or suspend the same for the period during which such license is suspended without liability to you other than for compensation on records sold or to be sold after such suspension, termination or revocation. If we elect to suspend this agreement as aforesaid, the term thereof shall be deemed extended for a period equal to such suspension.

9. We may at our election assign this agreement or any of our rights hereunder.

10. This agreement sets forth the entire agreement between the parties with respect to the subject matter thereof, and no modification, amendment, waiver, termination, or discharge of this agreement or any provisions thereof shall be binding upon us unless confirmed by a written instrument signed by an officer of this Company. No waiver of any provision of or default under this agreement shall affect our right thereafter to enforce such provision or to exercise any right or remedy in the event of any other default, whether or not similar.

11. (a) All notices required to be given hereunder shall be in writing and sent by registered mail to us at 701 Seventh Avenue, New York City, and to you at the address aforesaid, or such other address as either of us may hereafter designate. Such notice shall be deemed to have been given on the date of mailing.

(b) Any option to extend the term of this agreement, as hereinafter set forth, may be exercised by us by giving you notice in writing by registered mail at least thirty days prior to the expiration of such term.

12. We shall have the right, upon giving you notice at least thirty days prior to the end of the term hereof or any renewal term as the case may be, to extend this agreement for three (3) further periods of one (1) year each commencing 2/1/59, 2/1/60 and 2/1/61 upon the same terms and conditions as herein contained. Each option shall be exercised separately.

Please indicate your acceptance by signing below.

Very truly yours,

LOEW'S INCORPORATED
(M-G-M Records Division)

ACCEPTED AND AGREED TO:

By_____

Vice President.

George Francanegro

Approved for M-G-M Records

Connie Francanegro (p/k/a Connie Francis)

By_____

*Exhibit 2*

# MGM RECORDS

A DIVISION OF
LOEW'S INCORPORATED

1540 BROADWAY
NEW YORK 36 N. Y.
JUDSON 2-2000

January 5, 1959.

Miss Connie Francenegro
FKA:  CONNIE FRANCIS
c/o Mr. George Scheck
1697 Broadway
New York, N. Y.

Dear Miss Francenegro:

1.  We hereby engage you to render such services as we may require in the production of phonograph records, and you hereby accept such engagement and agree to render such services for us for a period commencing January 5, 1959 and terminating January 4, 1962.  If for any reason you are unavailable or unable to render the services herein contracted for, this agreement shall, at our election, be deemed extended until you are as available, but this sentence shall not apply in any respect if you record, or, in good faith offer to record the minimum number of mutually acceptable compositions per year, upon all of the terms and conditions of this agreement.

2.  Subject to your bona fide commitments for personal appearances, a minimum of sixteen (16) 45 rpm record sides, or their equivalent in other speeds, shall be recorded during each year of the term hereof; additional recordings shall be performed by you and recorded by us by mutual agreement between us.  Each recording shall be subject to our approval as satisfactory for the manufacture and sale of phonograph records, and upon our request you will re-record any composition until a master record commercially satisfactory shall have been obtained.  All recordings shall be made at such studios as we may designate and at such times as we shall mutually agree upon.

All compositions to be recorded hereunder, all arrangements and arrangers, and the recordings to be released hereunder, shall be mutually agreed upon between us.  Subject to the foregoing, during each year of the term hereof, eight (8) 45 rpm records, or their equivalent, containing your performances on both sides thereof as recorded by you hereunder, shall be manufactured and released for sale by us as single records and twelve (12) of the compositions recorded by you for us hereunder shall be manufactured and released for sale by us in the form of a record album.  On all recordings to be made by you for us hereunder, you shall be the sole recording artist, except for background accompaniment, vocal and/or instrumental.

# MGM RECORDS

A DIVISION OF
LOEW'S INCORPORATED

1540 BROADWAY
NEW YORK 36, N.Y.
JUdson 7-1000

page two

3. You will not, during the term hereof, perform
for anyone else for the purpose of making phonograph records
and you will not, for a period of five years after the date
of recording perform any musical composition recorded here-
under for anyone else other than us for the purpose of making
phonograph records. In the event of a breach by you of the
provisions of this paragraph, or any similar provision contained
in any prior contract between us, then in addition to any other
right or remedy which we may have by law or otherwise, you shall
be deemed to have waived all future royalties which may accrue
to you from the date of said breach from the distribution and
sale by us of recordings made hereunder of compositions which
you shall record for others in violation of the provisions of
this paragraph 3 and in addition thereto, we shall be entitled
to recover from you, as liquidated damages a sum equal to the
amount of royalties earned by you with respect to the recordings
made by you in violation of the provisions of this paragraph 3.

