sentence of this Paragraph 6. In the event that MGM is the manu-
facturer and distributor of the tapes, the royalty to Producer
from sales thereof shall be the same as from the sale of disc
records manufactured and distributed by MGM.

7. In the event that during the period covered by
this agreement, royalties accruing to Producer from the sales
of records made from recordings produced during the term of this
said agreement and containing performances by Artist, are less
than Three Hundred Thousand Dollars ($300,000.00), MGM shall
have the right to recoup the deficiency, but not in excess of
One Hundred Thousand Dollars ($100,000.00) of such deficiency,
from royalties accruing to Producer commencing January 5, 1970
(or January 5, 1972, if the option referred to in Paragraph 3
is exercised by MGM) from sales of any records produced under
the Agreement or this agreement or any other agreement between
MGM and Producer.

8. The following shall be deemed added to Paragraph 5(c)
of the Agreement:

> "Prior to the scheduling of any
> recording session, you and we shall, in good
> faith, discuss and mutually agree on a re-
> cording budget for any such session, and you
> agree, in good faith, to adhere to said bud-
> get for recordings made pursuant hereto."

9. MGM may, at its election, assign this agreement
or any of its rights hereunder, to any subsidiary or affiliated
company or to any company acquiring a major portion of the assets
of the MGM Records Label Division or license any of its rights
anywhere in the world. In the event of assignment to a subsidiary
or affiliated company, MGM shall not be relieved of its obligations
hereunder.

10. Producer agrees that it will cause Artist to
sign MGM's form of artist's guarantee of performance, a copy
of which is annexed hereto as Exhibit "A" and made part hereof.

11.  All notices required to be given hereunder shall
be in writing and sent by registered mail to MGM at 1350 Avenue
of the Americas, New York City, and to Producer at the address
aforesaid, or such other address as either party may hereafter
designate.  Such notice shall be deemed to have been given on
the date of mailing.

12.  This agreement sets forth the entire agreement
between the parties with respect to the subject matter thereof,
and no modification, amendment, waiver, termination or discharge
of this agreement or any provisions thereof shall be binding
upon either party unless confirmed by a written instrument
signed by an officer of said party.  No waiver of any provi-
sion of or default under this agreement shall affect either
party's rights thereafter to enforce such provision or to exer-
cise any right or remedy in the event of any other default,
whether or not similar.  This agreement and all of its provi-
sions shall be interpreted and construed everywhere in accordance
with the laws of the State of New York, applicable to contracts
executed and to be performed therein.

IN WITNESS WHEREOF, the parties have hereunto set
their hands this        day of

METRO-GOLDWYN-MAYER INC.
(MGM Records Division)

By_____
            Vice President

G.G.C. PRODUCTIONS CORP.

By_____

- 7 -

EXHIBIT "A"

Metro-Goldwyn-Mayer Inc.
 (MGM Records Division)
~~Hollywood~~ 1350 Ave. of Americas          Dated:
New York 19, New York 10019

Gentlemen:

1.  Pursuant to a personal service contract between the undersigned
and    G.G.C. PRODUCTIONS CORP.        (herein called "Producer"),
said Producer is entitled to my services for the recording of phono-
graph records.  I have been advised that Producer is about to enter
into an agreement in writing with you (herein referred to as the
"Agreement") pursuant to which Producer is to make my services avail-
able to you for the purposes and upon terms and conditions as to my
services which have been fully explained to me.

2.  In consideration of your company executing the Agreement and as
a further inducement to you to do so, I hereby confirm, warrant and
guaranty to you:
    (a)  That Producer has the right, insofar as I am concerned, to
enter into the Agreement and to assume all of the obligations, warranties
and undertakings to you on the part of Producer therein contained,
and that Producer will continue to have such rights until the said
obligations, warranties and undertakings have been fully performed
and discharged.
    (b)  All of the warranties and representations on the part of
Producer contained in the Agreement, concerning me, are true and
correct insofar as I am concerned.
    (c)  I will duly and to the best of my ability, perform, and dis-
charge all of the obligations and undertakings of the Agreement insofar
as same are required of me and which Producer has undertaken to procure
me to do and perform in the Agreement.

3.  If during the term of the Agreement or any extension thereof,
Producer shall cease to be entitled to make my services available to
you in accordance with the terms of said Agreement, or fail or refuse
to make my services available to you, I shall, at your request, do
all such acts and things as shall give to you the same rights, privi-
leges and benefits as you would have had under the Agreement if Pro-
ducer had continued to be entitled to my services and make same avail-
able to you, and such rights, privileges and benefits shall be enforce-
able in your behalf against me.

4.  I hereby consent, as provided in the Agreement, to your having the
exclusive right to use and publish and to permit others to use and pub-
lish my name and photograph, and to write and publish and to permit
others to write and publish articles concerning me for advertising
and trade purposes in connection with the sale and exploitation of
phonograph records recorded under the Agreement; to use as descriptive
of me the phrase "MGM Artist" or any other similar or appropriate
phrase in connection with any trade name or label used by your MGM
Records Division, and I agree that I will not, during the term of the
Agreement or any extension or renewal thereof, perform for anyone else
for the purpose of making phonograph records, and I will not, for a
period of five (5) years after the ~~termination of the Agreement or the~~
~~any extension or renewals thereof,~~ perform any musical composition
or material recorded under the Agreement for anyone else other than
you for the purpose of making phonograph records.

5.  No termination of your Agreement with Producer shall operate to
diminish my liability or obligations hereunder without your consent.

6.  I hereby consent and agree that you may in your own name institute
any action or proceeding against me to enforce your rights under the
Agreement and/or pursuant hereto.

EXHIBIT "A"
PAGE 1 OF 2 PAGES

7.  In the event that during the period covered by the Agreement, royalties accruing to Producer from the sales of records made from recordings produced during the term of the Agreement and containing my performances are less than Three Hundred Thousand Dollars ($300,000.00), you shall have the right to recoup the deficiency, but not in excess of One Hundred Thousand Dollars ($100,000.00) of such deficiency, from royalties accruing to me commencing January 5, 1970 (or January 5, 1972 if the option referred to in Paragraph 3 of the Agreement is exercised by you) from sales of any records under any agreement between your company and myself.

CONNIE FRANCIS

EXHIBIT "A"
PAGE 2 of 2 PAGES

*Exhibit 6*

Agreement made as of January 9th, 1980, by and between POLYDOR INCORPORATED, 810 Seventh Avenue, New York, New York, 10019 ("COMPANY") and  G.G.C. PRODUCTION CORP., c/o David Erlich & Co., 380 Madison Avenue, New York, New York, 10017 ("PRODUCER").

### W I T N E S S E T H:

WHEREAS, COMPANY is in the business of exploiting, distributing and marketing Phonograph Records, and

WHEREAS, PRODUCER desires to produce for COMPANY recordings embodying performances of CONNIE FRANCIS, hereinafter referred to as "ARTIST", for distribution by COMPANY upon the terms and conditions of this agreement.

NOW THEREFORE, in consideration of the representations and warranties and the mutual promises hereinafter set forth it is agreed as follows:

1.   For the purposes of this agreement, the following terms shall mean:

(a)  "Master", "Master Recording", "Recording":   Any recording of sound, whether or not coupled with a visual image, by any method and on any substance or material, whether now or hereafter known, intended for reproduction in the form of Phonograph Records, or otherwise.  An "Original Master", or "Original Recording" shall mean the recording which first fixes sounds in a medium sufficiently permanent or stable to permit it to be perceived, reproduced or otherwise communicated for a period of more than transitory duration, or, in the case of recordings which are made by a process of mixing and fixing together independently fixed sounds, the recording which first fixes any mix of such sounds.  "Copy Masters" or "Duplicate Masters" are recordings derived from an Original Master without change other than is inherently introduced by the technical limitations of the re-recording process.

(b)  "Side":  A recording of sufficient playing time to constitute one (1) Side of a 7 inch, 45 rpm disc Phonograph Record, but not less than two and one-half (2-1/2) minutes of continuous sound, embodying performances of ARTIST.

(c)  "Matrix", "Derivative": Any device, now or hereafter used, directly or indirectly, in the manufacture of Phonograph Records or Audio-Visual Devices and which is derived from a Master Recording, inclusive of Copy Masters but not limited thereto.

212:12.18.79
PARC



-2-

(d) "Records", "Phonograph Records":  All forms of reproductions of recordings, now or hereafter known, manufactured or distributed primarily for home and/or juke box use and/or on or in means of transportation.

(e). "Audio-Visual Devices": All forms of reproductions of Audio-Visual Recordings, now or hereafter known, manufactured or distributed primarily for home and/or juke box use and/or on or in means of transportation.  Audio-Visual Recordings means every form of recording embodying performances of ARTIST wherein are fixed visual images of ARTIST together with sound, but exclusive of recordings used exclusively in motion pictures or broadcast television.

(f) "Single":  A 7 inch, 45 rpm, double-sided Phonograph Record embodying thereon at least two (2) Sides.  A Single embodying more than two (2) Sides may from time to time be referred to as an "Extended Play".

(g) "LP":  A 12 inch, 33-1/3 rpm, double-sided long-play Phonograph Record or the equivalent thereof embodying thereon the equivalent of not fewer than nine (9) sides and not more than eleven (11) Sides, and having not less than thirty-three (33) minutes playing time.

(h) "Album":  One or more 12 inch, 33-1/3 rpm Records, or the equivalent thereof, sold in a single package.

(i) "Disco-Disc":  A 12 inch, 33-1/3 rpm or 45 rpm double-sided long-play disc Phonograph Record embodying thereon not more than four (4) sides; Disco-Discs shall be regarded for all purposes as Singles hereunder.

(j) "Retail List Price":  means, with respect to Records sold in the United States, COMPANY's suggested Retail List Price in the United States, and, with respect to Records sold outside the United States, COMPANY's or its licensee's suggested retail price in the country of manufacture or sale, as COMPANY is paid, or, in the absence in a particular country of such suggested Retail List Price the actual retail price as may be established by COMPANY or its licensee(s) in conformity with the general practice of the record industry in such country, provided that COMPANY shall be entitled to utilize the corresponding retail price adopted by the local mechanical copyright collection agency for the collection of mechanical copyright royalties.  For purposes of royalty calculation, the Retail List Price shall be subject to the adjustments set forth in paragraph 7(e) hereof, except in the case of 12 inch Disco-Discs which shall be subject to the provisions of paragraph 7(b) hereof.

212:12.18.79
PARC

-3-

(k) "Recording Costs": means all costs including pre- and post-production costs incurred for and with respect to the production of Masters embodying ARTIST's performances hereunder.   Recording Costs include, without limitation, union scale, the costs of all instruments, musicians, vocalists, conductors, arrangers, orchestrators, copyists, etc., payments to a trustee or fund based on wages to the extent required by an agreement between COMPANY and any labor organization or trustee, all studio costs, tape, editing, mixing, mastering to tape, rehearsal halls, costs of non-studio facilities and equipment, dubbing, transportation of instruments and other costs and expenses including production fees incurred in producing the Masters hereunder, from time to time, and which are customarily recognized as Recording Costs in the phonograph record industry.

(l) "Composition": means a musical composition or medley consisting of words and/or music, or any dramatic performance, reading, monologue, dialogue and other performance in a unit of literary, dramatic or musical material, whether in the form of instrumental and/or vocal music, prose or otherwise, irrespective of length.