4. We, and/or our subsidiaries, affiliates and licensees,
shall have the exclusive right to all the products of your services
hereunder, including but not limited to the exclusive right:

(a) to manufacture, advertise, sell, lease, license
or otherwise use or dispose of, in any or all fields of use,
and by any method now or hereafter known, throughout the world,
phonograph records, tapes, wire and other reproductions em-
bodying the performances to be recorded hereunder, upon such
terms and conditions as we may elect, or, at our discretion,
to refrain therefrom.

(b) to use and publish and to permit others to use
and publish your name and photograph; to write and publish
and to permit others to write and publish articles concerning
you for advertising and trade purposes in connection with the
sale and exploitation of phonograph records recorded hereunder;
to use as descriptive of you the phrase "M-G-M Artist" or any
other similar or appropriate phrase; and not to use or author-
ize any direct endorsement by you of any record or performance
without your prior consent.

(c) to release, by mutual agreement between us,
phonograph records of the compositions performed by you and
recorded hereunder on any medium or device now or hereafter
known under the name "M-G-M Records", or the primary label
which we or our subsidiaries, affiliates and licensees may
from time to time elect.

Case 2:12-cv-08502-JGB-AGR Document 67 Filed 05/13/13 Page 28 of 50 Page ID #:671

# *MGM RECORDS* 

A DIVISION OF
LOEW'S INCORPORATED

page four

1540 BROADWAY
NEW YORK 36, N.Y.
JUDSON 2-3000

(d) If any of the compositions to be recorded hereunder are included with other compositions or recordings on a so-called long playing or extended play record, then, hereunder, with respect to such composition, shall be measured in the proportion that five percent (5%) of the suggested retail list price (exclusive of all taxes) of ninety (90%) per cent of all such records sold bears to the total number of compositions contained on such record.

(e) Royalties on records included in albums, jackets, boxes, or any other type of package or container, shall be based solely upon the suggested retail list price (exclusive of all taxes) for replacement records.

(f) We may discontinue the manufacture and sale of any records made hereunder, when in our sole discretion they are no longer commercially satisfactory or their further sale and manufacture cease to be profitable or advisable.

6. Except as to an occurrence within the purview of Paragraph 3 thereof, provided that you fully keep and perform the remaining provisions of this agreement on your part to be kept and performed, we shall advance to you on account of all royalties due or to become due to you hereunder upon recordings made after the date hereof, the sum of SIXTEEN THOUSAND FIVE HUNDRED ($16,500.00) DOLLARS during each period of one year of the term hereof, payable as follows:

(i) The sum of EIGHT THOUSAND TWO HUNDRED FIFTY ($8,250.) DOLLARS to be paid to you within thirty (30) days after the execution of this agreement;

(ii) The sum of EIGHT THOUSAND TWO HUNDRED FIFTY ($8,250.) DOLLARS on the 5th day of January and July of each year during the term hereof subsequent to the date hereof.

In the event that during any one year of the term hereof you do not record for us a minimum of sixteen (16) record sides or their equivalent or in good faith offer to do so, you agree that you will on demand, repay to us a sum equal to the number of compositions less than sixteen not so recorded, multiplied by $1031.25. In the event that you fail to repay said sum we may, in addition to other remedies, deduct the same from any further advances to be made hereunder or from any royalties which

# MGM RECORDS

A DIVISION OF
LOEW'S INCORPORATED

page five

1540 BROADWAY
NEW YORK 36, N.Y.
JUDSON 2-3000

between us. No such credit shall be retained by us with respect
to the number of compositions less than sixteen, during any year,
that you fail to record by reason of any refusal to permit you
to record a composition for us, which refusal, on our part, has
not been in good faith. Except with respect to circumstances
described in this unnumbered paragraph, the foregoing advances
shall be charged only against royalties which may become due to
you hereunder. Such advances are non-returnable, except as herein
provided.

7. It is specifically understood and agreed between us
that from and after the date hereof no payments to be made by us
to you shall be in excess of TWENTY-FIVE THOUSAND ($25,000.)
DOLLARS per calendar year in the aggregate, whether by way of
advances and/or royalties under this or any other prior agreement
between us. In the event that in any one calendar year the total
sums payable to you by us as advances and/or royalties, whether
under this agreement or any other agreement between us, shall ex-
ceed the sum of TWENTY-FIVE THOUSAND ($25,000.) DOLLARS, the ex-
cess shall be paid to you in the succeeding calendar year. Subject
to the limitation of total payments in the sum of TWENTY-FIVE
THOUSAND ($25,000.) DOLLARS in any one calendar year, this proce-
dure shall be followed so long as sums shall be due and payable to
you. The terms of this provision shall survive termination of this
agreement.