(m) "Controlled Composition": means any composition embodied on a Master hereunder which is written, composed, owned and/or controlled by PRODUCER and/or any person who produces Masters hereunder and/or ARTIST and/or any party which is allied or affiliated with any one or more of them or in which one or more of them has a direct or indirect interest or from the use of which on a published sound recording subject hereto one or more of them would derive direct or indirect benefit.

(n) "Records Sold For Distribution In The United States": means Records sold by POLYGRAM DISTRIBUTION, INC., or any independent distributors with whom COMPANY may now or hereafter enter into arrangements or agreements for distribution to the retail trade, which shall exclude, for purposes of illustration but not by way of limitation, record club, and other mail order, "key outlet marketing" sales and budget sales.

(o) "Territory": means the world.

(p) "ARTIST": shall mean the individual or individuals hereinabove referred to as performing for the purpose of making recordings pursuant to this agreement.

212:12.18.79
PARC

 

-4-

(q) "Budget Records": Albums sold in a particular country of the territory at a suggested Retail List Price which is seventy-five (75%) per cent or less of COMPANY's suggested Retail List Price in such country of the Territory for top "pop" single LP Albums. The suggested Retail List Price of a multi-record Album for the purposes of this definition shall be the actual suggested Retail List Price of such Album divided by the number of disc LPs or the equivalent thereof embodied therein. A Promotional Record released under COMPANY's top "pop" label if otherwise it fulfills the criteria for a Budget Record set forth above shall be subject to the provisions of this agreement related to Budget Records except that any release restrictions pertaining thereto shall not apply to such Promotional Records.

(r) "Person": Any individual, corporation, partnership, association, or other business entity, and/or the legal successors or representatives of any of the foregoing.

(s) "Non-Affiliated Third Parties": Persons other than: Members of the POLYGRAM GROUP as now or hereafter constituted, and other than Persons as to which COMPANY now or hereafter directly or indirectly holds at least fifty (50%) per cent interest or control (including joint ventures) or Persons in which the principals of COMPANY or any of the POLYGRAM GROUP now or hereafter collectively hold at least a fifty (50%) per cent interest or control.

2. (a) COMPANY hereby engages PRODUCER to furnish the exclusive services of ARTIST, and the services of an individual producer to produce and deliver to COMPANY three (3) Sides embodying performances of ARTIST, and such optional further number of Sides as provided for hereinafter. PRODUCER accepts such engagement, agrees to deliver to COMPANY recordings embodying performances of ARTIST in accordance herewith, and agrees that the individual producer shall render his services to the best of his ability and in accordance with first-class standards of performance for producers in the phonograph record industry, and subject to the terms and conditions hereof. PRODUCER hereby grants to COMPANY three (3) separate and consecutive options, the first of which shall be for one (1) further LP, and the second and third of which shall be for two (2) LPs each, which options shall be exercised, if at all, in accordance with the provisions of paragraph 3 below.

(b) The Term of this agreement, where reference is made herein to the Term, shall mean the period of time

212:12.18.79
PARC



-5-

commencing on the date hereof and ending nine (9) months after delivery to COMPANY of the last LP to be delivered to COMPANY in accordance herewith, or, in the case of the three (3) Sides, six (6) months after the Initial Release thereof. An Option Period is the period of the Term commencing on exercise of an option for one or more Albums and expiring upon exercise of the next subsequent option, or upon expiration of the Term, whichever shall occur earlier.

3.   (a)  During the Term, PRODUCER warrants that ARTIST shall perform for the purpose of making Phonograph Records exclusively for PRODUCER, and COMPANY shall have the exclusive right for phonograph record purposes to all recorded performances of ARTIST made throughout the Term. PRODUCER shall deliver to COMPANY the number of newly recorded Sides embodying the performances of ARTIST as hereinafter provided in this paragraph 3.

(b)  COMPANY's execution hereof shall be deemed its request that PRODUCER deliver the Masters comprising the first three (3) Sides within ninety (90) days of such request.

(c)  Not later than six (6) months after release by COMPANY of the LP containing the first three (3) Sides, COMPANY shall, at its option, have the right to give PRODUCER written notice of its request that PRODUCER deliver a First LP hereunder in accordance with the provisions of subparagraph (f) below, and PRODUCER shall deliver such LP if so requested.  If COMPANY fails to exercise its right as set forth in this subparagraph, the Term of this Agreement shall expire forthwith.

(d)  Not later than nine (9) months after delivery to COMPANY of the First LP, COMPANY shall, at its option, have the right to give PRODUCER written notice of its request that PRODUCER deliver a Second and a Third LP hereunder in accordance with the provisions of subparagraph (f) below, and PRODUCER shall deliver such LPs if so requested.  If COMPANY fails to exercise its right as set forth in this subparagraph, the Term of this Agreement shall expire forthwith.

(e)  Not later than nine (9) months after delivery to COMPANY of the Third LP, COMPANY shall, at its option, have the right to give PRODUCER written notice of its request that PRODUCER deliver a Fourth and a Fifth LP hereunder in accordance with the provisions of subparagraph (f) below, and PRODUCER shall deliver such LPs if so requested.  If COMPANY fails to exercise its right as set forth in this subparagraph, the Term of this Agreement shall expire forthwith.

212:12.18.79
PARC

-6-

(f) Subsequent to the First LP, PRODUCER shall deliver to COMPANY subsequent LPs hereunder, as specified in sub-paragraphs (b), (c), and (d) above, any one not earlier than six (6) months, nor later than twelve (12) months following delivery of the immediately preceding album. PRODUCER shall deliver completed, edited and fully mixed original master tapes in accordance with COMPANY's reasonable instructions. Said master tapes shall invariably include a stereo two track master tape compatible for monaural reproduction. The compositions to be recorded shall be designated by PRODUCER and PRODUCER shall have complete creative control over the production of Masters hereunder, subject to the provisions of paragraph 5(f) below, and provided that each Master recording shall be approved by COMPANY as technically satisfactory for the manufacture and sale of Phonograph Records.

(g) For the purposes of paragraphs 2 and 3 hereof the date of PRODUCER's delivery of any LP hereunder shall be that date which PRODUCER, by written notice to COMPANY given within thirty (30) days after the delivery to COMPANY of the fully mixed and edited tapes for such LP, informs COMPANY to be such delivery date, provided that:

(i) Such date shall in no event be earlier than the date of completion by PRODUCER of the procedures to be performed in accordance with paragraph 11 hereof with respect to such LP, and

(ii) That COMPANY shall have the right to object to such date by written notice to PRODUCER given within thirty (30) days after receipt of the notice from PRODUCER provided for in the foregoing, but solely on the grounds that PRODUCER had not by the date given by PRODUCER completed delivery of the LP by performance of all of the procedures set forth herein to be performed by PRODUCER with respect to such LP to enable COMPANY to release such LP. In the event that COMPANY does so object, COMPANY and PRODUCER shall mutually and in good faith agree on the date to be deemed the delivery date which shall be the earliest date on which PRODUCER has so completely performed with respect to such LP. In the event that COMPANY does not respond to PRODUCER within the aforesaid thirty (30) days period in which it may lodge objection, or does not otherwise object to the date given by PRODUCER as the date which PRODUCER deems to be the date of delivery, then such date given by PRODUCER shall be deemed to be the delivery date of the LP in question. In the event that PRODUCER does not notify COMPANY within thirty (30) days after the delivery to COMPANY of the fully mixed and edited tapes for any LP of the date which PRODUCER deems to be the delivery date of

212:12.18.79

 

-7-

such LP, then such LP shall be deemed to have been delivered sixty (60) days prior to its date of initial release in the United States.

(h) PRODUCER warrants that ARTIST's performances hereunder shall be reasonably consistent in concept and style and that subsequent Masters hereunder will in general artistic concept and style be similar to the previously delivered Masters hereunder. In the event ARTIST desires to perform in any new concept and style, COMPANY's prior written consent shall be required. PRODUCER further agrees that neither "live" performance recordings nor multiple LP Albums shall be recorded and accepted as part of PRODUCER's delivery obligation hereunder unless with COMPANY's prior written consent; without limitation of the generality of the foregoing, any multi-LP Album hereunder shall be deemed a single LP for the purposes of product delivery and payment therefor unless COMPANY explicitly in writing by an authorized officer agrees otherwise.

(i) All Masters delivered hereunder shall be recorded no earlier than six (6) months prior to delivery to COMPANY and shall not embody Compositions which have been previously delivered to COMPANY.

4.    (a) Without limitation of the generality of paragraph 3(a) above, PRODUCER warrants that ARTIST will not license nor consent to the use of ARTIST's name, likeness, biographical material or other identification ("ARTIST's Identification") for or in connection with the exploitation by anyone other than COMPANY of Phonograph Records or Audio-Visual Recordings derived from recordings made during the Term.

(b) PRODUCER further warrants that ARTIST will not perform nor license, nor consent to the use by any one or more third parties of ARTIST's Identification for or in connection with the recording or exploitation of any Phonograph Record embodying any Composition recorded by ARTIST under this agreement prior to the later of the date five (5) years subsequent to the date of delivery to COMPANY of a Master embodying that Composition recorded hereunder, or the date three (3) years subsequent to the expiration or other termination of the Term of this agreement. Should ARTIST so perform or should licensed or consented to use of ARTIST's Identification by any one or more third parties occur in connection with any such Composition during the period referred to above, then COMPANY shall have the right, at its election, to terminate this agreement and COMPANY shall have no further obligation with respect to such violative Composition to pay royalties to PRODUCER.

212:12.18.79
PARC



-8-

5. All Masters and any Audio-Visual Recordings produced hereunder shall be recorded by PRODUCER on COMPANY's behalf, and all Records embodied therein shall from inception of their creation be entirely the property of COMPANY in perpetuity throughout the Territory, free of any claim whatsoever by PRODUCER or by ARTIST or by any Persons deriving any rights or interests therefrom, and COMPANY shall have the right to copyright the Masters recorded during the Term embodying performances of ARTIST in COMPANY's name as owner and author (as employer for hire, such relationship being solely for the purpose of applicable copyright law) and to secure any and all renewals of such copyright. The method, manner and extent of release, packaging, promotion, advertising, distribution and sales relating to reproductions of Master Recordings involved herein shall be within the sole discretion of COMPANY unless otherwise herein specifically provided. COMPANY's rights in the Masters recorded during the Term embodying performances of ARTIST shall specifically but without limitation include the following subject to any express restrictions set forth in this paragraph 5, or paragraphs 7 and/or 19 below:

(a) The sole and exclusive right of ownership of all performances hereunder, and of all Masters embodying such performances, including the sole and exclusive right in all matrices and other derivatives of the Masters, irrespective of the method of such embodiment, whether electronic, magnetic, mechanical, or other now or hereafter known;

(b) The sole and exclusive right to reproduce the Masters and the performances embodied thereon and to manufacture therefrom all forms of derivatives and derivative works including Phonograph Records in any speed, size, or format whatsoever, coupling the Masters at COMPANY's option with other Masters not the subject hereof;

(c) The sole and exclusive right to distribute reproductions of the Masters and the performances embodied thereon by sale or other transfer, rental, lease, or lending, and under any name, trademark or label which COMPANY and/or its subsidiaries, affiliates and licensees may from time to time elect; provided that during the Term and in the United States, the initial release of all Masters hereunder shall be on COMPANY's top "pop" label;

(d) The sole and exclusive right to perform publicly the Masters and the reproductions thereof and to permit the public performance thereof by means of radio or television broadcast, or any other method now or hereafter known;

212:12.18.79
PARC



-9-

(e)  The sole and exclusive right, in the case of individual images of any Audio-Visual Recording subject hereto, to display the work publicly;

(f)  The sole and exclusive right to edit the Masters to conform to the technological or commercial requirements of Phonograph Records in various formats, or of other reproductions of the Masters, or to eliminate material which might subject COMPANY to any civil or criminal action if reproduced and/or distributed;

(g)  The sole and exclusive right to use and to permit others to use the performances hereunder in time synchronization with visual images, providing, however, that such visual images shall not consist of visual images of musical performing artists other than ARTIST, and provided that the exploitation of visual images of ARTIST in combination with sound recordings shall be subject to the provisions of paragraph 6 below;

(h)  The sole and exclusive right to use the names, photographs and biographical material of ARTIST, PRODUCER, and the individual producer of the Masters in connection with the promotion, exploitation and sale of derivatives of the Masters subject hereto;

(i)  The sole and exclusive right to convey the rights set forth in the preceding subparagraphs in whole or in part to third parties, whether by license or assignment.