8. (a) During each year of the term of this agreement
we agree to lay out, contract for and pay for four (4) advertise-
ments not exceeding one (1) page each, in connection with record-
ings released hereunder, to appear in each of CASHBOX, MUSIC
VENDOR and THE BILLBOARD. With respect to such advertisements,
the selection of the publication or publications, layout, literary
material and artwork shall be solely in our discretion, subject to
subdivision (b) hereof, which shall at all times be applicable.

(b) If during the term hereof, an institutional
advertisement, dealing with phonograph records exclusively, is
placed by our MGM Records Division, and the name or names of any
of our recording artists is mentioned therein, you shall receive
top billing in the upper left-hand corner of such advertisement
if, and only if, during the three (3) months prior to such ad-
vertisement, a record containing a composition recorded by you
shall have been sold by us in greater volume than that of any
other record sold by us during such period.

# MGM RECORDS

A DIVISION OF
LOEW'S INCORPORATED

page six

1540 BROADWAY
NEW YORK 36, N.Y.
JUdSON 6-3900

(c) All personal appearances outside the metro-
politan area of New York City, for the purpose of promoting
and exploiting records released, or to be released by us here-
under, shall be by mutual agreement between us, and in con-
nection with personal appearances so made by you upon our
mutual agreement, we shall pay the actual amount of your nec-
essary travelling expenses, and in addition thereto your
reasonable local travel and incidental expenses up to TWENTY-
FIVE ($25.00) DOLLARS per day.

9. Accountings shall be made to you semi-annually on
the first day of May for the period ending the preceding Febru-
ary 28th and on the first day of November for the period end-
ing the preceding August 31st, together with payment of accrued
royalties, if any, earned during the preceding half year. All
royalty statements and all other accounts rendered by us to you
shall be binding upon you and not subject to any objection by
you for any reason unless specific objection in writing, stating
the basis thereof, is given to us within six (6) months from
the date rendered. You or your representatives shall have the
right within six (6) months after the receipt of a royalty
statement from us to inspect our books and records in Bloomfield,
New Jersey, during regular business hours and upon five (5)
days' prior written notice to us, for the purpose of checking
the royalties due to you hereunder.

10. You expressly agree that your services hereunder
are of a special and unique character and that in the event of
a breach by you of any term, condition or covenant herein, we
shall be entitled to injunctive relief in addition to any other
remedies available to us.

11. (a) In the event we are materially hampered,
because of any labor controversy or any other cause not entirely
within our control, in the recording, manufacture, distribution
or sale of records, then for the duration of such contingency
we may suspend this agreement. The number of such days of
suspension may, at our election, be added to the term hereof
and the term of this agreement shall be accordingly extended.

(b) In the event that any license issued to us
by the American Federation of Musicians, pursuant to which the
services of instrumental musicians who are members of said
American Federation of Musicians are engaged for the purpose of
your recordings hereunder, is suspended, terminated or revoked
with or without cause, you agree that we may terminate and cancel
this agreement in the event of termination or revocation of our
such license or suspend the same for the period during which
such license is suspended without liability to you other than
for compensation on records sold or to be sold prior to and after

# MGM RECORDS

A DIVISION OF
LOEW'S INCORPORATED

Page Seven

1540 BROADWAY
NEW YORK 36, N.Y.
JUDSON 2-1600

such suspension, termination or revocation. If we elect to
suspend this agreement as aforesaid, the term thereof shall be
deemed extended for a period equal to such suspension.

12. We may at our election assign this agreement or
any of our rights hereunder, to any company with which we may
merge or consolidate, or which may otherwise become our successor
company, or acquire all or a substantial portion of the assets
of our MGM Records Division.

13. This agreement sets forth the entire agreement
between the parties with respect to the subject matter thereof,
and no modification, amendment, waiver, termination or discharge
of this agreement, or any provisions thereof, shall be binding
upon us, unless confirmed by a written instrument signed by an
officer of this Company. No waiver of any provision of or de-
fault under this agreement shall affect our right thereafter to
enforce such provision, or to exercise any right or remedy in
the event of any other default, whether or not similar.

14. It is mutually agreed that all prior agreements
between us are terminated as of the date hereof, with the same
force and effect as if such date was the date provided in said
prior agreements for termination, except that all of our rights
under said agreements (as in the case of termination) and your
right to receive royalties and statements thereafter, shall
continue in accordance with such agreements.

15. All notices required to be given hereunder shall be
in writing and sent by registered mail to us at 1540 Broadway,
New York, N. Y., and to you at the address aforesaid, with copy
to George Scheck, 1697 Broadway, New York, N. Y., or such other
address as either of us may hereafter designate. Such notice
shall be deemed to have been given on the date of mailing.