6.   (a)  (i)   COMPANY shall not have the right to request PRODUCER to deliver ARTIST's performances in the form of Audio-Visual Recordings, nor to require ARTIST to perform therefor without PRODUCER's consent, nor shall COMPANY be required to accept ARTIST's performances in the form of Audio-Visual Recordings.

(ii)  Notwithstanding anything to the contrary expressed or implied above, ARTIST shall not during the Term perform for the purpose of making Audio-visual Recordings for any other COMPANY.

(b)  PRODUCER agrees that ARTIST shall be available from time to time at COMPANY's request and expense, whenever the same will not unreasonably interfere with other professional activities of ARTIST, to perform for the purpose of recording by means of film, video tape, or other

212:12.18.79
PARC



audio-visual medium performances by ARTIST of Compositions embodied on Masters hereunder to be used for promotional purposes, provided that nothing herein shall be construed as granting rights in Audio-Visual Recordings for release on Audio-Visual Devices to the extent such rights are not granted elsewhere herein.   ARTIST's compensation therefor shall be limited to any minimum amounts required to be paid for such performances pursuant to any collective bargaining agreements pertaining thereto except that in the event that COMPANY shall receive any income from its use of such promotional film it shall share such income with PRODUCER in accordance with the provisions of paragraph 7(s) below.

7.   COMPANY shall credit to the account of PRODUCER and shall pay to PRODUCER in accordance with the provisions of paragraph 8 below the following royalties for the sale of Phonograph Records derived from the Masters against which all advances paid to or on behalf of PRODUCER, including without limitation, the sums referred to in paragraph 9 shall be chargeable and COMPANY shall recoup such sums from the following royalties:

(a)   (i)   A royalty of ten (10%) per cent of ninety (90%) per cent of the Retail List Price for all Singles hereunder, sold by COMPANY for distribution in the United States.

(ii)   A royalty of eleven (11%) per cent of one hundred (100%) per cent of the Retail List Price for all Albums hereunder, sold by COMPANY for distribution in the United States.

(iii)   In the event that full royalty bearing net sales in the United States of the initial disc release of any LP subject to the royalty provisions of (ii) above shall exceed three hundred and fifty (350,000) thousand units, then for such sales of such LP disc Album in the United States in excess of three hundred and fifty thousand (350,000) units and for such sales of the equivalent pre-recorded tape Album in excess of one hundred fifty thousand (150,000) units, the applicable royalty rate in (ii) above shall be increased by one (1%) per cent of one hundred (100%) per cent of the Retail List Price.

(iv)   A royalty of seven (7%) per cent of one hundred (100%) per cent of the Retail List Price for all Singles and Albums derived from the Masters hereunder sold for distribution outside the United States by COMPANY or other Persons, corporations or firms under leasing or licensing arrangements or agreements with COMPANY.

212:12.18.79
PARC

-11-

(v)   The rate set forth in (i) above shall sometimes hereinafter be referred to as the "Base Rate for Singles"; the rate set forth in (ii) above shall sometimes hereinafter be referred to as the "Base Rate for LPs"; and collectively the said rates shall hereinafter sometimes be referred to as the "Base Rates for Domestic Sales".  The rate set forth in (iv) above shall hereinafter sometimes be referred to as the "Base Rate for Overseas Sales".  The foregoing provisions of paragraph 7 shall be subject to any modifications expressed or implied in the following provisions of paragraph 7.

(b)   In the event that COMPANY releases a Disco-Disc the suggested Retail List Price of which is less than five ($5) dollars, such higher-priced Disco-Disc shall be deemed a Budget Record and the royalty provisions therefor shall apply, but in any event any release restrictions herein contained related to Budget Records shall not apply to such Disco-Disc.

(c)   (i)   As to Records derived from the Masters hereunder sold in the United States or Canada through non-affiliated third party record clubs or similar sales plans or devices operated by non-affiliated third parties, PRODUCER shall receive a sum equal to fifty (50%) per cent of COMPANY's net receipts therefrom.

(ii)   As to Records derived from the Masters hereunder sold in the United States or Canada through COMPANY's affiliated record clubs or similar sales plans or devices operated by parties affiliated to COMPANY, PRODUCER shall receive a royalty equal to five (5%) per cent of eighty-five (85%) per cent of the suggested Retail List Price of such Records.

(iii)   As to Records derived from the Masters hereunder sold for distribution outside of the United States or Canada through record clubs or similar sales plans or devices, PRODUCER shall receive a sum equal to one-half (1/2) of the applicable Base Rate for Overseas Sales.

(iv)   No royalty shall be payable with respect to Records hereunder distributed to members of record clubs as "bonus" or "free" records as a result of joining the club, and/or recommending that another join the club and/or purchasing a required number of Records, provided that COMPANY shall pay royalties to PRODUCER on all Records hereunder for which it receives payment.

212  12.18.79
PARC

 

-12-

(d)  As to Records not consisting entirely of Masters hereunder, PRODUCER's royalties otherwise payable hereunder shall be pro-rated on the basis of the number of Sides hereunder which are on such Records compared to the total number of Sides on such Records.

(e)  Royalties on Phonograph Records hereunder included in Albums, jackets, boxes or any other type of package or container (herein collectively referred to as "containers") shall be based solely upon the Retail List Price of such Phonograph Records in containers less all taxes and duties and also a container charge of ten (10%) per cent of the Retail List Price for a Single, Extended Play, or Disco-Disc packaged in a non-standard sleeve, or for a single-fold disc Album, fifteen (15%) per cent of the Retail List Price for a double-fold disc Album whether containing one or more LPs, or an LP packaged in a non-standard sleeve, or for a disc Album which contains an insert, and twenty (20%) per cent of the Retail List Price for a pre-recorded tape Album.

(f)  (i)  Expressly, but without limitation of its rights elsewhere herein granted, COMPANY shall have the right to license the Masters hereunder to non-affiliated third parties for all methods of distribution, including, without limitation, the method known as "key outlet marketing" or distribution through retail fulfillment centers in conjunction with special advertisements on radio or television, direct mail, or mail order, or for "premium" use, or by any combination of the methods set forth above, and for sale on Budget Record lines.  Unless otherwise provided for, COMPANY shall credit PRODUCER's royalty account with fifty (50%) per cent of COMPANY's net royalty receipts in respect of each such license pertaining to the Masters hereunder.

(ii)  As to long-playing Records (other than Promotional Records hereinafter provided for) sold as Budget Records, and for the sale of Records which include Masters hereunder which are sold through the method known as "key outlet marketing" (or distribution through retail fulfill-ment centers in conjunction with special advertisements on radio or television, direct mail, or mail order), or for "premium" use, or by any combination of the methods set forth above, by COMPANY and/or affiliated licensees and/or outside the United States and Canada, the rate shall be one-half (1/2) the otherwise applicable royalty rates; in the case of "premiums" the Retail List Price for such Records shall be deemed to be COMPANY's or its licensee's actual sales price.

212:12.18.79
PARC



-13-

(iii)  COMPANY shall be entitled to use and publish and to license or permit others to use and publish, ARTIST's Identification with respect to the products and services in connection with "premium" Records provided that such use is not an endorsement of the product or service.  In any case where more than one (1) Side hereunder is embodied on a "premium" Record sold in the United States or Canada, COMPANY agrees that the prior consent of PRODUCER shall be required for "premium" usage in such case, which consent shall not be unreasonably withheld.

(iv)  Notwithstanding anything to the contrary expressed or implied elsewhere herein, COMPANY agrees that during the Term and in the United States it shall not release any particular Master on a Budget Record within one (1) year of the initial release of such Master, subject to the provisions of (h) below.

(g)  The royalty rate for the sale of pre-recorded tapes shall be one hundred (100%) per cent of the otherwise applicable royalty rate.

(h)  (i)  For record club purposes, COMPANY shall have the right to include or to license others to include any one or more of the Masters hereunder in Promotional Records on which such Masters and other recordings are included, which Promotional Records are designed for sale at twenty-five (25%) per cent or less of the regular price of COMPANY's full price Records embodying the same number of discs, or the equivalent thereof, and such Promotional Records shall be royalty-free, provided that not more than two (2) Sides hereunder shall be included on any one such Record, and provided further that no other artist of COMPANY receives royalties from COMPANY on such Record.

(ii)  With respect to Promotional Records as provided for above, but other than for record clubs, COMPANY shall have the same rights as above except that in such case not more than one (1) Side may be included on any one such Promotional Record.

(i)  COMPANY shall have the right to license the Masters hereunder for non-Phonograph Record use on a flat-fee basis.  COMPANY shall credit PRODUCER's royalty account with fifty (50%) per cent of the net amount received by COMPANY under each such license.

(j)  No royalty shall be payable for Records returned for credit by any buyer, for Records given away gratis or sold for fifty (50%) per cent of less of the "gross price",

212:12.18.79
PARC



-14-

as hereinafter defined, for Records distributed to disc jockeys, radio stations, television stations, motion picture companies, publishers, distributors, dealers, consumers, or any others for publicity, advertising, or promotional purposes, for Records sold as cutouts, or for Records sold as scrap.  Furthermore:

(i)  To the extent that Records hereunder are sold subject to a sales plan entailing a selling price for such Records reduced by a percentage discount from COMPANY's Gross Price (an example of which, for illustrative purposes only, is set forth in subparagraph (1) below), the number of such Records deemed for royalty purposes to have been sold shall be determined by reducing the number of Records actually sold by the percentage of discount granted applicable to such sale, and

(ii)  To the extent that free or bonus Records are given away together with Records sold for monetary consideration (being the form of sales plan known in the record industry as the giving of "free goods"), such free or bonus Records shall not be included in the number of Records deemed for royalty purposes to have been sold, provided however that:

(iii)  The aggregate number of Records deemed not sold for royalty purposes under clause (i) above and deemed not sold for royalty purposes under clause (ii) above shall not, except for the requirements for special sales plans, exceed COMPANY's standard policy in this regard which is at present, for singles, 23.08% per cent of the gross total sold and, for LPs, 15% of the gross total sold.