16. Not later than thirty (30) days after the date of
the execution of this agreement by you, we shall furnish you
with a list of all compositions recorded by you under this or
any other prior agreements between us. In addition thereto,
we shall, together with each accounting made to you, furnish

# MGM RECORDS

A DIVISION OF
LOEW'S INCORPORATED

1540 BROADWAY
NEW YORK 36, N.Y.
JUdson 2-2000

page eight

you with a list of all compositions recorded by you during the period covered by said accounting. Failure on our part to furnish you with such a list shall not be deemed a default by us hereunder unless we fail to furnish the same within thirty (30) days after the receipt of a notice from you requesting such list.

Please indicate your acceptance by signing below.

Very truly yours,

ACCEPTED AND AGREED TO:

LOEW'S INCORPORATED
(MGM Records Division)

_____
CONNIE FRANCAHERO
PKA: CONNIE FRANCIS

By _____
Vice President

Approved for MGM Records

By _____

# MGM RECORDS

A DIVISION OF
LOEW'S INCORPORATED

1540 BROADWAY
NEW YORK 36, N.Y.
JUdson 2-2000

May 22, 1959

Miss Connie Francanegro
PKA: CONNIE FRANCIS
c/o George Scheck
1697 Broadway
New York, N. Y.

Re:  Agreement dated January 5, 1959

Dear Miss Francis:

It is mutually agreed as follows:

1. Paragraph 2 of the above agreement is modified to the extent that the minimum number of records to be recorded during each year of the term of the agreement is increased from 16 45rpm record sides or their equivalent in other speeds, to a minimum of 28 45rpm record sides or their equivalent in other speeds, and during each year of the term of the agreement, two record albums shall be manufactured and released for sale by us instead of one record album.

2. Paragraph 6 of the above agreement is hereby modified to the extent that wherever in said Paragraph the sum of $1031.25 appears, the sum of $589.28 shall be substituted therefor.

3. During each year of the term of the agreement, we shall supply you with not in excess of 17,000 fan club cards; 7,000 3x5 picture post cards and mail same pursuant to your instructions; and 8,000 8x10 photographs. All of the foregoing shall be of the same type as heretofore provided for you.

Except as hereinabove modified, the above agreement continues in full force and effect.

Kindly confirm the foregoing by signing below.

Very truly yours,

LOEW'S INCORPORATED
(MGM Record Division)

By _____
Vice President

CONFIRMED:

_____
CONNIE FRANCANEGRO
PKA: CONNIE FRANCIS

Approved for MGM Records

By _____

*Exhibit 3*

# MGM RECORDS

A DIVISION OF
LOEW'S INCORPORATED

May 22, 1959

1540 BROADWAY
NEW YORK 36, N. Y.
JUDSON 2-2000

Miss Connie Francanegro
PKA: CONNIE FRANCIS
c/o George Scheck
1697 Broadway
New York, N. Y.

Re: Agreement dated January 5, 1959

Dear Miss Francis:

It is mutually agreed as follows:

1. Paragraph 2 of the above agreement is modified to the extent that the minimum number of records to be recorded during each year of the term of the agreement is increased from 16 45rpm record sides or their equivalent in other speeds, to a minimum of 28 45rpm record sides or their equivalent in other speeds, and during each year of the term of the agreement, two record albums shall be manufactured and released for sale by us instead of one record album.

2. Paragraph 6 of the above agreement is hereby modified to the extent that wherever in said Paragraph the sum of $589.28 appears, the sum of $1031.25 shall be substituted therefor.

3. During each year of the term of the agreement, we shall supply you with not in excess of 10,000 3x5 picture post cards and mail same pursuant to your instructions; and 50000 8x10 photographs. All of the foregoing shall be of the same type as heretofore provided for you.

Except as hereinabove modified, the above agreement continues in full force and effect.

Kindly confirm the foregoing by signing below.

Very truly yours,

LOEW'S INCORPORATED
(MGM Record Division)

By _____
Vice President

CONFIRMED:

_____
CONNIE FRANCANEGRO
PKA: CONNIE FRANCIS

Approved for MGM Records

By _____

# MGM RECORDS

A DIVISION OF
LOEW'S INCORPORATED

1540 BROADWAY
NEW YORK 36, N.Y.
JUdson 2-1000

May 22, 1959

Miss Connie Franconegro
PKA: CONNIE FRANCIS
c/o George Scheck
1697 Broadway
New York, N. Y.

Re: Agreement dated January 5, 1959

Dear Miss Francis:

It is mutually agreed as follows:

1. Paragraph 2 of the above agreement is modified to the extent that the minimum number of records to be recorded during each year of the term of the agreement is increased from 16 45rpm record sides or their equivalent in other speeds, to a minimum of 28 45rpm record sides or their equivalent in other speeds, and during each year of the term of the agreement, two record albums shall be manufactured and released for sale by us instead of one record album.