(k)  (i)  Notwithstanding the foregoing, at COMPANY's election it may report as records sold the number of Records deemed pursuant to (j)(i) and (j)(ii) above not sold for royalty purposes, and instead reduce the per Record royalty payable hereunder proportionately as the number of such Records deemed not sold for royalty purposes bears to the gross total invoiced, paid for and not returned.  For the purposes of this agreement in any case where any event is predicated upon the achievement of a particular sales volume level, the terms "net sales" and/or "net royalty-bearing sales" shall be the sales determined by the operation of the above clauses (j)(i) and (j)(ii).

(ii)  Whether or not in accordance with a published sales plan, in any case in which Records are sold by COMPANY or its distributor for less than the Gross Price, but for more than fifty (50%) per cent thereof, the rate of royalty payable hereunder shall be reduced in the same proportion as the reduction from the Gross Price.

-15-

(1) COMPANY's "Gross Price" shall mean for the purposes of this agreement the gross selling price of COMPANY or its distributor (in particular, but without limitation, in the United States, POLYGRAM DISTRIBUTION, INC., or its successors) before any discount or merchandise or other sales plan, any free or bonus Records, or any other discount is given. For purposes of illustration only, the following are, at the time of execution hereof, the suggested Retail List Price, Gross Price, and the selling price (after deduction of the discount in accordance with COMPANY's current policy) for Singles with a suggested Retail List Price of $1.29 and single disc Albums and pre-recorded tapes with a suggested Retail List Price of $7.98, sold to rack jobbers by POLYGRAM DISTRIBUTION, INC., COMPANY's present distributor:

|  | Sugg. Retail List Price | Gross Price | Sales Plan Discount | Selling Price |
|---|---|---|---|---|
| Singles | $1.29 | $0.90 | $0.23/23.08% | $0.67 |
| LP/Tape | $7.98 | $4.68 | $0.70/15.00% | $3.98 |

(m) Without limitation of the generality of subparagraph (j) above, COMPANY shall have the right to deduct from the number of Records sold returns and credits of any nature, including without limitation: (i) those on account of any return or exchange privilege; (ii) defective merchandise; and (iii) errors in billing or shipment, provided that returns shall be pro-rated between royalty-bearing and non-royalty-bearing Records on the assumption that such Records were shipped pursuant to COMPANY's standard basic sales plan as described in (j)(iii) above. COMPANY shall have the right to withhold a reasonable portion of PRODUCER's royalties as a reserve against returns; any such reserve withheld shall not exceed, for Singles, fifty (50%) per cent of the sales of Singles in the period to which it relates, and, for LPs, thirty-five (35%) per cent of the sales of LPs in the period to which it relates, and, further, shall be liquidated within eighteen (18) months of the date first withheld.

(n) Royalties for Phonograph Records sold for distribution outside the United States shall be computed in the same national currency as COMPANY is accounted to by its licensees and as to sales made outside of the United States, shall be paid at the same rate of exchange as COMPANY is paid, and shall be subject to any taxes applicable to royalties remitted by or received from foreign sources,

212;12.18.79
PARC

 
-16-

provided, however, that royalties on Phonograph Records sold
outside the United States shall not be due and payable by
COMPANY until payment therefor has been received by COMPANY
in the United States in United States Dollars, and provided,
further, that if COMPANY shall not receive payment in the
United States, or in United States Dollars, and shall be
required to accept payment in foreign currency or in a
foreign country, COMPANY shall deposit to the credit of
PRODUCER (and at the expense of PRODUCER) in such currency
in a depository in the country in which COMPANY is required
to accept payment but selected by PRODUCER payments so
received applicable to royalties hereunder and shall notify
PRODUCER promptly thereof.  Deposit as aforesaid shall
fulfill the obligations of COMPANY as to Phonograph Record
sales to which such royalty payments are applicable.  In
countries where COMPANY's foreign licensees in general do
not account for returns, an allowance of fifteen (15%) per
cent of gross shipments may be granted or deducted by
COMPANY.

(o)  The royalty rate for Records sold outside the
United States for sale in Armed Forces Post Exchanges shall
be fifty (50%) per cent of the otherwise applicable royalty
rates.

(p)  Notwithstanding anything to the contrary contained
herein, the royalty rate for Audio-Visual Recordings shall
be negotiated between the parties in good faith.  Such
negotiations shall take into account, among other things,
prevailing conditions at the time thereof as well as
PRODUCER's royalty rate for sound recordings, and ARTIST's
current stature as a recording artist.

(q)  The royalties provided herein shall include all
sums due to ARTIST, the individual producer and any other
parties PRODUCER has express or implied contractual respon-
sibility to make payment to in respect of sales of Records
subject hereto, subject to the provisions of paragraph 12
below.

(r)  In the event that any recordings made hereunder
are participated in by any other artist(s) who should
then be under contract to COMPANY, then the royalties
and non-returnable payments due hereunder for such joint
performances shall be the royalties and non-returnable
payments herein provided for divided by the number of
artists participating therein including ARTIST.

(s)  In the event that COMPANY receives income from any
commercial usage of the Masters hereunder not specifically

212:12.18.79
PARC



-17-

provided for in the foregoing, and in the further event that COMPANY's receipts are not already net of a payment made directly to ARTIST, then COMPANY agrees to pay to PRODUCER fifty (50%) per cent of the net amount received of such income, provided always that such income is accounted to COMPANY on an artist-by-artist or Master-by-Master basis.

(t)   In the foregoing provisions of paragraph 7 the terms "net royalty receipts" and "net amount received" shall mean the gross amounts received by COMPANY in connection with the subject matter therewith less any amounts which COMPANY is obligated to pay to third parties (such as, without limitation, manufacturing costs, mechanical copy-right payments, AFofM and other union payments).

(u)   For the purposes of this paragraph 7, COMPANY shall be deemed to have been paid when and if COMPANY's account has been credited in respect of such payment.

8.   (a)   Accountings as to royalties payable hereunder shall be made by COMPANY to PRODUCER on or before the 30th day of September for the period ending the preceding June 30th, and on or before the 31st day of March for the period ending the preceding December 31st, or such other accounting periods as COMPANY may in general adopt, but in no case less frequently than semi-annually, together with payment of accrued royalties, if any, earned by PRODUCER during such preceding half-year, subject to (b) and (e) below.   All royalty statements and all other accounts rendered by COMPANY to PRODUCER shall be binding upon PRODUCER and not subject to any objection by PRODUCER for any reason unless specific objection in writing, stating the basis thereof, is given to COMPANY within two (2) years from the date rendered, and after such notice of objection, unless suit is instituted within one (1) year after the date on which COMPANY notifies PRODUCER that it denies the valid-ity of the objection.   Failure to make specific objection within said time period shall be deemed approval of such statement.

(b)   Notwithstanding anything to the contrary contained above, in the event that PRODUCER's net royalty earnings at the end of a given accounting period are less than twenty-five ($25) dollars, COMPANY may, at its option, carry forward such earnings to the next such accounting period.

(c)   PRODUCER shall have the right at PRODUCER's own expense to audit COMPANY's books and records as the same pertain to sales under this agreement and make extracts and



-18-

copies thereof once a year with respect to the statements
relating to the recordings hereunder pertaining to the
four (4) prior accounting periods prior to such audit, and
COMPANY agrees to make all necessary sales information, data
and documents available for such purposes at COMPANY's
accounting offices at its address first mentioned herein.
Such audit shall be conducted by a Certified Public
Accountant during normal business hours and on reasonable
written notice.

(d)   Any statements hereunder shall be deemed to have
been rendered on the date due absent written notice from
PRODUCER to COMPANY to the contrary given within one hundred
eighty (180) days after the date on which such statement was
due in accordance with the foregoing.

(e)   PRODUCER hereby irrevocably instructs and directs
COMPANY to pay to GEORGE SCHECK fifteen (15%) per cent of
all royalties earned by PRODUCER in accordance herewith.
PRODUCER shall have the right in respect of any Masters
recorded hereunder to give similar irrevocable instruc-
tion and direction in writing to pay to any individual
producer(s) of such Masters a proportion of the royalties
earned by PRODUCER in accordance herewith in relation to
such Masters.

9.   (a)  For the rights herein granted to ..MPANY and for
the services to be rendered by PRODUCER,    , provided that
PRODUCER performs its obligations hereun .., COMPANY agrees
that it shall pay on behalf of PRODUCER ... Recording Costs
(as defined in paragraph 1 above) subje.t in particular but
without limitation to the provisions of paragraph 10 below.
All such Recording Costs paid by COMPANY shall constitute
advances to be charged against and recoupable from all
royalties payable to PRODUCER if and when earned.

(b)   All monies paid to PRODUCER or on PRODUCER's
behalf during the Term of this agreement at PRODUCER's
request, other than royalties paid pursuant to paragraph 7
hereof, shall be deemed advances against and recoupable from
royalties payable hereunder, unless COMPANY shall have
expressly agreed in writing by an authorized officer of
COMPANY that such monies shall not be deemed advances.

10.  (a)  PRODUCER agrees that all Masters recorded here-
under shall be recorded under COMPANY's own AFofM recording
license, and PRODUCER shall only record such Masters within
the framework of a recording budget approved by COMPANY.
No recording session shall be produced, nor shall any
musicians, vocalists, arrangers, or others be engaged unless

212:12.18.79
PARC



-19-

and until a written proposed recording budget for each such session shall have been submitted by PRODUCER and approved in writing by one of COMPANY's officers.  In the event Recording Costs of such approved session shall exceed the approved budget, PRODUCER shall be responsible for such costs.  COMPANY may, at its option, pay such excess and deduct the same from any and all sums due or to become due to PRODUCER hereunder, including without limitation, advances and/or approved budgets for future recordings.

(b)  PRODUCER shall employ an individual producer to producer the Masters hereunder, and COMPANY and PRODUCER shall mutually agree as to who such individual producer shall be in respect of each recording project to be undertaken hereunder prior to commencement of recording.  In the event that COMPANY and PRODUCER cannot agree as to such individual producer in respect of any recording project, COMPANY's decision as to such individual producer shall be binding on both PRODUCER and ARTIST, provided that in such event COMPANY shall be responsible for any royalty in excess of four (4%) per cent to such individual producer which PRODUCER would otherwise be obligated to pay.

11.  PRODUCER shall follow the procedures set forth below in connection with Master Recordings made hereunder.  No Master recorded hereunder shall be deemed delivered unless and until PRODUCER has completed its obligations hereunder in relation to such recording.

(a)  Except as expressly noted otherwise in this agreement, and prior to the commencement of recording, in each instance PRODUCER shall obtain the approval of COMPANY, which approval shall not unreasonably be withheld, of each of the following in order, before proceeding further:

(i)  Selection of the individual producer of the Masters.

(ii)  Selection of material to be recorded (including the number of Compositions to be recorded and the copyright royalty rate at which each such Composition will be licensed to COMPANY).  COMPANY shall not be deemed to be unreasonable in rejecting any request to record an LP consisting of more than one (1) twelve-inch, 33-1/3 rpm Record.

(iii)  Specification of accompaniment, arrangement and copying services.

212-12.18.79
PARC

 

-20-

(iv)  Selection of dates of recording and studios where recording is to take place, including the cost of recording therein.  COMPANY shall not be deemed to be unreasonable in rejecting any request to begin recording any Master which is a part of the minimum recording commitment hereunder within three (3) months after the acceptance of a prior LP hereunder.