2. Paragraph 6 of the above agreement is hereby modified to the extent that wherever in said Paragraph the sum of $1031.25 appears, the sum of $589.28 shall be substituted therefor.

3. During each year of the term of the agreement, we shall supply you with not in excess of 10,000 fan club cards; 7,000 3x5 picture post cards and mail same pursuant to your instructions; and 15,000 8x10 photographs. All of the foregoing shall be of the same type as heretofore provided for you.

Except as hereinabove modified, the above agreement continues in full force and effect.

Kindly confirm the foregoing by signing below.

Very truly yours,

LOEW'S INCORPORATED
(MGM Record Division)

By _____
        Vice President

CONFIRMED:

_____
CONNIE FRANCONEGRO
PKA: CONNIE FRANCIS

Approved for MGM Records

By _____

*Exhibit 4*



## *MGM RECORDS* 

A DIVISION OF
METRO-GOLDWYN-MAYER INC.

1540 BRO/
NEW YORK
JUDSON 2-

*Jan 5, 1962*

Miss Connie Francis
c/o Mr. George Scheck
161 West 54th Street
New York, N. Y.

Re: Agreement dated January 5, 1959
   As Amended

Dear Miss Francis:

Reference is hereby made to the above agreement between us (hereinafter referred to as the "Agreement") with respect to which it is mutually agreed as follows:

1. Our said Agreement is hereby extended for a further period of five (5) years commencing January 5, 1962 and terminating January 4, 1967 upon all of the same terms and conditions as therein contained except as hereinbelow specifically provided.

2. Subject to your bonafide commitments in motion pictures, television presentations and personal appearance engagements, Paragraph 2 of the Agreement is modified to the extent that a minimum of fifty-six (56) 45-rpm record sides or their equivalent in other speeds, which shall consist of four (4) phonograph record albums and four (4) single records, shall be recorded by you for us during each year of the term referred to in Paragraph 1 hereinabove. All compositions to be recorded hereunder shall be selected by you. All arrangements and arrangers, and the recordings to be released hereunder, shall be mutually agreed upon between us except that you agree to approve of the release of not less than fifty-six (56) record sides recorded by you during each year of this extended term.

Subject to the foregoing, during each year of the term hereof, four (4) albums and four (4) single records, shall be manufactured and released for sale by us. On all recordings to be made by you for us hereunder, you shall be the sole recording artist, except for background accompaniment, vocal and/or instrumental. We shall not couple your recordings with those of any other artist without your consent.



3. Paragraph 4(b) shall be deemed deleted and the f
ing shall be substituted therefor:

(b) In connection with the advertising and explo:
tion of your recordings to use and publish and to permit othe:
use and publish your name and photograph, to write and publisl
to permit others to write and publish articles concerning you
advertising and trade purposes in connection with the sale and
ploitation of phonograph records recorded hereunder, to use as
descriptive of you the phrase "MGM Artist" or any other simila
appropriate phrase; and not to use or authorize any direct end
ment by you of any record or performance without your prior co:

Paragraph 4(c) shall be deemed amended by adding a
end thereof, the following:

To the extent that we have or shall have the right
control the timing of releases in foreign countries by reason o
our contractual obligations to licensees and distributors in su
foreign countries, you shall have the right to approve the fore
release dates of albums released by us pursuant hereto. We sha
endeavor to have our licensees in the following countries or te:
tories, England, France, Italy, Australia, Japan, Hong Kong and
West Germany, abide by your recommendations for the timing of th
release of your recordings.

4. The last sentence of Paragraph 5(a) of the Agreemen
shall be deemed deleted and the following shall be substituted t
for:

We both recognize the necessity of promoting the sa:
of records which requires the distribution of records free of ch
and that free records containing your performances will be distri
for promotional purposes. It is understood that royalties will n
be applicable to such quantities of free records as shall be agre
upon by you and us at the time of release of each new recording o
sales program involving the distribution of your recordings.

sum, we may, in addition to other remedies, deduct the a
any further advances to be made hereunder or from any re
which may be due or become due to you under the Agreemen
this extension thereof, or any prior agreement between u
such credit shall be retained by us with respect to the
compositions less than fifty-six (56), during any year,
fail to record by reason of any refusal to permit you to
composition for us, which refusal on our part, has not b
good faith, nor with respect to the number of compositio
than fifty-six (56), during any year, that you have not :
and which you have offered in good faith to record.  Exc
respect to circumstances described in this Paragraph 5(b)
going advances shall be charged only against royalties w
come due to you hereunder.  Such advances are non-return:
as herein provided.