(v)  Fill out and submit to COMPANY a proposed budget on COMPANY's then current Recording Authorization budget form (this shall be done sufficiently before the planned commencement of recording so as to give COMPANY a reasonable period of time to review same in order to approve or disapprove at least fourteen (14) days before the planned commencement of recording).

(b)  PRODUCER shall notify the appropriate local of the American Federation of Musicians in advance of each recording session.  At the time of call of musicians engaged hereunder, such musicians shall be advised by PRODUCER, or by any agent engaged by PRODUCER (such as, without limitation, an individual producer, leader or contractor) that COMPANY is the employer, and all "Form B" contracts for sessions hereunder shall indicate COMPANY as employer.

(c)  As and when required by COMPANY, PRODUCER shall allow COMPANY representatives to attend any or all recording sessions hereunder.

(d)  PRODUCER shall timely supply COMPANY with all of the information it needs in order:  (i) to make payments in connection with such recordings; and  (ii) to comply with any other obligations COMPANY may have to prepare to release Phonograph Records derived from such Masters. Without limiting the generality of clause (ii) of the preceding sentence, PRODUCER shall furnish COMPANY with all information it requires to comply with its obligations under its union agreements, including without limitation, the following:

(i)  If a session is held to record new tracks intended to be mixed with existing tracks (and if such information is requested by the American Federation of Musicians) the dates and place of the prior sessions at which such existing tracks were made, and the AFofM Phonograph Recording Contract ("Form B") number(s) covering such sessions.

212.12.18.79
PAAC

 

-21-

(ii) Each change of title of any composition listed in an AFofM Phonograph Recording Contract ("Form B").

(iii) A listing of all the musical selections contained in recordings made at location sessions and delivered to COMPANY hereunder.

(e) Nothing in this agreement shall obligate COMPANY to continue or permit the continuation of any recording session or project even if previously approved hereunder if COMPANY reasonably anticipates that the Recording Costs will exceed those specified in the approved budget or that the recordings being produced will not be satisfactory.

(f) PRODUCER shall, subject to the provisions of paragraph 3(f) above, deliver to COMPANY a two-track stereo master tape for each Master recorded hereunder, which tapes shall be fully edited, mixed and leadered prior to delivery to COMPANY so that they are in proper form for the pro- duction of the parts necessary for the manufacture of Phonograph Records. PRODUCER shall edit, sequence, and leader multi-track master tapes for the Masters, in parallel sequence to any two-track master tapes delivered hereunder, and shall further deliver same to COMPANY. Each and every matrix, acetate copy or other derivative shall also be delivered to COMPANY or kept available for COMPANY and subject to COMPANY's control at the recording studio, and this shall constitute PRODUCER's irrevocable authori- zation for COMPANY to request that such studio or other third party release to COMPANY such tapes and derivatives, and such studio or other third party is hereby requested to release to COMPANY all such tapes and derivatives.

(g) PRODUCER shall furnish COMPANY, in writing, with the label copy (including song titles, and any subtitles), names of composers, any show or movie credits, complete publisher line, affiliate (BMI, ASCAP, etc.), timings, any arranger credits, any accompaniment credits, names of engineers, list of musicians with instruments played, exact recording date(s), and studio location(s) and producer and/or production company credits.

(h) PRODUCER shall also furnish to COMPANY, in writing, the liner credits for each Album recorded here- under.

212:12.18.79
PARC

 

-22-

(i) PRODUCER shall obtain and furnish to COMPANY, in writing, all consents and clearances required by COMPANY (including without limitation, consents to use the names of all individuals appearing in liner credits) in relation to the use by COMPANY of any of the elements which are within the scope of PRODUCER's functions hereunder, provided that nothing herein shall be construed as obligating PRODUCER to secure mechanical licenses on behalf of COMPANY in respect of compositions subject to the compulsory licensing provisions of the Copyright Act.

(j) Without limitation of the generality of the provisions of this agreement related to PRODUCER's obligations in connection with the production of recordings delivered hereunder it is agreed, in particular but without limitation, that no recordings hereunder shall be deemed delivered unless and until PRODUCER shall have secured on behalf of COMPANY from the copyright proprietors of all compositions first recorded, or recorded in a form which would subject COMPANY to a claim for infringement, and embodied on recordings to be delivered to COMPANY hereunder, such copyright proprietor's consent to such recording and its irrevocable permission to COMPANY to manufacture copies of such recording. Without limitation of the generality of the foregoing or of COMPANY's rights, in the event that any copyright proprietor shall by notice to COMPANY revoke any such consent and permission not given to COMPANY in writing, or shall claim that no such consent or permission was given in respect of the recordings delivered to COMPANY, then the recording(s) in respect of which such notice or claim is received shall be deemed not delivered hereunder, provided that the provisions of paragraphs 14(g) and 14(i) shall nevertheless apply as fully and completely as if the recording(s) had been deemed delivered.

(k) Satisfactory completion by PRODUCER of the procedures in the foregoing shall be a necessary but not necessarily a sufficient condition in determining whether any recording hereunder has been delivered within the meaning of this agreement. In the event that this agreement provides for any payment to be made upon delivery of recordings, COMPANY's election to make such payment shall not be deemed to be its acknowledgement that such delivery has properly been made, and COMPANY shall not be deemed to have waived its right to require such complete and proper performance thereafter, nor its remedies for PRODUCER's failure to perform in accordance herewith.

212.12.18.79
PARC



-23-

12. (a) COMPANY shall be responsible for all payments to the Music Performance Trust Fund and the Special Payments Fund of the AFofM, and any payments to similar union funds under agreements providing for COMPANY to make payments with respect to records sold. To assist COMPANY in making such payments, ARTIST shall indicate in conjunction with ARTIST's execution of the guarantee of performance referred to in paragraph 14(f) hereof, ARTIST's social security number and applicable union affiliation.

(b) Subject to (c), (d) and (e) below and the provisions of paragraph 14(g) hereof, COMPANY shall be responsible for mechanical royalties payable in connection with Records sold hereunder.

(c) The following provisions shall pertain to Controlled Compositions:

(i) Controlled Compositions shall be licensed to COMPANY at a copyright royalty rate of two and three-quarters (2-3/4") cents per Controlled Composition on the basis of net sales of Records, subject to the provisions of (ii) and (iii) below.

(ii) With respect to Records sold and/or distributed through any record club, by the methods of mail order or "key outlet marketing", or at a budget price, the royalty rate shall be three-quarters (3/4) of the mutually agreeable rate set forth in (i) above.

(iii) No copyright royalties with respect to Controlled Compositions shall be payable on Records not royalty-bearing pursuant to the provisions of the prevailing terms of Harry Fox Agency Licenses; nor with respect to Compositions which go into the public domain in a particular territory with respect to such territory, on and after the date on which such material goes into the public domain; nor for non-musical material.

(iv) Arranged versions of compositions in the public domain, when furnished by any one or more of the persons described in the definition of a Controlled Composition above, shall be free of copyright royalties, provided, however, that in the event that any such arranged version has a new title and entirely different lyrics or a substantial addition of melodic material, then, notwithstanding anything to the contrary contained herein, such arranged version shall be licensed to Company at a copyright royalty rate to be calculated by taking the rate applicable for original Controlled Compositions above and multiplying such

212:12.18.79
PARC

-24-

rate by the percentage used by the applicable Performing Rights Society in determining the credits to be given by the publisher of such arranged version for public performances of such work; provided, however, that PRODUCER shall furnish to COMPANY a copy of the letter of the Performing Rights Society setting forth the percentage of the otherwise applicable credit which the publisher will receive for such public performances.  In the event that PRODUCER fails to provide COMPANY with such letter from the Performing Rights Society, COMPANY shall not be obligated to pay any copyright royalty with respect to any such arranged version.

(v)  Any assignment made of the ownership or copyright in any Controlled Composition or in any above described arranged version of a composition in the public domain shall be made subject to the provisions of this sub-paragraph (c).

(d)  (i)  Notwithstanding anything to the contrary elsewhere herein, PRODUCER warrants, represents, and agrees that COMPANY shall have no obligation whatsoever to pay an aggregate copyright royalty rate in respect of any Record hereunder, regardless of the number of Controlled Compositions and/or other compositions contained thereon, in excess of the following sums:

(A)  In respect of an LP:  ten (10) times minimum Statutory Rate, except as set forth in (ii) below.

(B)  In respect of any multi-Record Album: ten (10) times minimum Statutory Rate multiplied by the relationship between the Retail List Price of the multi-LP Album and the current Retail List Price of COMPANY's top "pop" single disc LPs.

(C)  In respect of a Single:  five and one-half (5-1/2") cents.

(ii)  Without limitation of the generality of clause (i) above, if the aggregate copyright royalty rate in respect of any recording hereunder is more than the applicable amounts set forth in (i)(A), (B) and (C) above, then, without limitation of COMPANY's rights, COMPANY shall have the right, at its election, if it elects to release such recording:

(A)  To release such Record and reduce the aggregate copyright royalty payable with respect to Controlled Compositions on such Record so that the aggregate copyright royalty payable with respect to all compositions on such Record does not exceed the applicable maximum amount, and/or

2124
PARC 12.18.79




-25-

(B). To release such Record and deduct from royalties and/or other payments due to PRODUCER hereunder that amount of the aggregate copyright royalty payable by COMPANY with respect to such Record in excess of the applicable maximum amount.

(e) The provisions of this paragraph 12 shall constitute and are accepted by PRODUCER, on PRODUCER's own behalf and on behalf of any other owner of any Controlled Composition(s) or any rights therein, as full compliance by COMPANY with all of its obligations under the compulsory license provisions of the Copyright Law, as the same may be amended, or otherwise, arising from any use by COMPANY of Controlled Compositions as provided for herein.

13. (a) PRODUCER agrees that ARTIST shall be available from time to time at COMPANY's request and expense, whenever the same will not unreasonably interfere with other professional activities of ARTIST, to appear for photography, poster, and cover art, etc., under the direction of COMPANY and its nominees to appear for interviews with representatives of the communications media and COMPANY's publicity personnel and to perform other reasonable services.

(b) PRODUCER does hereby agree that PRODUCER shall not directly or indirectly, place or authorize or direct anyone else to place any advertisement in any newspaper, trade journal, magazine, or in any other advertising medium, covering or relating to any Phonograph Records or prerecorded tapes embodying Masters hereunder, unless PRODUCER first obtains COMPANY's written consent thereto, which shall not unreasonably be withheld.

14. PRODUCER warrants and represents the following:

(a) To the best of PRODUCER's knowledge, there are now in existence no prior recorded performances by ARTIST unreleased within the United States, except as set forth on Schedule "A".

(b) To the best of PRODUCER's knowledge, there are no restrictions with respect to Compositions ARTIST is legally able to perform for COMPANY hereunder, except as set forth on Schedule "A".

(c) (i) No contract or agreement of any kind entered into by PRODUCER or ARTIST prior to the time of execution hereof will interfere in any manner with complete performance of the within agreement by PRODUCER or ARTIST.

212:12.18.79
FARC

 

-26-

Neither PRODUCER nor ARTIST is under any disability, restriction or prohibition with respect to each individual's right to sign and perform under this agreement.

(ii) PRODUCER has no knowledge of any claim or purported claim which, if valid, would interfere with COMPANY's rights hereunder or create any liability on the part of COMPANY.