        6. A.  Paragraph 8, subparagraphs (a) and (c) of
ment, shall be deleted and the following shall be substit
for:

        (a)  In connection with advertising and promo
your recordings hereunder, we agree to lay out, contract
pay for advertisements not exceeding one (1) page, in con
with each album and single record released hereunder, to
each of CASHBOX, MUSIC VENDOR and THE BILLBOARD.  With re
such advertisements, the layout of such advertisements sh
subject to your approval.  The literary material and artw
be solely in our discretion, subject to subdivision (b) h
which shall at all times be applicable.

        (c)  All personal appearances outside the metr
area of New York City, for the purpose of promoting and c
records released, or to be released by us hereunder, shall
mutual agreement between us, and in connection with person
ances so made by you pursuant to our mutual agreement, we
the actual amounts incurred by you and one other person fo
traveling expenses to and from the city wherein such perso
ance shall take place and in addition thereto, your reason
travel and incidental expenses in such city up to $25.00 p
you and for such other person.



-5-

6. B.  The following shall be deemed added as paragraphs 8(d), (e), (f) and (g) of the Agreement:

(d)  In connection with the exploitation of record-ings hereunder by you, we agree that similarly as was done by us during the year 1961 in connection with your recordings, we will make or have made, pay for, and for the mailing of the following items: 8x10 photographs, 3x5 picture post cards, fan club cards and promotional and advertising material to disc jockeys, distri-butors and press.

(e)  We shall each pay 50% of the cost of advertise-ments with respect to your recordings hereunder, in connection with special events and honors awards involving you or your re-cordings but we shall not be obligated to contribute to more than a total of three (3) such advertisements during any year of the term hereof.

(f)  We agree to pay for:

(i)  The cost of all research material used by you in connection with the record-ing of albums hereunder but not in excess of $500.00 for any album.

(ii)  Reasonable compensation for for-eign language instruction in connection with recording of an album in a foreign language.

(iii)  The services of an A&R man selected by you and who (in addition to our own A&R man) attends your recording sessions, but not in excess of $200.00 per session.

(g) All cover artwork and liner notes of any album released by us, pursuant hereto, shall be subject to your prior written approval which you agree you will not unreasonably withhold. In the event that within ten (10) days after the submission to you of artwork and liner notes you do not signify your disapproval thereof, the same shall be deemed approved. In the event of your disapproval, you will notify us as to the reasons therefor and submit such recommendations to us with respect to the cover and liner notes as you may desire to have incorporated therein. Your recommendations shall not be binding upon us. However, we shall continue making new submissions to you of artwork and liner notes until mutually satisfactory covers and liners have been obtained.

7. If at any time during the term hereof, you enter into an agreement to perform in a stage theatrical production or in a motion picture or in a television presentation (each of the foregoing being herein referred to as the "Production") and if phonograph records containing your performance have sold in greater volume during the three year period immediately preceding the date of your extension of said agreement than phonograph records of any other performer to appear in such Production for the same three year period, then your agreement with the producer or producing company (hereinafter referred to as the "Producing Company") must provide that with respect to the Production for which you are to render your services, we shall have the right of first refusal with respect to an "original cast" or "original sound track" album of the musical compositions performed therein which "original cast" album shall include lead-in and lead-out dialogue of the Production. Our right of first refusal shall mean the following: The Producing Company having such rights, will give us written notice by registered mail, setting forth the basic terms upon which they desire to grant the right to record, distribute, sell, exploit and license an "original cast" record album of the Production and together therewith, deliver to us the sheet music and lyrics of the musical compositions to be performed therein; and of the book thereof. Within thirty (30) days (exclusive of Saturdays, Sundays and holidays) after the receipt of such notice by us and receipt by us of the musical

compositions and books, we shall advise the Producing Company by
registered mail, whether we desire to acquire the rights offered
upon the terms so offered and if acceptable to us, a formal agree-
ment shall then be entered into between us, the Producing Company
and the music publisher.  If within said period of thirty days, we
do not notify the Producing Company that we wish to acquire said
rights or notify the Producing Company within said period of
thirty days that we do not wish to acquire said rights, then the
Producing Company shall be free to dispose of such rights in the
"original cast" album to any other party upon terms no less favor-
able than those offered to us.  If pursuant hereto the aforemention-
ed rights with respect to an "original cast" album are disposed of
to others than ourselves, then notwithstanding the provisions of
Paragraph 3 of the Agreement, you will be permitted to render your
services to such other party than ourselves for the purpose of re-
cording the "original cast" album of said production.  In the event
that the Producing Company does not dispose of the "original cast"
album rights and is willing to accept less favorable terms than the
terms previously offered to us, the same procedure as above out-
lined shall be followed ad infinitum.