(d) PRODUCER has the right to use ARTIST's real names, CONNIE FRANCIS, and professional names, CONNIE FRANCIS, and any other professional names used by ARTIST and grants to COMPANY for the Territory the exclusive right to use and allow others to use said name and any other names used by ARTIST, and photographs and likenesses of ARTIST for Phonograph Record and audio-visual purposes during the Term and the exclusive right to such use thereafter in connection with recordings subject hereto; COMPANY's use of such names in accordance with the terms hereof will not infringe upon the rights of any third party.

(e) The Masters hereunder and the performances embodied thereon shall be produced in accordance with the rules and regulations of the American Federation of Musicians and the American Federation of Television and Radio Artists and in accordance with the rules and regulations of said Federation and of all other unions having jurisdiction. ARTIST is or will become and will remain to the extent necessary to enable to performance of this agreement, a member in good standing of all labor unions or guilds, membership in which may be lawfully required for the performance of ARTIST's services hereunder.

(f) There is in existence between PRODUCER and ARTIST a valid and enforceable agreement under the terms of which ARTIST is required to perform exclusively for PRODUCER as a recording artist during the Term of this agreement as extended. During the Term of this agreement, PRODUCER will waive none of its rights thereunder and shall take all steps necessary or desirable to keep the same in full force and effect so that COMPANY shall have the full benefit of ARTIST's exclusive services as a recording ARTIST during the term hereof as if ARTIST has contracted directly with COMPANY. Said agreement shall provide that ARTIST shall be absolutely restricted from recording the Compositions embodied on the masters subject hereto during the period referred to in paragraph 4(b). Simultaneously with the execution of this agreement, PRODUCER shall deliver to COMPANY an agreement between COMPANY and ARTIST in the form annexed hereto as Exhibit "A"; PRODUCER hereby gives its consent and approval to the content thereof; and said Exhibit "A" is hereby made part hereof.

212:12.18.79
PARC

 

-27-

(g)  That neither the Masters hereunder nor the performances embodied thereon, nor any other materials supplied by PRODUCER to COMPANY in connection therewith, nor any use thereof by COMPANY or its grantees, licensees, or assigns will violate or infringe upon the rights of any third party.

(h)  PRODUCER shall be solely responsible for and shall pay all sums due to ARTIST whose performances are embodied upon the Masters hereunder and the individual producer of the Masters, and the sums set forth in paragraph 7 hereof include all the monies due to ARTIST and the individual producer.

(i)  PRODUCER agrees to and does hereby indemnify, save and hold harmless COMPANY of and from any and all loss and damage (including reasonable attorneys' fees) arising out of or connected with any claim by any one or more third parties which is inconsistent with any of the warranties or representations made by PRODUCER herein, and agrees to reimburse COMPANY on demand for any payment made by it at any time after the date hereof with respect to any liability or claim to which the foregoing indemnity applies, which is reduced to judgement or settled with PRODUCER's consent. Pending the determination of any claim involving such alleged breach or failure, COMPANY may withhold sums due PRODUCER hereunder in an amount consistent with such claim. COMPANY shall give PRODUCER notice of any claim, and PRODUCER shall have the right to participate in the defense of any claim with counsel of PRODUCER's own choice and at PRODUCER's own expense.  COMPANY shall not settle any such claim without PRODUCER's prior written consent, which consent shall not be unreasonably withheld.

15.  (a)  COMPANY reserves the right by written notice to PRODUCER to suspend the operation of the Term for the duration of the following contingencies, if by reason of such contingencies it is materially hampered in its recording, manufacture, distribution or sale of Records, or its normal business operations become commercially impracticable: labor disagreements; fire; catastrophe; shortage of materials; or any cause beyond COMPANY's control.  A number of days equal to the total of all such days of suspension shall be added to the period of the Term in which such contingency occurs and the dates for the exercise by COMPANY of its options as set forth in paragraph 2 and the date of commencement of subsequent periods of the Term shall be deemed extended accordingly.  It is agreed that such suspension shall not exceed three (3) months in any Option Period unless such contingency is industry-wide, in which event COMPANY shall have the right to suspend the applicable Option Period for the duration of such contingency.

212:12.18.79
PARC

 

-28-

(b) (i) In the event that PRODUCER, for any reasonable cause of which PRODUCER has given written notice to COMPANY (other than COMPANY's refusal to allow PRODUCER to perform), is unable to fulfill PRODUCER's recording obligations hereunder, in particular but without limitation in the case of any LP hereunder subsequent to the first, to deliver such LP on or before the date one (1) year after delivery to COMPANY of the immediately preceding LP, then, provided that such notice of PRODUCER is given not later than sixty (60) days prior to the last date when pursuant to paragraph 3(f) above such recording obligation should have been completed COMPANY shall give notice to PRODUCER within thirty (30) days of receipt of PRODUCER's notice, of its election either: (A) if the said recording obligations are not fulfilled within sixty (60) days of COMPANY's notice, to reduce the minimum recording obligation for the then current Option Period accordingly, or (B) to extend the then current Option Period for a period such that it shall expire nine (9) months after PRODUCER in fact completes his recording obligations for such Option Period with the dates for the exercise by COMPANY of its options as set forth in paragraph 2 and the dates of commencement of subsequent periods of the Term deemed extended accordingly. Notwithstanding anything to the contrary set forth in the foregoing, in the event that COMPANY elects to extend the duration of the then current Option Period pursuant to (B) above, and in the further event that PRODUCER has not completed PRODUCER's recording obligations within sixty (60) days of COMPANY's written notice of its election, then at any time after the sixtieth (60th) day COMPANY may terminate this agreement upon written notice to PRODUCER without further obligation to PRODUCER as to unrecorded sides, and without prejudice to any other rights and remedies of COMPANY.

(ii) In the event of any material default or breach by PRODUCER of any of PRODUCER's obligations hereunder other than as set forth above, or in the event that PRODUCER fails to fulfill the minimum recording obligation with respect to any Option Period within the time frame set forth in paragraph 3 above without reasonable cause, whereby any failure of which PRODUCER does not give notice in accordance with (i) above shall be deemed a failure without reasonable cause, or in the event that PRODUCER does not give notice on or before the date sixty (60) days prior to the last date on which the minimum recording obligation should have been completed in accordance with paragraph 3(f) above, as provided for in (i) above, then COMPANY, by written notice to PRODUCER, in addition to any other rights

212:12.18.79
PARC

 

-29-

or remedies which it may have at law or otherwise, may (A) suspend its obligations hereunder for the duration of such default or breach and until the same has been cured; or (B) at any time thereafter terminate the Term without further obligation to PRODUCER other than the obligation to pay royalties if earned, and may, at its election, extend the Term for a period equal to all or part of the period of such default or breach, plus an additional period of one hundred and eighty (180) days and the dates for the exercise by COMPANY of its options as set forth in paragraph 2 and the date of commencement of subsequent periods of the Term shall be deemed extended accordingly.

(iii) Notwithstanding the foregoing clauses (i) and (ii), in no event shall the Term hereunder be suspended and extend any Option Period such that (A) such Option Period shall be of longer duration than three (3) years times the number of LPs required to fulfill PRODUCER's recording obligations at the time of COMPANY's giving notice to PRODUCER, or (B) such that the Term shall exceed the maximum permitted under any statute, law or order of any authority having jurisdiction over this agreement. At the end of the maximum period of suspension of any Option Period in accordance herewith COMPANY shall either exercise its next option to extend the Term for a further Option Period, or shall terminate the agreement forthwith by notice to PRODUCER. Except as provided in this clause (iii), PRODUCER shall not be relieved of any product delivery obligation solely by the passage of time.

16. Wherever in this agreement PRODUCER's approval or consent is required, COMPANY may require PRODUCER formally to give or withhold such approval or consent by giving PRODUCER written notice requesting the same and by furnishing PRODUCER with the information or material in respect of which such approval or consent is sought. PRODUCER shall give COMPANY written notice of approval or disapproval within ten (10) business days after such notice is received by PRODUCER. In the event of disapproval or no consent, the reasons therefor shall be stated. Failure to give such notice to COMPANY as aforesaid shall be deemed to be consent or approval.

17. PRODUCER agrees subject to the provisions of paragraph 4(b) hereinabove that ARTIST will not record or authorize or with knowing intent permit to be recorded for any purpose any performance for a third party without in each case taking reasonable measures to prevent the manufacture, distribution and sale at any time by any person other than COMPANY of phonograph records and other devices, including without limitation, Audio-Visual Devices for home

212:12.18.79
PARC

 

-30-

use and/or juke box use and/or use in or on means of transportation embodying such performance. Specifically, without limiting the generality of the foregoing, PRODUCER agrees that:

    (i) if, during the Term, ARTIST performs any Composition for the purposes of making transcriptions for radio or television or soundtracks for motion picture films, or

    (ii) if, during the period referred to in paragraph 4(b) hereof ARTIST performs for any such purpose any Composition which shall have been recorded pursuant to this agreement, ARTIST will do so only pursuant to a written contract containing an express provision that neither such performance nor any recording therof will be used, directly or indirectly for the purpose of making phonograph records or any other device, including without limitation, Audio-Visual Devices for home use and/or juke box use and/or use on or in means of transportation. PRODUCER will promptly furnish to COMPANY a copy of the pertinent provisions of each such contract and will cooperate fully with COMPANY in any controversy which may arise or litigation which may be brought relating to the rights of COMPANY under this paragraph.

18. PRODUCER agrees that in all of ARTIST's endeavours in the entertainment field, ARTIST will exert best efforts to be billed, advertised, and described as a "Polydor Exclusive Recording Artist".

19. (a) PRODUCER recognizes that the sale of records is speculative and agrees that the judgement of COMPANY with regard to any matter affecting the sale, distribution and exploitation of such records shall be binding and conclusive upon PRODUCER. Nothing contained in this agreement shall obligate COMPANY to make, sell, license, or distribute records manufactured from the masters recorded hereunder other than as specifically provided for herein, provided always that:

    (i) COMPANY agrees that it shall release in the United States each album delivered hereunder within ninety (90) days of the receipt by COMPANY of the fully mixed, edited, and leadered master tapes for such album, together with all elements to be delivered by PRODUCER to COMPANY in conjunction with such album, including without limitation all consents and approvals to be secured by PRODUCER to the benefit of COMPANY on COMPANY's behalf; for the purpose of this paragraph 19(a)(i) the Album embodying the first three (3) Sides hereunder shall be deemed an Album delivered hereunder.

212:12.18.79
PARC

 

-31-

(ii)  In the event that COMPANY fails to release any album delivered hereunder within the period specified, without reasonable cause, and provided that PRODUCER notifies COMPANY in writing within thirty (30) days of the expiration of such period of PRODUCER's requirement that COMPANY fulfill such release obligation, then COMPANY shall either cure such failure within sixty (60) days of the receipt of such notice, or PRODUCER shall have the right to terminate this agreement by notice to COMPANY given within thirty (30) days of the expiration of such sixty (60) days period; on receipt by COMPANY of such notice the Term of this agreement shall terminate and all parties shall be deemed to have fulfilled all of their obligations hereunder except for those obligations which survive the end of the Term such as warranties, re-recording restrictions, and the obligation to pay royalties if earned; and this shall be PRODUCER's sole remedy for COMPANY's failure to fulfill its release obligation pursuant to (i) above.