If, however, your records have not sold in greater volume
during the aforementioned period of three years, than the sales of
records of any other such performer, then you shall use your best
efforts to obtain for us the same rights of first refusal as above
mentioned.

It is understood and agreed that we shall have the right
without any restriction whatsoever, to manufacture, distribute, ad-
vertise and sell one sound track album from the sound track of each
motion picture produced by Frannot Productions, Inc., subject to the
payment of royalties as herein provided, on such sound track phono-
graph record album as shall contain your performance.  Such record-
ings whether or not released by us, shall not reduce your obligation
to record a minimum of 56 record sides pursuant to Paragraph 2 herein-
above.

8.  Paragraph 12 of the Agreement shall be deleted and in
lieu thereof, the following shall prevail:

We may at our election, assign this Agreement or any of
our rights hereunder, to any company with which we may merge or con-
solidate, or which may otherwise become our successor company, or
acquire all or a substantial portion of the assets of our MGM Records
Division, but such assignment shall not relieve us of our obligations
hereunder in the event of default on the ..........



Except as hereinabove modified, our above referred to
Agreement shall continue in full force and effect.

Kindly confirm the foregoing by signing below and this
shall constitute an agreement between us.

Very truly yours,

METRO-GOLDWYN-MAYER INC.
(MGM RECORDS DIVISION)

BY _____
Vice President

ACCEPTED AND AGREED TO:

_____
CONNIE FRANCONERO
PKA: CONNIE FRANCIS

Approved for MGM RECORDS

BY _____

*Exhibit 5*



AGREEMENT made this 3rd day of October 1966 by and between METRO-GOLDWYN-MAYER INC. (MGM Records Division), hereinafter referred to as "MGM", with principal offices located at 1350 Avenue of the Americas, New York, New York 10019 and G.G.C. PRODUCTIONS CORP. of 161 West 54 Street, New York, New York, hereinafter referred to as "Producer".

WHEREAS, the parties hereto have mutually agreed that Producer shall during the times hereinafter set forth, produce master recordings for MGM to be used by MGM for the manufacture, distribution, and sale of phonograph records therefrom.

NOW, THEREFORE, it is hereby mutually agreed by and between the parties hereto as follows:

1. As used herein, the following terms shall have the following meanings:

"MASTER" or "MASTER RECORDING" - An acetate, lacquer or wax disc, or magnetic tape, film, or wire or such other material or device now or hereafter known, on which sound may be recorded and from which phonograph records may be manufactured.

"PHONOGRAPH RECORDS" or "RECORDS" - Shall mean phonograph records and record albums of any r.p.m. and any similar devices for the reproduction of sound reproduced on any material which may now or hereafter be known, including, but not limited to, discs of wax, vinyl, or any other composition, or tape, film, or wire. Where used herein, "single" records shall be deemed to include extended-play records.

2.  Producer represents and warrants that:

(a)  Producer has the sole and exclusive right to the services of CONNIE FRANCIS (herein called "Artist") for the purpose of producing master recordings for the sale and distribution of records therefrom; that the duration of Producer's rights to Artist's services will be for the period of this agreement and all options granted to MGM herein to extend said period; that Artist will be a member of AFTRA or AFM or will become such member in accordance with the current applicable codes or agreements between MGM and such organizations.  Producer agrees to sign, adopt and conform to the 1965-68 AFTRA CODE OF FAIR PRACTICE FOR PHONOGRAPH RECORDINGS and to deliver a signed copy of the Code to AFTRA not later than forty-eight (48) hours prior to the first recording engagement pursuant hereto and to notify MGM thereof.

(b)  Producer has the sole and exclusive authority to enter into this agreement on the terms and conditions contained herein and to grant to MGM all of the rights granted to MGM herein;

(c)  Neither Artist nor Producer has granted to others any of the rights being granted to MGM herein nor will Producer record or produce with Artist, pursuant hereto, any composition heretofore recorded by Artist for others;

(d)  Producer will maintain and protect its sole and exclusive right to the services of Artist as hereinabove stated for the duration of the term hereof and all option periods granted to MGM herein to extend said term, and Producer will enforce all of Artist's obligations to Producer and MGM, as required of Artist hereunder;

(e)  No change will be made by Producer in any agreement with Artist without MGM's consent, which would in any way change the obligation of such Artist to perform the services

- 2 -

required of Artist or impair the rights given to MGM by Producer hereunder.

(f)  Producer will obtain all mechanical reproduction licenses necessary to be secured from copyright proprietors of compositions recorded pursuant hereto in order to enable MGM to manufacture and sell mechanical reproductions of such compositions.  Prior to concluding such arrangements, Producer agrees to consult with MGM concerning the mechanical royalty to be paid pursuant to each such license.