(b)  COMPANY agrees that during the Term it shall mutually agree with PRODUCER as to artwork for LPs released in the United States.  In the event that PRODUCER proposes an artwork concept which would entail an extraordinary initial cost, and/or an extraordinary manufacturing cost in either case in excess of COMPANY's standard costs, COMPANY reserves the right to makes its agreement to use such concept conditional upon PRODUCER's agreement that part or all of the excess cost applicable as an advance to be recouped from royalties payable hereunder, and/or (in the case of excess manufacturing cost) deductible from royalties earned from sales of the LP so packaged.  In any event, COMPANY's decision as to artwork shall be final and binding upon PRODUCER in the event of dispute, it being agreed by the parties hereto that failure to reach agreement may not be allowed to delay or hinder the release of any record hereunder.

(c)  COMPANY agrees that it shall cause its licensee in the relevant country of the Territory, within ninety (90) days of release of any LP hereunder in the United States, to release in the United Kingdom, France, Germany, The Netherlands, Japan, and Australia, such LP.  In the event COMPANY's licensee in any one or more of the said countries fails to release any such LP within the said ninety (90) day period, and further, if upon such failure of COMPANY's licensee PRODUCER gives written notice to COMPANY that he requires such licensee to release such LP, COMPANY shall either cause such licensee to release such LP within thirty (30) days of COMPANY's receipt of such notice from

212:12.18.79
PARC

 

-32-

PRODUCER or COMPANY shall revoke such licensee's license with respect to each such country and such LP, and shall appoint a new licensee for each such country and such LP, subject to PRODUCER's approval of each such new licensee.

(d.)  During the Term and in the United States, PRODUCER shall have the right to approve photographs and biographical material of ARTIST to be used for publicity purposes by COMPANY.  In the event that PRODUCER fails to approve photographs and/or biographical material submitted by COMPANY on two (2) consecutive submissions, COMPANY may require PRODUCER to submit for COMPANY's use, within ten (10) days of COMPANY's request therefor, photographs and biographical material for publicity purposes.

20.  (a)  Paragraph 20 is DELETED.

21.  (a)  Without limiting any other rights COMPANY may have, it is specifically understood and agreed that in the event of PRODUCER's dissolution or the liquidation of PRODUCER's assets, or the filing of a petition in bankruptcy or insolvency or for an arrangement or reorganization by, for or against PRODUCER, or in the event of the appointment of a receiver or a trustee for all or a portion of PRODUCER's property, or in the event that PRODUCER shall make an assignment for the benefit of creditors or commit any act for or in bankruptcy or become insolvent or in the event PRODUCER shall fail to fulfill its obligations under this agreement then at any time after the occurrence of any such event, COMPANY shall have the option by notice in writing sent to PRODUCER at PRODUCER's address last known to COMPANY either to suspend the operation of the Term as provided for in paragraph 15(b) hereinabove, to terminate the agreement or to require that ARTIST render ARTIST's personal services directly to COMPANY for the remaining balance of the Term of this agreement, including extensions thereof, for the purpose of making Phonograph Records, upon all the same terms and conditions as are herein contained, except that in respect of Compositions performed by ARTIST and recorded by COMPANY subsequent to COMPANY's exercise of such option, the royalty rates payable hereunder shall be the difference, if any, between the royalty rates set forth in paragraph 7 hereof, and the sum of  (i) the royalty rates payable to any individual producer engaged by COMPANY in connection therewith, and  (ii) the royalty rates payable to ARTIST pursuant to ARTIST's agreement with PRODUCER, which shall be paid by COMPANY direct to ARTIST.

In the event that, in respect of such Compositions performed by ARTIST and recorded by COMPANY, the sum of any

212.12.18.79
PARC

 

-33-

such individual producer's fees and COMPANY's Recording Costs shall be less than the sums set forth in paragraph 9 hereof, such difference shall be deemed an advance against royalties payable .o ARTIST and PRODUCER pursuant to the provisions of this paragraph, and shall be paid to ARTIST and PRODUCER in such proportion as shall be determined by the relation between the Base Rates payable to ARTIST pursuant to Exhibit "A" and the Base Rates payable to PRODUCER pursuant to the provisions of this paragraph subsequent to COMPANY's exercise of its option, and any individual producer's fees and COMPANY's recording costs shall be deemed advances against and recoupable therefrom in the same proportion.

(b)  In the event that ARTIST shall notify COMPANY in writing that ARTIST will no longer render services to PRODUCER as required by COMPANY, then COMPANY shall have the same options as set forth in (a) above, except that with regard to royalties and advances COMPANY may withhold all such payments to ARTIST and PRODUCER in escrow pending settlement of any disputes between PRODUCER and ARTIST with respect to the subject matter hereof.  Notwithstanding said right to withhold payment, COMPANY shall have the right in its sole discretion to make payment to ARTIST and/or PRODUCER at a royalty rate not in excess of one (1%) per cent less than either would receive by the operation of the provisions of (a) above, the balance to be held in escrow by COMPANY pending final settlement.

(c)  In no event shall COMPANY be liable to pay to ARTIST and PRODUCER combined, after exercise of its options as set forth in (a) and (b) above, any royalty rate in excess of the royalty rates set forth in paragraph 7 hereof less any individual producer's rates; except that COMPANY shall be responsible for any royalty rate to an individual producer in excess of four (4%) per cent Base Rate.

22.  PRODUCER hereby authorizes and directs COMPANY to withhold from any monies due to PRODUCER from COMPANY any part thereof required by the United States Internal Revenue Service to be withheld, and to pay same to the United States Internal Revenue Service.

23.  PRODUCER acknowledges that ARTIST's services in connection herewith are unique and extraordinary and that COMPANY shall be entitled to injunctive relief to enforce the provisions of this agreement.

24.  COMPANY may, at its election, assign this agreement or any of its rights hereunder to any other division of

212:12.18.79
PARC

 

-34-

COMPANY, to a company that is a member of the POLYGRAM GROUP, to any subsidiary or licensee in which COMPANY now has or may hereafter obtain a substantial interest, or to any company that merges its assets with those of COMPANY or whose assets are acquired by COMPANY whether by purchase or otherwise or to any company that acquires all or substantially all of COMPANY's assets.

25. If any clause, sentence, paragraph or part of this agreement or the application thereof to any person, shall for any reason be adjudged by court of competent jurisdiction to be invalid, such judgement shall not affect the remainder of this agreement, which shall continue in full force and effect but such judgement shall be limited and confined in its operation to the clause, sentence, paragraph or part thereof directly involved in the controversy in which such judgement shall have been rendered and to the person involved.

26. All notices hereunder required to be given to COMPANY shall be sent to COMPANY at its address first mentioned herein and all royalties, statements and payments and any and all notices to PRODUCER shall be sent to PRODUCER at PRODUCER's address first mentioned herein, or such other address as each party respectively may hereafter designate by notice in writing to the other. All such notices shall be in writing and, except for royalty statements shall be sent by registered or certified mail, return receipt requested, and the day of mailing of any such notice shall be deemed the date of the giving thereof. All notices to COMPANY shall be served upon COMPANY to the attention of the President with a carbon copy to the Vice President, Business Affairs. Courtesy copies of all notices to PRODUCER, and of all royalty statements rendered hereunder shall be sent to DAVID ERLICH AND CO., 380 Madison Avenue, New York, New York 10017, and GEORGE SCHECK, 303 East 57th Street, New York, New York 10022, provided that the failure of COMPANY to send any such courtesy copy shall not invalidate in any way or nullify the effectiveness of any notice sent to PRODUCER at PRODUCER's address in the manner set forth above.

27. (a) Except as provided in (b) below, neither party shall have the right to terminate this agreement as a consequence of the other party's default or breach hereunder (including COMPANY's failure to exercise the options set forth in paragraph 2 above) unless such default or breach is a "material" default or breach and unless the party seeking to terminate because of the other party's default or breach gives notice of such claim in writing by certified mail,

212-12.19.79
PARC

 

-35-

return receipt requested, and unless the party against whom or breach is claimed shall fail to cure the same within thirty (30) days after the receipt of such notice. If the default or breach is not fully cured within such thirty (30) day cure period, the party claiming default or breach shall, after the expiration of the cure period, without prejudicing its other rights and remedies, have the right to immediately terminate this agreement.

(b)  The provisions of (a) above shall not add an additional requirement to the procedures set forth in paragraphs 3 and 15 for termination for failure to timely deliver masters hereunder, nor contravene COMPANY's right pursuant to paragraph 23 to immediately seek injunctive or other equitable relief to enforce performance of the obligations of ARTIST pursuant to this agreement.

28.  This agreement is entered into in the State of New York and shall be construed in accordance with the laws of said state applicable to contracts to be wholly performed therein.  The parties hereto agree that any controversy arising under this agreement shall be adjudicated under the jurisdiction of a competent court within the City of New York.  This agreement may not be modified except by an instrument in writing executed by both parties hereto.  The validity or unenforceability of any provision hereof shall not affect the validity or enforceability of any other provision hereof.

29.  This writing sets forth the entire understanding between the parties with respect to the subject matter hereof, and no modification, amendment, waiver, termination or discharge of this agreement shall be binding upon COMPANY unless confirmed by written instrument signed by an officer of COMPANY.  No waiver of any provision of or default under this agreement nor any failure to exercise its rights hereunder shall prejudice the rights of COMPANY thereafter, nor shall it form precedent for the future.

IN WITNESS WHEREOF, the parties hereto have executed this agreement the day and year hereinabove first written.

POLYDOR INCORPORATED

By _____

By _____

G.G.C. PRODUCTION CORP.

By _____

212.12.18.79
PARC

 

"EXHIBIT A"

Dated as of, *Jan 9, 1980*

POLYDOR INCORPORATED
810 Seventh Avenue
New York, New York  10019

Gentlemen:

Pursuant to an exclusive recording agreement between G.G.C. PRODUCTION CORP. ("Company") and me, dated Company is entitled to my exclusive services as a recording artist.  I have been advised that Company is entering into a written agreement with you of even date herewith ("Agreement"), pursuant to which Company is agreeing to furnish my exclusive services to perform at recording sessions for the purpose of making phonograph records to be distributed by you.  I am familiar with and approve of all terms and conditions of the Agreement which is for an initial delivery obligation of three (3) Sides, commencing on the date hereof, and which may be extended for three (3) further consecutive options, the first of which is for one (1) additional LP, and the second and third of which are for two (2) additional LPs each.

In consideration of your executing the Agreement and as a further inducement for you to do so (it being to my benefit as a recording artist that you execute the same), I hereby agree as follows:

1.  I confirm, warrant, guarantee and agree that I will duly and to the best of my ability, perform and discharge all of the obligations undertaken by me pursuant to the terms and conditions of my agreement with Company so as to fulfill all of the commitments contained in the Agreement as the same applies to me.  Without limiting the generality of the foregoing, I agree to perform for the recording of master recordings embodying my performances as provided for in the Agreement.