3.  The term of this agreement shall be in period commencing January 5, 1967 and terminating January 4, 1970. MGM shall have the right, upon giving notice to Producer at least ninety (90) days prior to January 4, 1970, to extend the term of this agreement for the further period of two (2) years commencing January 5, 1970, upon all of the terms and conditions hereof.

4.  Pursuant to an agreement dated January 5, 1959, as amended, (said agreement and amendments thereto are herein referred to as the "Agreement"), Artist agreed to render her exclusive services for MGM for the manufacture and sale of phonograph records, and Artist has been rendering her said services under said Agreement.  All of the terms and conditions of the Agreement shall be applicable hereto as if fully set forth herein, except as hereby modified, and except that Paragraphs 6 and 7 of the agreement of January 5, 1959 and Paragraph 5 of the amendatory agreement of January 5, 1962, shall be deemed deleted therefrom and the following substituted therefor in this agreement:

"Provided that Producer and Artist fully keep and perform the provisions of this Agreement, MGM guarantees that the royalties accruing on sales of records from recordings containing performances by Artist made during the three-year term hereof and during the option period referred to in Paragraph 3 above, if such option is exercised by MGM shall be

- 3 -

not less than One Hundred Thousand Dollars ($100,000.00) per year.  Said annual guaranteed royalty shall be recouped by MGM out of royalties credited to Producer's account at any time from recordings made by Artist during the term hereof.  Commencing with the 5th day of January, 1970, or on the 5th day of January, 1972, if the option to extend the term of this extension pursuant to Paragraph 1 above is exercised by MGM (and on the 5th day of each January thereafter), MGM shall pay to Producer any remaining royalties in its account at the rate of One Hundred Thousand Dollars ($100,000.00) per year, which royalties may be or become due and payable by MGM to Producer as royalties under this agreement, or such lesser amount than One Hundred Thousand Dollars ($100,000.00) as may then be standing to Producer's credit in Producer's royalty account with MGM on the date that payment is due."

5.  We shall pay to you the One Hundred Thousand Dollars ($100,000.00) per year referred to in Paragraph 4 above on January 5, 1967 and on each anniversary date thereafter during the term of this agreement for your services and the services of Artist pursuant hereto as advances against royalties, as provided in Paragraph 5 of the Agreement, which royalties shall be computed as provided in said Agreement, except as follows:

(a)  Royalties on records sold as albums in jackets, boxes, or any other type of package or container shall be based solely upon the suggested retail list price (exclusive of all excise taxes and exclusive of twenty cents (20¢) for album cover and packaging), of each album on which a royalty is payable.

(b)  (i)  In computing royalties payable to Producer, the term "records sold" shall not include records distributed to or for publications, radio and television stations, or similar organizations for the purpose of promoting, publicizing or advertising Artist or the records in which Artist's performance is contained, nor records sold by MGM as "cut-outs" or for scrap, nor shall "records sold" include records containing Artist's performances and returned to MGM by any buyer during the same or any other accounting period, which returns are made for any reason whatsoever, including returns made at MGM's request.

- 4 -

No "single" records and no albums may be sold by MGM as "cut-outs"
until after the expiration of one (1) year from date of original
release for public sale and distribution of any particular "single"
record, and five (5) years after the original release of any parti-
cular album.

(ii)  In addition to the foregoing, "records
sold" shall not include records given away gratis or sold at less
than fifty percent (50%) of MGM's listed wholesale price to re-
cord distributors in connection with the sale of records or albums
in which Artist's performance is contained.  With respect to royalty-
free records referred to in the next preceding sentence, MGM agrees
that the royalty-free records shall be limited to three hundred
(300) records for every one thousand (1,000) 45 r.p.m. "single"
records purchased by record distributors or dealers and to twenty
percent (20%) of the long-playing albums purchased by record dis-
tributors or dealers.  In the event that records or albums are sold
by us at a discount, the number of records arrived at by multiplying
the discount in percent by the total number of records or albums
shipped shall be deemed royalty-free records pursuant to this para-
graph 5.(b)(ii).

6.  Royalties on records or albums sold by MGM through
or by means of so-called record club distribution or to record
clubs or in the form of pre-recorded tape or tapes shall be com-
puted and paid to Producer at one-half of the rate of royalty
provided in the Agreement.  Notwithstanding the foregoing, with
respect to the sale of tapes manufactured by a licensee of MGM,
and containing Artist's performances, the royalty to Producer
shall be fifty percent "(50%) of the net amount received by MGM
from such licensee from the sale of such tape, after deducting
therefrom MGM's expenses, but in no event shall such royalty be
less than a royalty computed pursuant to the next preceding

- 5 -