2.   If, during the term of the Agreement or any extensions or renewals thereof, Company shall cease to be entitled to my recording services in accordance with the terms of the agreement between Company and myself, or if Company shall fail or refuse to furnish master recordings embodying my performances to you, I shall, at your request do all such acts and things as shall give to you the same rights, privileges, and benefits as you would have had under the

212:12.18.79
PARC:B11

 

-2-

Agreement if Company had continued to be entitled to my recording services and if Company had continued to furnish master recordings to you and such rights, privileges, and benefits shall be enforceable in your behalf against me and all the terms and conditions contained in the Agreement shall be effective, except that with respect to the royalty provisions, the royalties payable to me in respect of Compositions performed by me and recorded by you subsequent to each request shall be the same as provided for in my agreement with Company, which royalties, together with any and all other recording fees and other monies which may become payable to me under my agreement with Company subsequent to the date of your request as specified in this Paragraph 2, shall be paid by you directly to me, except that I shall continue to look to Company for payment of royalties in respect of Compositions performed by me and recorded by Company prior to such request, and such other monies as Company was obligated to pay to me prior to such request.

3.   During the term of the Agreement you have the exclusive right to use and publish and permit others to use and publish my name (both legal and professional) and likeness for advertising and purposes of trade in connection with the manufacture and sale of phonograph records and audio-visual devices, you have the right to refer to me as your exclusive artist, and you shall be entitled to seek equitable relief, including injunctive relief, to enforce the provisions of this agreement.   After the term you have the exclusive right to use and publish and permit others to use and publish my name (both legal and professional) and likeness for advertising and purposes of trade in connection with the manufacture and sale of phonograph records and audio-visual devices recorded embodying my performances during the term of the Agreement, and you shall be entitled at any time hereafter to injunctive relief, as well as other equitable relief, to enforce any breach of this grant of exclusivity by me, or my heirs or legal assigns.

4.   I shall not, during the term of the Agreement, or any extensions or renewals thereof, perform individually or as a part of a group or otherwise for anyone other than you or Company (pursuant to the Agreement) for the purpose of making phonograph records.   In addition, after the expiration of the term of the Agreement, I will not perform any musical composition which shall have been recorded pursuant to the Agreement for the purpose of making phonograph records prior to the latter of the date five (5) years from the date of delivery to you of the master recording embodying such composition, or the date three (3) years subsequent to the expiration or other termination of the Term of the Agreement.

PARCEL8178.79



-3-

5.   During the term and thereafter as provided for herein, I will not record or authorize or with knowing intent permit to be recorded, for any purpose, any performance for a third party other than Company, without in each case taking reasonable measures to prevent the manufacture, distribution and sale at any time by any person other than you of phonograph records and other devices for home use and/or juke box use and/or use in or on means of transportation embodying such performance.   Specifically, without limitation of the generality of the foregoing, I agree that:

     (a)  If, during the term of the Agreement, I perform any composition for the purpose of making transcriptions for radio or television or soundtracks for motion picture films, or

     (b)  If, during the period of re-recording restriction referred to in paragraph 4 above, I perform for any such purpose any composition which was recorded pursuant to the Agreement, I will do so only pursuant to a written contract containing an express provision that neither such performance nor any recording thereof will be used, directly or indirectly, for the purpose of making phonograph records or any other device for home use and/or juke box use and/or use on or in means of transportation.   I agree upon your request promptly to furnish to you a copy of the pertinent provisions of each such contract and will co-operate with you in any controversy which may arise or litigation which may be brought relating to your rights under this paragraph.

6.   No termination of my agreement with Company shall operate to diminish my liability or obligation hereunder without your written consent.

7.   Except as provided for in Paragraph 2 above, I agree that I will look solely to Company for the payment of all monies payable to me by reason of my rendering services in accordance with the Agreement, and I agree that you shall have no responsibility to me therefor whatsoever.   No breach by Company of any agreement which I may now or from time to time have with Company shall be sufficient cause for my failure or refusal to fully perform for you in accordance with the Agreement and this agreement.

8.   During the term, I will exert best efforts to be billed, advertised and described as a "Polydor Exclusive Recording Artist".

9.   Any assignment (pursuant to the Agreement) by you of the Agreement shall constitute an assignment of this agreement to such assignee and I hereby consent to any such

212.12.18.79
PARC




-4-

assignment. Upon any such assignment you shall have no further obligation to me, or to Artist, other than payment of royalties otherwise due to me or Artist with respect to records sold prior to such assignment.

10. I agree to indemnify, save and hold you harmless from and against any liability, loss, damage, cost or expense (including reasonable attorneys' fees), paid or incurred by you by reason of any breach by me of the covenants, representations or warranties contained herein or in the Agreement or in my agreement with Company, and agree to reimburse you on demand for any payment made by you at any time after the date hereof with respect to any liability or claim to which the foregoing indemnity applies which is reduced to judgement or settled with my consent, which consent shall not unreasonably be withheld. Pending the determination of any claim involving such alleged breach or failure, you may withhold sums due me in an amount consistent with such claim. You shall give me notice of any claim and I shall have the right to participate in the defense of any claim with counsel of my own choice and at my own expense. You shall not settle any such claim without my prior written consent, which consent shall not unreasonably be withheld.

ACCEPTED AND AGREED TO:

POLYDOR INCORPORATED

By _____

By _____

Very truly yours,

_Connie Francis_
CONNIE FRANCIS

SS# 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

Union
Affiliation  AGVA AFTRA Local

EXECUTED BY ARTIST WITH OUR CONSENT:

G.G.C. PRODUCTION CORP.

By _____

212:12.18.79
PARC:B14

*Exhibit 7*

# PolyGram Records

March 16, 1982

George Scheck
George Scheck Enterprises
161 West 54th Street
New York, New York  10019

Dear George:

Columbia Special Products would like to include Connie Fran-
cis' recording of "Lipstick On Your Collar" in an album pack-
age entitled "Disk Celebrates Its 25th Anniversary".  The lp
will consist of 10 selections by various artists and will be
distributed by Lever Brothers as a sweepstakes prize and trade
giveaway, as well as self liquidation at the point of sale
with a retail selling price of $3.50.

We would, therefore, appreciate your waiving the cover art-
work and liner note approval contained in our agreement with
Ms. Francis so that her recording may be included in the above
mentioned package.

You will, of course, receive royalties equivalent to 50% of
the net amount received by us in connection with the above
mentioned master recording.

If the above meets with your approval, kindly so indicate by
signing the enclosed copy of this letter and returning it to
my attention as soon as possible.

Sincerely,

POLYGRAM SPECIAL PROJECTS

Patricia A. Sweeting
Associate Manager

Telephone (212) 399 7100          Casablanca                PolyGram Classics
Telex 620985                      Mercury                   PolyGram Distribution
                                  Polydor

CF 004276

*Exhibit 8*

# PolyGram Records

• • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • •

April 7, 1983

John F. Breglio, Esq.
Paul, Weiss, Rifkind, Wharton &
    Garrison
345 Park Avenue
New York, New York  10154

Dear Mr. Breglio:

We have received a license request from Suffolk Marketing, Inc.
for 18 Connie Francis recordings (repertoire listing attached)
for use in an as yet untitled Connie Francis package.  The lp
and comparable tape counterpart will be sold via tv/mail order
at $7.98 for the lp, $9.98 for the tape.

We would, therefore, appreciate the waiving of the coupling,
cover artwork and liner note approvals contained in Ms. Francis'
agreement with MGM Records so that her recordings may be in-
cluded in the above-mentioned package.

For this use Ms. Francis will receive a royalty in the amount
of 50% net income received.

If the above meets with your approval, kindly indicate by
signing the enclosed copy of this letter and returning it to
my attention as soon as conveniently possible.

Sincerely,

POLYGRAM SPECIAL PROJECTS

Patricia A. Sweeting
Associate Manager


The undersigned does hereby agree and consent to the foregoing:


_____          _____
John F. Breglio                       Date
on behalf of Connie Francis


PolyGram Records Inc          Telephone (212) 399-7100      Casablanca          PolyGram Classics
810 Seventh Avenue            Telex 620965                  Mercury             PolyGram Distribution
New York NY 10019                                           Polydor

*Exhibit 9*

# PolyGram Records

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

September 16, 1983

Ms. Connie Francis
50 Holton Lane
Essex Fells, N.J. 07021

Dear Ms. Francis:

We have received a request from Richard Huntley, presidnet of Suffolk Marketing, for the use on an album of the recordings listed on the attached exhibit which were chosen by Mr. Huntley from a list submitted by you to him. The album, as yet untitled, will contain the 20 selections, and will be sold via broadcast, print and direct mail order, at a price of $7.98 per disc and $9.98 per tape counterpart. Mr. Huntley has requested a ninety (90) day test period on the package and, if successful, a license agreement to cover a two (2) year term.

Accordingly, we would appreciate your waiving the licensing and artwork restrictions contained in your agreements with us (as successor in interest with MGM Records, Inc.) so that your recordings may be included in the above mentioned package.

We will agree, of course, to pay you fifty (50%) percent of our share of ten (10%) percent of the retail selling price, in accordance with your agreement with us.

If the above meets with your approval, please sign the enclosed copy of this letter and return it to me as soon as possible.

Sincerely,

POLYGRAM SPECIAL PROJECTS


Judie Jenkins
Associate Manager

The undersigned does hereby agree and consent to the foregoing:


_____
Connie Francis

cc:  John F. Breglio, Esq.

PolyGram Records Inc
810 Seventh Avenue
New York NY 10019

Telephone (212) 399-7100
Telex 620985

Casablanca
Mercury
Polydor

PolyGram Classics
PolyGram Distribution

1

## PROOF OF SERVICE

2    I am a resident of California, over the age of eighteen years, and not a party to the within
3    action; my business address is 433 N. Camden Drive, Suite 970, Beverly Hills, Los Angeles
     County, California 90210, and on the date set forth below, I caused to have served the within
     document **THIRD AMENDED COMPLAINT,** by the means described below:

4

5    _ x _    BY EMAIL:  Copy transmitted by email pursuant to prior practice in this matter.

6

     ____   BY PERSONAL DELIVERY:  Causing the document(s) to be personally delivered on the
7    date set forth below.

8    ____   BY OVERNIGHT DELIVERY:  Placing the document(s) in a sealed envelope designated
     by FedEx or United Parcel Service, with the delivery fees paid or provided for, for delivery the
9    next business day, addressed as set forth below, and depositing the envelope in the box or other
     facility regularly maintained by such company.

10

     ____   BY EXPRESS MAIL:  Placing the document(s) in a sealed envelope, with Express Mail
11   postage fully prepaid, addressed as set forth below, and depositing the envelope for collection
     today with the United States Postal Service as an Express Mail item in a facility regularly
12   maintained therefor.

13   ____   BY FACSIMILE: Transmission of the document(s) to the fax number addressed as set
     forth below, by the outgoing facsimile machine phone number (310) 278-2254, with a copy of
14   the transmission report for this service, made by such facsimile machine, and showing the
     transmission was completed without error, as attached hereto.

15

16   Lisa J. Kohn                                    Carletta F. Higginson
17   Jenner & Block LLP                              Jenner & Block LLP
     633 West 5th Street, Suite 3600                 919 Third Avenue
18   Los Angeles, CA 90071                           New York, NY 10022-3902
     Fax (213) 239-2234                              Fax (212) 909-0817
19   lkohn@jenner.com,                               CHigginson@jenner.com
     jschneider@jenner.com,
20   jsalazargarcia@jenner.com

21

22    I declare under penalty of perjury under the laws of California and the United States of
     America that the above is true and correct.

23   Executed on May 10, 2013 at Beverly Hills, California.

24

25

26                                          Kimberly Fernandez

27

28