

1  Paul S. Sigelman, SBN 45954
   paul@sigelmanlaw.com
2  SIGELMAN LAW CORPORATION
   433 N. Camden Drive, Suite 970
3  Beverly Hills, California 90210-4426
   Tel:   310-278-8011
4  Fax:   310-278-2254

5  Ira M. Siegel, SBN 78142
   irasiegel@earthlink.net
6  LAW OFFICES OF IRA M. SIEGEL
   433 N. Camden Drive, Suite 970
7  Beverly Hills, California 90210-4426
   Tel:   310-435-7656
8  Fax:   310-657-2187



9  Attorneys for Plaintiff
   Connie Franconero p/k/a Connie Francis

10

11              UNITED STATES DISTRICT COURT

12      FOR THE CENTRAL DISTRICT OF CALIFORNIA

13                  WESTERN DIVISION

14  CONNIE FRANCONERO, p/k/a          CASE NO. CV 12-03382 JGB(AGRx)
    CONNIE FRANCIS,
15
                    Plaintiff,        **FOURTH AMENDED**
16                                     **COMPLAINT**

17           v.                        **and**

    UMG RECORDINGS, INC.,
18                                     **DEMAND FOR JURY TRIAL**
                    Defendant.
19
                                       **JESUS G. BERNAL,**
20                                      United States District Judge

21       Plaintiff Connie Franconero p/k/a Connie Francis brings this Fourth

22  Amended Complaint against Defendant UMG Recordings, Inc. and alleges as

23  follows:

24                        THE PARTIES

25       1.      Connie Francis ("Francis") is an internationally acclaimed and

26  accomplished recording artist, residing outside the State of California.  Francis is

27  the successor to her previously wholly-owned production company, G.G.C.

28

                              1
                    Fourth Amended Complaint

1  Productions Corp.  She has recorded over 1,000 compositions, many of which
2  remain currently popular.

3       2.     This action is brought against UMG Recordings, Inc. ("Universal" or
4  "Defendant"), a Delaware corporation with its headquarters in the Santa Monica,
5  California, and conducting its principal business activity in the Central District of
6  California.  On information and belief, Universal is a successor to, or was
7  previously known as, Universal Music Corp., and is a successor to PolyGram
8  Records, Inc., successor to and/or previously named as Polydor Incorporated, and
9  in turn successor to MGM Records Division of Metro-Goldwyn-Mayer, previously
10  named MGM Records, a division of Loew's, Inc. (hereafter collectively the
11  "Company").

12  JURISDICTION AND VENUE

13       3.     This court has jurisdiction pursuant to 28 U.S.C. §1332(d)(2) in that
14  there is complete diversity of citizenship between the parties and the amount in
15  controversy exclusive of interest and costs exceeds $75,000.  Venue lies in this
16  District pursuant to 28 U.S.C. §1391 in that the Company's principle office is
17  located in this District.  Further, on information and belief, Universal's obligations
18  of rendering full accounting and payment of proper royalties due by contract and
19  mutual agreement in course of performance, and the breach by failure to do so,
20  occurred at its business offices in the Central District of California, where all
21  records pertaining to the accounting are maintained.

22  THE AGREEMENTS

23       4.     On about January 3, 1958, Company, through its predecessor, MGM,
24  engaged Francis' professional services by a form contract (the "1958 Agreement"),
25  a copy of which is attached hereto as **Exhibit 1**.

26       5.     In an agreement dated January 5, 1959, MGM again engaged Francis'
27  professional services by contract (the "1959 Agreement").  A copy of the 1959

28

1  Agreement is attached hereto as **Exhibit 2**.  The 1959 Agreement was written on

2  MGM stationery.  Section 1 of the 1959 Agreement provides in part,

3            "We [MGM] hereby engage you [Francis] to render services as we

4            may require in the production of phonograph records, and you hereby

5            accept such engagement and agree to render such services for us for a

6            period commencing January 5, 1959 and terminating January 4, 1992."

7  The first paragraph of Section 2 of the 1959 Agreement provides in part,

8            " . . . [A] minimum of sixteen (16) 45 rpm record sides, or their

9            equivalent in other speeds, shall be recorded during each year of the

10            term hereof; additional recordings shall be performed by you and

11            recorded by us by mutual agreement between us.  Each recording shall

12            be subject to our approval as satisfactory for the manufacture and sale

13            of phonograph records, and upon our request you will re-record any

14            composition until a master record commercially satisfactory shall

15            have been obtained."

16  The second paragraph of Section 2 of the 1959 Agreement provides in part,

17            "All compositions to be recorded hereunder, all arrangements and

18            arrangers, and the recordings to be released hereunder shall be

19            mutually agreed upon between us.  Subject to the foregoing, during

20            each year of the term hereof, eight (8) 45 rpm records, or their

21            equivalent, containing your performances on both sides thereof as

22            recorded by you hereunder, shall be manufactured and released for

23            sale by us as single records and twelve (12) of the compositions

24            recorded by you for us hereunder shall be manufactured and released

25            for sale by us in the form of a record album."

26  The introductory paragraph of Section 4 of the 1959 Agreement provides,

27  //

28

1                 "We, and/or our subsidiaries, affiliates and licensees, all have the

2                 exclusive right to all the products of your services hereunder,

3                 including but not limited to the exclusive right:"

4 Section 4(a) of the 1959 Agreement provides,

5                 "to manufacture, advertise, sell, lease, license or otherwise use

6                 or dispose of, in any or all fields of use, and by any method now or

7                 hereafter known, throughout the world, phonograph records, tapes,

8                 wire and other reproductions embodying the performances to be

9                 recorded hereunder, upon such terms and conditions as we may elect,

10                or, at our discretion, to refrain therefrom."

11 Section 4(c) of the 1959 Agreement provides,

12                 "to release, by mutual agreement between us, phonograph

13                 records of the compositions performed by you and recorded hereunder

14                 on any medium or device now or hereafter known under the name

15                 "M-G-M Records", or the primary label which we or our subsidiaries,

16                 affiliates and licensees may from time to time elect."

17           <u>MGM DRAFTED CONCESSIONS FOR FRANCIS</u>

18       6.      The 1959 Agreement, written on MGM stationery, was entered into

19 by Francis and MGM after the very successful release of phonograph records

20 bearing Francis' recording of the song "Who's Sorry Now" under the 1958

21 Agreement. MGM saw in Francis a super star future, and in fact she became one

22 of MGM's best-selling recording stars of all time. The 1958 Agreement and the

23 1959 Agreement are very similar to each other in many respects that were without

24 significance. After the standard 1958 form agreement, however, with the indicated

25 success of a super star, MGM intended to hand tailor and concede to Francis'

26 mutual control over certain business elements not in the standard agreement of

27 MGM or that of other similar recording companies. Thus, as consideration for

28

1 | Francis' entering the 1959 Agreement, MGM wrote in various grants tailored to
2 | benefit Francis as compared to the 1958 Agreement.

3 |      7.    Whereas, the 1958 Agreement has only one paragraph in its Section 2,
4 | by contrast the 1959 Agreement has two paragraphs in its Section 2. The first
5 | paragraph of the 1958 Agreement's Section 2 corresponds to the first paragraph of
6 | the 1959 Agreement's Section 2. But, whereas the 1958 Agreement provides that
7 | "Compositions to be recorded shall be designated by us," the 1959 Agreement does
8 | not provide that MGM could designate the compositions to be recorded. Further,
9 | the 1958 Agreement Section 2 has no provision for additional recordings beyond
10 | the minimum, whereas Section 2 of the 1959 Agreement provides that "additional
11 | recordings [beyond the minimum] shall be performed by you and recorded by us
12 | by mutual agreement between us."

13 |      8.    Where the first paragraph of Section 2 of the 1959 Agreement is either
14 | silent on or provides that mutual agreement is required regarding the
15 | "compositions" to be recorded, the second paragraph of the 1959 Agreement
16 | provides that "the recordings to be released hereunder shall be mutually agreed
17 | upon between us." No comparative provision exists in the 1958 Agreement.

18 |      9.    Section 4(a) of the 1958 Agreement describes the media on which
19 | MGM could exploit the recordings as "phonograph records and other reproductions
20 | embodying the performances to be recorded hereunder," while the 1959 Agreement
21 | describes such media as "phonograph records, tapes, wire and other reproductions
22 | embodying the performances to be recorded hereunder."

23 |      10.    Section 4(c) of the 1958 Agreement provides that MGM may "release
24 | phonograph records of the compositions performed by you and recorded hereunder
25 | on any medium or device now or hereafter known." In contrast, Section 4(c) of the
26 | 1959 Agreement included the additional condition "by mutual agreement between
27 | us" regarding such release (i.e., MGM may "release, by mutual agreement between
28 | us, phonograph records of the compositions performed by you and recorded

1  hereunder on any medium or device now or hereafter known"). No comparative

2  provision exists in the 1958 Agreement.

3      11.    A further modification was written on MGM stationery at a later date

4  of May 22, 1959 (a copy of which is attached hereto as **Exhibit 3**), but is not

5  believed to affect the instant action.

6      12.    Again by another an agreement, typed on MGM stationery and

7  entered into by MGM and Francis on about January 5, 1962 (the "1962

8  Agreement"), a copy of which is attached hereto as **Exhibit 4**, MGM and Francis

9  amended the 1959 Agreement by, among other things, extending its term by five

10  years to January 4, 1967 and adding the following second paragraph to Section 2 of

11  the 1959 Agreement:

12      "To the extent that we have or shall have the right to control the

13      timing of releases in foreign countries by reason of our contractual

14      obligations to licensees and distributors in such foreign countries, you

15      shall have the right to approve the foreign release dates of albums

16      released by us pursuant hereto. We shall endeavor to have our

17      licensees in the following countries or territories, England, France,

18      Italy, Australia, Japan, Hong Kong and West Germany, abide by your

19      recommendations for the timing of the release of your recordings."

20      13.    Before the end of the extended term, MGM and loan-out company

21  G.G.C. Productions Corp., entered into another agreement (the "1966

22  Agreement"), a copy of which is attached hereto as **Exhibit 5**. G.G.C. Productions

23  Corp. was a loan-out company providing the services of Francis (and Francis is

24  now the successor to G.G.C. Productions Corp.). The 1966 Agreement specified in

25  its Section 4 that, "All of the terms and conditions of the [1959] Agreement [as

26  previously amended] shall be applicable hereto as if fully set forth herein, except

27  as hereby modified...."

28

14.     Thus, the 1959-1966 Agreements (the "1959 Governing Agreements") include separate concessions hand drawn for the benefit of Francis.  These concessions include a condition for release of recordings other than as set out by Section 4(a), and are promised obligations of MGM requiring it to obtain Connie Francis' "mutual agreement" in certain instances with respect to the release of such recordings. Further, these "mutual agreement" provisions were special concessions departing from the form agreements that were otherwise used by MGM.

## ROYALTY RATE

15.     Under the 1959 Governing Agreements, Francis was to receive 5% of the retail listed price of 90% of all records sold – that is phonograph records, tapes, wire and other reproductions, or, as stated in the 1966 Agreement, phonograph records and record albums of any r.p.m. and any similar devices for the reproduction of sound reproduced on any material which may now or hereafter be known, including, but not limited to, discs of wax, vinyl, or any other composition, or tape, film or wire.  By mutual agreement of July 15, 1992 with respect to the release of compact discs to the marketplace, pursuant to the agreement the royalty rate base was to be the wholesale price paid by defendant's customers in the normal course of business, multiplied by 130%, less taxes and a packaging deduction for the cost of protecting each compact disc during shipment and for physical delivery thereof to the customers.

## PROMISE AND CONDITION ON RELEASE

16.     It was separately, explicitly, and by the written 1959 Governing Agreements, provided as a condition and promise that both parties were required to arrive at a "mutual agreement" for the release "on any media or device now or hereafter known."  Neither of the terms "media" and "device" is in Section 4(a) of the 1959 Agreement.  Non-mechanical copies of Francis' recordings were unknown in 1959.  It was intended by Section 4(c) that for copies to be released by MGM or

1   any of its licensees of Francis' recordings otherwise than on the media described in

2   Section 4(a) of the 1959 Agreement or the second paragraph of Section 1 of the

3   1966 Agreement, that "mutual agreement" must first be reached "between us."

4       17.   On information and belief, before ever dealing with Francis, MGM

5   had experience in drafting artists' contracts wherein MGM intended to have the

6   unconditional right to release recordings of a singer by any means whatsoever.  In

7   those agreements MGM could do so without the express condition and promise of

8   "mutual agreement."  By way of example, on information and belief, MGM

9   entered agreements in 1947, 1948 and 1949 with superstar singer Hank Williams

10  which provided that,

11        "All recordings and all records and reproductions made therefrom,

12        together with the performances embodied therein, shall be entirely our

13        property, free of any claims whatsoever by you..."

14  No such wording appears in any of the 1959 Governing Agreements for Connie

15  Francis.  Instead release was on condition and promise of mutual agreement.

16      18.   Defendant was the drafter of the 1958 Agreement and the 1959

17  Governing Agreements (and all the agreements mentioned herein between

18  Defendant and Miss Francis).  If the "mutual agreement" condition and promise of

19  Section 4(c) is in conflict with other wording of the contract, since Defendant was

20  the drafter and it caused any uncertainty to exist, the benefit to Francis of the future

21  "mutual agreement" obligation is to govern.  Moreover, were there any ambiguity,

22  or ambivalence as compared to the other language of the Agreement, the course of

23  performance adapted by the Defendant was to negotiate mutual agreement terms

24  with Francis.

25      <u>BREACH OF PROMISE MADE AND TO SATISFY CONDITION</u>

26      19.   Section 4(c) the 1959 Agreement requires that mutual agreement be

27  reached between Defendant and Francis before Defendant could release a copies of

28  any Francis recordings made under the 1959 Governing Agreements by any means

1   or media not described in Section 4(a) of the 1959 Agreement or the second

2   paragraph of Section 1 of the 1966 Agreement.  Nevertheless, the Company has

3   licensed third parties, such as Apple iTunes and Amazon, to sell and distribute

4   digital downloads over the Internet of such Francis recordings.  Digital downloads

5   are not means or media described in in Section 4(a) of the 1959 Agreement or the

6   second paragraph of Section 1 of the 1966 Agreement.  Stated another way, the

7   Company licensed Apple iTunes and Amazon, and other companies (the identities

8   of whom will be uncovered by discovery) to release copies of Francis' recordings,

9   and the Company did so without first negotiating for and obtaining from Francis

10  her "agreement" (as in "mutual agreement") required by Section 4(c).  To this day,

11  the Company has not obtained Francis agreement to such releases.

12      20.     Pursuant to licenses obtained from Defendant, third parties such as

13  Apple iTunes and Amazon have been selling and distributing digital downloads of

14  Francis recordings made under the 1959 Governing Agreements, and continue to

15  do so.

16      21.     The Company in breach of its obligation to obtain mutual agreement

17  from Francis before engaging in release of Internet distribution of digital

18  downloads, either itself or through licensees such as Apple iTunes and Amazon,

19  never even attempted to do so.  As indicated above, Defendant never obtained the

20  "mutual agreement" required by Section 4(c) of the 1959 Agreement.

21                       LOSS BY BREACH OF SECTION 4(c)

22      22.     Without mutual agreement from Francis, the Defendant had no right

23  to authorize Amazon iTunes, Amazon or anyone else to release copies of her

24  recordings by digital downloads.  By the Defendant's wrongful conduct it has

25  rendered difficult the determination of what the "mutual agreement" would have

26  been that the parties would have entered into.  Thus, the Defendant itself has

27  obstructed calculation of damages and cannot take advantage of its own wrong.

28

1  The determination of Francis' loss is thereby to be made by a reasonable estimate
2  of damages.

3       23.    Because there was agreement on the material elements of Ms. Francis'
4  performance, including the number of songs to be recorded, how selected, studio
5  time, accompaniments, advertising, billing, personal appearances, union
6  arrangements, accounting periods, etc., the parties were to proceed with good faith
7  understanding as to the business arrangement would be made exclusive of the
8  specified royalty due.  Such arrangement allowed Francis a right of negotiation for
9  the single element of payment to be made to her to obtain her "mutual agreement"
10  for the release of her recordings by digital download.  The likely endpoint of such
11  negotiation may be found by commercial practice, industry usage and custom, as
12  well as the parties' situation and objected acts and utterances.   Consistent
13  therewith, plaintiff is informed, believes and alleges that,

14           (a) Certain artists have been awarded a sign off, non-recoupable bonus
15              for a record label (including Defendant) to proceed with digital
16              download exploitation of a successful artist's performance, the amount
17              and method to be ascertained by discovery herein and proven at trial;

18           (b) Certain artists have not agreed to release their prior performance for
19              sale or distribution by digital download, because to do so for single
20              hits reduces the sale of their CD album compilations, so that they
21              receive royalty on only one song instead of 10 to 12 on their own
22              album compilation, the amount and method to be ascertained by
23              discovery herein and proven at trial; and,

24           (c) By course of performance of Defendant when mutual agreement was
25              required the arrangement in addition to, or over and above stated
26              royalty, or in replacement thereof, such as by 50% of net receipts by
27              the Company, the amount and method to be ascertained by discovery
28              herein and proven at trial.

24.     The commercial practice, industry usage and customary arrangement
for the parties may be found in the Company's own practice, as well as that of the
industry.  By an agreement entered in January 1980, a copy of which is attached
hereto as **Exhibit 6**, the Company recognized that as an inducement to plaintiff a
payment of 50% of net receipts for license to third parties for all methods of
distribution not provided by the existing agreement.  Thereafter, when the
Company was entertaining third party deals for Francis' MGM recordings, which
deals required mutual agreement for release of the recordings, the proposed
additional element for business arrangement was again 50% of gross receipts:

 (a) On March 16, 1982 a letter, copy of which is attached hereto as
   **Exhibit 7**, to Francis' manager regarding licensing a 1959 Francis'
   MGM Recording to a marketing firm, requiring mutual agreement
   and thereby a bonus arrangement was offered:

    "Columbia Special products would like to include Connie
    Francis' recording of "Lipstick On Your Collar" in an album
    package entitled 'Wisk Celebrates its 25th Anniversary.'
    * * *

    "You will, of course, receive royalties' equivalent to 50% of the
    net amount received by us in connection with the above
    mentioned master recording.

 (b) On April 7, 1983 by letter, copy of which is attached hereto as
   **Exhibit 8**, to Francis's attorney about a potential licensing
   requiring mutual agreement and thereby a bonus arrangement
   was offered:

    "For this use Ms. Francis will receive a royalty in the
    amount of 50% net income received.

 (c) On September 16, 1983 a letter, copy of which is attached
   hereto as **Exhibit 9**,  directly to Francis, about a potential

licensing deal for 20 of her MGM recordings to be sold by broadcast, print and mail order, requiring mutual agreement and thereby a bonus arrangement was offered:

"We will agree, of course, to pay you fifty percent (50%) of our share of ten (10%) percent of the retail selling price, in accordance with your agreement with us."

The recordings subject of the 1959 Governing Agreements, and thereby requiring mutual agreement for release are set forth in **Exhibit 10** hereto, and the identity of which has been so released, is known to the Company and subject to discovery.

25.     Presently, the Company pays 50% of net receipts to Francis from third parties licensed to provide Internet streaming, subscriptions, and ringtones lifted from Connie Francis' performances.

26.     In the mid-1970s Company paid to Francis 50% of Company's receipts from an album release for distribution by the Sessions Company.

27.     In the late 1980s Company paid to Francis 50% of Company's receipts from copies of recordings released and distributed by the Heartland Record Company.

BREACH OF CONTRACT-UNDERREPORTED SALES AND ROYALTIES

28.     On information and belief, not all sales by Universal and/or its licenses of copies of Francis' recordings have been reported by Universal to Francis, with a corresponding underpayment of royalties regardless of the rate or rates at which such royalties should have been paid.

29.     As to the calculation of royalty as set forth by the Governing Agreements, including that for release of CDs, the company has refused, or failed to make available for audit by Francis books and records.  Thereby the Company has not provided information to determine whether royalty reports are correct, including the inability and/or refusal to provide:

1       (a) Pressing and duplication records for all products distributed;

2       (b) General ledger as to Sales, Costs, Inventory, and Licensee Income;

3       (c) Unit totals for UMG's All-in-Fee Reports;

4       (d) Inventory Reports;

5       (e) Foreign public performance fee accountings;

6       (f) Third party accountings for Licensed Master uses; and,

7       (g) Wholesale and retail prices.

8      30.  Plaintiff is informed and believes and herein alleges that under payment

9  of the specified royalties includes:

10       (a) That the royalty statements reported to Connie Francis uses data

11         different than the artist share reported to the Company;

12       (b)  That the amount of free non-royalty barring shipments exceed the

13         allowable thresholds;

14       (c) Product sales data cannot be paired with royalty payment information;

15       (d) Royalty payments by percentage of receipts cannot be correlated with

16         gross receipts;

17       (e) Foreign  sale tax deductions have been claimed although such amount

18         has not been levied by foreign sales; and,

19       (f) Company branches have collected the artist share of foreign

20         publication performance fees, which have not been reported to the

21         artist.

22  For the period of January 1, 2008 through December 31, 2009 the amount of the

23  loss was approximately $80,000--some small part which was subsequently

24  admitted by defendant.   Same or similar losses are believed continued to date.  In

25  addition thereto, payment on selling and distribution on digital downloads at the

26  specified royalty rate for recordings, such as "Lipstick On Your Collar," appear to

27  have been made on wholesale price, rather than on 130% of wholesale as provided

28  by the July 15, 1992 Agreement for CDs, and the digital downloads are believed to

1  be made from the CD media, see **Exhibit 11**.  In addition thereto, payment on

2  selling and distribution at the specified royalty rate for recordings under the 1958

3  Agreement are not believed to have been based on the retail sales price as required

4  therein.

PERFORMANCE BY PLAINTIFF

5

6      31.    All promises and obligations of Francis (and/or G.G.C. Productions

7  Corp.) were performed and completed by her (and/or G.G.C. Productions Corp.).

LITIGATION HOLD

8

9      32.    Demand is hereby made that Defendant preserve all electronically

10  stored information ("ESI"), as well as documents and tangible things, potentially

11  relevant to the facts and issues plead in this complaint, including by the way of

12  example, correspondence, memoranda, journal entries, accounting on income

13  received and receivable, accounts paid and payable, charges,  cancelled royalty

14  checks, bank statements, check registers, and description of monies received or

15  disbursed, and be prepared to produce such documents and ESI in discovery.  ESI

16  includes by the way of example information electronically, magnetically or

17  optically stored, such as digital communications, word processed documents,

18  calendar and diary entry data, backup and archival files, all as stored on

19  Defendants' computer systems and employee systems, or other media and devices,

20  such as their personal is digital assistants, voice-messaging systems, on-line

21  repositories and cell phones.  It is further demanded that Defendants' management

22  and counsel pursue immediate intervention to prevent loss due to routine

23  operations, to initiate a litigation hold for potentially relevant ESI, and to prevent

24  degradation of the ability to search ESI by electronic means.  Such litigation hold

25  is to secure ESI on office work stations and servers, home and portable systems, to

26  anticipate that employees may seek to delete or destroy information that they

27  regard as confidential or embarrassing, and to secure documents which are

28

1   required to access, interpret or search relevant ESI, including logs, control sheets,
2   specifications, naming protocols, diagrams, and user ID and password rosters.

3

4                           FIRST CLAIM FOR RELIEF
5               [Breach of the 1959 Governing Agreements/Mutual Agreement]
6        33.    Plaintiff repeats and incorporates herein by reference the allegations
7   in paragraphs 1-32 above of this Fourth Amended Complaint.
8        34.    The Company has breached the 1959 Governing Agreements by
9   releasing and/or licensing third parties to release copies of Francis' recordings by
10  digital downloads without obtaining the "mutual agreement" of Francis. This
11  breach precluded Francis from obtaining consideration, from Company and/or
12  from third party licensees, for her agreement to allow such release.
13       35.    Plaintiff has been damaged in the sum not less than $75,000, all in an
14  amount according to proof which will be offered at trial, together with legal
15  interest thereon. Plaintiff further demands an accounting by Universal of all
16  transactions involving Plaintiff's recordings to date.

17

18                          SECOND CLAIM FOR RELIEF
19             [Removed by Order of Court from Fourth Amended Complaint]

20

21                          THIRD CLAIM FOR RELIEF
22                   [Money Had and Received Common Count]
23       36.    Plaintiff repeats and incorporates herein by reference the allegations
24  in paragraphs 1-32 and 34 above of this Fourth Amended Complaint.
25       37.    Defendant became indebted to Plaintiff for royalty money received by
26  Defendant for use or benefit of Plaintiff, and thereby became indebted to Plaintiff
27  and obligated to pay to Plaintiff the monies and profits as a result of payments
28  received by Defendant derived from internet downloads and from other sources.

1        38.    Although demand has been made that Defendant pay over to Plaintiff

2 such monies as have been received from the third-party licensees has been made,

3 Defendant has failed to do so.  Such monies are due together with legal interest

4 thereon.

5        39.    Plaintiff has been damaged in the sum not less than $75,000, all in an

6 amount according to proof which will be offered at trial, together with legal

7 interest thereon.  Plaintiff further demands an accounting by Universal of all

8 transactions involving Plaintiff's recordings to date.

9

10 FOURTH CLAIM FOR RELIEF

11 [Removed by Order of the Court from Fourth Amended Complaint]

12

13 FIFTH CLAIM FOR RELIEF

14 [Breach of the 1958 Agreement and the 1959 Governing Agreements]

15        42.    Plaintiff repeats and incorporates herein by reference the allegations

16 in paragraphs 1-32, 34 and 37-38 above of this Fourth Amended Complaint.

17        43.    On information and belief, not all sales by Universal and/or its

18 licenses of copies of Francis' recordings have been reported by Universal to

19 Francis, with a corresponding underpayment or failure of any payment of stated

20 royalty rate.  This has resulted in breach by Universal of its obligation to pay

21 royalties to Francis under the 1958 Agreement, the 1959 Government Agreements,

22 and any other agreements between Company and Francis that cover recordings that

23 are not covered by the 1958 Agreement and the 1959 Government Agreements.

24        44.    Francis has been damaged by Universal's breaches during the period

25 beginning from January 1, 2006 and continuing though to the present, as a result of

26 the underpayment of royalties that follows the underreporting of sales, and Francis

27 continues to be damaged, in an amount that will be proven at trial, and which on

28 information and belief exceeds $75,000.00.

1      WHEREFORE, Plaintiff prays for:

2          (a)    Compensatory damages in an amount which is not yet ascertained but

3   proof of which shall be offered at trial and within the jurisdiction of this Court with

4   Legal interest according to law;

5          (b)    An accounting of all transactions since December 31, 2005,

6   concerning any and all recordings of plaintiffs', and file with this Court and serve

7   on plaintiffs within 30 days of a Court ordered accounting, a report in the detail,

8   manner and form which will comply with the Court Order.

9          (c)    Judgment declaring the rights and obligations of the parties;

10         (d)    Award of costs of suit; and

11         (e)    For such other and further relief as the Court deems just and proper.

12

13  Respectfully submitted,

14

15  Date:  October 7, 2013          /s/ Paul Sigelman
                                    Paul S. Sigelman, SBN 45954
16                                  paul@sigelmanlaw.com
                                    SIGELMAN LAW CORPORATION
17                                  433 N. Camden Drive, Suite 970
                                    Beverly Hills, California 90210-4426
18                                  Tel:   310-278-8011
                                    Fax:   310-278-2254
19

20
    Date:  October 7, 2013          /s/ Ira M. Siegel
21                                  Ira M. Siegel, SBN 78142
                                    irasiegel@earthlink.net
22                                  LAW OFFICES OF IRA M. SIEGEL
                                    433 N. Camden Drive, Suite 970
23                                  Beverly Hills, California 90210-4426
                                    Tel:   310-435-7656
24                                  Fax:   310-657-2187

25                                  Attorneys for Plaintiff
                                    Connie Franconero p/k/a Connie Francis
26

27

28

1

## JURY DEMAND

2      Plaintiff hereby demands trial by jury on all issues so triable.

3

4   Date:  October 7, 2013              /s/ Paul Sigelman
                                        Paul S. Sigelman, SBN 45954
5                                       paul@sigelmanlaw.com
                                        SIGELMAN LAW CORPORATION
6                                       433 N. Camden Drive, Suite 970
                                        Beverly Hills, California 90210-4426
7                                       Tel:   310-278-8011
                                        Fax:  310-278-2254
8

9

10  Date:  October 7, 2013              /s/ Ira M. Siegel
                                        Ira M. Siegel, SBN 78142
11                                      irasiegel@earthlink.net
                                        LAW OFFICES OF IRA M. SIEGEL
12                                      433 N. Camden Drive, Suite 970
                                        Beverly Hills, California 90210-4426
13                                      Tel:   310-435-7656
                                        Fax:  310-657-2187
14                                      Attorneys for Plaintiff
                                        Connie Franconero p/k/a Connie Francis
15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Exhibit 1*

13:11   3347572000                    CONCETTA CORPORATION                    PA.



# M·G·M RECORDS

### A DIVISION OF LOEW'S INCORPORATED

701 SEVENTH AVEN.
NEW YORK 36, NEW YOR

January 3, 1958

Mr. George Francanegro
Miss Connie Francanegro (p/k/a Connie Francis)
182 Forrest Street
Bellville, N.J.

Dear  Mr. Francanegro and Miss Francis:
           Connie Francis

1.  We hereby engage you to render such services as we may require in the production of phonograph records, and you hereby accept such engagement and agree to render such services for us for a period commencing February 1, 1958 and terminating January 31, 1959. If for any reason you are unavailable or unable to render the services herein contracted for, this agreement shall, at our election, be deemed extended until you are so available.

2.  A minimum of six 78 r.p.m. record sides or their equivalent shall be recorded during the term hereof; additional recordings shall be performed by you and recorded by us at our election. Compositions to be recorded shall be designated by us and each recording shall be subject to our approval as satisfactory for the manufacture and sale of phonograph records, and upon our request you will re-record any composition until a master record commercially satisfactory shall have been obtained. All recordings shall be made at such studios and times as we may designate.
           Connie Francis

3.  You will not, during the term hereof, perform for anyone else for the purpose of making phonograph records and you will not, for a period of five years after the termination of this agreement or any extensions or renewals thereof, perform any musical composition recorded hereunder for anyone else other than us for the purpose of making phonograph records. In the event of a breach by you of the provisions of this paragraph, then in addition to any other right or remedy which we may have by law or otherwise, you shall automatically be deemed to have waived all future royalties which may accrue hereunder after the date of such breach.

4.  We, and/or our subsidiaries, affiliates and licensees, shall have the exclusive right to all the products of your services hereunder, including but not limited to the exclusive right:

(a)  to manufacture, advertise, sell, lease, license or otherwise use or dispose of, in any or all fields of use, and by any method now or hereafter known, throughout the world, phonograph records and other reproductions embodying the performances to be recorded hereunder, upon such terms and conditions as we may elect, or, at our discretion, to refrain therefrom.

(b)  to use and publish and to permit others to use and publish your name and photograph, to write and publish and to permit others to write and publish articles concerning you for advertising and trade purposes in connection with the sale and exploitation of phonograph records recorded hereunder; to use as descriptive of you the phrase "M-G-M Artist" or any other similar or appropriate phrase; and not to use or authorize any direct endorsement by you of any record or performance without your prior consent;

(c)  to release phonograph records of the compositions performed by you and recorded hereunder on any medium or device now or hereafter known under the name "M-G-M Records" and/or any other name, trademark or label which we and/or our subsidiaries, affiliates and licensees may from time to time elect;

(d)  to publicly perform the records and to permit the public performance thereof by means of radio broadcast, television, or by any method now or hereafter known;

(e)  to incorporate from time to time in records to be made hereunder, instrumentations, orations and arrangements owned by you of compositions to be recorded hereunder.

A-2

## Miss Francis's

5.   (a)  We shall pay you for your services to be rendered hereunder and for the rights granted herein,
a royalty of  FIVE per cent (5%.)    of the suggested retail list price (exclusive of all taxes) of 90%
of all records sold containing on both sides thereof a composition or compositions performed by you and
recorded hereunder, manufactured and sold by us or by any subsidiary, affiliate or licensee, and one-half of
such royalty for 90% of all records sold embodying such composition or compositions on only one side thereof.

(b)  Royalties for records sold outside of the United States of America may, at our election, be
based upon the suggested retail list price (exclusive of all taxes) of such records in the country of manu-
facture, the United States, England, or the country of sale. Such royalties shall be computed in the national
currency of the country to which the list price so elected applies, and as to sales made outside of the United
States, shall be paid at the same rate of exchange as we are paid; provided, however, that royalties on records
sold outside of the United States shall not be due and payable until payment therefor has been received by us
in the United States, and provided further, that if we do not receive payment in United States dollars currently
and agree to accept payment in a foreign currency, we may deposit to your credit (and at your expense) in
such currency, in a depository elected by us, all payments so received as royalties applicable to this agreement,
and shall notify you thereof promptly. Deposit as above stated, shall fulfill our obligation hereunder as to record
sales to which such royalty payments are applicable.

(c)  We shall specify and pay the costs of your accompaniment (instrumental and vocal), arrange-
ments and copying in respect of recordings made hereunder; and all such costs shall constitute advances and
shall be charged against and deducted from your royalties under this or any other agreement between you and
us if and when earned. Without limiting the generality of the foregoing, included among costs or payments
which shall hereunder constitute advances chargeable against royalties shall be all amounts which are paid by
us pursuant to the requirements of any agreements between us and any union representing you or other persons
who render services hereunder or in connection with any accompaniment (instrumental and vocal), arrange-
ments and copying for performances hereunder if, whether or not received by you or such persons, such
amounts are related to, based upon or computed by reference to union scale payments for services rendered
by you or such persons.

(d)  If any of the compositions to be recorded hereunder are included with other compositions or
recordings on a so-called long playing or extended play record, then, instead of the above royalties, the
royalties payable to you hereunder, with respect to such composition, shall be measured in the proportion that
5%    of the suggested retail list price (exclusive of all taxes) of 90% of all such records sold bears to the
total number of compositions contained on such record.

(e)  Royalties on records included in albums, jackets, boxes or any other type of package or con-
tainer, shall be based solely upon the suggested retail list price (exclusive of all taxes) for replacement records.
Miss Francis's

(f)  In the event any recording produced hereunder shall embody your performance together with
the performance of another artist to whom we are obliged to pay a royalty in respect of such recording, the
royalty payable to you in respect thereof shall be at 1/2 of the foregoing rates, and 1/2 of the costs of the
accompaniment (instrumental and vocal), arrangements and copying in respect of such recording shall be
charged against your royalties if and when earned.

(g)  We may discontinue the manufacture and sale of any records made hereunder, when in our
sole discretion they are no longer commercially satisfactory or their further sale and manufacture cease to be
profitable or advisable.

(h)  **We shall advance to you against all royalties due you here-
under, a sum equivalent to AFTRA scale for each composition recorded
by Miss Francis, satisfactory to us.**

6.  Accountings shall be made to you semi-annually on the first day of May for the period ending the
preceding February 28th and on the first day of November for the period ending the preceding August 31st,
together with payment of accrued royalties, if any, earned during the preceding half year. All royalty state-
ments and all other accounts rendered by us to you shall be binding upon you and not subject to any objection
by you for any reason unless specific objection in writing, stating the basis thereof, is given to us within
ninety days from the date rendered.

A-3

the services of Miss Francis

7.  You expressly agree that your services hereunder are of a special and unique character and that in the event of a breach by you of any term, condition or covenant herein, we shall be entitled to injunctive relief in addition to any other remedies available to us.

8.  (a)  In the event we are materially hampered, because of any labor controversy or any other cause not entirely within our control, in the recording, manufacture, distribution or sale of records, then for the duration of such contingency we may suspend this agreement. The number of such days of suspension may, at our election, be added to the term hereof and the term of this agreement shall be accordingly extended.

(b)  In the event that any license issued to us by the American Federation of Musicians, pursuant to which the services of instrumental musicians who are members of said American Federation of Musicians are engaged for the purpose of your recordings hereunder, is suspended, terminated or revoked with or without cause, you agree that we may terminate and cancel this agreement or suspend the same for the period during which such license is suspended without liability to you other than for compensation on records sold or to be sold after such suspension, termination or revocation. If we elect to suspend this agreement as aforesaid, the term thereof shall be deemed extended for a period equal to such suspension.

9.  We may at our election assign this agreement or any of our rights hereunder.

10.  This agreement sets forth the entire agreement between the parties with respect to the subject matter thereof, and no modification, amendment, waiver, termination, or discharge of this agreement or any provisions thereof shall be binding upon us unless confirmed by a written instrument signed by an officer of this Company. No waiver of any provision of or default under this agreement shall affect our right thereafter to enforce such provision or to exercise any right or remedy in the event of any other default, whether or not similar.

11.  (a)  All notices required to be given hereunder shall be in writing and sent by registered mail to us at 701 Seventh Avenue, New York City, and to you at the address aforesaid, or such other address as either of us may hereafter designate. Such notice shall be deemed to have been given on the date of mailing.

(b)  Any option to extend the term of this agreement, as hereinafter set forth, may be exercised by us by giving you notice in writing by registered mail at least thirty days prior to the expiration of such term.

12.  We shall have the right, upon giving you notice at least thirty days prior to the end of the term hereof or any renewal term as the case may be, to extend this agreement for three (3) further periods of one (1) year each, commencing 2/1/59, 2/1/60 and 2/1/61 upon the same terms and conditions as herein contained.  Each option shall be exercised separately.

Please indicate your acceptance by signing below.

Very truly yours,

LOEW'S INCORPORATED
(M-G-M Records Division)

ACCEPTED AND AGREED TO:

By_____

Vice President

_____
George Francaanegro

Approved for M-G-M Records

_____
Connie Francanegro (p/k/a
Connie Francis)

By_____

*Exhibit 2*

# MGM RECORDS

A DIVISION OF
LOEW'S INCORPORATED

1540 BROADWAY
NEW YORK 36 N Y
JUDSON 3-7000

January 5, 1959

Miss Connie Francanegro
PKA:  CONNIE FRANCIS
c/o Mr. George Scheck
1697 Broadway
New York, N. Y.

Dear Miss Francanegro:

1.   We hereby engage you to render such services as we may require in the production of phonograph records, and you hereby accept such engagement and agree to render such services for us for a period commencing January 5, 1959 and terminating January 4, 1962.  If for any reason you are unavailable or unable to render the services herein contracted for, this agreement shall, at our election, be deemed extended until you are so available, but this sentence shall not apply in any respect if you record, or in good faith offer to record the minimum number of mutually acceptable compositions per year, upon all of the terms and conditions of this agreement.

2.   Subject to your bona fide commitments for personal appearances, a minimum of sixteen (16) 45rpm record sides, or their equivalent in other speeds, shall be recorded during each year of the term hereof; additional recordings shall be performed by you and recorded by us by mutual agreement between us.  Each recording shall be subject to our approval as satisfactory for the manufacture and sale of phonograph records, and upon our request you will re-record any composition until a master record commercially satisfactory shall have been obtained.  All recordings shall be made at such studios as we may designate and at such times as we shall mutually agree upon.

All compositions to be recorded hereunder, all arrangements and arrangers, and the recordings to be released hereunder, shall be mutually agreed upon between us.  Subject to the foregoing, during each year of the term hereof, eight (8) 45 rpm records, or their equivalent, containing your performances on both sides thereof as recorded by you hereunder, shall be manufactured and released for sale by us as single records and twelve (12) of the compositions recorded by you for us hereunder shall be manufactured and released for sale by us in the form of a record album.  On all recordings to be made by you for us hereunder, you shall be the sole recording artist, except for background accompaniment, vocal and/or instrumental.

# MGM RECORDS 

A DIVISION OF
LOEW'S INCORPORATED

1546 BROADWAY
NEW YORK 36, N.Y.
JUdson 2-2000

page two

3. You will not, during the term hereof, perform for anyone else for the purpose of making phonograph records and you will not, for a period of five years after the date of recording perform any musical composition recorded hereunder for anyone else other than us for the purpose of making phonograph records. In the event of a breach by you of the provisions of this paragraph, or any similar provision contained in any prior contract between us, then in addition to any other right or remedy which we may have by law or otherwise, you shall be deemed to have waived all future royalties which may accrue to you from the date of said breach from the distribution and sale by us of recordings made hereunder of compositions which you shall record for others in violation of the provisions of this paragraph 3 and in addition thereto, we shall be entitled to recover from you as liquidated damages a sum equal to the amount of royalties earned by you with respect to the recordings made by you in violation of the provisions of this paragraph 3.

4. We, and/or our subsidiaries, affiliates and licensees, ll have the exclusive right to all the products of your services hereunder, including but not limited to the exclusive right:

(a) to manufacture, advertise, sell, lease, license or otherwise use or dispose of, in any or all fields of use, and by any method now or hereafter known, throughout the world, phonograph records, tapes, wire and other reproductions embodying the performances to be recorded hereunder, upon such terms and conditions as we may elect, or, at our discretion, to refrain therefrom.

(b) to use and publish and to permit others to use and publish your name and photograph; to write and publish and to permit others to write and publish articles concerning you for advertising and trade purposes in connection with the sale and exploitation of phonograph records recorded hereunder; to use as descriptive of you the phrase "M-G-M Artist" or any other similar or appropriate phrase; and not to use or authorize any direct endorsement by you of any record or performance without your prior consent.

(c) to release, by mutual agreement between us, phonograph records of the compositions performed by you and recorded hereunder on any medium or device now or hereafter known under the name "M-G-M Records", or the primary label which we or our subsidiaries, affiliates and licensees may from time to time elect.

# MGM RECORDS

A DIVISION OF
LOEW'S INCORPORATED

Page Three

1540 BROADWAY
NEW YORK 36, N.Y.
JUdson 2-2000

(d) to publicly perform the records and to permit the public performance thereof by means of radio broadcast, television, or by any method now or hereafter known;

(e) by mutual consent between us, to incorporate from time to time in records to be made hereunder, instrumentations, orchestrations and arrangements owned by you of compositions to be recorded hereunder.

5. (a) We shall pay you for your services to be rendered hereunder and for the rights granted herein, a royalty of five percent (5%) of the suggested retail list price (exclusive of all taxes) of ninety (90%) percent of all records sold containing on both sides thereof a composition or compositions performed by you and recorded hereunder, manufactured and sold by us or by any subsidiary, affiliate or licensee, and one-half of such royalty for ninety percent (90%) of all records sold embodying such composition or compositions on only one side thereof. The same royalties shall be paid by us upon all "premium" or "give-away" sales by us, but no royalties shall be paid on records given away by us for bona fide promotion of your records.

(b) Royalties for records sold outside of the United States of America may, at our election, be based upon the suggested retail list price (exclusive of all taxes) of such records in the country of manufacture, the United States, England, or the country of the country to which the list price so elected applies, and as to sales made outside of the United States, shall be paid at the same rate of exchange as we are paid; provided, however, that royalties on records sold outside of the United States shall not be due and payable until payment therefor has been received by us in the United States, and provided further, that if we do not receive payment in United States dollars currency and agree to accept payment in a foreign currency, we may deposit to your credit (and at your expense) such currency, in a depository elected by us, all payments so received as royalties applicable to this agreement, and shall notify you thereof promptly. Deposit as above stated shall fulfill our obligation hereunder as to record sales to which such royalty payments are applicable.

(c) We shall pay all costs of recording sessions hereunder and we shall pay the costs of your accompaniment (instrumental and vocal), arrangements and copying in respect of recordings made hereunder. None of such costs or payments shall be charged against or deducted from your royalties hereunder or royalties payable by us to you under any other contract between us.

# MGM RECORDS

A DIVISION OF
LOEW'S INCORPORATED

page four

1540 BROADWAY
NEW YORK 36, N.Y.
JUDSON 2-2000

(d) If any of the compositions to be recorded hereunder are included with other compositions or recordings on a so-called long playing or extended play record, then, instead of the above royalties, the royalties payable to you hereunder, with respect to such composition, shall be measured in the proportion that five percent (5%) of the suggested retail list price (exclusive of all taxes) of ninety (90%) per cent of all such records sold bears to the total number of compositions contained on such record.

(e) Royalties on records included in albums, jackets, boxes, or any other type of package or container, shall be based solely upon the suggested retail list price (exclusive of all taxes) for replacement records.

(f) We may discontinue the manufacture and sale of any records made hereunder, when in our sole discretion they are no longer commercially satisfactory or their further sale and manufacture cease to be profitable or advisable.

6. Except as to an occurrence within the purview of Paragraph 3 thereof, provided that you fully keep and perform the remaining provisions of this agreement on your part to be kept and performed, we shall advance to you on account of all royalties due or to become due to you hereunder upon recordings made after the date hereof, the sum of SIXTEEN THOUSAND FIVE HUNDRED ($16,500.00) DOLLARS during each period of one year of the term hereof, payable as follows:

(i) The sum of EIGHT THOUSAND TWO HUNDRED FIFTY ($8,250.) DOLLARS to be paid to you within thirty (30) days after the execution of this agreement;

(ii) The sum of EIGHT THOUSAND TWO HUNDRED FIFTY ($8,250.) DOLLARS on the 5th day of January and July of each year during the term hereof subsequent to the date hereof.

In the event that during any one year of the term hereof you do not record for us a minimum of sixteen (16) 45rpm record sides or their equivalent or in good faith offer to do so, you agree that you will on demand, repay to us a sum equal to the number of compositions less than sixteen not so recorded, multiplied by $1031.25. In the event that you fail to repay said sum we may, in addition to other remedies, deduct the same from any further advances to be made hereunder or from any royalties which

# MGM RECORDS  A DIVISION OF LOEW'S INCORPORATED

page five

1540 BROADWAY
NEW YORK 36, N.Y.
JUDSON 2-5686

between us. No such credit shall be retained by us with respect to the number of compositions less than sixteen, during any year, that you fail to record by reason of any refusal to permit you to record a composition for us, which refusal, on our part, has not been in good faith. Except with respect to circumstances described in this unnumbered paragraph, the foregoing advances shall be charged only against royalties which may become due to you hereunder. Such advances are non-returnable, except as herein provided.

7. It is specifically understood and agreed between us that from and after the date hereof no payments to be made by us to you shall be in excess of TWENTY-FIVE THOUSAND ($25,000.) DOLLARS per calendar year in the aggregate, whether by way of advances and/or royalties under this or any other prior agreement between us. In the event that in any one calendar year the total sums payable to you by us as advances and/or royalties, whether under this agreement or any other agreement between us, shall exceed the sum of TWENTY-FIVE THOUSAND ($25,000.) DOLLARS, the excess shall be paid to you in the succeeding calendar year. Subject to the limitation of total payments in the sum of TWENTY-FIVE THOUSAND ($25,000.) DOLLARS in any one calendar year, this procedure shall be followed so long as sums shall be due and payable to you. The terms of this provision shall survive termination of this agreement.

8. (a) During each year of the term of this agreement we agree to lay out, contract for and pay for four (4) advertisements not exceeding one (1) page each, in connection with recordings released hereunder, to appear in each of CASHBOX, MUSIC VENDOR and THE BILLBOARD. With respect to such advertisements, the selection of the publication or publications, layout, literary material and artwork shall be solely in our discretion, subject to subdivision (b) hereof, which shall at all times be applicable.

(b) If during the term hereof, an institutional advertisement, dealing with phonograph records exclusively, is placed by our MGM Records Division, and the name or names of any of our recording artists is mentioned therein, you shall receive top billing in the upper left-hand corner of such advertisement if, and only if, during the three (3) months prior to such advertisement, a record containing a composition recorded by you shall have been sold by us in greater volume than that of any other record sold by us during such period.

# MGM RECORDS

A DIVISION OF
LOEW'S INCORPORATED

page six

1349 BROADWAY
NEW YORK 36, N.Y.
JUDSON X-1006

(e) All personal appearances outside the metro-
politan area of New York City, for the purpose of promoting
and exploiting records released, or to be released by us here-
under, shall be by mutual agreement between us, and in con-
nection with personal appearances so made by you upon our
mutual agreement, we shall pay the actual amount of your nec-
essary travelling expenses, and in addition thereto your
reasonable local travel and incidental expenses up to TWENTY-
FIVE ($25.00) DOLLARS per day.

9. Accountings shall be made to you semi-annually on
the first day of May for the period ending the preceding Febru-
ary 28th and on the first day of November for the period end-
ing the preceding August 31st, together with payment of accrued
royalties, if any, earned during the preceding half year. All
royalty statements and all other accounts rendered by us to you
shall be binding upon you and not subject to any objection by
you for any reason unless specific objection in writing, stating
the basis thereof, is given to us within six (6) months from
the date rendered. You or your representatives shall have the
right within six (6) months after the receipt of a royalty
statement from us to inspect our books and records in Bloomfield,
New Jersey, during regular business hours and upon five (5)
days' prior written notice to us, for the purpose of checking
the royalties due to you hereunder. .

10. You expressly agree that your services hereunder
are of a special and unique character and that in the event of
a breach by you of any term, condition or covenant herein, we
shall be entitled to injunctive relief in addition to any other
remedies available to us.

11. (a) In the event we are materially hampered,
because of any labor controversy or any other cause not entirely
within our control, in the recording, manufacture, distribution
or sale of records, then for the duration of such contingency
we may suspend this agreement. The number of such days of
suspension may, at our election, be added to the term hereof
and the term of this agreement shall be accordingly extended.

(b) In the event that any license issued to us
by the American Federation of Musicians, pursuant to which the
services of instrumental musicians who are members of said
American Federation of Musicians are engaged for the purpose of
your recordings hereunder, is suspended, terminated or revoked
with or without cause, you agree that we may terminate and cancel
this agreement in the event of termination or revocation of our
such license or suspend the same for the period during which
such license is suspended without liability to you other than
for compensation on records sold or to be sold prior to such effec-

# MGM RECORDS

A DIVISION OF
LOEW'S INCORPORATED

1540 BROADWAY
NEW YORK 20, N.Y.
JUDSON 2-2000

page seven

such suspension, termination or revocation. If we elect to suspend this agreement as aforesaid, the term thereof shall be deemed extended for a period equal to such suspension.

12. We may at our election assign this agreement or any of our rights hereunder, to any company with which we may merge or consolidate, or which may otherwise become our successor company, or acquire all or a substantial portion of the assets of our MGM Records Division.

13. This agreement sets forth the entire agreement between the parties with respect to the subject matter thereof, and no modification, amendment, waiver, termination or discharge of this agreement, or any provisions thereof, shall be binding upon us, unless confirmed by a written instrument signed by an officer of this Company. No waiver of any provision or default under this agreement shall affect our right thereafter to enforce such provision, or to exercise any right or remedy in the event of any other default, whether or not similar.

14. It is mutually agreed that all prior agreements between us are terminated as of the date hereof, with the same force and effect as if such date was the date provided in said prior agreements for termination, except that all of our rights under said agreements (as in the case of termination) and your right to receive royalties and statements thereafter, shall continue in accordance with such agreements.

15. All notices required to be given hereunder shall be in writing and sent by registered mail to us at 1540 Broadway, New York, N. Y., and to you at the address aforesaid, with copy to George Scheck, 1697 Broadway, New York, N. Y., or such other address as either of us may hereafter designate. Such notice shall be deemed to have been given on the date of mailing.

16. Not later than thirty (30) days after the date of the execution of this agreement by you, we shall furnish you with a list of all compositions recorded by you under this or any other prior agreements between us. In addition thereto, we shall, together with each accounting made to you, furnish

# MGM RECORDS  A DIVISION OF LOEW'S INCORPORATED

1540 BROADWAY
NEW YORK 36, N.Y.
JUdson 2-1000

page eight

you with a list of all compositions recorded by you during the
period covered by said accounting. Failure on our part to
furnish you with such a list shall not be deemed a default by
us hereunder unless we fail to furnish the same within thirty
(30) days after the receipt of a notice from you requesting
such list.

Please indicate your acceptance by signing below.

Very truly yours,

LOEW'S INCORPORATED
(MGM Records Division)

ACCEPTED AND AGREED TO:

By _____
Vice President.

CONNIE FRANCONERO
PKA: CONNIE FRANCIS

Approved for MGM Records

By _____

# MGM RECORDS 

A DIVISION OF
LOEW'S INCORPORATED

1540 BROADWAY
NEW YORK 36, N.Y.
JUdson 2-2000

May 22, 1959

Miss Connie Francanegro
PKA:   CONNIE FRANCIS
c/o George Scheck
1697 Broadway
New York, N. Y.

Re:   Agreement dated January 5, 1959

Dear Miss Francis:

It is mutually agreed as follows:

1.  Paragraph 2 of the above agreement is modified to the extent that the minimum number of records to be recorded during each year of the term of the agreement is increased from 16 45rpm record sides or their equivalent in other speeds, to a minimum of 28 45rpm record sides or their equivalent in other speeds, and during each year of the term of the agreement, two record albums shall be manufactured and released for sale by us instead of one record album.

2.  Paragraph 6 of the above agreement is hereby modified to the extent that wherever in said Paragraph the sum of $1031.25 appears, the sum of $589.28 shall be substituted therefor.

3.  During each year of the term of the agreement, we shall supply you with not in excess of 10,000 fan club cards; 3,000 3x5 picture post cards and mail same pursuant to your instructions; and 8,000 8x10 photographs.  All of the foregoing shall be of the same type as heretofore provided for you.

Except as hereinabove modified, the above agreement continues in full force and effect.

Kindly confirm the foregoing by signing below.

Very truly yours,

LOEW'S INCORPORATED
(MGM Record Division)

By _____
Vice President

Approved for MGM Records

By _____

CONFIRMED:

_____
CONNIE FRANCANEGRO
PKA: CONNIE FRANCIS

*Exhibit 3*

# MGM RECORDS

A DIVISION OF
LOEW'S INCORPORATED

1540 BROADWAY
NEW YORK 36, N. Y.
JUdson 2-2000

May 22, 1959

Miss Connie Franconegro
PKA:  CONNIE FRANCIS
c/o George Scheck
1697 Broadway
New York, N. Y.                    Re:  Agreement dated January 5, 1959

Dear Miss Francis:

It is mutually agreed as follows:

1.  Paragraph 2 of the above agreement is modified to the extent that the minimum number of records to be recorded during each year of the term of the agreement is increased from 16 45rpm record sides or their equivalent in other speeds, to a minimum of 28 45rpm record sides or their equivalent in other speeds, and during each year of the term of the agreement, two record albums shall be manufactured and released for sale by us instead of one record album.

2.  Paragraph 6 of the above agreement is hereby modified to the extent that wherever in said Paragraph the sum of $1031.25 appears, the sum of $589.28 shall be substituted therefor.

3.  During each year of the term of the agreement, we shall supply you with not in excess of 16,000 fan club cards; 7000 3x5 picture post cards and mail same pursuant to your instructions; and 8000 8x10 photographs.  All of the foregoing shall be of the same type as heretofore provided for you.

Except as hereinabove modified, the above agreement continues in full force and effect.

Kindly confirm the foregoing by signing below.

Very truly yours,

LOEW'S INCORPORATED
(MGM Record Division)

By _____
     Vice President

Approved for MGM Records

By _____

CONFIRMED:

_____
CONNIE FRANCONEGRO
PKA: CONNIE FRANCIS



# MGM RECORDS

A DIVISION OF
LOEW'S INCORPORATED

1540 BROADWAY
NEW YORK 39, N.Y.
JUdson 2-2000

May 22, 1959

Miss Connie Francanegro
PKA:   CONNIE FRANCIS
c/o George Scheck
1697 Broadway
New York, N. Y.          Re:   Agreement dated January 5, 1959

Dear Miss Francis:

It is mutually agreed as follows:

1.   Paragraph 2 of the above agreement is modified to the extent that the minimum number of records to be recorded during each year of the term of the agreement is increased from 16 45-rpm record sides or their equivalent in other speeds, to a minimum of 28 45-rpm record sides or their equivalent in other speeds, and during each year of the term of the agreement, two record albums shall be manufactured and released for sale by us instead of one record album.

2.   Paragraph 6 of the above agreement is hereby modified to the extent that wherever in said Paragraph the sum of $1031.25 appears, the sum of $589.28 shall be substituted therefor.

3.   During each year of the term of the agreement, we shall supply you with not in excess of ~~15,000~~ fan club cards; ~~2,000~~ 3x5 picture post cards and mail same pursuant to your instructions; and 50,000 8x10 photographs.  All of the foregoing shall be of the same type as heretofore provided for you.

Except as hereinabove modified, the above agreement continues in full force and effect.

Kindly confirm the foregoing by signing below.

Very truly yours,

LOEW'S INCORPORATED
(MGM Record Division)

By _____
        Vice President

Approved for MGM Records

By _____

CONFIRMED:

_____
     CONNIE FRANCANEGRO
PKA: CONNIE FRANCIS

*Exhibit 4*

 

**MGM RECORDS**

A DIVISION OF
METRO-GOLDWYN-MAYER INC.

1540 BROADWAY
NEW YORK
JUDSON 2-

*Jan 5, 1962*

Miss Connie Francis
c/o Mr. George Scheck
161 West 54th Street
New York, N. Y.

Re: Agreement dated January 5, 1959
   As Amended

Dear Miss Francis:

Reference is hereby made to the above agreement between us (hereinafter referred to as the "Agreement") with respect to which it is mutually agreed as follows:

1. Our said Agreement is hereby extended for a further period of five (5) years commencing January 5, 1962 and terminating January 4, 1967 upon all of the same terms and conditions as therein contained except as hereinbelow specifically provided.

2. Subject to your bonafide commitments in motion pictures, television presentations and personal appearance engagements, Paragraph 2 of the Agreement is modified to the extent that a minimum of fifty-six (56) 45-rpm record sides or their equivalent in other speeds, which shall consist of four (4) phonograph record albums and four (4) single records, shall be recorded by you for us during each year of the term referred to in Paragraph 1 hereinabove. All compositions to be recorded hereunder shall be selected by you. All arrangements and arrangers, and the recordings to be released hereunder, shall be mutually agreed upon between us except that you agree to approve of the release of not less than fifty-six (56) record sides recorded by you during each year of this extended term.

Subject to the foregoing, during each year of the term hereof, four (4) albums and four (4) single records, shall be manufactured and released for sale by us. On all recordings to be made by you for us hereunder, you shall be the sole recording artist, except for background accompaniment, vocal and/or instrumental. We shall not couple your recordings with those of any other artist without your consent.



3. Paragraph 4(b) shall be deemed deleted and the f
ing shall be substituted therefor:

(b) In connection with the advertising and explo.
tion of your recordings to use and publish and to permit othe:
use and publish your name and photograph, to write and publish
to permit others to write and publish articles concerning you
advertising and trade purposes in connection with the sale and
ploitation of phonograph records recorded hereunder, to use as
descriptive of you the phrase "MGM Artist" or any other simila
appropriate phrase; and not to use or authorize any direct end
ment by you of any record or performance without your prior co:

Paragraph 4(c) shall be deemed amended by adding :
end thereof, the following:

To the extent that we have or shall have the right
control the timing of releases in foreign countries by reason o
our contractual obligations to licensees and distributors in su
foreign countries, you shall have the right to approve the fore
release dates of albums released by us pursuant hereto. We sha
endeavor to have our licensees in the following countries or te:
tories, England, France, Italy, Australia, Japan, Hong Kong and
West Germany, abide by your recommendations for the timing of t
release of your recordings.

4. The last sentence of Paragraph 5(a) of the Agreemen
shall be deemed deleted and the following shall be substituted t
for:

We both recognize the necessity of promoting the sa:
of records which requires the distribution of records free of ch:
and that free records containing your performances will be distri
for promotional purposes. It is understood that royalties will n
be applicable to such quantities of free records as shall be agre
upon by you and us at the time of release of each new recording o
sales program involving the distribution of your recordings.



sum, we may, in addition to other remedies, deduct the s
any further advances to be made hereunder or from any ro
which may be due or become due to you under the Agreemen
this extension thereof, or any prior agreement between u
such credit shall be retained by us with respect to the
compositions less than fifty-six (56), during any year,
fail to record by reason of any refusal to permit you to
composition for us, which refusal on our part, has not b
good faith, nor with respect to the number of compositio
than fifty-six (56), during any year, that you have not
and which you have offered in good faith to record.   Exce
respect to circumstances described in this Paragraph 5(b)
going advances shall be charged only against royalties wl
come due to you hereunder.   Such advances are non-returne
as herein provided.

6. A. Paragraph 8, subparagraphs (a) and (c) of
ment, shall be deleted and the following shall be substit
for:

(a) In connection with advertising and promo
your recordings hereunder, we agree to lay out, contract
pay for advertisements not exceeding one (1) page, in con
with each album and single record released hereunder, to
each of CASHBOX, MUSIC VENDOR and THE BILLBOARD.   With re
such advertisements, the layout of such advertisements sh
subject to your approval.   The literary material and artw
be solely in our discretion, subject to subdivision (b) h
which shall at all times be applicable.

(c) All personal appearances outside the metr
area of New York City, for the purpose of promoting and c
records released, or to be released by us hereunder, shall
mutual agreement between us, and in connection with persor
ances so made by you pursuant to our mutual agreement, we
the actual amounts incurred by you and one other person fo
traveling expenses to and from the city wherein such perso
ance shall take place and in addition thereto, your reason
travel and incidental expenses in such city up to $25.00 p
you and for such other person.

-5-

8. B.   The following shall be deemed added as paragraphs 8(d), (e), (f) and (g) of the Agreement:

(d)  In connection with the exploitation of recordings hereunder by you, we agree that similarly as was done by us during the year 1961 in connection with your recordings, we will make or have made, pay for, and for the mailing of the following items: 8x10 photographs, 3x5 picture post cards, fan club cards and promotional and advertising material to disc jockeys, distributors and press.

(e)  We shall each pay 50% of the cost of advertisements with respect to your recordings hereunder, in connection with special events and honors awards involving you or your recordings but we shall not be obligated to contribute to more than a total of three (3) such advertisements during any year of the term hereof.

(f)  We agree to pay for:

(i)  The cost of all research material used by you in connection with the recording of albums hereunder but not in excess of $500.00 for any album.

(ii)  Reasonable compensation for foreign language instruction in connection with recording of an album in a foreign language.

(iii)  The services of an A&R man selected by you and who (in addition to our own A&R man) attends your recording sessions, but not in excess of $200.00 per session.

(g) All cover artwork and liner notes of any album released by us, pursuant hereto, shall be subject to your prior written approval which you agree you will not unreasonably withhold. In the event that within ten (10) days after the submission to you of artwork and liner notes you do not signify your disapproval thereof, the same shall be deemed approved. In the event of your disapproval, you will notify us as to the reasons therefor and submit such recommendations to us with respect to the cover and liner notes as you may desire to have incorporated therein. Your recommendations shall not be binding upon us. However, we shall continue making new submissions to you of artwork and liner notes until mutually satisfactory covers and liners have been obtained.

7. If at any time during the term hereof, you enter into an agreement to perform in a stage theatrical production or in a motion picture or in a television presentation (each of the foregoing being herein referred to as the "Production") and if phonograph records containing your performance have sold in greater volume during the three year period immediately preceding the date of your extension of said agreement than phonograph records of any other performer to appear in such Production for the same three year period, then your agreement with the producer or producing company (hereinafter referred to as the "Producing Company") must provide that with respect to the Production for which you are to render your services, we shall have the right of first refusal with respect to an "original cast" or "original sound track" album of the musical compositions performed therein which "original cast" album shall include lead-in and lead-out dialogue of the Production. Our right of first refusal shall mean the following: The Producing Company having such rights, will give us written notice by registered mail, setting forth the basic terms upon which they desire to grant the right to record, distribute, sell, exploit and license an "original cast" record album of the Production and together therewith, deliver to us the sheet music and lyrics of the musical compositions to be performed therein and of the book thereof. Within thirty (30) days (exclusive of Saturdays, Sundays and holidays) after the receipt of such notice by us and receipt by us of the musical

compositions and books, we shall advise the Producing Company by
registered mail, whether we desire to acquire the rights offered
upon the terms so offered and if acceptable to us, a formal agree-
ment shall then be entered into between us, the Producing Company
and the music publisher. If within said period of thirty days, we
do not notify the Producing Company that we wish to acquire said
rights or notify the Producing Company within said period of
thirty days that we do not wish to acquire said rights, then the
Producing Company shall be free to dispose of such rights in the
"original cast" album to any other party upon terms no less favor-
able than those offered to us. If pursuant hereto the aforemention-
ed rights with respect to an "original cast" album are disposed of
to others than ourselves, then notwithstanding the provisions of
Paragraph 3 of the Agreement, you will be permitted to render your
services to such other party than ourselves for the purpose of re-
cording the "original cast" album of said production. In the event
that the Producing Company does not dispose of the "original cast"
album rights and is willing to accept less favorable terms than the
terms previously offered to us, the same procedure as above out-
lined shall be followed _ad infinitum_.

If, however, your records have not sold in greater volume
during the aforementioned period of three years, than the sales of
records of any other such performer, then you shall use your best
efforts to obtain for us the same rights of first refusal as above
mentioned.

It is understood and agreed that we shall have the right
without any restriction whatsoever, to manufacture, distribute, ad-
vertise and sell one sound track album from the sound track of each
motion picture produced by Frennet Productions, Inc., subject to the
payment of royalties as herein provided, on such sound track phono-
graph record album as shall contain your performance. Such record-
ings whether or not released by us, shall not reduce your obligation
to record a minimum of 56 record sides pursuant to Paragraph 2 herein-
above.

8. Paragraph 12 of the Agreement shall be deleted and in
lieu thereof, the following shall prevail:

We may at our election, assign this Agreement or any of
our rights hereunder, to any company with which we may merge or con-
solidate, or which may otherwise become our successor company, or
acquire all or a substantial portion of the assets of our MGM Records
Division, but such assignment shall not relieve us of our obligations
hereunder in the event of default in the ....



Except as hereinabove modified, our above referred to Agreement shall continue in full force and effect.

Kindly confirm the foregoing by signing below and this shall constitute an agreement between us.

Very truly yours,

METRO-GOLDWYN-MAYER INC.
(MGM RECORDS DIVISION)

BY _Robert H. O'Brien_
Vice President

ACCEPTED AND AGREED TO:

_Connie Francis_
CONNIE FRANCONERO
PKA: CONNIE FRANCIS

Approved for MGM RECORDS

BY _L. D. N_

*Exhibit 5*



AGREEMENT made this 3rd day of October    1966

by and between METRO-GOLDWYN-MAYER INC. (MGM Records Division),

hereinafter referred to as "MGM", with principal offices located

at 1350 Avenue of the Americas, New York, New York 10019 and

G.G.C. PRODUCTIONS CORP. of 161 West 54 Street, New York, New

York, hereinafter referred to as "Producer".

WHEREAS, the parties hereto have mutually agreed that

Producer shall during the times hereinafter set forth, produce

master recordings for MGM to be used by MGM for the manufacture,

distribution, and sale of phonograph records therefrom.

NOW, THEREFORE, it is hereby mutually agreed by and be-

tween the parties hereto as follows:

1.  As used herein, the following terms shall have the

following meanings:

"MASTER" or "MASTER RECORDING" - An acetate, lacquer

or wax disc, or magnetic tape, film, or wire or such other materiel

or device now or hereafter known, on which sound may be recorded

and from which phonograph records may be manufactured.

"PHONOGRAPH RECORDS" or "RECORDS" - Shall mean

phonograph records and record albums of any r.p.m. and any si-

milar devices for the reproduction of sound reproduced on any

material which may now or hereafter be known, including, but

not limited to, discs of wax, vinyl, or any other composition,

or tape, film, or wire. Where used herein, "single" records shall

be deemed to include extended-play records.

2.  Producer represents and warrants that:

(a)  Producer has the sole and exclusive right to the services of CONNIE FRANCIS (herein called "Artist") for the purpose of producing master recordings for the sale and distribution of records therefrom; that the duration of Producer's rights to Artist's services will be for the period of this agreement and all options granted to MGM herein to extend said period; that Artist will be a member of AFTRA or AFM or will become such member in accordance with the current applicable codes or agreements between MGM and such organizations.  Producer agrees to sign, adopt and conform to the 1965-68 AFTRA CODE OF FAIR PRACTICE FOR PHONOGRAPH RECORDINGS and to deliver a signed copy of the Code to AFTRA not later than forty-eight (48) hours prior to the first recording engagement pursuant hereto and to notify MGM thereof.

(b)  Producer has the sole and exclusive authority to enter into this agreement on the terms and conditions contained herein and to grant to MGM all of the rights granted to MGM herein;

(c)  Neither Artist nor Producer has granted to others any of the rights being granted to MGM herein nor will Producer record or produce with Artist, pursuant hereto, any composition heretofore recorded by Artist for others;

(d)  Producer will maintain and protect its sole and exclusive right to the services of Artist as hereinabove stated for the duration of the term hereof and all option periods granted to MGM herein to extend said term, and Producer will enforce all of Artist's obligations to Producer and MGM, as required of Artist hereunder;

(e)  No change will be made by Producer in any agreement with Artist without MGM's consent, which would in any way change the obligation of such Artist to perform the services

- 2 -

required of Artist or impair the rights given to MGM by Producer hereunder.

(f) Producer will obtain all mechanical reproduction licenses necessary to be secured from copyright proprietors of compositions recorded pursuant hereto in order to enable MGM to manufacture and sell mechanical reproductions of such compositions. Prior to concluding such arrangements, Producer agrees to consult with MGM concerning the mechanical royalty to be paid pursuant to each such license.

3. The term of this agreement shall be a period commencing January 5, 1967 and terminating January 4, 1970. MGM shall have the right, upon giving notice to Producer at least ninety (90) days prior to January 4, 1970, to extend the term of this agreement for the further period of two (2) years commencing January 5, 1970, upon all of the terms and conditions hereof.

4. Pursuant to an agreement dated January 5, 1959, as amended, (said agreement and amendments thereto are herein referred to as the "Agreement"), Artist agreed to render her exclusive services for MGM for the manufacture and sale of phonograph records, and Artist has been rendering her said services under said Agreement. All of the terms and conditions of the Agreement shall be applicable hereto as if fully set forth herein, except as hereby modified, and except that Paragraphs 6 and 7 of the agreement of January 5, 1959 and Paragraph 5 of the amendatory agreement of January 5, 1962, shall be deemed deleted therefrom and the following substituted therefor in this agreement:

"Provided that Producer and Artist fully keep and perform the provisions of this Agreement, MGM guarantees that the royalties accruing on sales of records from recordings containing performances by Artist made during the three-year term hereof and during the option period referred to in Paragraph 3 above, if such option is exercised by MGM shall be

- 3 -

not less than One Hundred Thousand Dollars ($100,000.00) per year. Said annual guaranteed royalty shall be recouped by MGM out of royalties credited to Producer's account at any time from recordings made by Artist during the term hereof. Commencing with the 5th day of January, 1970, or on the 5th day of January, 1972, if the option to extend the term of this extension pursuant to Paragraph 1 above is exercised by MGM (and on the 5th day of each January thereafter), MGM shall pay to Producer any remaining royalties in its account at the rate of One Hundred Thousand Dollars ($100,000.00) per year, which royalties may be or become due and payable by MGM to Producer as royalties under this agreement, or such lesser amount than One Hundred Thousand Dollars ($100,000.00) as may then be standing to Producer's credit in Producer's royalty account with MGM on the date that payment is due."

5.  We shall pay to you the One Hundred Thousand Dollars ($100,000.00) per year referred to in Paragraph 4 above on January 5, 1967 and on each anniversary date thereafter during the term of this agreement for your services and the services of Artist pursuant hereto as advances against royalties, as provided in Paragraph 5 of the Agreement, which royalties shall be computed as provided in said Agreement, except as follows:

(a)  Royalties on records sold as albums in jackets, boxes, or any other type of package or container shall be based solely upon the suggested retail list price (exclusive of all excise taxes and exclusive of twenty cents (20¢) for album cover and packaging), of each album on which a royalty is payable.

(b)  (i)  In computing royalties payable to Producer, the term "records sold" shall not include records distributed to or for publications, radio and television stations, or similar organizations for the purpose of promoting, publicizing or advertizing Artist or the records in which Artist's performance is contained, nor records sold by MGM as "cut-outs" or for scrap, nor shall "records sold" include records containing Artist's performances and returned to MGM by any buyer during the same or any other accounting period, which returns are made for any reason whatsoever, including returns made at MGM's request.

- 4 -

No "single" records and no albums may be sold by MGM as "cut-outs"
until after the expiration of one (1) year from date of original
release for public sale and distribution of any particular "single"
record, and five (5) years after the original release of any parti-
cular album.

      (ii)  In addition to the foregoing, "records
sold" shall not include records given away gratis or sold at less
than fifty percent (50%) of MGM's listed wholesale price to re-
cord distributors in connection with the sale of records or albums
in which Artist's performance is contained.  With respect to royalty-
free records referred to in the next preceding sentence, MGM agrees
that the royalty-free records shall be limited to three hundred
(300) records for every one thousand (1,000) 45 r.p.m. "single"
records purchased by record distributors or dealers and to twenty
percent (20%) of the long-playing albums purchased by record dis-
tributors or dealers.  In the event that records or albums are sold
by us at a discount, the number of records arrived at by multiplying
the discount in percent by the total number of records or albums
shipped shall be deemed royalty-free records pursuant to this para-
graph 5(b)(ii).

      6.  Royalties on records or albums sold by MGM through
or by means of so-called record club distribution or to record
clubs or in the form of pre-recorded tape or tapes shall be com-
puted and paid to Producer at one-half of the rate of royalty
provided in the Agreement.  Notwithstanding the foregoing, with
respect to the sale of tapes manufactured by a licensee of MGM,
and containing Artist's performances, the royalty to Producer
shall be fifty percent (50%) of the net amount received by MGM
from such licensee from the sale of such tape, after deducting
therefrom MGM's expenses, but in no event shall such royalty be
less than a royalty computed pursuant to the next preceding

- 5 -

sentence of this Paragraph 6.   In the event that MGM is the manu-
facturer and distributor of the tapes, the royalty to Producer
from sales thereof shall be the same as from the sale of disc
records manufactured and distributed by MGM.

7.   In the event that during the period covered by
this agreement, royalties accruing to Producer from the sales
of records made from recordings produced during the term of this
said agreement and containing performances by Artist, are less
than Three Hundred Thousand Dollars ($300,000.00), MGM shall
have the right to recoup the deficiency, but not in excess of
One Hundred Thousand Dollars ($100,000.00) of such deficiency,
from royalties accruing to Producer commencing January 5, 1970
(or January 5, 1972, if the option referred to in Paragraph 3
is exercised by MGM) from sales of any records produced under
the Agreement or this agreement or any other agreement between
MGM and Producer.

8.   The following shall be deemed added to Paragraph 5(c)
of the Agreement:

> "Prior to the scheduling of any
> recording session, you and we shall, in good
> faith, discuss and mutually agree on a re-
> cording budget for any such session, and you
> agree, in good faith, to adhere to said bud-
> get for recordings made pursuant hereto."

9.   MGM may, at its election, assign this agreement
or any of its rights hereunder, to any subsidiary or affiliated
company or to any company acquiring a major portion of the assets
of the MGM Records Label Division or license any of its rights
anywhere in the world.   In the event of assignment to a subsidiary
or affiliated company, MGM shall not be relieved of its obligations
hereunder.

10.   Producer agrees that it will cause Artist to
sign MGM's form of artist's guarantee of performance, a copy
of which is annexed hereto as Exhibit "A" and made part hereof.

11. All notices required to be given hereunder shall be in writing and sent by registered mail to MGM at 1350 Avenue of the Americas, New York City, and to Producer at the address aforesaid, or such other address as either party may hereafter designate. Such notice shall be deemed to have been given on the date of mailing.

12. This agreement sets forth the entire agreement between the parties with respect to the subject matter thereof, and no modification, amendment, waiver, termination or discharge of this agreement or any provisions thereof shall be binding upon either party unless confirmed by a written instrument signed by an officer of said party. No waiver of any provision of or default under this agreement shall affect either party's rights thereafter to enforce such provision or to exercise any right or remedy in the event of any other default, whether or not similar. This agreement and all of its provisions shall be interpreted and construed everywhere in accordance with the laws of the State of New York, applicable to contracts executed and to be performed therein.

IN WITNESS WHEREOF, the parties have hereunto set their hands this          day of

METRO-GOLDWYN-MAYER INC.
(MGM Records Division)

By _____
Vice President

G.G.C. PRODUCTIONS CORP.

By _____

- 7 -

EXHIBIT "A"

Metro-Goldwyn-Mayer Inc.
(MGM Records Division)                                    Dated:
EXEMBERKARKARK 1350 Ave. of Americas
New York XX, New York 10019

Gentlemen:

1.  Pursuant to a personal service contract between the undersigned and   G.G.C. PRODUCTIONS CORP.                     (herein called "Producer"), said Producer is entitled to my services for the recording of phonograph records.  I have been advised that Producer is about to enter into an agreement in writing with you (herein referred to as the "Agreement") pursuant to which Producer is to make my services available to you for the purposes and upon terms and conditions as to my services which have been fully explained to me.

2.  In consideration of your company executing the Agreement and as a further inducement to you to do so, I hereby confirm, warrant and guaranty to you:
    (a)  That Producer has the right, insofar as I am concerned, to enter into the Agreement and to assume all of the obligations, warranties and undertakings to you on the part of Producer therein contained, and that Producer will continue to have such rights until the said obligations, warranties and undertakings have been fully performed and discharged.
    (b)  All of the warranties and representations on the part of Producer contained in the Agreement, concerning me, are true and correct insofar as I am concerned.
    (c)  I will duly and to the best of my ability, perform, and discharge all of the obligations and undertakings of the Agreement insofar as they are required of me and which Producer has undertaken to procure me to do and perform in the Agreement.

3.  If during the term of the Agreement or any extension thereof, Producer shall cease to be entitled to make my services available to you in accordance with the terms of said Agreement, or fail or refuse to make my services available to you, I shall, at your request, do all such acts and things as shall give to you the same rights, privileges and benefits as you would have had under the Agreement if Producer had continued to be entitled to my services and made same available to you, and such rights, privileges and benefits shall be enforceable in your behalf against me.

4.  I hereby consent, as provided in the Agreement, to your having the exclusive right to use and publish and to permit others to use and publish my name and photograph, and to write and publish and to permit others to write and publish articles concerning me for advertising and trade purposes in connection with the sale and exploitation of phonograph records recorded under the Agreement; to use as descriptive of me the phrase "MGM Artist" or any other similar or appropriate phrase in connection with any trade name or label used by your MGM Records Division, and I agree that I will not, during the term of the Agreement or any extension or renewal thereof, perform for anyone else for the purpose of making phonograph records, and I will not, for a period of five (5) years after the termination of the Agreement or any extension or renewal thereof, perform any musical composition or material recorded under the Agreement for anyone else other than you for the purpose of making phonograph records.

5.  No termination of your Agreement with Producer shall operate to diminish my liability or obligations hereunder without your consent.

6.  I hereby consent and agree that you may in your own name institute any action or proceeding against me to enforce your rights under the Agreement and/or pursuant hereto.

EXHIBIT "A"
PAGE 1 OF 2 PAGES

7.   In the event that during the period covered by the Agreement, royalties accruing to Producer from the sales of records made from recordings produced during the term of the Agreement and containing my performances are less than Three Hundred Thousand Dollars ($300,000.00), you shall have the right to recoup the deficiency, but not in excess of One Hundred Thousand Dollars ($100,000.00) of such deficiency, from royalties accruing to me commencing January 5, 1970 (or January 5, 1972 if the option referred to in Paragraph 3 of the Agreement is exercised by you) from sales of any records under any agreement between your company and myself.

CONNIE FRANCIS

EXHIBIT "A"
PAGE 2 of 2 PAGES

*Exhibit 6*

Agreement made as of January 9th, 1930, by and between POLYDOR INCORPORATED, 810 Seventh Avenue, New York, New York 10019 ("COMPANY") and G.G.C. PRODUCTION CORP., c/o David Erlich & Co., 380 Madison Avenue, New York, New York, 10017 ("PRODUCER").

## W I T N E S S E T H:

WHEREAS, COMPANY is in the business of exploiting, distributing and marketing Phonograph Records, and

WHEREAS, PRODUCER desires to produce for COMPANY recordings embodying performances of CONNIE FRANCIS, hereinafter referred to as "ARTIST", for distribution by COMPANY upon the terms and conditions of this agreement.

NOW THEREFORE, in consideration of the representations and warranties and the mutual promises hereinafter set forth it is agreed as follows:

1. For the purposes of this agreement, the following terms shall mean:

(a) "Master", "Master Recording", "Recording": Any recording of sound, whether or not coupled with a visual image, by any method and on any substance or material, whether now or hereafter known, intended for reproduction in the form of Phonograph Records, or otherwise. An "Original Master", or "Original Recording" shall mean the recording which first fixes sounds in a medium sufficiently permanent or stable to permit it to be perceived, reproduced or otherwise communicated for a period of more than transitory duration, or, in the case of recordings which are made by a process of mixing and fixing together independently fixed sounds, the recording which first fixes any mix of such sounds. "Copy Masters" or "Duplicate Masters" are recordings derived from an Original Master without change other than is inherently introduced by the technical limitations of the re-recording process.

(b) "Side": A recording of sufficient playing time to constitute one (1) Side of a 7 inch, 45 rpm disc Phonograph Record, but not less than two and one-half (2-1/2) minutes of continuous sound, embodying performances of ARTIST.

(c) "Matrix", "Derivative": Any device, now or hereafter used, directly or indirectly, in the manufacture of Phonograph Records or Audio-Visual Devices and which is derived from a Master Recording, inclusive of Copy Masters but not limited thereto.

212:12.18.79
PARC



-2-

(d) "Records", "Phonograph Records": All forms of reproductions of recordings, now or hereafter known, manufactured or distributed primarily for home and/or juke box use and/or on or in means of transportation.

(e). "Audio-Visual Devices": All forms of reproductions of Audio-Visual Recordings, now or hereafter known, manufactured or distributed primarily for home and/or juke box use and/or on or in means of transportation.  Audio-Visual Recordings means every form of recording embodying performances of ARTIST wherein are fixed visual images of ARTIST together with sound, but exclusive of recordings used exclusively in motion pictures or broadcast television.

(f) "Single": A 7 inch, 45 rpm, double-sided Phonograph Record embodying thereon at least two (2) Sides.  A Single embodying more than two (2) Sides may from time to time be referred to as an "Extended Play".

(g) "LP": A 12 inch, 33-1/3 rpm, double-sided long-play Phonograph Record or the equivalent thereof embodying thereon the equivalent of not fewer than nine (9) sides and not more than eleven (11) Sides, and having not less than thirty-three (33) minutes playing time.

(h) "Album": One or more 12 inch, 33-1/3 rpm Records, or the equivalent thereof, sold in a single package.

(i) "Disco-Disc": A 12 inch, 33-1/3 rpm or 45 rpm double-sided long-play disc Phonograph Record embodying thereon not more than four (4) sides; Disco-Discs shall be regarded for all purposes as Singles hereunder.

(j) "Retail List Price": means, with respect to Records sold in the United States, COMPANY's suggested Retail List Price in the United States, and, with respect to Records sold outside the United States, COMPANY's or its licensee's suggested retail price in the country of manufacture or sale, as COMPANY is paid, or, in the absence in a particular country of such suggested Retail List Price the actual retail price as may be established by COMPANY or its licensee(s) in conformity with the general practice of the record industry in such country, provided that COMPANY shall be entitled to utilize the corresponding retail price adopted by the local mechanical copyright collection agency for the collection of mechanical copyright royalties. For purposes of royalty calculation, the Retail List Price shall be subject to the adjustments set forth in paragraph 7(e) hereof, except in the case of 12 inch Disco-Discs which shall be subject to the provisions of paragraph 7(b) hereof.

212:12.18.79
PARC

-3-

(k) "Recording Costs": means all costs including pre- and post-production costs incurred for and with respect to the production of Masters embodying ARTIST's performances hereunder.  Recording Costs include, without limitation, union scale, the costs of all instruments, musicians, vocalists, conductors, arrangers, orchestrators, copyists, etc., payments to a trustee or fund based on wages to the extent required by an agreement between COMPANY and any labor organization or trustee, all studio costs, tape, editing, mixing, mastering to tape, rehearsal halls, costs of non-studio facilities and equipment, dubbing, transportation of instruments and other costs and expenses including production fees incurred in producing the Masters hereunder, from time to time, and which are customarily recognized as Recording Costs in the phonograph record industry.

(l) "Composition": means a musical composition or medley consisting of words and/or music, or any dramatic performance, reading, monologue, dialogue and other performance in a unit of literary, dramatic or musical material, whether in the form of instrumental and/or vocal music, prose or otherwise, irrespective of length.

(m) "Controlled Composition": means any composition embodied on a Master hereunder which is written, composed, owned and/or controlled by PRODUCER and/or any person who produces Masters hereunder and/or ARTIST and/or any party which is allied or affiliated with any one or more of them or in which one or more of them has a direct or indirect interest or from the use of which on a published sound recording subject hereto one or more of them would derive direct or indirect benefit.

(n) "Records Sold For Distribution In The United States": means Records sold by POLYGRAM DISTRIBUTION, INC., or any independent distributors with whom COMPANY may now or hereafter enter into arrangements or agreements for distribution to the retail trade, which shall exclude, for purposes of illustration but not by way of limitation, record club, and other mail order, "key outlet marketing" sales and budget sales.

(o) "Territory": means the world.

(p) "ARTIST": shall mean the individual or individuals hereinabove referred to as performing for the purpose of making recordings pursuant to this agreement.

212:12.18.79
PARC

-4-

(q) "Budget Records": Albums sold in a particular country of the territory at a suggested Retail List Price which is seventy-five (75%) per cent or less of COMPANY's suggested Retail List Price in such country of the Territory for top "pop" single LP Albums. The suggested Retail List Price of a multi-record Album for the purposes of this definition shall be the actual suggested Retail List Price of such Album divided by the number of disc LPs or the equivalent thereof embodied therein. A Promotional Record released under COMPANY's top "pop" label if otherwise it fulfills the criteria for a Budget Record set forth above shall be subject to the provisions of this agreement related to Budget Records except that any release restrictions pertaining thereto shall not apply to such Promotional Records.

(r) "Person": Any individual, corporation, partner-ship, association, or other business entity, and/or the legal successors or representatives of any of the foregoing.

(s) "Non-Affiliated Third Parties": Persons other than: Members of the POLYGRAM GROUP as now or hereafter constituted, and other than Persons as to which COMPANY now or hereafter directly or indirectly holds at least fifty (50%) per cent interest or control (including joint ventures) or Persons in which the principals of COMPANY or any of the POLYGRAM GROUP now or hereafter collectively hold at least a fifty (50%) per cent interest or control.

2.  (a) COMPANY hereby engages PRODUCER to furnish the exclusive services of ARTIST, and the services of an indivi-dual producer to produce and deliver to COMPANY three (3) Sides embodying performances of ARTIST, and such optional further number of Sides as provided for hereinafter. PRODUCER accepts such engagement, agrees to deliver to COMPANY recordings embodying performances of ARTIST in accordance herewith, and agrees that the individual producer shall render his services to the best of his ability and in accordance with first-class standards of performance for producers in the phonograph record industry, and subject to the terms and conditions hereof. PRODUCER hereby grants to COMPANY three (3) separate and consecutive options, the first of which shall be for one (1) further LP, and the second and third of which shall be for two (2) LPs each, which options shall be exercised, if at all, in accordance with the provisions of paragraph 3 below.

(b) The Term of this agreement, where reference is made herein to the Term, shall mean the period of time

212:12.18.79
PARC

 

-5-

commencing on the date hereof and ending nine (9) months
after delivery to COMPANY of the last LP to be delivered to
COMPANY in accordance herewith, or, in the case of the three
(3) Sides, six (6) months after the Initial Release thereof.
An Option Period is the period of the Term commencing on
exercise of an option for one or more Albums and expiring
upon exercise of the next subsequent option, or upon expira-
tion of the Term, whichever shall occur earlier.

3.    (a)  During the Term, PRODUCER warrants that ARTIST
shall perform for the purpose of making Phonograph Records
exclusively for PRODUCER, and COMPANY shall have the
exclusive right for phonograph record purposes to all
recorded performances of ARTIST made throughout the Term.
PRODUCER shall deliver to COMPANY the number of newly
recorded Sides embodying the performances of ARTIST as
hereinafter provided in this paragraph 3.

      (b)  COMPANY's execution hereof shall be deemed
its request that PRODUCER deliver the Masters comprising
the first three (3) Sides within ninety (90) days of such
request.

      (c)  Not later than six (6) months after release by
COMPANY of the LP containing the first three (3) Sides,
COMPANY shall, at its option, have the right to give PRO-
DUCER written notice of its request that PRODUCER deliver a
First LP hereunder in accordance with the provisions of
subparagraph (f) below, and PRODUCER shall deliver such LP
if so requested.  If COMPANY fails to exercise its right as
set forth in this subparagraph, the Term of this Agreement
shall expire forthwith.

      (d)  Not later than nine (9) months after delivery to
COMPANY of the First LP, COMPANY shall, at its option, have
the right to give PRODUCER written notice of its request
that PRODUCER deliver a Second and a Third LP hereunder in
accordance with the provisions of subparagraph (f) below,
and PRODUCER shall deliver such LPs if so requested.  If
COMPANY fails to exercise its right as set forth in this
subparagraph, the Term of this Agreement shall expire
forthwith. .

      (e)  Not later than nine (9) months after delivery to
COMPANY of the Third LP, COMPANY shall, at its option, have
the right to give PRODUCER written notice of its request
that PRODUCER deliver a Fourth and a Fifth LP hereunder in
accordance with the provisions of subparagraph (f) below,
and PRODUCER shall deliver such LPs if so requested.  If
COMPANY fails to exercise its right as set forth in this
subparagraph, the Term of this Agreement shall expire
forthwith.

212:12.18.79
PARC

-6-

(f)  Subsequent to the First LP, PRODUCER shall deliver
to COMPANY subsequent LPs hereunder, as specified in sub-
paragraphs (b), (c), and (d) above, any one not earlier than
six (6) months, nor later than twelve (12) months following
delivery of the immediately preceding album.  PRODUCER shall
deliver completed, edited and fully mixed original master
tapes in accordance with COMPANY's reasonable instructions.
Said master tapes shall invariably include a stereo two track
master tape compatible for monaural reproduction.   The
compositions to be recorded shall be designated by PRODUCER
and PRODUCER shall have complete creative control over the
production of Masters hereunder, subject to the provisions
of paragraph 5(f) below, and provided that each Master
recording shall be approved by COMPANY as technically
satisfactory for the manufacture and sale of Phonograph
Records.

(g)  For the purposes of paragraphs 2 and 3 hereof the
date of PRODUCER's delivery of any LP hereunder shall be
that date which PRODUCER, by written notice to COMPANY given
within thirty (30) days after the delivery to COMPANY of the
fully mixed and edited tapes for such LP, informs COMPANY to
be such delivery date, provided that:

(i).  Such date shall in no event be earlier than
the date of completion by PRODUCER of the procedures to be
performed in accordance with paragraph 11 hereof with
respect to such LP; and

(ii)  That COMPANY shall have the right to object
to such date by written notice to PRODUCER given within
thirty (30) days after receipt of the notice from PRODUCER
provided for in the foregoing, but solely on the grounds
that PRODUCER had not by the date given by PRODUCER com-
pleted delivery of the LP by performance of all of the
procedures set forth herein to be performed by PRODUCER with
respect to such LP to enable COMPANY to release such LP.  In
the event that COMPANY does so object, COMPANY and PRODUCER
shall mutually and in good faith agree on the date to be
deemed the delivery date which shall be the earliest date on
which PRODUCER has so completely performed with respect to
such LP.  In the event that COMPANY does not respond to
PRODUCER within the aforesaid thirty (30) days period in
which it may lodge objection, or does not otherwise object
to the date given by PRODUCER as the date which PRODUCER
deems to be the date of delivery, then such date given by
PRODUCER shall be deemed to be the delivery date of the
LP in question.  In the event that PRODUCER does not notify
COMPANY within thirty (30) days after the delivery to
COMPANY of the fully mixed and edited tapes for any LP of
the date which PRODUCER deems to be the delivery date of

212:12.18.79

 

-7-

such LP, then such LP shall be deemed to have been delivered sixty (60) days prior to its date of initial release in the United States.

(h) PRODUCER warrants that ARTIST's performances hereunder shall be reasonably consistent in concept and style and that subsequent Masters hereunder will in general artistic concept and style be similar to the previously delivered Masters hereunder. In the event ARTIST desires to perform in any new concept and style, COMPANY's prior written consent shall be required. PRODUCER further agrees that neither "live" performance recordings nor multiple LP Albums shall be recorded and accepted as part of PRODUCER's delivery obligation hereunder unless with COMPANY's prior written consent; without limitation of the generality of the foregoing, any multi-LP Album hereunder shall be deemed a single LP for the purposes of product delivery and payment therefor unless COMPANY explicitly in writing by an authorized officer agrees otherwise.

(i) All Masters delivered hereunder shall be recorded no earlier than six (6) months prior to delivery to COMPANY and shall not embody Compositions which have been previously delivered to COMPANY.

4. (a) Without limitation of the generality of paragraph 3(a) above, PRODUCER warrants that ARTIST will not license nor consent to the use of ARTIST's name, likeness, biographical material or other identification ("ARTIST's Identification") for or in connection with the exploitation by anyone other than COMPANY of Phonograph Records or Audio-Visual Recordings derived from recordings made during the Term.

(b) PRODUCER further warrants that ARTIST will not perform nor license, nor consent to the use by any one or more third parties of ARTIST's Identification for or in connection with the recording or exploitation of any Phonograph Record embodying any Composition recorded by ARTIST under this agreement prior to the later of the date five (5) years subsequent to the date of delivery to COMPANY of a Master embodying that Composition recorded hereunder, or the date three (3) years subsequent to the expiration or other termination of the Term of this agreement. Should ARTIST so perform or should licensed or consented to use of ARTIST's Identification by any one or more third parties occur in connection with any such Composition during the period referred to above, then COMPANY shall have the right, at its election, to terminate this agreement and COMPANY shall have no further obligation with respect to such violative Composition to pay royalties to PRODUCER.

212:12.18.79
PARC

 

-8-

5. All Masters and any Audio-Visual Recordings produced hereunder shall be recorded by PRODUCER on COMPANY's behalf, and all Records embodied therein shall from inception of their creation be entirely the property of COMPANY in perpetuity throughout the Territory, free of any claim whatsoever by PRODUCER or by ARTIST or by any Persons deriving any rights or interests therefrom, and COMPANY shall have the right to copyright the Masters recorded during the Term embodying performances of ARTIST in COMPANY's name as owner and author (as employer for hire, such relationship being solely for the purpose of applicable copyright law) and to secure any and all renewals of such copyright. The method, manner and extent of release, packaging, promotion, advertising, distribution and sales relating to reproductions of Master Recordings involved herein shall be within the sole discretion of COMPANY unless otherwise herein specifically provided. COMPANY's rights in the Masters recorded during the Term embodying performances of ARTIST shall specifically but without limitation include the following subject to any express restrictions set forth in this paragraph 5, or paragraphs 7 and/or 19 below:

(a) The sole and exclusive right of ownership of all performances hereunder, and of all Masters embodying such performances, including the sole and exclusive right in all matrices and other derivatives of the Masters, irrespective of the method of such embodiment, whether electronic, magnetic, mechanical, or other now or hereafter known;

(b) The sole and exclusive right to reproduce the Masters and the performances embodied thereon and to manufacture therefrom all forms of derivatives and derivative works including Phonograph Records in any speed, size, or format whatsoever, coupling the Masters at COMPANY's option with other Masters not the subject hereof;

(c) The sole and exclusive right to distribute reproductions of the Masters and the performances embodied thereon by sale or other transfer, rental, lease, or lending, and under any name, trademark or label which COMPANY and/or its subsidiaries, affiliates and licensees may from time to time elect; provided that during the Term and in the United States, the initial release of all Masters hereunder shall be on COMPANY's top "pop" label;

(d) The sole and exclusive right to perform publicly the Masters and the reproductions thereof and to permit the public performance thereof by means of radio or television broadcast, or any other method now or hereafter known;

212:12.18.79
PARC

-9-

(e)  The sole and exclusive right, in the case of individual images of any Audio-Visual Recording subject hereto, to display the work publicly;

(f)  The sole and exclusive right to edit the Masters to conform to the technological or commercial requirements of Phonograph Records in various formats, or of other reproductions of the Masters, or to eliminate material which might subject COMPANY to any civil or criminal action if reproduced and/or distributed;

(g)  The sole and exclusive right to use and to permit others to use the performances hereunder in time synchronization with visual images, providing, however, that such visual images shall not consist of visual images of musical performing artists other than ARTIST, and provided that the exploitation of visual images of ARTIST in combination with sound recordings shall be subject to the provisions of paragraph 6 below;

(h)  The sole and exclusive right to use the names, photographs and biographical material of ARTIST, PRODUCER, and the individual producer of the Masters in connection with the promotion, exploitation and sale of derivatives of the Masters subject hereto;

(i)  The sole and exclusive right to convey the rights set forth in the preceding subparagraphs in whole or in part to third parties, whether by license or assignment.

6.  (a)  (i)  COMPANY shall not have the right to request PRODUCER to deliver ARTIST's performances in the form of Audio-Visual Recordings, nor to require ARTIST to perform therefor without PRODUCER's consent, nor shall COMPANY be required to accept ARTIST's performances in the form of Audio-Visual Recordings.

(ii)  Notwithstanding anything to the contrary expressed or implied above, ARTIST shall not during the Term perform for the purpose of making Audio-visual Recordings for any other COMPANY.

(b)  PRODUCER agrees that ARTIST shall be available from time to time at COMPANY's request and expense, whenever the same will not unreasonably interfere with other professional activities of ARTIST, to perform for the purpose of recording by means of film, video tape, or other

212:12.18.79
PARC



-10-

audio-visual medium performances by ARTIST of Compositions
embodied on Masters hereunder to be used for promotional
purposes, provided that nothing herein shall be construed as
granting rights in Audio-Visual Recordings for release on
Audio-Visual Devices to the extent such rights are not
granted elsewhere herein. ARTIST's compensation therefor
shall be limited to any minimum amounts required to be paid
for such performances pursuant to any collective bargaining
agreements pertaining thereto except that in the event that
COMPANY shall receive any income from its use of such
promotional film it shall share such income with PRODUCER in
accordance with the provisions of paragraph 7(s) below.

7. COMPANY shall credit to the account of PRODUCER and
shall pay to PRODUCER in accordance with the provisions of
paragraph 8 below the following royalties for the sale of
Phonograph Records derived from the Masters against which
all advances paid to or on behalf of PRODUCER, including
without limitation, the sums referred to in paragraph 9
shall be chargeable and COMPANY shall recoup such sums from
the following royalties:

(a) (i) A royalty of ten (10%) per cent of ninety
(90%) per cent of the Retail List Price for all Singles
hereunder, sold by COMPANY for distribution in the United
States.

(ii) A royalty of eleven (11%) per cent of one
hundred (100%) per cent of the Retail List Price for all
Albums hereunder, sold by COMPANY for distribution in the
United States.

(iii) In the event that full royalty bearing net
sales in the United States of the initial disc release of
any LP subject to the royalty provisions of (ii) above
shall exceed three hundred and fifty (350,000) thousand
units, then for such sales of such LP disc Album in the
United States in excess of three hundred and fifty thousand
(350,000) units and for such sales of the equivalent pre-
recorded tape Album in excess of one hundred fifty thousand
(150,000) units, the applicable royalty rate in (ii) above
shall be increased by one (1%) per cent of one hundred
(100%) per cent of the Retail List Price.

(iv) A royalty of seven (7%) per cent of one
hundred (100%) per cent of the Retail List Price for all
Singles and Albums derived from the Masters hereunder sold
for distribution outside the United States by COMPANY or
other Persons, corporations or firms under leasing or
licensing arrangements or agreements with COMPANY.

212:12.18.79
PARC

-11-

(v)  The rate set forth in (i) above shall some-
times hereinafter be referred to as the "Base Rate for
Singles"; the rate set forth in (ii) above shall sometimes
hereinafter be referred to as the "Base Rate for LPs";
and collectively the said rates shall hereinafter sometimes
be referred to as the "Base Rates for Domestic Sales".  The
rate set forth in (iv) above shall hereinafter sometimes be
referred to as the "Base Rate for Overseas Sales".  The
foregoing provisions of paragraph 7 shall be subject to
any modifications expressed or implied in the following
provisions of paragraph 7.

(b)  In the event that COMPANY releases a Disco-Disc
the suggested Retail List Price of which is less than five
($5) dollars, such higher-priced Disco-Disc shall be deemed
a Budget Record and the royalty provisions therefor shall
apply, but in any event any release restrictions herein
contained related to Budget Records shall not apply to
such Disco-Disc.

(c)  (i)  As to Records derived from the Masters
hereunder sold in the United States or Canada through
non-affiliated third party record clubs or similar sales
plans or devices operated by non-affiliated third parties,
PRODUCER shall receive a sum equal to fifty (50%) per cent
of COMPANY's net receipts therefrom.

(ii)  As to Records derived from the Masters
hereunder sold in the United States or Canada through
COMPANY's affiliated record clubs or similar sales plans or
devices operated by parties affiliated to COMPANY, PRODUCER
shall receive a royalty equal to five (5%) per cent of
eighty-five (85%) per cent of the suggested Retail List
Price of such Records.

(iii)  As to Records derived from the Masters
hereunder sold for distribution outside of the United States
or Canada through record clubs or similar sales plans or
devices, PRODUCER shall receive a sum equal to one-half
(1/2) of the applicable Base Rate for Overseas Sales.

(iv)  No royalty shall be payable with respect to
Records hereunder distributed to members of record clubs as
"bonus" or "free" records as a result of joining the club,
and/or recommending that another join the club and/or
purchasing a required number of Records, provided that
COMPANY shall pay royalties to PRODUCER on all Records
hereunder for which it receives payment.

212-12.18.79
PARC

 

-12-

(d) As to Records not consisting entirely of Masters hereunder, PRODUCER's royalties otherwise payable hereunder shall be pro-rated on the basis of the number of Sides hereunder which are on such Records compared to the total number of Sides on such Records.

(e) Royalties on Phonograph Records hereunder included in Albums, jackets, boxes or any other type of package or container (herein collectively referred to as "containers") shall be based solely upon the Retail List Price of such Phonograph Records in containers less all taxes and duties and also a container charge of ten (10%) per cent of the Retail List Price for a Single, Extended Play, or Disco-Disc packaged in a non-standard sleeve, or for a single-fold disc Album, fifteen (15%) per cent of the Retail List Price for a double-fold disc Album whether containing one or more LPs, or an LP packaged in a non-standard sleeve, or for a disc Album which contains an insert, and twenty (20%) per cent of the Retail List Price for a pre-recorded tape Album.

(f) (i) Expressly, but without limitation of its rights elsewhere herein granted, COMPANY shall have the right to license the Masters hereunder to non-affiliated third parties for all methods of distribution, including, without limitation, the method known as "key outlet marketing" or distribution through retail fulfillment centers in conjunction with special advertisements on radio or television, direct mail, or mail order, or for "premium" use, or by any combination of the methods set forth above, and for sale on Budget Record lines. Unless otherwise provided for, COMPANY shall credit PRODUCER's royalty account with fifty (50%) per cent of COMPANY's net royalty receipts in respect of each such license pertaining to the Masters hereunder.

(ii) As to long-playing Records (other than Promotional Records hereinafter provided for) sold as Budget Records, and for the sale of Records which include Masters hereunder which are sold through the method known as "key outlet marketing" (or distribution through retail fulfillment centers in conjunction with special advertisements on radio or television, direct mail, or mail order), or for "premium" use, or by any combination of the methods set forth above, by COMPANY and/or affiliated licensees and/or outside the United States and Canada, the rate shall be one-half (1/2) the otherwise applicable royalty rates; in the case of "premiums" the Retail List Price for such Records shall be deemed to be COMPANY's or its licensee's actual sales price.

212:12.18.79
PARC

 

-13-

(iii)  COMPANY shall be entitled to use and publish and to license or permit others to use and publish, ARTIST's Identification with respect to the products and services in connection with "premium" Records provided that such use is not an endorsement of the product or service.  In any case where more than one (1) Side hereunder is embodied on a "premium" Record sold in the United States or Canada, COMPANY agrees that the prior consent of PRODUCER shall be required for "premium" usage in such case, which consent shall not be unreasonably withheld.

(iv)  Notwithstanding anything to the contrary expressed or implied elsewhere herein, COMPANY agrees that during the Term and in the United States it shall not release any particular Master on a Budget Record within one (1) year of the initial release of such Master, subject to the provisions of (h) below.

(g)  The royalty rate for the sale of pre-recorded tapes shall be one hundred (100%) per cent of the otherwise applicable royalty rate.

(h)  (i)  For record club purposes, COMPANY shall have the right to include or to license others to include any one or more of the Masters hereunder in Promotional Records on which such Masters and other recordings are included, which Promotional Records are designed for sale at twenty-five (25%) per cent or less of the regular price of COMPANY's full price Records embodying the same number of discs, or the equivalent thereof, and such Promotional Records shall be royalty-free, provided that not more than two (2) Sides hereunder shall be included on any one such Record, and provided further that no other artist of COMPANY receives royalties from COMPANY on such Record.

(ii)  With respect to Promotional Records as provided for above, but other than for record clubs, COMPANY shall have the same rights as above except that in such case not more than one (1) Side may be included on any one such Promotional Record.

(i)  COMPANY shall have the right to license the Masters hereunder for non-Phonograph Record use on a flat-fee basis.  COMPANY shall credit PRODUCER's royalty account with fifty (50%) per cent of the net amount received by COMPANY under each such license.

(j)  No royalty shall be payable for Records returned for credit by any buyer, for Records given away gratis or sold for fifty (50%) per cent of less of the "gross price",

212:12.18.79
PARC



-14-

as hereinafter defined, for Records distributed to disc jockeys, radio stations, television stations, motion picture companies, publishers, distributors, dealers, consumers, or any others for publicity, advertising, or promotional purposes, for Records sold as cutouts, or for Records sold as scrap.  Furthermore:

    (i)  To the extent that Records hereunder are sold subject to a sales plan entailing a selling price for such Records reduced by a percentage discount from COMPANY's Gross Price (an example of which, for illustrative purposes only, is set forth in subparagraph (1) below), the number of such Records deemed for royalty purposes to have been sold shall be determined by reducing the number of Records actually sold by the percentage of discount granted applicable to such sale, and

    (ii)  To the extent that free or bonus Records are given away together with Records sold for monetary consideration (being the form of sales plan known in the record industry as the giving of "free goods"), such free or bonus Records shall not be included in the number of Records deemed for royalty purposes to have been sold, provided however that:

    (iii)  The aggregate number of Records deemed not sold for royalty purposes under clause (i) above and deemed not sold for royalty purposes under clause (ii) above shall not, except for the requirements of special sales plans, exceed COMPANY's standard policy in this regard which is at present, for singles, 23.08% per cent of the gross total sold and, for LPs, 15% of the gross total sold.

(k)  (i)  Notwithstanding the foregoing, at COMPANY's election it may report as records sold the number of Records deemed pursuant to (j)(i) and (j)(ii) above not sold for royalty purposes, and instead reduce the per Record royalty payable hereunder proportionately as the number of such Records deemed not sold for royalty purposes bears to the gross total invoiced, paid for and not returned.  For the purposes of this agreement in any case where any event is predicated upon the achievement of a particular sales volume level, the terms "net sales" and/or "net royalty-bearing sales" shall be the sales determined by the operation of the above clauses (j)(i) and (j)(ii).

    (ii)  Whether or not in accordance with a published sales plan, in any case in which Records are sold by COMPANY or its distributor for less than the Gross Price, but for more than fifty (50%) per cent thereof, the rate of royalty payable hereunder shall be reduced in the same proportion as the reduction from the Gross Price.

PARC 12.18.79

-15-

(1)  COMPANY's "Gross Price" shall mean for the pur-
poses of this agreement the gross selling price of COMPANY
or its distributor (in particular, but without limitation,
in the United States, POLYGRAM DISTRIBUTION, INC., or its
successors) before any discount or merchandise or other
sales plan, any free or bonus Records, or any other discount
is given.  For purposes of illustration only, the following
are, at the time of execution hereof, the suggested Retail
List Price, Gross Price, and the selling price (after
deduction of the discount in accordance with COMPANY's
current policy) for Singles with a suggested Retail List
Price of $1.29 and single disc Albums and pre-recorded tapes
with a suggested Retail List Price of $7.98, sold to rack
jobbers by POLYGRAM DISTRIBUTION, INC., COMPANY's present
distributor:

| | Sugg. Retail List Price | Gross Price | Sales Plan Discount | Selling Price |
|---|---|---|---|---|
| Singles | $1.29 | $0.90 | $0.23/23.08% | $0.67 |
| LP/Tape | $7.98 | $4.68 | $0.70/15.00% | $3.98 |

(m)  Without limitation of the generality of subpara-
graph (j) above, COMPANY shall have the right to deduct from
the number of Records sold returns and credits of any
nature, including without limitation:  (i) those on account
of any return or exchange privilege;  (ii) defective
merchandise; and  (iii) errors in billing or shipment,
provided that returns shall be pro-rated between royalty-
bearing and non-royalty-bearing Records on the assumption
that such Records were shipped pursuant to COMPANY's
standard basic sales plan as described in (j)(iii) above.
COMPANY shall have the right to withhold a reasonable
portion of PRODUCER's royalties as a reserve against
returns; any such reserve withheld shall not exceed, for
Singles, fifty (50%) per cent of the sales of Singles in the
period to which it relates, and, for LPs, thirty-five (35%)
per cent of the sales of LPs in the period to which it
relates, and, further, shall be liquidated within eighteen
(18) months of the date first withheld.

(n)  Royalties for Phonograph Records sold for distrib-
ution outside the United States shall be computed in the
same national currency as COMPANY is accounted to by its
licensees and as to sales made outside of the United States,
shall be paid at the same rate of exchange as COMPANY is
paid, and shall be subject to any taxes applicable to
royalties remitted by or received from foreign sources.

212.12.18.79
PARC

 

-16-

provided, however, that royalties on Phonograph Records sold
outside the United States shall not be due and payable by
COMPANY until payment therefor has been received by COMPANY
in the United States in United States Dollars, and provided,
further, that if COMPANY shall not receive payment in the
United States, or in United States Dollars, and shall be
required to accept payment in foreign currency or in a
foreign country, COMPANY shall deposit to the credit of
PRODUCER (and at the expense of PRODUCER) in such currency
in a depository in the country in which COMPANY is required
to accept payment but selected by PRODUCER payments so
received applicable to royalties hereunder and shall notify
PRODUCER promptly thereof.  Deposit as aforesaid shall
fulfill the obligations of COMPANY as to Phonograph Record
sales to which such royalty payments are applicable.  In
countries where COMPANY's foreign licensees in general do
not account for returns, an allowance of fifteen (15%) per
cent of gross shipments may be granted or deducted by
COMPANY.

(o)  The royalty rate for Records sold outside the
United States for sale in Armed Forces Post Exchanges shall
be fifty (50%) per cent of the otherwise applicable royalty
rates.

(p)  Notwithstanding anything to the contrary contained
herein, the royalty rate for Audio-Visual Recordings shall
be negotiated between the parties in good faith.  Such
negotiations shall take into account, among other things,
prevailing conditions at the time thereof as well as
PRODUCER's royalty rate for sound recordings, and ARTIST's
current stature as a recording artist.

(q)  The royalties provided herein shall include all
sums due to ARTIST, the individual producer and any other
parties PRODUCER has express or implied contractual respon-
sibility to make payment to in respect of sales of Records
subject hereto, subject to the provisions of paragraph 12
below.

(r)  In the event that any recordings made hereunder
are participated in by any other artist(s) who should
then be under contract to COMPANY, then the royalties
and non-returnable payments due hereunder for such joint
performances shall be the royalties and non-returnable
payments herein provided for divided by the number of
artists participating therein including ARTIST.

(s)  In the event that COMPANY receives income from any
commercial usage of the Masters hereunder not specifically

212:12.18.79
PARC



-17-

provided for in the foregoing, and in the further event that COMPANY's receipts are not already net of a payment made directly to ARTIST, then COMPANY agrees to pay to PRODUCER fifty (50%) per cent of the net amount received of such income, provided always that such income is accounted to COMPANY on an artist-by-artist or Master-by-Master basis.

(t) In the foregoing provisions of paragraph 7 the terms "net royalty receipts" and "net amount received" shall mean the gross amounts received by COMPANY in connection with the subject matter therewith less any amounts which COMPANY is obligated to pay to third parties (such as, without limitation, manufacturing costs, mechanical copy-right payments, AFofM and other union payments).

(u) For the purposes of this paragraph 7, COMPANY shall be deemed to have been paid when and if COMPANY's account has been credited n respect of such payment.

8. (a) Accountings as to royalties payable hereunder shall be made by COMPANY to PRODUCER on or before the 30th day of September for the period ending the preceding June 30th, and on or before the 31st day of March for the period ending the preceding December 31st, or such other accounting periods as COMPANY may in general adopt, but in no case less frequently than semi-annually, together with payment of accrued royalties, if any, earned by PRODUCER during such preceding half-year, subject to (b) and (e) below. All royalty statements and all other accounts rendered by COMPANY to PRODUCER shall be binding upon PRODUCER and not subject to any objection by PRODUCER for any reason unless specific objection in writing, stating the basis thereof, is given to COMPANY within two (2) years from the date rendered, and after such notice of objection, unless suit is instituted within one (1) year after the date on which COMPANY notifies PRODUCER that it denies the valid-ity of the objection. Failure to make specific objection within said time period shall be deemed approval of such statement.

(b) Notwithstanding anything to the contrary contained above, in the event that PRODUCER's net royalty earnings at the end of a given accounting period are less than twenty-five ($25) dollars, COMPANY may, at its option, carry forward such earnings to the next such accounting period.

(c) PRODUCER shall have the right at PRODUCER's own expense to audit COMPANY's books and records as the same pertain to sales under this agreement and make extracts and

212;12.18.79
PARC

 

-18-

copies thereof once a year with respect to the statements
relating to the recordings hereunder pertaining to the
four (4) prior accounting periods prior to such audit, and
COMPANY agrees to make all necessary sales information, data
and documents available for such purposes at COMPANY's
accounting offices at its address first mentioned herein.
Such audit shall be conducted by a Certified Public
Accountant during normal business hours and on reasonable
written notice.

(d) Any statements hereunder shall be deemed to have
been rendered on the date due absent written notice from
PRODUCER to COMPANY to the contrary given within one hundred
eighty (180) days after the date on which such statement was
due in accordance with the foregoing.

(e) PRODUCER hereby irrevocably instructs and directs
COMPANY to pay to GEORGE SCHECK fifteen (15%) per cent of
all royalties earned by PRODUCER in accordance herewith.
PRODUCER shall have the right in respect of any Masters
recorded hereunder to give similar irrevocable instruc-
tion and direction in writing to pay to any individual
producer(s) of such Masters a proportion of the royalties
earned by PRODUCER in accordance herewith in relation to
such Masters.

9. (a) For the rights herein granted to COMPANY and for
the services to be rendered by PRODUCER, provided that
PRODUCER performs its obligations hereunder, COMPANY agrees
that it shall pay on behalf of PRODUCER all Recording Costs
(as defined in paragraph 1 above) subject in particular but
without limitation to the provisions of paragraph 10 below.
All such Recording Costs paid by COMPANY shall constitute
advances to be charged against and recoupable from all
royalties payable to PRODUCER if and when earned.

(b) All monies paid to PRODUCER or on PRODUCER's
behalf during the Term of this agreement at PRODUCER's
request, other than royalties paid pursuant to paragraph 7
hereof, shall be deemed advances against and recoupable from
royalties payable hereunder, unless COMPANY shall have
expressly agreed in writing by an authorized officer of
COMPANY that such monies shall not be deemed advances.

10. (a) PRODUCER agrees that all Masters recorded here-
under shall be recorded under COMPANY's own AFofM recording
license, and PRODUCER shall only record such Masters within
the framework of a recording budget approved by COMPANY.
No recording session shall be produced, nor shall any
musicians, vocalists, arrangers, or others be engaged unless

212:12.18.79
PARC

-19-

and until a written proposed recording budget for each such session shall have been submitted by PRODUCER and approved in writing by one of COMPANY's officers.  In the event Recording Costs of such approved session shall exceed the approved budget, PRODUCER shall be responsible for such costs.  COMPANY may, at its option, pay such excess and deduct the same from any and all sums due or to become due to PRODUCER hereunder, including without limitation, advances and/or approved budgets for future recordings.

(b)  PRODUCER shall employ an individual producer to producer the Masters hereunder, and COMPANY and PRODUCER shall mutually agree as to who such individual producer shall be in respect of each recording project to be undertaken hereunder prior to commencement of recording.  In the event that COMPANY and PRODUCER cannot agree as to such individual producer in respect of any recording project, COMPANY's decision as to such individual producer shall be binding on both PRODUCER and ARTIST, provided that in such event COMPANY shall be responsible for any royalty in excess of four (4%) per cent to such individual producer which PRODUCER would otherwise be obligated to pay.

11.  PRODUCER shall follow the procedures set forth below in connection with Master Recordings made hereunder.  No Master recorded hereunder shall be deemed delivered unless and until PRODUCER has completed its obligations hereunder in relation to such recording.

(a)  Except as expressly noted otherwise in this agreement, and prior to the commencement of recording, in each instance PRODUCER shall obtain the approval of COMPANY, which approval shall not unreasonably be withheld, of each of the following in order, before proceeding further:

(i)  Selection of the individual producer of the Masters.

(ii)  Selection of material to be recorded (including the number of Compositions to be recorded and the copyright royalty rate at which each such Composition will be licensed to COMPANY).  COMPANY shall not be deemed to be unreasonable in rejecting any request to record an LP consisting of more than one (1) twelve-inch, 33-1/3 rpm Record.

(iii)  Specification of accompaniment, arrangement and copying services.

2126 12.18.79
PARC

 

-20-

(iv) Selection of dates of recording and studios
where recording is to take place, including the cost of
recording therein. COMPANY shall not be deemed to be
unreasonable in rejecting any request to begin recording any
Master which is a part of the minimum recording commitment
hereunder within three (3) months after the acceptance of a
prior LP hereunder.

(v) Fill out and submit to COMPANY a proposed
budget on COMPANY's then current Recording Authorization
budget form (this shall be done sufficiently before the
planned commencement of recording so as to give COMPANY a
reasonable period of time to review same in order to approve
or disapprove at least fourteen (14) days before the planned
commencement of recording).

(b) PRODUCER shall notify the appropriate local of
the American Federation of Musicians in advance of each
recording session. At the time of call of musicians engaged
hereunder, such musicians shall be advised by PRODUCER,
or by any agent engaged by PRODUCER (such as, without
limitation, an individual producer, leader or contractor)
that COMPANY is the employer, and all "Form B" contracts for
sessions hereunder shall indicate COMPANY as employer.

(c) As and when required by COMPANY, PRODUCER shall
allow COMPANY representatives to attend any or all recording
sessions hereunder.

(d) PRODUCER shall timely supply COMPANY with all of
the information it needs in order: (i) to make payments
in connection with such recordings; and (ii) to comply
with any other obligations COMPANY may have to prepare to
release Phonograph Records derived from such Masters.
Without limiting the generality of clause (ii) of the
preceding sentence, PRODUCER shall furnish COMPANY with all
information it requires to comply with its obligations under
its union agreements, including without limitation, the
following:

(i) If a session is held to record new tracks
intended to be mixed with existing tracks (and if such
information is requested by the American Federation of
Musicians) the dates and place of the prior sessions at
which such existing tracks were made, and the AFofM Phono-
graph Recording Contract ("Form B") number(s) covering such
sessions.

212t12.18.79
PAR



-21-

(ii)   Each change of title of any composition listed in an AFofM Phonograph Recording Contract ("Form B").

(iii)   A listing of all the musical selections contained in recordings made at location sessions and delivered to COMPANY hereunder.

(e)   Nothing in this agreement shall obligate COMPANY to continue or permit the continuation of any recording session or project even if previously approved hereunder if COMPANY reasonably anticipates that the Recording Costs will exceed those specified in the approved budget or that the recordings being produced will not be satisfactory.

(f)   PRODUCER shall, subject to the provisions of paragraph 3(f) above, deliver to COMPANY a two-track stereo master tape for each Master recorded hereunder, which tapes shall be fully edited, mixed and leadered prior to delivery to COMPANY so that they are in proper form for the production of the parts necessary for the manufacture of Phonograph Records.   PRODUCER shall edit, sequence, and leader multi-track master tapes for the Masters, in parallel sequence to any two-track master tapes delivered hereunder, and shall further deliver same to COMPANY.   Each and every matrix, acetate copy or other derivative shall also be delivered to COMPANY or kept available for COMPANY and subject to COMPANY's control at the recording studio, and this shall constitute PRODUCER's irrevocable authorization for COMPANY to request that such studio or other third party release to COMPANY such tapes and derivatives, and such studio or other third party is hereby requested to release to COMPANY all such tapes and derivatives.

(g)   PRODUCER shall furnish COMPANY, in writing, with the label copy (including song titles, and any subtitles), names of composers, any show or movie credits, complete publisher line, affiliate (BMI, ASCAP, etc.), timings, any arranger credits, any accompaniment credits, names of engineers, list of musicians with instruments played, exact recording date(s), and studio location(s) and producer and/or production company credits.

(h)   PRODUCER shall also furnish to COMPANY, in writing, the liner credits for each Album recorded hereunder.

212:12.18.79
PARC

 

-22-

(i) PRODUCER shall obtain and furnish to COMPANY, in
writing, all consents and clearances required by COMPANY
(including without limitation, consents to use the names of
all individuals appearing in liner credits) in relation to
the use by COMPANY of any of the elements which are within
the scope of PRODUCER's functions hereunder, provided that
nothing herein shall be construed as obligating PRODUCER to
secure mechanical licenses on behalf of COMPANY in respect
of compositions subject to the compulsory licensing provi-
sions of the Copyright Act.

(j) Without limitation of the generality of the
provisions of this agreement related to PRODUCER's obliga-
tions in connection with the production of recordings
delivered hereunder it is agreed, in particular but without
limitation, that no recordings hereunder shall be deemed
delivered unless and until PRODUCER shall have secured on
behalf of COMPANY from the copyright proprietors of all
compositions first recorded, or recorded in a form which
would subject COMPANY to a claim for infringement, and
embodied on recordings to be delivered to COMPANY hereunder,
such copyright proprietor's consent to such recording and
its irrevocable permission to COMPANY to manufacture copies
of such recording. Without limitation of the generality of
the foregoing or of COMPANY's rights, in the event that any
copyright proprietor shall by notice to COMPANY revoke any
such consent and permission not given to COMPANY in writing,
or shall claim that no such consent or permission was given
in respect of the recordings delivered to COMPANY, then the
recording(s) in respect of which such notice or claim is
received shall be deemed not delivered hereunder, provided
that the provisions of paragraphs 14(g) and 14(i) shall
nevertheless apply as fully and completely as if the
recording(s) had been deemed delivered.

(k) Satisfactory completion by PRODUCER of the pro-
cedures in the foregoing shall be a necessary but not
necessarily a sufficient condition in determining whether
any recording hereunder has been delivered within the
meaning of this agreement. In the event that this agree-
ment provides for any payment to be made upon delivery of
recordings, COMPANY's election to make such payment shall
not be deemed to be its acknowledgement that such delivery
has properly been made, and COMPANY shall not be deemed to
have waived its right to require such complete and proper
performance thereafter, nor its remedies for PRODUCER's
failure to perform in accordance herewith.

212t12.18.78
PARC



-23-

12.  (a)  COMPANY shall be responsible for all payments
to the Music Performance Trust Fund and the Special Payments
Fund of the AFofM, and any payments to similar union funds
under agreements providing for COMPANY to make payments
with respect to records sold.  To assist COMPANY in making
such payments, ARTIST shall indicate in conjunction with
ARTIST's execution of the guarantee of performance referred
to in paragraph 14(f) hereof, ARTIST's social security
number and applicable union affiliation.

(b)  Subject to (c), (d) and (e) below and the pro-
visions of paragraph 14(g) hereof, COMPANY shall be
responsible for mechanical royalties payable in connection
with Records sold hereunder.

(c)  The following provisions shall pertain to Con-
trolled Compositions:.

(i)  Controlled Compositions shall be licensed
to COMPANY at a copyright royalty rate of two and three-
quarters (2-3/4") cents per Controlled Composition on the
basis of net sales of Records, subject to the provisions
of (ii) and (iii) below.

(ii)  With respect to Records sold and/or distri-
buted through any record club, by the methods of mail order
or "key outlet marketing", or at a budget price, the royalty
rate shall be three-quarters (3/4) of the mutually agreeable
rate set forth in (i) above.

(iii)  No copyright royalties with respect to
Controlled Compositions shall be payable on Records not
royalty-bearing pursuant to the provisions of the prevailing
terms of Harry Fox Agency Licenses; nor with respect to
Compositions which go into the public domain in a particular
territory with respect to such territory, on and after the
date on which such material goes into the public domain;
nor for non-musical material.

(iv)  Arranged versions of compositions in the
public domain, when furnished by any one or more of the
persons described in the definition of a Controlled Composi-
tion above, shall be free of copyright royalties, provided,
however, that in the event that any such arranged version
has a new title and entirely different lyrics or a substan-
tial addition of melodic material, then, notwithstanding
anything to the contrary contained herein, such arranged
version shall be licensed to Company at a copyright royalty
rate to be calculated by taking the rate applicable for
original Controlled Compositions above and multiplying such

212:12.18.79
PARC

-24-

rate by the percentage used by the applicable Performing
Rights Society in determining the credits to be given by the
publisher of such arranged version for public performances
of such work; provided, however, that PRODUCER shall furnish
to COMPANY a copy of the letter of the Performing Rights
Society setting forth the percentage of the otherwise
applicable credit which the publisher will receive for such
public performances.  In the event that PRODUCER fails to
provide COMPANY with such letter from the Performing Rights
Society, COMPANY shall not be obligated to pay any copy-
right royalty with respect to any such arranged version.

     (v)  Any assignment made of the ownership or
copyright in any Controlled Composition or in any above
described arranged version of a composition in the public
domain shall be made subject to the provisions of this
sub-paragraph (c).

    (d)  (i)  Notwithstanding anything to the contrary
elsewhere herein, PRODUCER warrants, represents, and agrees
that COMPANY shall have no obligation whatsoever to pay an
aggregate copyright royalty rate in respect of any Record
hereunder, regardless of the number of Controlled Composi-
tions and/or other compositions contained thereon, in excess
of the following sums:

       (A)  In respect of an LP:  ten (10) times
minimum Statutory Rate, except as set forth in (ii) below.

       (B)  In respect of any multi-Record Album:
ten (10) times minimum Statutory Rate multiplied by the
relationship between the Retail List Price of the multi-LP
Album and the current Retail List Price of COMPANY's top
"pop" single disc LPs.

       (C)  In respect of a Single:  five and
one-half (5-1/2") cents.

     (ii)  Without limitation of the generality of
clause (i) above, if the aggregate copyright royalty rate
in respect of any recording hereunder is more than the
applicable amounts set forth in (i)(A), (B) and (C) above,
then, without limitation of COMPANY's rights, COMPANY shall
have the right, at its election, if it elects to release
such recording:

       (A)  To release such Record and reduce
the aggregate copyright royalty payable with respect to
Controlled Compositions on such Record so that the aggregate
copyright royalty payable with respect to all compositions
on such Record does not exceed the applicable maximum
amount, and/or

212
PARC 12.18.79




-25-

(B). To release such Record and deduct from royalties and/or other payments due to PRODUCER hereunder that amount of the aggregate copyright royalty payable by COMPANY with respect to such Record in excess of the applicable maximum amount.

(e) The provisions of this paragraph 12 shall constitute and are accepted by PRODUCER, on PRODUCER's own behalf and on behalf of any other owner of any Controlled Composition(s) or any rights therein, as full compliance by COMPANY with all of its obligations under the compulsory license provisions of the Copyright Law, as the same may be amended, or otherwise, arising from any use by COMPANY of Controlled Compositions as provided for herein.

13. (a) PRODUCER agrees that ARTIST shall be available from time to time at COMPANY's request and expense, whenever the same will not unreasonably interfere with other professional activities of ARTIST, to appear for photography, poster, and cover art, etc., under the direction of COMPANY and its nominees to appear for interviews with representatives of the communications media and COMPANY's publicity personnel and to perform other reasonable services.

(b) PRODUCER does hereby agree that PRODUCER shall not directly or indirectly, place or authorize or direct anyone else to place any advertisement in any newspaper, trade journal, magazine, or in any other advertising medium, covering or relating to any Phonograph Records or pre-recorded tapes embodying Masters hereunder, unless PRODUCER first obtains COMPANY's written consent thereto, which shall not unreasonably be withheld.

14. PRODUCER warrants and represents the following:

(a) To the best of PRODUCER's knowledge, there are now in existence no prior recorded performances by ARTIST unreleased within the United States, except as set forth on Schedule "A".

(b) To the best of PRODUCER's knowledge, there are no restrictions with respect to Compositions ARTIST is legally able to perform for COMPANY hereunder, except as set forth on Schedule "A".

(c) (i) No contract or agreement of any kind entered into by PRODUCER or ARTIST prior to the time of execution hereof will interfere in any manner with complete performance of the within agreement by PRODUCER or ARTIST.

212c12.18.79
PLRC

 

-26-

Neither PRODUCER nor ARTIST is under any disability, restriction or prohibition with respect to each individual's right to sign and perform under this agreement.

(ii) PRODUCER has no knowledge of any claim or purported claim which, if valid, would interfere with COMPANY's rights hereunder or create any liability on the part of COMPANY.

(d) PRODUCER has the right to use ARTIST's real names, CONNIE FRANCIS, and professional names, CONNIE FRANCIS, and any other professional names used by ARTIST and grants to COMPANY for the Territory the exclusive right to use and allow others to use said name and any other names used by ARTIST, and photographs and likenesses of ARTIST for Phonograph Record and audio-visual purposes during the Term and the exclusive right to such use thereafter in connection with recordings subject hereto; COMPANY's use of such names in accordance with the terms hereof will not infringe upon the rights of any third party.

(e) The Masters hereunder and the performances embodied thereon shall be produced in accordance with the rules and regulations of the American Federation of Musicians and the American Federation of Television and Radio Artists and in accordance with the rules and regulations of said Federation and of all other unions having jurisdiction. ARTIST is or will become and will remain to the extent necessary to enable to performance of this agreement, a member in good standing of all labor unions or guilds, membership in which may be lawfully required for the performance of ARTIST's services hereunder.

(f) There is in existence between PRODUCER and ARTIST a valid and enforceable agreement under the terms of which ARTIST is required to perform exclusively for PRODUCER as a recording artist during the Term of this agreement as extended. During the Term of this agreement, PRODUCER will waive none of its rights thereunder and shall take all steps necessary or desirable to keep the same in full force and effect so that COMPANY shall have the full benefit of ARTIST's exclusive services as a recording ARTIST during the term hereof as if ARTIST has contracted directly with COMPANY. Said agreement shall provide that ARTIST shall be absolutely restricted from recording the Compositions embodied on the masters subject hereto during the period referred to in paragraph 4(b). Simultaneously with the execution of this agreement, PRODUCER shall deliver to COMPANY an agreement between COMPANY and ARTIST in the form annexed hereto as Exhibit "A"; PRODUCER hereby gives its consent and approval to the content thereof; and said Exhibit "A" is hereby made part hereof.

212:12.18.79
PARC

 

-27-

(g)  That neither the Masters hereunder nor the performances embodied thereon, nor any other materials supplied by PRODUCER to COMPANY in connection therewith, nor any use thereof by COMPANY or its grantees, licensees, or assigns will violate or infringe upon the rights of any third party.

(h)  PRODUCER shall be solely responsible for and shall pay all sums due to ARTIST whose performances are embodied upon the Masters hereunder and the individual producer of the Masters, and the sums set forth in paragraph 7 hereof include all the monies due to ARTIST and the individual producer.

(i)  PRODUCER agrees to and does hereby indemnify, save and hold harmless COMPANY of and from any and all loss and damage (including reasonable attorneys' fees) arising out of or connected with any claim by any one or more third parties which is inconsistent with any of the warranties or representations made by PRODUCER herein, and agrees to reimburse COMPANY on demand for any payment made by it at any time after the date hereof with respect to any liability or claim to which the foregoing indemnity applies, which is reduced to judgement or settled with PRODUCER's consent. Pending the determination of any claim involving such alleged breach or failure, COMPANY may withhold sums due PRODUCER hereunder in an amount consistent with such claim. COMPANY shall give PRODUCER notice of any claim, and PRODUCER shall have the right to participate in the defense of any claim with counsel of PRODUCER's own choice and at PRODUCER's own expense.  COMPANY shall not settle any such claim without PRODUCER's prior written consent, which consent shall not be unreasonably withheld.

15.  (a)  COMPANY reserves the right by written notice to PRODUCER to suspend the operation of the Term for the duration of the following contingencies, if by reason of such contingencies it is materially hampered in its recording, manufacture, distribution or sale of Records, or its normal business operations become commercially impracticable: labor disagreements; fire; catastrophe; shortage of materials; or any cause beyond COMPANY's control.  A number of days equal to the total of all such days of suspension shall be added to the period of the Term in which such contingency occurs and the dates for the exercise by COMPANY of its options as set forth in paragraph 2 and the date of commencement of subsequent periods of the Term shall be deemed extended accordingly.  It is agreed that such suspension shall not exceed three (3) months in any Option Period unless such contingency is industry-wide, in which event COMPANY shall have the right to suspend the applicable Option Period for the duration of such contingency.

212:12.18.79
PARC

 

-28-

(b) .(i) In the event that PRODUCER, for any reasonable
cause of which PRODUCER has given written notice to COMPANY
(other than COMPANY's refusal to allow PRODUCER to perform),
is unable to fulfill PRODUCER's recording obligations
hereunder, in particular but without limitation in the case
of any LP hereunder subsequent to the first, to deliver such
LP on or before the date one (1) year after delivery to
COMPANY of the immediately preceding LP, then, provided that
such notice of PRODUCER is given not later than sixty (60)
days prior to the last date when pursuant to paragraph 3(f)
above such recording obligation should have been completed
COMPANY shall give notice to PRODUCER within thirty (30)
days of receipt of PRODUCER's notice, of its election
either:   (A) if the said recording obligations are not
fulfilled within sixty (60)· days of COMPANY's notice, to
reduce the minimum recording obligation for the then current
Option Period accordingly, or   (B) to extend the then
current Option· Period for a period such that it shall
expire nine (9) months after PRODUCER in fact completes his
recording obligations for such Option Period with the dates
for the exercise by COMPANY of its options as set forth in
.paragraph 2 and the dates of commencement of subsequent
periods of the Term deemed extended accordingly.   Not-
withstanding anything to the contrary set forth in the
foregoing, in the event that COMPANY elects ·to extend the
duration of the then current Option Period pursuant to (B)
above, and in the further event that PRODUCER has not
completed PRODUCER's recording obligations within sixty (60)
days of COMPANY's written notice of its election, then at
any time after the sixtieth (60th) day COMPANY may terminate
this agreement upon written notice to PRODUCER without
further obligation to PRODUCER as to unrecorded sides, and
without prejudice to any other rights and· remedies of
COMPANY.

(ii) In the event of any material default or
breach by PRODUCER of any of PRODUCER's obligations here-
under other than as set forth above, or in the event that
PRODUCER fails to fulfill the minimum recording obligation
with respect to any Option Period within the time frame set
forth in paragraph 3 above without reasonable cause, whereby
any failure of which PRODUCER does not give notice in
accordance with (i) above shall be deemed a failure without
reasonable cause, or in the event that PRODUCER does not
give notice on or before the date sixty (60) days prior to
the last date on which the minimum recording obligation
should have been completed in accordance with paragraph 3(f)
above, as provided for in (i) above, then COMPANY, by
written notice to PRODUCER, in addition to any other rights

212:12.18.79
FARC

 

-29-

or remedies which it may have at law or otherwise, may (A) suspend its obligations hereunder for the duration of such default or breach and until the same has been cured; or (B) at any time thereafter terminate the Term without further obligation to PRODUCER other than the obligation to pay royalties if earned, and may, at its election, extend the Term for a period equal to all or part of the period of such default or breach, plus an additional period of one hundred and eighty (180) days and the dates for the exercise by COMPANY of its options as set forth in paragraph 2 and the date of commencement of subsequent periods of the Term shall be deemed extended accordingly.

(iii) Notwithstanding the foregoing clauses (i) and (ii), in no event shall the Term hereunder be suspended and extend any Option Period such that (A) such Option Period shall be of longer duration than three (3) years times the number of LPs required to fulfill PRODUCER's recording obligations at the time of COMPANY's giving notice to PRODUCER, or (B) such that the Term shall exceed the maximum permitted under any statute, law or order of any authority having jurisdiction over this agreement. At the end of the maximum period of suspension of any Option Period in accordance herewith COMPANY shall either exercise its next option to extend the Term for a further Option Period, or shall terminate the agreement forthwith by notice to PRODUCER. Except as provided in this clause (iii), PRODUCER shall not be relieved of any product delivery obligation solely by the passage of time.

16. Wherever in this agreement PRODUCER's approval or consent is required, COMPANY may require PRODUCER formally to give or withhold such approval or consent by giving PRODUCER written notice requesting the same and by furnishing PRODUCER with the information or material in respect of which such approval or consent is sought. PRODUCER shall give COMPANY written notice of approval or disapproval within ten (10) business days after such notice is received by PRODUCER. In the event of disapproval or no consent, the reasons therefor shall be stated. Failure to give such notice to COMPANY as aforesaid shall be deemed to be consent or approval.

17. PRODUCER agrees subject to the provisions of paragraph 4(b) hereinabove that ARTIST will not record or authorize or with knowing intent permit to be recorded for any purpose any performance for a third party without in each case taking reasonable measures to prevent the manufacture, distribution and sale at any time by any person other than COMPANY of phonograph records and other devices, including without limitation, Audio-Visual Devices for home

212:12.18.79
PARC

 

-30-

use and/or juke box use and/or use in or on means of trans-
portation embodying such performance. Specifically, without
limiting the generality of the foregoing, PRODUCER agrees
that:

(i) if, during the Term, ARTIST performs any
Composition for the purposes of making transcriptions
for radio or television or soundtracks for motion picture
films, or

(ii) if, during the period referred to in para-
graph 4(b) hereof ARTIST performs for any such purpose any
Composition which shall have been recorded pursuant to this
agreement, ARTIST will do so only pursuant to a written
contract containing an express provision that neither such
performance nor any recording thereof will be used, directly
or indirectly for the purpose of making phonograph records
or any other device, including without limitation, Audio-
Visual Devices for home use and/or juke box use and/or use
on or in means of transportation. PRODUCER will promptly
furnish to COMPANY a copy of the pertinent provisions of
each such contract and will cooperate fully with COMPANY in
any controversy which may arise or litigation which may
be brought relating to the rights of COMPANY under this
paragraph.

18. PRODUCER agrees that in all of ARTIST's endeavours
in the entertainment field, ARTIST will exert best efforts
to be billed, advertised, and described as a "Polydor
Exclusive Recording Artist".

19. (a) PRODUCER recognizes that the sale of records is
speculative and agrees that the judgement of COMPANY with
regard to any matter affecting the sale, distribution and
exploitation of such records shall be binding and conclusive
upon PRODUCER. Nothing contained in this agreement shall
obligate COMPANY to make, sell, license, or distribute
records manufactured from the masters recorded hereunder
other than as specifically provided for herein, provided
always that:

(i) COMPANY agrees that it shall release in the
United States each album delivered hereunder within ninety
(90) days of the receipt by COMPANY of the fully mixed,
edited, and leadered master tapes for such album, together
with all elements to be delivered by PRODUCER to COMPANY in
conjunction with such album, including without limitation
all consents and approvals to be secured by PRODUCER to the
benefit of COMPANY on COMPANY's behalf; for the purpose of
this paragraph 19(a)(i) the Album embodying the first three
(3) Sides hereunder shall be deemed an Album delivered
hereunder.

212.12.18.79
PARC

  

-31-

(ii)  In the event that COMPANY fails to release
any album delivered hereunder within the period specified,
without reasonable cause, and provided that PRODUCER noti-
fies COMPANY in writing within thirty (30) days of the
expiration of such period of PRODUCER's requirement that
COMPANY fulfill such release obligation, then COMPANY shall
either cure such failure within sixty (60) days of the
receipt of such notice, or PRODUCER shall have the right to
terminate this agreement by notice to COMPANY given within
thirty (30) days of the expiration of such sixty (60) days
period; on receipt by COMPANY of such notice the Term of
this agreement shall terminate and all parties shall be
deemed to have fulfilled all of their obligations hereunder
except for those obligations which survive the end of the
Term such as warranties, re-recording restrictions, and the
obligation to pay royalties if earned; and this shall be
PRODUCER's sole remedy for COMPANY's failure to fulfill its
release obligation pursuant to (i) above.

(b)  COMPANY agrees that during the Term it shall
mutually agree with PRODUCER as to artwork for LPs released
in the United States.  In the event that PRODUCER proposes
an artwork concept which would entail an extraordinary
initial cost, and/or an extraordinary manufacturing cost in
either case in excess of COMPANY's standard costs, COMPANY
reserves the right to make its agreement to use such
concept conditional upon PRODUCER's agreement that part or
all of the excess cost applicable as an advance to be
recouped from royalties payable hereunder, and/or (in the
case of excess manufacturing cost) deductible from royalties
earned from sales of the LP so packaged.  In any event,
COMPANY's decision as to artwork shall be final and binding
upon PRODUCER in the event of dispute, it being agreed by
the parties hereto that failure to reach agreement may not
be allowed to delay or hinder the release of any record
hereunder.

(c)  COMPANY agrees that it shall cause its licensee in
the relevant country of the Territory, within ninety (90)
days of release of any LP hereunder in the United States,
to release in the United Kingdom, France, Germany, The
Netherlands, Japan, and Australia, such LP.  In the event
COMPANY's licensee in any one or more of the said countries
fails to release any such LP within the said ninety (90) day
period, and further, if upon such failure of COMPANY's
licensee PRODUCER gives written notice to COMPANY that he
requires such licensee to release such LP, COMPANY shall
either cause such licensee to release such LP within
thirty (30) days of COMPANY's receipt of such notice from

212:12.18.79
FARC

 

-32-

PRODUCER or COMPANY shall revoke such licensee's license
with respect to each such country and such LP, and shall
appoint a new licensee for each such country and such LP,
subject to PRODUCER's approval of each such new licensee.

(d.) During the Term and in the United States, PRODUCER
shall have the right to approve photographs and biographical
material of ARTIST to be used for publicity purposes by
COMPANY. In the event that PRODUCER fails to approve
photographs and/or biographical material submitted by
COMPANY on two (2) consecutive submissions, COMPANY may
require PRODUCER to submit for COMPANY's use, within
ten (10) days of COMPANY's request therefor, photographs and
biographical material for publicity purposes.

20. (a) Paragraph 20 is DELETED.

21. (a) Without limiting any other rights COMPANY may
have, it is specifically understood and agreed that in the
event of PRODUCER's dissolution or the liquidation of
PRODUCER's assets, or the filing of a petition in bankruptcy
or insolvency or for an arrangement or reorganization
by, for or against PRODUCER, or in the event of the appoint-
ment of a receiver or a trustee for all or a portion of
PRODUCER's property, or in the event that PRODUCER shall
make an assignment for the benefit of creditors or commit
any act for or in bankruptcy or become insolvent or in the
event PRODUCER shall fail to fulfill its obligations under
this agreement then at any time after the occurrence of any
such event, COMPANY shall have the option by notice in
writing sent to PRODUCER at PRODUCER's address last known to
COMPANY either to suspend the operation of the Term as
provided for in paragraph 15(b) hereinabove, to terminate
the agreement or to require that ARTIST render ARTIST's
personal services directly to COMPANY for the remaining
balance of the Term of this agreement, including extensions
thereof, for the purpose of making Phonograph Records, upon
all the same terms and conditions as are herein contained,
except that in respect of Compositions performed by ARTIST
and recorded by COMPANY subsequent to COMPANY's exercise of
such option, the royalty rates payable hereunder shall be
the difference, if any, between the royalty rates set forth
in paragraph 7 hereof, and the sum of (i) the royalty rates
payable to any individual producer engaged by COMPANY in
connection therewith, and (ii) the royalty rates payable to
ARTIST pursuant to ARTIST's agreement with PRODUCER, which
shall be paid by COMPANY direct to ARTIST.

In the event that, in respect of such Compositions
performed by ARTIST and recorded by COMPANY, the sum of any

212;12.18.79
PARC

 

-33-

such individual producer's fees and COMPANY's Recording
Costs shall be less than the sums set forth in paragraph 9
hereof, such difference shall be deemed an advance against
royalties payable to ARTIST and PRODUCER pursuant to the
provisions of this paragraph, and shall be paid to ARTIST
and PRODUCER in such proportion as shall be determined by
the relation between the Base Rates payable to ARTIST
pursuant to Exhibit "A" and the Base Rates payable to
PRODUCER pursuant to the provisions of this paragraph
subsequent to COMPANY's exercise of its option, and any
individual producer's fees and COMPANY's recording costs
shall be deemed advances against and recoupable therefrom in
the same proportion.

(b)  In the event that ARTIST shall notify COMPANY in
writing that ARTIST will no longer render services to
PRODUCER as required by COMPANY, then COMPANY shall have the
same options as set forth in (a) above, except that with
regard to royalties and advances COMPANY may withhold all
such payments to ARTIST and PRODUCER in escrow pending
settlement of any disputes between PRODUCER and ARTIST with
respect to the subject matter hereof. Notwithstanding said
right to withhold payment, COMPANY shall have the right
in its sole discretion to make payment to ARTIST and/or
PRODUCER at a royalty rate not in excess of one (1%) per
cent less than either would receive by the operation of the
provisions of (a) above, the balance to be held in escrow by
COMPANY pending final settlement.

(c)  In no event shall COMPANY be liable to pay to
ARTIST and PRODUCER combined, after exercise of its options
as set forth in (a) and (b) above, any royalty rate in
excess of the royalty rates set forth in paragraph 7 hereof
less any individual producer's rates; except that COMPANY
shall be responsible for any royalty rate to an individual
producer in excess of four (4%) per cent Base Rate.

22.  PRODUCER hereby authorizes and directs COMPANY to
withhold from any monies due to PRODUCER from COMPANY any
part thereof required by the United States Internal Revenue
Service to be withheld, and to pay same to the United States
Internal Revenue Service.

23.  PRODUCER acknowledges that ARTIST's services in
connection herewith are unique and extraordinary and that
COMPANY shall be entitled to injunctive relief to enforce
the provisions of this agreement.

24.  COMPANY may, at its election, assign this agreement
or any of its rights hereunder to any other division of

212:12.18.79
PARC



-34-

COMPANY, to a company that is a member of the POLYGRAM
GROUP, to any subsidiary or licensee in which COMPANY now
has or may hereafter obtain a substantial interest, or to
any company that merges its assets with those of COMPANY or
whose assets are acquired by COMPANY whether by purchase or
otherwise or to any company that acquires all or substan-
tially all of COMPANY's assets.

25.  If any clause, sentence, paragraph or part of this
agreement or the application thereof to any person, shall
for any reason be adjudged by court of competent jurisdic-
tion to be invalid, such judgement shall not affect the
remainder of this agreement. which shall continue in full
force and effect but such judgement shall be limited and
confined in its operation to the clause, sentence, paragraph
or part thereof directly involved in the controversy in
which such judgement shall have been rendered and to the
person involved.

26.  All notices hereunder required to be given to COMPANY
shall be sent to COMPANY at its address first mentioned
herein and all royalties, statements and payments and any
and all notices to PRODUCER shall be sent to PRODUCER at
PRODUCER's address first mentioned herein, or such other
address as each party respectively may hereafter designate
by notice in writing to the other.  All such notices shall
be in writing and, except for royalty statements shall
be sent by registered or certified mail, return receipt
requested, and the day of mailing of any such notice shall
be deemed the date of the giving thereof.  All notices to
COMPANY shall be served upon COMPANY to the attention of the
President with a carbon copy to the Vice President, Business
Affairs.  Courtesy copies of all notices to PRODUCER, and of
all royalty statements rendered hereunder shall be sent to
DAVID ERLICH AND CO., 380 Madison Avenue, New York, New York
10017, and GEORGE SCHECK, 303 East 57th Street, New York,
New York 10022, provided that the failure of COMPANY to
send any such courtesy copy shall not invalidate in any
way or nullify the effectiveness of any notice sent to
PRODUCER at PRODUCER's address in the manner set forth
above.

27.  (a)  Except as provided in (b) below, neither party
shall have the right to terminate this agreement as a
consequence of the other party's default or breach hereunder
(including COMPANY's failure to exercise the options set
forth in paragraph 2 above) unless such default or breach is
a "material" default or breach and unless the party seeking
to terminate because of the other party's default or breach
gives notice of such claim in writing by certified mail,

212c 12.19.79
PARC

 

-35-

return receipt requested, and unless the party against whom or breach is claimed shall fail to cure the same within thirty (30) days after the receipt of such notice.  If the default or breach is not fully cured within such thirty (30) day cure period, the party claiming default or breach shall, after the expiration of the cure period, without prejudicing its other rights and remedies, have the right to immediately terminate this agreement.

(b)  The provisions of (a) above shall not add an additional requirement to the procedures set forth in paragraphs 3 and 15 for termination for failure to timely deliver masters hereunder, nor contravene COMPANY's right pursuant to paragraph 23 to immediately seek injunctive or other equitable relief to enforce performance of the obligations of ARTIST pursuant to this agreement.

28.  This agreement is entered into in the State of New York and shall be construed in accordance with the laws of said state applicable to contracts to be wholly performed therein.  The parties hereto agree that any controversy arising under this agreement shall be adjudicated under the jurisdiction of a competent court within the City of New York.  This agreement may not be modified except by an instrument in writing executed by both parties hereto.  The validity or unenforceability of any provision hereof shall not affect the validity or enforceability of any other provision hereof.

29.  This writing sets forth the entire understanding between the parties with respect to the subject matter hereof, and no modification, amendment, waiver, termination or discharge of this agreement shall be binding upon COMPANY unless confirmed by written instrument signed by an officer of COMPANY.  No waiver of any provision of or default under this agreement nor any failure to exercise its rights hereunder shall prejudice the rights of COMPANY thereafter, nor shall it form precedent for the future.

IN WITNESS WHEREOF, the parties hereto have executed this agreement the day and year hereinabove first written.

POLYDOR INCORPORATED

By

By

G.G.C. PRODUCTION CORP.

By

212.12.18.79
PARC

 

"EXHIBIT A"

Dated as of: Jan. 9, 1980

POLYDOR INCORPORATED
810 Seventh Avenue
New York, New York  10019

Gentlemen:

Pursuant to an exclusive recording agreement between G.G.C.
PRODUCTION CORP. ("Company") and me, dated
Company is entitled to my exclusive services as a recording
artist.  I have been advised that Company is entering
into a written agreement with you of even date herewith
("Agreement"), pursuant to which Company is agreeing to
furnish my exclusive services to perform at recording
sessions for the purpose of making phonograph records to be
distributed by you.  I am familiar with and approve of all
terms and conditions of the Agreement which is for an
initial delivery obligation of three (3) Sides, commencing
on the date hereof, and which may be extended for three (3)
further consecutive options, the first of which is for one
(1) additional LP, and the second and third of which are for
two (2) additional LPs each.

In consideration of your executing the Agreement and as a
further inducement for you to do so (it being to my benefit
as a recording artist that you execute the same), I hereby
agree as follows:

1.  I confirm, warrant, guarantee and agree that I will duly
and to the best of my ability, perform and discharge all of
the obligations undertaken by me pursuant to the terms and
conditions of my agreement with Company so as to fulfill all
of the commitments contained in the Agreement as the same
applies to me.  Without limiting the generality of the
foregoing, I agree to perform for the recording of master
recordings embodying my performances as provided for in the
Agreement.

2.  If, during the term of the Agreement or any extensions
or renewals thereof, Company shall cease to be entitled to
my recording services in accordance with the terms of the
agreement between Company and myself, or if Company shall
fail or refuse to furnish master recordings embodying my
performances to you, I shall, at your request do all such
acts and things as shall give to you the same rights,
privileges, and benefits as you would have had under the

212:12.18.79
PARC:B11



-2-

Agreement if Company had continued to be entitled to my
recording services and if Company had continued to furnish
master recordings to you and such rights, privileges, and
benefits shall be enforceable in your behalf against me and
all the terms and conditions contained in the Agreement
shall be effective, except that with respect to the royalty
provisions, the royalties payable to me in respect of
Compositions performed by me and recorded by you subsequent
to each request shall be the same as provided for in my
agreement with Company, which royalties, together with any
and all other recording fees and other monies which may
become payable to me under my agreement with Company subse-
quent to the date of your request as specified in this
Paragraph 2, shall be paid by you directly to me, except
that I shall continue to look to Company for payment of
royalties in respect of Compositions performed by me and
recorded by Company prior to such request, and such other
monies as Company was obligated to pay to me prior to such
request.

3.    During the term of the Agreement you have the exclusive
right to use and publish and permit others to use and
publish my name (both legal and professional) and likeness
for advertising and purposes of trade in connection with the
manufacture and sale of phonograph records and audio-visual
devices, you have the right to refer to me as your exclusive
artist, and you shall be entitled to seek equitable relief,
including injunctive relief, to enforce the provisions of
this agreement.   After the term you have the exclusive
right to use and publish and permit others to use and
publish my name (both legal and professional) and likeness
for advertising and purposes of trade in connection with the
manufacture and sale of phonograph records and audio-
visual devices recorded embodying my performances during the
term of the Agreement, and you shall be entitled at any time
hereafter to injunctive relief, as well as other equitable
relief, to enforce any breach of this grant of exclusivity
by me, or my heirs or legal assigns.

4.    I shall not, during the term of the Agreement, or any
extensions or renewals thereof, perform individually or as a
part of a group or otherwise for anyone other than you or
Company (pursuant to the Agreement) for the purpose of
making phonograph records.   In addition, after the expira-
tion of the term of the Agreement, I will not perform any
musical composition which shall have been recorded pursuant
to the Agreement for the purpose of making phonograph
records prior to the latter of the date five (5) years
from the date of delivery to you of the master recording
embodying such composition, or the date three (3) years
subsequent to the expiration or other termination of the
Term of the Agreement.

PAAc18i18.79

-3-

5.   During the term and thereafter as provided for herein, I will not record or authorize or with knowing intent permit to be recorded, for any purpose, any performance for a third party other than Company, without in each case taking reasonable measures to prevent the manufacture, distribution and sale at any time by any person other than you of phonograph records and other devices for home use and/or juke box use and/or use in or on means of transportation embodying such performance.   Specifically, without limitation of the generality of the foregoing, I agree that:

    (a)  If, during the term of the Agreement, I perform any composition for the purpose of making transcriptions for radio or television or soundtracks for motion picture films, or

    (b)  If, during the period of re-recording restriction referred to in paragraph 4 above, I perform for any such purpose any composition which was recorded pursuant to the Agreement, I will do so only pursuant to a written contract containing an express provision that neither such performance nor any recording thereof will be used, directly or indirectly, for the purpose of making phonograph records or any other device for home use and/or juke box use and/or use on or in means of transportation.   I agree upon your request promptly to furnish to you a copy of the pertinent provisions of each such contract and will co-operate with you in any controversy which may arise or litigation which may be brought relating to your rights under this paragraph.

6.   No termination of my agreement with Company shall operate to diminish my liability or obligation hereunder without your written consent.

7.   Except as provided for in Paragraph 2 above, I agree that I will look solely to Company for the payment of all monies payable to me by reason of my rendering services in accordance with the Agreement, and I agree that you shall have no responsibility to me therefor whatsoever.   No breach by Company of any agreement which I may now or from time to time have with Company shall be sufficient cause for my failure or refusal to fully perform for you in accordance with the Agreement and this agreement.

8.   During the term, I will exert best efforts to be billed, advertised and described as a "Polydor Exclusive Recording Artist".

9.   Any assignment (pursuant to the Agreement) by you of the Agreement shall constitute an assignment of this agreement to such assignee and I hereby consent to any such

212A 12.18.79
PARC

 

-4-

assignment.  Upon any such assignment you shall have no further obligation to me, or to Artist, other than payment of royalties otherwise due to me or Artist with respect to records sold prior to such assignment.

10.  I agree to indemnify, save and hold you harmless from and against any liability, loss, damage, cost or expense (including reasonable attorneys' fees), paid or incurred by you by reason of any breach by me of the covenants, representations or warranties contained herein or in the Agreement or in my agreement with Company, and agree to reimburse you on demand for any payment made by you at any time after the date hereof with respect to any liability or claim to which the foregoing indemnity applies which is reduced to judgement or settled with my consent, which consent shall not unreasonably be withheld.  Pending the determination of any claim involving such alleged breach or failure, you may withhold sums due me in an amount consistent with such claim. You shall give me notice of any claim and I shall have the right to participate in the defense of any claim with counsel of my own choice and at my own expense.  You shall not settle any such claim without my prior written consent, which consent shall not unreasonably be withheld.

Very truly yours,

*Connie Francis*
CONNIE FRANCIS

SS# 104 - 26 - 0520

Union        ACUA
Affiliation   AFTRA Local

ACCEPTED AND AGREED TO:

POLYDOR INCORPORATED

By _____

By _____

EXECUTED BY ARTIST WITH OUR CONSENT:

G.G.C. PRODUCTION CORP.

By _____

212:12.18.79
PARC:B14

*Exhibit 7*

## PolyGram Records

March 16, 1982

George Scheck
George Scheck Enterprises
161 West 54th Street
New York, New York 10019

Dear George:

Columbia Special Products would like to include Connie Fran-
cis' recording of "Lipstick On Your Collar" in an album pack-
age entitled "Wisk Celebrates Its 25th Anniversary". The lp
will consist of 10 selections by various artists and will be
distributed by Lever Brothers as a sweepstakes prize and trade
giveaway, as well as self liquidation at the point of sale
with a retail selling price of $3.50.

We would, therefore, appreciate your waiving the cover art-
work and liner note approval contained in our agreement with
Ms. Francis so that her recording may be included in the above
mentioned package.

You will, of course, receive royalties equivalent to 50% of
the net amount received by us in connection with the above
mentioned master recording.

If the above meets with your approval, kindly so indicate by
signing the enclosed copy of this letter and returning it to
my attention as soon as possible.

Sincerely,

POLYGRAM SPECIAL PROJECTS

Patricia A. Sweeting
Associate Manager

Telephone (212) 399-7100          Casablanca          PolyGram Classics
Telex 620985                      Mercury             PolyGram Distribution
                                  Polydor

CE 004276

*Exhibit 8*

# PolyGram Records

April 7, 1983

John F. Breglio, Esq.
Paul, Weiss, Rifkind, Wharton &
    Garrison
345 Park Avenue
New York, New York 10154

Dear Mr. Breglio:

We have received a license request from Suffolk Marketing, Inc.
for 18 Connie Francis recordings (repertoire listing attached)
for use in an as yet untitled Connie Francis package. The lp
and comparable tape counterpart will be sold via tv/mail order
at $7.98 for the lp, $9.98 for the tape.

We would, therefore, appreciate the waiving of the coupling,
cover artwork and liner note approvals contained in Ms. Francis'
agreement with MGM Records so that her recordings may be in-
cluded in the above-mentioned package.

For this use Ms. Francis will receive a royalty in the amount
of 50% net income received.

If the above meets with your approval, kindly indicate by
signing the enclosed copy of this letter and returning it to
my attention as soon as conveniently possible.

Sincerely,

POLYGRAM SPECIAL PROJECTS

Patricia A. Sweeting
Associate Manager


The undersigned does hereby agree and consent to the foregoing:


_____          _____
John F. Breglio                                      Date
on behalf of Connie Francis

PolyGram Records, Inc.          Telephone (212) 399-7100      Casablanca        PolyGram Classics
810 Seventh Avenue                Telex 620965                    Mercury           PolyGram Distribution
New York, NY 10019                                                Polydor

*Exhibit 9*

# PolyGram Records

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

September 16, 1983

Ms. Connie Francis
58 Holton Lane
Essex Fells, N.J. 07021

Dear Ms. Francis:

We have received a request from Richard Huntley, presidnet of Suffolk Marketing, for the use on an album of the recordings listed on the attached exhibit which were chosen by Mr. Huntley from a list submitted by you to him. The album, as yet untitled, will contain the 20 selections, and will be sold via broadcast, print and direct mail order, at a price of $7.98 per disc and $9.98 per tape counterpart. Mr. Huntley has requested a ninety (90) day test period on the package and, if successful, a license agreement to cover a two (2) year term.

Accordingly, we would appreciate your waiving the licensing and artwork restrictions contained in your agreements with us (as successor in interest with MGM Records, Inc.) so that your recordings may be included in the above mentioned package.

We will agree, of course, to pay you fifty (50%) percent of our share of ten (10%) percent of the retail selling price, in accordance with your agreement with us.

If the above meets with your approval, please sign the enclosed copy of this letter and return it to me as soon as possible.

Sincerely,

POLYGRAM SPECIAL PROJECTS

Judie Jenkins
Associate Manager

The undersigned does hereby agree and consent to the foregoing:

_____
Connie Francis

cc:  John F. Breglio, Esq.

PolyGram Records Inc
810 Seventh Avenue
New York, NY 10019

Telephone (212) 399-7100
Telex 620985

Casablanca
Mercury
Polydor

PolyGram Classics
PolyGram Distribution

*Exhibit 10*

http://en.wikipedia.org/wiki/Connie_Francis_discography

| Year | Cat. | Title | | | | Title | | | |
|------|------|-------|---|---|---|-------|---|---|---|
| | | | | | | Day | | | |
| 1959 | K 12793 | (Lipstick on Your Collar) | 5 | - | 10 (R&B) | Frankie | 9 | | 19 (R&B) |
| 1959 | K 12824 | You're Gonna Miss Me | 34 | - | - | Plenty Good Lovin' | 69 | - | |
| 1959 | K 12841 | Among My Souvenirs | 7 | - | 10 (R&B) | God Bless America | 36 | | - |
| 1960 | K 12878 | Mama | 8 | - | | Teddy | 17 | | - |
| 1960 | K 12899 | Jealous of You (Tango Della Gelosia) | 19 | - | - | Everybody's Somebody's Fool | 1 | | 2 (R&B) # 24 (Country) |
| 1960 | K 12923 | My Heart Has a Mind of Its Own | 1 | - | 11 (R&B) | Malagueña | 42 | | - |
| 1960 | K 12964 | Many Tears Ago | 7 | - | - | Senza Mamma e Nnammurata | 87 | | - |
| 1961 | K 12971 | Where the Boys Are | 4 | - | - | No One | 34 | - | - |
| 1961 | K 12995 | Breakin' in a Brand New Broken Heart | 7 | - | - | Someone Else's Boy | - | | - |
| 1961 | K 12995 | Together | 6 | 1 | - | Too Many Rules | 72 | | - |
| 1961 | K 13005 | Atashi-no | - | - | - | Swanee | - | | - |
| 1961 | K 13039 | (He's My) Dreamboat | 14 | - | - | Hollywood | 42 | | - |
| 1961 | K 13051 | When the Boy in Your Arms (Is the Boy in Your Heart) | 10 | 2 | - | Baby's First Christmas | 26 | 7 | - |
| 1962 | K 13059 | Don't Break the Heart That Loves You | 1 | 1 | - | Drop It, Joe | - | - | - |
| 1962 | K 13074 | Second Hand Love | 7 | 3 | - | Gonna Git That Man | - | - | - |

10/6/2013 11:51 AM

| Year | Cat.-No. | A-Side | Chart peak Pop | Chart peak AC | Chart peak misc. | B-Side | Chart peak Pop | Chart peak Adult Contemporary | Chart peak misc. |
|------|----------|--------|------|------|------|--------|------|------|------|
| 1955 | K 12015 | *Freddy* | - | - | - | *Didn't I Love You Enough* | - | - | - |
| 1955 | K 12056 | *(Oh, please) Make Him Jealous* | - | - | - | *Goody Goodbye* | - | - | - |
| 1956 | K 12191 | *My First Real Love* | - | - | - | *Believe In Me (Credemi)* | - | - | - |
| 1956 | K 12251 | *Send for My Baby* | - | - | - | *Forgetting* | - | - | - |
| 1956 | K 12375 | *I Never Had a Sweetheart* | - | - | - | *Little Blue Wren* | - | - | - |
| 1956 | K 12235 | *Everyone Needs Someone* | - | - | - | *My Sailor Boy* | - | - | - |
| 1957 | K 12440 | *No Other One* | - | - | - | *I Leaned On a Man* | - | - | - |
| 1957 | K 12090 | *Eighteen* | - | - | - | *Faded Orchid* | - | - | - |
| 1957 | K 12555 | *The Majesty of Love* | 93 | - | - | *You, My Darlin' You* | - | - | - |
| 1957 | K 12588 | *Who's Sorry Now?* | 4 | - | 4 (R&B) | *You Were Only Fooling (While I Was Falling in Love)* | - | - | - |
| 1958 | K 12647 | *I'm Sorry I Made You Cry* | 36 | - | - | *Lock Up Your Heart* | - | - | - |
| 1958 | K 12669 | *Heartaches* | - | - | - | *I Miss You so* | - | - | - |
| 1958 | K 12683 | *Stupid Cupid* | 14 | - | - | *Carolina Moon* | - | - | - |
| 1958 | K 12713 | *Fallin'* | 30 | - | - | *Happy Days and Lonely Nights* | - | - | - |
| 1958 | K 12738 | *My Happiness* | 2 | - | 11 (R&B) | *Never before* | 99 cashbox | - | - |
| 1959 | K 12769 | *If I Didn't Care* | 22 | - | 29 (R&B) | *Toward the End Of the* | - | - | - |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | *Day* | | | | |
| 1959 | K 12793 | *Lipstick on Your Collar* | 5 | - | 10 (R&B) | *Frankie* | 9 | - | 19 (R&B) |
| 1959 | K 12824 | *You're Gonna Miss Me* | 34 | - | - | *Plenty Good Lovin'* | 69 | - | - |
| 1959 | K 12841 | *Among My Souvenirs* | 7 | - | 10 (R&B) | *God Bless America* | 36 | - | - |
| 1960 | K 12878 | *Mama* | 8 | - | - | *Teddy* | 17 | - | - |
| 1960 | K 12899 | *Jealous of You (Tango Della Gelosia)* | 19 | - | - | *Everybody's Somebody's Fool* | 1 | - | 2 (R&B) # 24 (Country) |
| 1960 | K 12923 | *My Heart Has a Mind of Its Own* | 1 | - | 11 (R&B) | *Malagueña* | 42 | - | - |
| 1960 | K 12964 | *Many Tears Ago* | 7 | - | - | *Senza Mamma e Nnammurata* | 87 | - | - |
| 1961 | K 12971 | *Where the Boys Are* | 4 | - | - | *No One* | 34 | - | - |
| 1961 | K 12995 | *Breakin' in a Brand New Broken Heart* | 7 | - | - | *Someone Else's Boy* | - | - | - |
| 1961 | K 12995 | *Together* | 6 | 1 | - | *Too Many Rules* | 72 | - | - |
| 1961 | K 13005 | *Atashi-no* | - | - | - | *Swanee* | - | - | - |
| 1961 | K 13039 | *(He's My) Dreamboat* | 14 | - | - | *Hollywood* | 42 | - | - |
| 1961 | K 13051 | *When the Boy in Your Arms (Is the Boy in Your Heart)* | 10 | 2 | - | *Baby's First Christmas* | 26 | 7 | - |
| 1962 | K 13059 | *Don't Break the Heart That Loves You* | 1 | 1 | - | *Drop It, Joe* | - | - | - |
| 1962 | K 13074 | *Second Hand Love* | 7 | 3 | - | *Gonna Git That Man* | - | - | - |

| 1962 | K 13087 | V-A-C-A-T-I-O-N | 9 | - | - | The Biggest Sin of All | 116 | - | - |
| 1962 | K 13096 | I Was Such a Fool (To Fall in Love with You) | 24 | 8 | - | He Thinks I Still Care | 57 | 18 | - |
| 1962 | K 13116 | I'm Gonna Be Warm This Winter | 18 | 19 | - | Al Di Là | 90 | - | - |
| 1963 | K 13127 | Follow the Boys | 17 | 7 | - | Waiting for Billy | 127 | - | - |
| 1963 | K 13143 | If My Pillow Could Talk | 23 | - | - | You're the Only One Can Hurt Me | - | - | - |
| 1963 | K 13160 | Drownin' My Sorrows | 36 | - | - | Mala Femmena | 114 | - | - |
| 1963 | K 13176 | Your Other Love | 28 | 10 | - | Whatever Happened To Rosemarie | - | - | - |
| 1963 | K 13203 | In the Summer of His Years | 46 | - | - | My Buddy | - | - | - |
| 1964 | K 13214 | Blue Winter | 24 | 8 | - | You Know You Don't Want Me | - | - | - |
| 1964 | K 13237 | Be Anything (But Be Mine) | 25 | 9 | - | Tommy | - | - | - |
| 1964 | K 13256 | Looking For Love | 45 | - | - | This Is My Happiest Moment | - | - | - |
| 1964 | K 13287 | Don't Ever Leave Me | 42 | - | - | We Have Something More (Than a Summer Love) | 128 | - | - |
| 1964 | K 13303 | Whose Heart Are You Breaking Tonight | 43 | 7 | - | Come On, Jerry (Timber) | - | - | - |

| 1965 | K 13325 | For Mama (La Mamma) | 48 | 12 | - | She'll Be Comin' 'Round The Mountain | - | - | - |
| 1965 | K 13331 | Wishing It Was You | 57 | 14 | - | You're Mine (Just When You're Lonely) | - | - | - |
| 1965 | K 13363 | Forget Domani | 79 | 16 | - | No One Ever Sends Me Roses | - | - | - |
| 1965 | K 13389 | Roundabout | 80 | 10 | - | Bossa Nova Hand Dance (Deixa isso prà là) | - | - | - |
| 1965 | K 13420 | Jealous Heart | 47 | 10 | - | Can I Rely On You | - | - | - |
| 1966 | K 13470 | Love Is Me, Love Is You | 66 | 28 | - | I'd Let You Break My Heart All Over Again | - | - | - |
| 1966 | K 13505 | It's A Different World | 134 | - | - | Empty Chapel | - | - | - |
| 1966 | K 13545 | Letter From a Soldier (Dear Mama) | 105 | - | - | Somewhere, My Love | - | - | - |
| 1966 | K 13578 | So Nice (Summer Samba) | - | 17 | - | All the Love in the World | - | - | - |
| 1966 | K 13610 | Spanish Nights and You | 99 | 15 | - | Games That Lovers Play | - | - | - |
| 1967 | K 13665 | Another Page | 121 | - | - | Souvenir d'Italie | - | - | - |
| 1967 | K 13708 | Mama | - | - | - | Never On Sunday | - | - | - |
| 1967 | K 13709 | My Happiness | - | - | - | Al Di Là | - | - | - |
| 1967 | K 13710 | Malagueña | - | - | - | I Love You Much Too Much | - | - | - |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | *(Ich hob dich zifeel lieb)* | | | |
| 1967 | K 13711 | *Oh, Lonesome Me* | - | - | - | *Once In A Lifetime* | - | - | - |
| 1967 | K 13712 | *Jealous Heart* | - | - | - | *Will You Still Be Mine* | - | - | - |
| 1967 | K 13718 | *Time Alone Will Tell* | 94 | 14 | - | *Born Free* | - | - | - |
| 1967 | K 13773 | *My Heart Cries for You* | 118 | 12 | - | *Someone Took the Sweetness Out of Sweetheart* | - | - | - |
| 1967 | K 13814 | *Lonely Again* | - | 22 | - | *When You Care a Lot for Someone* | - | - | - |
| 1968 | K 13876 | *My World is Slipping Away* | - | 35 | - | *Till We're Together* | - | - | - |
| 1968 | K 13923 | *Why Say Goodbye* | 132 | 27 | - | *Addio, mi'Amore* | - | - | - |
| 1968 | K 13948 | *Somebody Else is Taking My Place* | - | - | - | *Brother, Can You Spare a Dime* | | - | - |
| 1968 | K 14004 | *I Don't Wanna Play House* | - | 40 | - | *The Welfare Check* | - | - | - |
| 1969 | K 14034 | *The Wedding Cake* | 91 | 19 | 33 (Country) | *Overhill, underground* | - | - | - |
| 1969 | K 14058 | *Gone Like the Wind* | - | - | - | *Am I blue* | - | - | - |
| 1969 | K 14089 | *Invierno triste azul* | - | - | - | *Noches españolas y tú* | - | - | - |
| 1969 | K 14091 | *Zingara* | - | - | - | *Mister Love* | - | - | - |

## US albums

| Year | Title | Cat.-No. Mono pressings | Cat.-No. Stereo pressings | Chart peak | Remark |
|------|-------|------------------------|---------------------------|------------|--------|
| 1958 | *Who's Sorry Now?* | E-3686 | - | - | - |
| 1959 | *The Exciting Connie Francis* | E-3761 | SE-3761 | - | - |
| 1959 | *My Thanks To You* | E-3776 | SE-3776 | - | - |
| 1959 | *Connie Francis sings Italian Favorites* | E-3791 | SE-3791 | 4 | - |
| 1959 | *Christmas In My Heart* | E-3792 | SE-3792 | 16 | - |
| 1959 | *Connie's Greatest Hits* | E-3793 | - | 17 | - |
| 1959 | *Rock 'n' Roll Million Sellers* | E-3794 | SE-3794 | - | - |
| 1959 | *Country & Western – Golden Hits* | E-3795 | SE-3795 | - | - |
| 1959 | *Connie Francis sings Fun Songs For Children* | L-70126 | - | - | Released on MGM Records' sublabel Lion Records |
| 1960 | *One For The Boys* | E-3815 | SE-3815 | - | Scheduled for release but last-minute withdrawal |
| 1960 | *Connie Francis sings Spanish And Latin American Favorites* | E-3853 | SE-3853 | - | - |
| 1960 | *Connie Francis sings Jewish Favorites* | E-3869 | SE-3869 | 69 | - |
| 1960 | *More Italian Favorites* | E-3871 | SE-3871 | 9 | - |
| 1961 | *Songs to a Swinging Band* | E-3893 | SE-3893 | - | - |
| 1961 | *Connie Francis at The Copa* | E-3913 | SE-3913 | 65 | Live album |
| 1961 | *More Greatest Hits* | E-3942 | SE-3942 | - | 1st edition, containing *Teddy* |
| 1961 | *More Greatest Hits* | E-3942 | SE-3942 | - | 2nd edition, *Teddy* replaced by *Valentino* |
| 1961 | *Connie Francis sings "Never On Sunday"* | E-3965 | SE-3965 | 11 | - |
| 1961 | *Connie Francis sings Folk Song Favorites* | E-3969 | SE-3869 | - | - |
| 1961 | *Sing Along with Connie Francis* | 8002 | - | - | Licensed to MatiMor Superecords |
| 1962 | *Connie Francis sings Irish Favorites* | E-4013 | SE-4013 | - | - |
| 1962 | *Do The Twist* | E-4022 | SE-4022 | 47 | Repackaged and rereleased in same year as *Dance Party* |

| 1962 | *Connie Francis sings Fun Songs For Children* | E-4023 | - | - | Rerelease of the 1959 album of the same name |
| 1962 | *Connie Francis sings "Second Hand Love"* | E-4049 | SE-4049 | 111 | - |
| 1962 | *Country Music – Connie Style* | E-4079 | SE-4079 | 22 | - |
| 1963 | *Connie Francis sings Modern Italian Hits* | E-4102 | SE-4102 | 103 | - |
| 1963 | *Connie Francis sings Award Winning Motion Picture Hits* | E-4048 | SE-4048 | 108 | Scheduled for release in June 1962, but postponed to April 1963 owing to extensive reworking of the instrumental playbacks |
| 1963 | *Follow the Boys* | E-4123 | SE-4123 | 66 | - |
| 1963 | *Greatest American Waltzes* | E-4145 | SE-4145 | 94 | - |
| 1963 | *"Mala Femmena" and Connie's Big Hits From Italy* | E-4161 | SE-4161 | 70 | - |
| 1963 | *In the Summer of His Years* | E-4210 | SE-4210 | 126 | - |
| 1964 | *Connie Francis sings German Favorites* | E-4124 | SE-4124 | - | Scheduled for release in April 1963, but postponed owing to postponed release of *Connie Francis sings Award Winning Motion Picture Hits* |
| 1964 | *Looking For Love* | E-4210 | SE-4210 | 122 | - |
| 1964 | *Connie Francis & Hank Williams, jr. sing Great Country Favorites* | E-4251 | SE-4251 | 149 | Duet album with Hank Williams, Jr. |
| 1964 | *A New Kind of Connie...* | E-4253 | SE-4253 | 149 | - |
| 1965 | *Connie Francis sings "For Mama"* | E-4294 | SE-4294 | 78 | - |
| 1965 | *Connie Francis sings All Time International Hits* | E-4298 | SE-4298 | - | |
| 1965 | *When the Boys Meet the Girls* | E-4334 | SE-4334 | 61 | - |
| 1966 | *Jealous Heart* | E-4355 | SE-4355 | 78 | - |
| 1966 | *Movie Greats Of The 60s* | E-4382 | SE-4382 | - | - |

| 1966 | Connie's Christmas | E-4399 | SE-4399 | - | Same as Christmas In My Heart |
| 1966 | Connie Francis Live at The Sahara in Las Vegas | E-4411 | SE-4411 | - | - |
| 1966 | Connie Francis and The Kids Next Door | - | LES-903 | - | Licenced to King Leo Records, originally scheduled as MGM Records E-4412/SE-4412 |
| 1967 | Love, Italian Style | E-4448 | SE-4448 | - | - |
| 1967 | Happiness – Connie Francis on Broadway Today | E-4472 | SE-4472 | - | - |
| 1967 | Grandes Exitos del Cine de los Años 60 | E-4474 | SE-4474 | - | - |
| 1967 | My Heart Cries For You | E-4487 | SE-4487 | - | - |
| 1968 | Hawaii Connie | E-4522 | SE-4522 | - | - |
| 1968 | Connie & Clyde – Hit Songs of The 30s | E-4573 | SE-4573 | - | - |
| 1968 | Connie Francis sings Bacharach & David | E-4585 | SE-4585 | - | - |
| 1969 | The Wedding Cake | - | SE-4637 | - | - |
| 1969 | Connie Francis sings the Songs of Les Reed | - | SE-4655 | - | - |

## US Extended Plays

| Year | Cat.-No. | Title | Tracks A-Side | Tracks B-Side |
|------|----------|-------|---------------|---------------|
| 1958 | X 1599 | Who's Sorry Now? | 1. Who's Sorry Now? 2. You Were Only Fooling (While I Was Falling In Love) | 1. Eighteen 2. Faded Orchid |
| 1959 | X 1691 | Rock 'n' Roll Million Sellers – Vol. 1 | 1. Heartbreak Hotel 2. Tweedlee Dee | 1. I Almost Lost My Mind . I Hear You Knockin' |
| 1959 | X 1692 | Rock 'n' Roll Million Sellers – Vol. 2 | 1. Just a Dream 2. Don't Be Cruel | 1. Lipstick On Your Collar 2. Sincerely |
| 1959 | X 1693 | Rock 'n' Roll Million Sellers – Vol. 3 | 1. Ain't That a Shame 2. Silhouettes | 1. I'm Walkin' 2. It's Only Make Believe |

| Year | Cat.-No | A-Side | Chart peak | B-Side | Chart peak |
|------|---------|--------|-----------|--------|-----------|
| 1956 | 45-SP-1169 | *Believe in me (Credemi)* | - | *My First Real Love* | - |
| 1956 | 45-MGM-932 | *My Sailor Boy* | - | *Everyone needs someone* | - |
| 1956 | 45-MGM-945 | *Little Blue Wren* | - | *I never had a Sweetheart* | - |
| 1957 | 45-MGM-92 | *Faded Orchid'* | - | *Eighteen* | - |
| 1957 | 45-MGM-969 | *The Majesty Of Love'* | - | *You, My Darlin' You* | - |
| 1957 | 45-MGM-975 | *Who's Sorry Now'* | 1 | *You Were Only Fooling (While I Was Falling In Love)* | - |
| 1958 | 45-MGM-982 | *I'm Sorry I Made You Cry'* | 11 | *Lock Up Your Heart* | - |
| 1958 | 45-MGM-985 | *Stupid Cupid'* | 1 | *Carolina Moon* | - |
| 1958 | 45-MGM-993 | *Fallin'* | 20 | *I'll Get By* | 19 |
| 1958 | 45-MGM-998 | *You Always Hurt the One You Love* | 13 | *In the Valley of Love* | - |
| 1958 | 45-MGM-1001 | *My Happiness* | 4 | *Happy Days and Lonely Nights* | - |
| 1958 | 45-MGM-1012 | *If I Didn't Care'* | - | *Toward the End of the Day* | - |
| 1959 | 45-MGM-1018 | *Lipstick on Your Collar* | 3 | *Frankie* | - |
| 1959 | 45-MGM-1036 | *You're Gonna Miss Me* | - | *Plenty Good Lovin'* | 18 |
| 1959 | 45-MGM-1046 | *Among My Souvenirs* | 11 | *Do You Love Me Like You Kiss Me* | - |
| 1960 | 45-MGM-1060 | *It Would Still Be Worth It* | - | *Valentino* | 27 |
| 1960 | 45-MGM-1070 | *Teddy* | - | *Mama* | 8 |
| 1960 | 45-MGM-1076 | *Mama* | 2 | *Robot Man* | 2 |
| 1960 | 45-MGM-1086 | *Jealous Of You* | - | *Everybody's Somebody's Fool* | 5 |
| 1960 | 45-MGM-1100 | *My Heart Has A Mind of Its Own* | 3 | *Malagueña* | - |
| 1960 | 45-MGM-1111 | *Many Tears Ago* | 12 | *Senza Mamma e Nnammurata* | - |
| 1961 | 45-MGM-1121 | *Where the Boys Are* | 5 | *Baby Roo* | - |
| 1961 | 45-MGM-1136 | *Breakin' In a Brand New Broken Heart* | 12 | *Someone Else's Boy* | - |
| 1961 | 45-MGM-1138 | *Too Many Rules* | - | *Together* | 6 |
| 1961 | 45-MGM-1145 | *Baby's First Christmas* | 30 | *I'm Falling In Love With You Tonight* | - |

Case 2:12-cv-03382-JGB-AGR   Document 90   Filed 11/08/13   Page 111 of 133   Page ID
#:1155

| 1962 | 45-MGM-1151 | *Don't Cry On My Shoulder* | - | *Mister Twister* (English version) | - |
| 1962 | 45-MGM-1157 | *Don't Break the Heart That Loves You* | 39 | *Ain't That Better, Baby* | - |
| 1962 | 45-MGM-1165 | *V-A-C-A-T-I-O-N* | 10 | *It's Gonna Take Me Some Time* | - |
| 1962 | 45-MGM-1171 | *I Was Such A Fool (To Fall In Love With You)* | - | *Playin' Games* | - |
| 1962 | 45-MGM-1185 | *I'm Gonna Be Warm This Winter* | 48 | *Pretty Little Baby* | - |
| 1963 | 45-MGM-1193 | *Follow the Boys* | - | *Tonight's My Night* | - |
| 1963 | 45-MGM-1202 | *Lollipop Lips* | - | *If My Pillow Could Talk* | - |
| 1963 | 45-MGM-1207 | *Drownin' My Sorrows* | - | *Look At Him* | - |
| 1963 | 45-MGM-1212 | *Whatever Happened to Rosemarie* | - | *Your Other Love* | - |
| 1963 | 45-MGM-1220 | *In the Summer of His Years* | - | *My Buddy* | - |
| 1964 | 45-MGM-1224 | *Blue Winter* | - | *Souvenirs* | - |
| 1964 | 45-MGM-1236 | *Tommy* | - | *Be Anything (But Be Mine)* | - |
| 1964 | 45-MGM-1253 | *Don't Ever Leave Me* | - | *Waiting For You* | - |
| 1965 | 45-MGM-1265 | *No Better Off* | - | *Forget Domani* | - |
| 1965 | 45-MGM-1271 | *My Child* | 26 | *No One Ever Sends Me Roses* | - |
| 1965 | 45-MGM-1282 | *Roundabout* | - | *Love Is Me, Love Is You* | - |
| 1966 | 45-MGM-1293 | *Jealous Heart* | 44 | *Can I Rely On You* | - |
| 1966 | 45-MGM-1295 | *The Phoenix Love Theme (Senza Fine)* | - | *Bossa Nova Hand Dance (Deixa isso prà là)* | - |
| 1966 | 45-MGM-1305 | *I'd Let You Break My Heart All Over Again* | - | *Love Is Me, Love Is You* | - |
| 1966 | 45-MGM-1320 | *Somewhere, My Love* | - | *Letter From a Soldier (Dear Mama)* | - |
| 1966 | 45-MGM-1327 | *Spanish Nights and You* | - | *Games That Lovers Play* | - |
| 1967 | 45-MGM-1334 | *Another Page* | - | *Souvenir d'Italie* | - |
| 1967 | 45-MGM-1336 | *Time Alone Will Tell* | - | *Born Free* | - |
| 1967 | 45-MGM-1347 | *My Heart Cries For You* | - | *If My Friends Could See Me Now/I'm a Brass Band* | - |
| 1968 | 45-MGM-1381 | *My World is Slipping Away* | - | *Till We're Together* | - |
| 1968 | 45-MGM-1407 | *Why Say Goodbye* | - | *Addio, mi'Amore* | - |

| 1968 | 45-MGM-1446 | Somebody Else Is Taking My Place | - | Brother, Can You Spare a Dime | - |
| 1968 | 45-MGM-1471 | The Wedding Cake | - | Overhill, underground | - |
| 1969 | 45-MGM-1493 | Mister Love | - | Zingara | - |
| 1969 | POSP 75 | Three Good Reasons | - | What's Wrong With My World | - |

## UK albums

| Year | Title | Cat.-No.Mono pressings | Cat.-No.Stereo pressings | Remark |
|------|-------|------------------------|--------------------------|--------|
| 1958 | Who's Sorry Now? | MGM-D-153 | - | 10" disc |
| 1959 | My Thanks To You | MGM-C-782 | - | Same as US album of same name |
| 1959 | The Exciting Connie Francis | MGM-C-786 | - | Same as US album of same name |
| 1959 | Christmas With Connie | MGM-C-797 | - | Same as US album Christmas In My Heart |
| 1959 | Connie Francis sings Fun Songs For Children | MGM-C-819 | - | Same as US album of same name |
| 1959 | Connie Francis sings Italian Favorites | MGM-C-821 | MGM-CS-6002 | Same as US album of same name |
| 1960 | Connie's Greatest Hits | MGM-C-831 | - | - |
| 1960 | Connie Francis sings Jewish Favorites | MGM-C-845 | MGM-CS-6021 | Same as US album of same name |
| 1963 | 16 of Connie's Biggest Hits | MGM-C-970 | - | - |
| 1966 | The Best of Connie Francis | MGM-C-8041 | - | - |
| 1968 | Hawaii Connie | MGM-C-8110 | MGM-CS-8110 | Vocals as on US album of same name, but different orchestrations |

## UK Extended Plays

Case 2:12-cv-03382-JGB-AGR   Document 90   Filed 11/08/13   Page 113 of 133   Page ID #:1157

| Year | Cat.-No. | Title | Tracks A-side | Tracks B-side |
|------|----------|-------|---------------|---------------|
| 1958 | MGM-EP-658 | *A Girl in Love* | 1. *Who's Sorry Now?*<br>2. *No Other One* | 1. *I Never Had a Sweetheart*<br>2. *Goody Goodbye* |
| 1958 | MGM-EP-677 | *Heartaches* | 1. *Carolina Moon*<br>2. *You Always Hurt The One You Love* | 1. *I'm Sorry I Made You Cry*<br>2. *Heartaches* |
| 1962 | MGM-EP-775 | *What Kind of Fool Am I?* | 1. *What Kind of Fool Am I?*<br>2. *Second Hand Love* | 1. *Gonna Git That Man*<br>2. *You're the Only One Can Hurt Me* |

## Germany Singles

| Year | Cat.-No. | A-Side | Chart peak | B-Side | Chart Peak | Remark |
|------|----------|--------|-----------|--------|-----------|--------|
| 1959 | M 21 100 | *My Happiness* | 6 | *You Always Hurt The One You Love* | - | Distributor: Electrola |
| 1959 | M 21 196 | *Lipstick On Your Collar* | - | *Frankie* | - | Distributor: Electrola |
| 1960 | 61 001 | *My Happiness* | - | *Never Before* | - | Distributor from here: Polydor |
| 1960 | 61 002 | *Lipstick On Your Collar* | - | *Frankie* | - | - |
| 1960 | 61 005 | *You're Gonna Miss Me* | - | *Plenty Good Lovin'* | - | - |
| 1960 | 61 009 | *Among My Souvenirs* | - | *God Bless America* | - | - |
| 1960 | 61 017 | *Mama* | - | *Non Dimenticar* | - | - |
| 1960 | 61 018 | *Valentino* | - | *Teddy* | - | - |
| 1960 | 61 023 | *Everybody's Somebody's Fool* | 26 | *Jealous Of You (Tango Della Gelosia)* | - | - |
| 1960 | 61 025 | *Die Liebe ist ein seltsames Spiel* | 1 | *Robot Man* | - | - |
| 1960 | 61 028 | *My Heart Has a Mind of Its Own* | - | *Malagueña* | - | - |
| 1960 | 61 031 | *Who's Sorry Now?* | - | *Carolina Moon* | - | - |
| 1960 | 61 034 | *Many Tears Ago* | - | *Senza Mamma e Nnammurata* | - | - |
| 1960 | 61 035 | *Ich komm' nie mehr von dir los* | 39 | *Singing the Blues* | - | - |
| 1961 | 61 038 | *Where the Boys Are* | | *No one* | - | - |
| 1961 | 61 039 | *Wenn ich träume* | | *Niemand* | - | - |
| 1961 | 61 041 | *Breakin' In a Brand New Broken Heart* | - | *Someone Else's Boy* | - | - |
| 1961 | 61 042 | *Schöner fremder Mann* | 2 | *Funiculì, Funiculà* | - | - |
| 1961 | 61 043 | *Havah Negilah* | - | *Shein vi di Levone* | - | - |
| 1961 | 61 044 | *Einmal komm' ich wieder* | 16 | *Immer und überall* | - | - |
| 1961 | 61 045 | *Together* | - | *Too Many Rules* | - | - |
| 1961 | 61 048 | *(He's My) Dreamboat* | - | *Hollywood* | - | - |

Case 2:12-cv-03382-JGB-AGR   Document 90   Filed 11/08/13   Page 115 of 133   Page ID #:1159

| 1961 | 61 050 | Eine Insel für zwei | 7 | Das ist zuviel (Too Many Rules) | - | - |
|------|--------|---------------------|---|----------------------------------|---|---|
| 1961 | 61 053 | Lili Marleen | 9 | Mond von Mexico | - | - |
| 1962 | 61 055 | When the Boy In Your Arms (Is the Boy In Your Heart) | - | La Paloma | - | - |
| 1962 | 61 056 | Tu' mir nicht weh | 2 | Paradiso | 1 | - |
| 1962 | 61 057 | Don't Break The Heart That Loves You | - | Mister Twister (English Version) | - | - |
| 1962 | 61 059 | Second Hand Love | - | Don't Cry On My Shoulder | - | - |
| 1962 | 61 063 | V-A-C-A-T-I-O-N | - | The Biggest Sin of All | - | - |
| 1962 | 61 065 | Wenn du gehst | 2 | Gondola d'amore | - | - |
| 1962 | 61 066 | Violino Tzigano | | Dammi la mano e corri | - | - |
| 1962 | 61 067 | I Was Such a Fool (To Fall In Love With You) | - | He Thinks I Still Care | - | - |
| 1963 | 61 072 | I'm Gonna Be Warm this Winter | - | Al Di Là | - | - |
| 1963 | 61 076 | Follow the Boys | - | Waiting For Billy | - | - |
| 1963 | 61 078 | Barcarole in der Nacht | 1 | Colombino | - | - |
| 1963 | 61 079 | If My Pillow Could Talk | - | You're The Only One Can Hurt Me | - | - |
| 1963 | 61 080 | Die Nacht ist mein | 3 | Mein Schiff fährt zu dir | - | - |
| 1963 | 61 081 | Drownin' My Sorrows | - | Mala Femmena | - | - |
| 1963 | 61 083 | Whatever Happened to Rosemarie | - | Your Other Love | - | - |
| 1964 | 61 085 | Nino | 12 | Jedes Boot hat seinen Hafen | - | - |
| 1964 | 61 086 | Gracias | - | Yo sé | - | - |
| 1964 | 61 089 | Blue Winter | - | Souvenirs | - | - |
| 1964 | 61 090 | Napoli | 12 | Meinen Sunny krieg' ich nie mehr wieder | - | - |
| 1964 | 61 091 | Be Anything (But Be Mine) | - | Tommy | - | - |

| 1964 | 61 094 | Looking For Love | - | Let's Have a Party | - | - |
| 1964 | 61 098 | Ich wär' gerne verliebt | - | Ich geb' 'ne Party heut' Nacht | 22 | - |
| 1964 | 61 101 | Abends in der Mondschein Allee | 23 | Abschiedsmelodie | - | - |
| 1964 | 61 102 | Don't Ever Leave Me | - | We Have Something More (Than a Summer Love) | - | - |
| 1965 | 61 106 | Ho bisogno di vederti | - | C'è Una Cosa Che Non Sai | - | - |
| 1965 | 61 108 | Whose Heart Are You Breaking Tonight | - | Come On, Jerry | - | - |
| 1965 | 61 109 | Du musst bleiben, Angelino | 10 | Jede Liebe geht einmal zu Ende | - | - |
| 1965 | 61 112 | For Mama (La Mamma) | - | She'll Be Comin' Round The Mountain | - | - |
| 1965 | 61 114 | Hast du Heimweh | flip | Weekend Boy | 29 | - |
| 1965 | 61 118 | Mein Herz wird warten | 24 | Denk' nicht an die and're | - | - |
| 1966 | 61 122 | Lass mich geh'n | 24 | Sternenmelodie | - | - |
| 1966 | 61 126 | Der Mond war schuld daran | - | Komm zu mir, Joe | - | - |
| 1966 | 61 131 | It's a Different World | - | Empty Chapel | - | - |
| 1966 | 61 134 | Somewhere, My Love | - | Letter From a Soldier (Dear Mama) | - | - |
| 1966 | 61 137 | Meine Reise ist zu Ende | 24 | Jeder Traum ist einmal ausgeträumt | - | - |
| 1966 | 61 143 | Spanish Nights and You | - | Games That Lovers Play | - | - |
| 1967 | 61 144 | Es ist so schön, dass es dich gibt | 27 | Das soll nie mehr vorübergeh'n | - | - |
| 1967 | 61 148 | Somewhere, My Love | - | Strangers in the Night | - | - |
| 1967 | 61 152 | Goodbye, Mama | - | Traumboot | - | - |
| 1967 | 61 163 | Keine Liebe ohne Tränen | 30 | Alte Liebe rostet nicht | - | - |
| 1968 | 61 178 | Lass mich bei dir sein | - | Er war nur ein Märchenerzähler | - | - |
| 1968 | 61 184 | My World Is Slipping Away | - | Till We're Together | - | - |

| 1968 | 61 189 | Why Say Goodbye | - | Addio, mi' Amore | - | - |
| 1968 | 61 192 | Du sagst goodbye (Why Say Goodbye) | - | Mein Herz ruft nach dir | - | - |
| 1968 | 61 196 | Canzone di Napoli | - | Jedem Abend folgt ein Morgen | - | - |
| 1968 | 61 200 | Stupid Cupid | - | Lipstick On Your Collar | - | - |
| 1969 | 61 212 | Fahre hinaus mit den Sternen | - | Happy Girl | - | - |
| 1969 | 61 216 | Gone Like The Wind | - | Am I Blue | - | - |
| 1969 | 61 217 | Strand der tausend Lieder | - | Lissabon | - | - |
| 1969 | 61 224 | Lass mir die bunten Träume | - | Gino | - | - |
| 1969 | 2006 004 | Ich zähl' die Stunden | - | Es begann in einer kleinen Bar | - | - |

## Germany albums

| Year | Title | Cat.-No. Mono pressings | Cat.-No. Stereo pressings | Remark |
|------|-------|------------------------|---------------------------|--------|
| 1960 | *The Exciting Connie Francis* | 65 010 | 665 010 | Same as US album of same name |
| 1960 | *Connie's Greatest Hits* | 65 017 | - | - |
| 1961 | *Connie Francis sings Film Hits* | 65 023 | 665 023 | Same as US album *Connie Francis sings "Never On Sunday"* |
| 1962 | *Connie Francis* | 65 029 | 665 029 | - |
| 1963 | *Country Music – Connie Style* | 65 033 | - | Same as US album of same name |
| 1963 | *Connie Francis sings Modern Italian Hits* | 65 034 | 665 034 | Same as US album of same name |
| 1963 | *Follow The Boys* | 65 036 | - | Same as US album of same name |
| 1963 | *Connie Francis sings Award Winning Motion Picture Hits* | 65 037 | 665 037 | Same as US album of same name |
| 1964 | *My Greatest Songs* | 65 039 | 665 039 | - |
| 1964 | *Ihre großen Erfolge* | 65 040 | 665 040 | - |
| 1964 | *Ich wär' so gerne verliebt* | 65 041 | 665 041 | Same as US album *Looking For Love* |
| 1964 | *Connie Francis sings Spanish Favorites* | 65 046 | 665 046 | Songs as on US album of Spanish And Latin American Favorites, but different running order |
| 1964 | *A new kind of Connie* | 667 023 | 677 023 | Same as US album of same name |
| 1965 | *Connie Francis sings All Time International Hits* | 65 058 | 665 058 | Same as US album of same name |
| 1966 | *Melodien, die die Welt erobern* | 65 061 | 665 061 | - |
| 1966 | *Movie Greats of the 60* | 65 065 | 665 065 | Same as US album of same name |
| 1967 | *Happiness - Connie Francis on Broadway today* | 65 080 | 665 080 | Same as US album of same name |
| 1967 | *Somewhere, My Love* | - | 60 709 | 10" disc |
| 1968 | *Lass mich bei dir sein* | - | 665 089 | |
| 1968 | *Connie & Clyde – Hit Songs of The 30s* | - | 665 103 | Same as US album of same name |

## Germany EPs

Case 2:12-cv-03382-JGB-AGR   Document 90   Filed 11/08/13   Page 119 of 133   Page ID
#:1163

| Year | Cat.-No. | Title | Tracks A-Side | Tracks B-Side |
|------|----------|-------|---------------|---------------|
| 1960 | 63 001 | *My Happiness* | 1. *My Happiness*<br>2. *Lipstick on Your Collar* | 1. *Frankie*<br>2. *Never Before* |
| 1961 | 63 010 | *Connie Francis* | 1. *Schöner fremder Mann*<br>2. *Havah Negilah* | 1. *Together*<br>2. *Funiculì, Funiculà* |
| 1961 | 63 019 | *Connie Francis* | 1. *Eine Insel für zwei*<br>2. *Das ist zuviel* | 1. *Lili Marleen*<br>2. *Mond von Mexico* |

## International Singles

Case 2:12-cv-03382-JGB-AGR    Document 90    Filed 11/08/13    Page 120 of 133    Page ID #:1164

| Year | Cat.-No. | A-side | B-side | Country | Chart peak |
|------|----------|--------|--------|---------|------------|
| 1960 | SPF-1069 | *Solamente una vez* | *Bésame mucho* | France | ? |
| 1960 | MGM 9049 | *¿Quién sera?* | *Quizás, quizás, quizás* | Greece | ? |
| 1960 | HK-5009 | *Mama* | *Teddy* | Netherlands | ? |
| 1960 | HK-5052 | *Ich komm' nie mehr von dir los* | *Ich denk' an dich* | Netherlands | ? |
| 1960 | HK-5057 | *Havah Negilah* | *Tzena, tzena, tzena* | Netherlands | ? |
| 1961 | MG-33028 | *Valentino* | *No one* | Argentina | ? |
| 1961 | SPF-1092 | *Jamais* | *Lily Marlène* | France | 1 |
| 1961 | SPF-1095 | *You're Nobody 'Til Somebody Loves You* | *Dat's Love* | France | ? |
| 1961 | K 2019 | *Qualcuno mi aspetta* | *Where the Boys are* | Italy | 1 |
| 1961 | LL-2116 | *Anniversary Song* | *O mein Papa (English-Yiddish version)* | Japan | ? |
| 1961 | MGM-12345 | *Je sais qu'un gars* | *Personne* | Canada | ? |
| 1961 | MGM-12346 | *Schöner fremder Mann* | *Die Liebe ist ein seltsames Spiel* | Canada | ? |
| 1961 | LSF-51 X | *Jamais* | *Celui que je veux* | Canada | ? |
| 1962 | MGM-10024 | *Tu' mir nicht weh* | *Paradiso* | Finland | ? |
| 1962 | K 2039 | *Mister Twister (Italian version)* | *Kissin' Twist (Kiss 'n' Twist)* | Italy | ? |
| 1962 | K 2065 | *Un bacio all'Italiana* | *Torna, torna amore* | Italy | ? |
| 1962 | LL-2122 | *Too Many Rules (Japanese version)* | *Pretty Little Baby (Japanese version)* | Japan | 1 |
| 1962 | MGM 12348 | *Mister Twister (French version)* | *Mon cœur est un violon* | Canada | ? |
| 1963 | MGM-10029 | *Drownin' My Sorrows* | *Look At Him* | Finland | ? |
| 1963 | 45-MGM-8055 | *Tonight's Night* | *In Your Arms* | India | ? |
| 1963 | K 2077 | *Per sempre con te* | *Ninna nanna per un bambino* | Italy | ? |
| 1963 | K 2078 | *Mala Femmena* | *Portami con te* | Italy | 1 |
| 1963 | LSF-57 X | *En suivant mon cœur* | *Toutes les étoiles* | Canada | ? |
| 1964 | K 2100 | *In cerca d'amore* | *Non vuoi baciami* | Italy | ? |
| 1964 | MGM 45/0379 | *En busca de amor* | *Por una razón* | Mexico | ? |

| Year | Title | Cat.-No. | Country | Remark |
|------|-------|----------|---------|--------|
| 1960 | *Connie Francis canta canciones Judias* | MG 85-021 | Argentina | Same as US album *Connie Francis sings Jewish Favorites* |
| 1960 | *Connie Francis Interpretando "Mama"* | MGM 16.007 | Brazil | - |
| 1961 | *Connie Francis no Copa* | MGM 16.031 | Brazil | Same as US album *Connie Francis at The Copa* |
| 1961 | *Mais Cancoes Italians* | MGM 16.031 | Brazil | Same as US album *More Italian Favorites* |
| 1961 | *Canzoni in celluloide* | EM-3965 | Italy | Same as US album *Connie Francis sings "Never on Sunday"* |
| 1962 | *Connie Francis à Paris* | F5-MGM-102 | France | 10" disc |
| 1962 | *Connie's Greatest Hits* | ZL-5044 | Japan | 10" disc |
| 1962 | *Minna no Connie* | ZL-5074 | Japan | 10" disc |
| 1962 | *Jamais* | LS.LP 1 | Canada | - |
| 1963 | *Connie Francis presenta 12 grandi successi Italiani* | EM-4102 | Italy | - |
| 1963 | *En suivant mon cœur* | LS.LP 2 | Canada | - |
| 1963 | *Décidement* | LS.LP 3 | Canada | - |
| 1963 | *Songs From the Heart* | MGM-JC-1127 | South Africa | - |
| 1964 | *En busca de amor* | 92006 | Argentina | Same as US album *Looking for Love* |
| 1964 | *Connie Francis sings German Favorites* | MC 6158 | New Zealand | Same as US album of same name |
| 1965 | *Connie Francis en El Patio* | 60011 | Colombia | - |
| 1967 | *Connie Francis i suoi best-seller* | MG 70.009 | Italy | - |
| 1968 | *Hawaii Connie* | ES-4054 | South Africa | Same as UK album of same name |

## International Extended Plays

| Year | Cat.-No. | Title | Tracks A-side | Tracks B-side | Country |
|------|----------|-------|---------------|---------------|---------|
| 1961 | EPF-70 | *Je sais qu'un gars* | 1. *Je sais qu'un gars*<br>2. *Personne* | 1. *Malagueña*<br>2. *Funiculì, Funiculà* | France |
| 1962 | EPF-82 | *Celui que je veux* | 1. *Celui que je veux*<br>2. *Faut pas faire, ça* | 1. *La seule qui t'aime*<br>2. *Jamais* | France |
| 1962 | EPF-86 | *Connie Francis* | 1. *Einmal komm' ich wieder*<br>2. *Schöner fremder Mann* | 1. *Immer und überall*<br>2. *Ich komm' nie mehr von dir los* | France |
| 1961 | X 2516 | *Connie Francis sings Italian Favorites* | 1. *Chitarra Romana*<br>2. *Senza Mamma e Nnammurata* | 1. *Dicitencello vuie*<br>2. *Guaglione* | Italy |
| 1961 | EP-197 | *Connie Francis* | 1. *Chitarra Romana*<br>2. *Hollywood* | 1. *Baby Roo*<br>2. *Too Many Rules* | Israel |
| 1961 | HT 057-78 | *El novio de otra* | 1. *El novio de otra*<br>2. *My Love, My Love* | 1. *Swanee*<br>2. *Breakin' In a Brand New Broken Heart* | Spain |
| 1961 | HT 057-51 | *Ana* | 1. *Ana (Anna/El negro zumbón)*<br>2. *Three Coins in the Fountain* | 1. *High Noon*<br>2. *Song from "Moulin Rouge"* | Spain |
| 1962 | MGM-EP-775 | *What Kind of Fool Am I?* | 1. *What Kind of Fool Am I?*<br>2. *Second Hand Love* | 1. *Gonna Git That Man*<br>2. *You're the Only One Can Hurt Me* | United Kingdom |
| 1962 | EPD 122 | *Connie Francis sjunger på Svenska* | 1. *V-A-C-A-T-I-O-N*<br>2. *The Biggest Sin of All* | 1. *Pretty Little Baby (Swedish version)*<br>2. *Mister Twister (Swedish version)* | Sweden |
| 1962 | HT 057-60 | *¡El Twist!* | 1. *Mister Twister (English version)*<br>2. *Johnny Darlin'* | 1. *Teach Me How to Twist*<br>2. *Telephone Lover* | Spain |
| 1962 | HT 057-64 | *Connie Francis canta "Mister Twister"* | 1. *Mister Twister (Spanish version)*<br>2. *Hey, Ring-A-Ding* | 1. *Ain't That Better, Baby*<br>2. *Does Ol' Broadway Ever Sleep* | Spain |
| 1963 | HT 057-78 | *Las Canciones de su pelicula "Detrás del amor"* | 1. *Esta es mi noche*<br>2. *Llevame a la luna* | 1. *Detrás del amor*<br>2. *She'll Have to Go* | Spain |
| 1964 | 63 514 | *Yo canto en Español* | 1. *No, no me dejes*<br>2. *Bésame mucho* | 1. *Invierno triste azul*<br>2. *Solamente una vez* | Spain |

| 1965 | 63 526 | Connie Francis | 1. *Forget Domani*<br>2. *Ma (He's Making Eyes At Me)* | 1. *My Man*<br>2. *More* | Spain |
| 1965 | 63 527 | Connie Francis | 1. *La Novia*<br>2. *Cuando Calienta el Sol* | 1. *La vie en rose*<br>2. *Milord* | Spain |

# Post MGM Records Era (1970 – present)

## US singles

| Jahr | Label | Cat.-No. | A-side | Chart peak<br>Pop | Chart peak<br>Adult Contemporary | Chart peak<br>misc. | B-Seite | Chart peak<br>Pop | Chart peak<br>Adult Contemporary | Chart peak<br>misc. |
|------|-------|----------|--------|------------|-------------------|-------------|---------|------------|-------------------|-------------|
| 1973 | GSF Records | GSF-6901 | *(Should I) Tie a Yellow Ribbon Round The Ole Oak Tree* | # 108 | - | - | *Paint The Rain* | - | - | - |
| 1973 | Ivanhoe Records | I-508 | *I Don't Want To Walk Without you* | - | - | - | *Don't Turn Around* | - | - | - |
| 1980 | MGM Records (distr. by Polydor) | K 14853 | *I'm Me Again* | - | # 40 | - | *Comme çi, comme ça* | - | - | - |
| 1982 | Polydor | 810 087-7 | *There's Still a Few Good Love Songs Left In Me* | - | - | 84<br>(Country) | *Let's Make It Love Tonight* | - | - | - |

## US albums

| Year | Title | Label | Cat.-No. | Chart peak |
|------|-------|-------|----------|------------|
| 1978 | *Who's Happy Now?* | United Artists Records | UAS 30182 | - |
| 1981 | *I'm Me Again* | MGM Records | MGM-1-5406 | - |
| 1989 | *Where the Hits Are* | Malaco Records | MAL 2003 | - |
| 1996 | *The Return Concert Live At Trump's Castle* | Click Records/Legacy Recordings | JK 64837 | - |

## Germany singles

| Year | Label | Cat.-No. | A-side | B-side | Chart peak |
|------|-------|----------|--------|--------|------------|
| 1971 | Polydor | 2041 185 | *Moderne Märchen* | *Gitarren der Liebe* | - |
| 1972 | Polydor | 2041 336 | *Meine Welt beginnt bei dir* | *Träume und Tränen* | - |
| 1978 | United Artists | 36 430 | *Lovin' Man* (German version) | *Heut' fiel auf einmal Schnee* | - |
| 1992 | Polydor | 863 350-7 | *Go, Connie Go* | *Bye, bye Connie* | - |
| 1992 | Polydor | 865 384-7 | *Jive Connie* | *Tribute to Connie Francis* | 2 |

## Germany albums

| Year | Title | Label | Cat.-No. |
|------|-------|-------|----------|
| 1978 | *Was ich bin* | United Artists Records | 30 196 XOT |
| 1992 | *Jive Connie -- Connie Francis Party Power* | Polydor | 513 432-4 |

## International singles

| Year | Label | Cat.-No. | A-side | B-side | Country |
|------|-------|----------|--------|--------|---------|
| 1978 | United Artists Records | UP 36 430 | *Where the Boys Are* (Disco Version) | *A-ba-ni-bi* | United Kingdom |
| 1978 | United Artists Records | UP 36 463 | *My Mother's Eyes* | *Lovin' Man* (Englisch Version) | United Kingdom |
| 1978 | United Artists Records | CM-190 | *Where the Boys Are* (Disco Version) | *Atashi-no* (Disco Version) | Japan |
| 1978 | Polydor | 2066 881 | *Burning Bridges* | *Let's Go Where the Good Times Go* | United Kingdom |

## International albums

*Exhibit 11*

**Artist Royalty Statement Summary**

Summary of the royalty earnings for a particular reporting period and the detail of recoupable costs deducted during the ending in the amount due or the unrecouped balance which is carried forward to the next accounting period.

**Artist Royalty Statement Detail**

**Source of Sales/Title** – The source of the revenue for royalty reporting and/or the title of the product reported.

**Sales Type** – This column represents the distribution channel through which the product was distributed. Various channels include the following:

*   **Retail** – Sales to consumers through retail channels; e.g. record stores or mass merchants.
*   **Direct Mail** – Sales made directly to consumers by UMG.
*   **License** – Third party exploitations other than that record club or synchronization.
*   **Military** – Sales to armed forces outlets.
*   **Premium** – Sales of items for distribution in conjunction with another product or service.
*   **Record Club** – Record Club license sales.
*   **Stream (Stream-39)** – Digital audio transmission that is not loaded on to a local storage device for later user receipt.
*   **Video Stream (Vidstream-79)** – Digital video transmission that is not loaded on to a local storage device for later use (example: Vevo).
*   **Synch** – Third party licenses for synchronization with films, videos, or commercials.
*   **TV Adver** – Sales supported by television advertising campaigns.
*   **PermDownl (Permdnl-39)** – Digital transmission to a local storage device, which is not subject to time or use limitations (example: Itunes).
*   **Mastertone** – Clips of the master recording to be downloaded to cell phone which will be used as ringers.

**Price Level** – The three price levels are TOP, MID, and BUDGET.

**Sales Date** – Refers to the period in which the related sale occurred if made by UMG or was reported if for a third party.

**Selection Number** – A unique identifier assigned to each product.

**Config Code** – Code that indicates the configuration of the product reported. Most commonly used codes are as follows:

CD = Compact Disc, DX = DVD, DX = CD/DVD Combo, 1D = Track, 1A = Digital Album,
IV = Digital Video,              1F = Vinyl Album,   S = Single, ST = Single 3T = Single 12 inch

---

Please direct all correspondence to the following address:

Universal Music Group
P.O. Box 4012
Woodland Hills, CA 91365

or email us at RoyaltyHelp@umusic.com
or call (800) 435-9175 and press 1

---

**Contract** – Internal UMG reference number for your contract and related contracts or letter of direction.

**Pr Code** – The price code indicates the price base or type of rate used in your royalty calculation. Most commonly use codes are as follows:

A – Fixed Penny Rate
I – Percentage of Receipts
H – Published Wholesale Price without Standard Free Goods
R – Suggested Retail List Price
S – Invoice Price – Billed Amount/Divided by Total Units Shipped
W – Published Wholesale Price with Standard Free Goods

**Price** – The actual price used in the royalty calculation as identified by the Price Code.

**Pckg Rate** – The packaging deduction, if any, used in the royalty calculation.

**Royalty Rate** – The rate used in the royalty calculation.

**% Part** – The percentage of the product in which the royalty participant shares.

**Effec Rate** – The result of the royalty calculation. The amount paid per unit reported on the statement. A negative calculation indicates a deducted rate for a third party.

**Units/Receipts** – The number of units on which royalties are calculated. Negative numbers in this column represent returned items. If the price code is I, this column contains the receipt amount on which the royalty is calculated.

**Tax Rate** – The tax rate in the applicable territory of sale.

**Net Royalty Earnings** – Royalties credited to your account. Negative numbers represent returns or amounts credited to third parties such as producers.

Balances under $50 will be carried forward to the next statement.

For a complete listing of config codes and sales types, refer to Frequently Asked Questions on our Website at http://www.umgroyalty.com

DISCLAIMER: This key and glossary is designed to be informational only. It is not intended to replace, supersede, amend, or modify any term of any contract, agreement, or course of conduct that you may have (or have had) with any Universal Music Group company, division, affiliate, or label. Nor is this key and glossary intended to create any new or different contractual obligations or confer on you any additional rights or benefits.

Page: 2

UMG RECORDINGS, INC.
OC - POLY/ATLAS
(PC)
P.O. BOX 4012
WOODLAND HILLS, CA 91365
UNITED STATES

RE 15 00020227

ASL:
ACCOUNT NAME: CONNIE FRANCIS - 1959 CONTRACT
ACCOUNT NUMBER: 1016/00D ACCT STATUS: A
PDD: $ 90

62643 TD4
CONNIE FRANCIS
MEAUN RUN MGT.RE:CONNIE FRANCIS
6413 NORTHWEST 103RD TERRACE
PARKLAND, FL 33076

Payer: G0003333   Vendor #: 0000020227
Act/Payee Status: A   Payee Status: 9

Artist Royalty Statement Summary for period ended: 06/30/12

Payee % Fact: 100.0000

| Activity Description | Description | Vendor Number | Voucher Number | Project Number | Activity Date | Activity Account | Account Payee | Payee Amount | Beginning/Ending Balance |
|---|---|---|---|---|---|---|---|---|---|

Payee Amount Due (Paid Via Direct Deposit) =      23,516.44

T o t a l s

Page: 1

UMG RECORDINGS, INC.
OO - MROY/ATLAS
(PC)
P.O. BOX 4012
WOODLAND HILLS, CA 91365
UNITED STATES)

RE 15 00020227

62642 TR4
CONNIE FRANCIS
MEADOW RUN MGT./RE/CONNIE FRANCIS
6413 NORTHWEST 102ND TERRACE
PARKLAND, FL 33076

ABI:
ACCOUNT NAME: CONNIE FRANCIS - 1959 CONTRACT
ACCOUNT NUMBER: 10166700 ACCT STATUS: A
PID: $ 90

Payee: GC003393   Vendor # 000020227                    Artist Royalty Statement Summary for period ended: 06/30/12
Acc/Payee Status: A   Payee Status: 9

ACCOUNT NAME: CONNIE FRANCIS - 1959 CONTRACT
ACCOUNT NUMBER: 10166700 ACCT STATUS: A
PID: $ 90                Payee % Part: 100.0000

| Activity Description | Description | Vendor Number | Voucher Number | Project Activity Number | Activity Date | Account | Activity Amount Payee | Beginning/Ending Balance Totals |
|---|---|---|---|---|---|---|---|---|
| | | | | | | Payee Balance Forward | - | 28,533.04 |
| PAYMENTS | Francis, Connie | 00000202 1016670CQ411 | | | 03/21/12 | *** PAYMENTS | -28,533.04 | -28,533.04 |
| PAYMENTS - AUDIT SETTL CONNIE FRANCIS V. UMG | | 00000202 | | | 07/21/12 | *** PAYMENTS | -205,000.00 | -205,000.00 |
| | | | | | | *** PAYMENTS - AUDIT SETTLEMENTS | -205,000.00 | -205,000.00 |
| FOREIGN ADJUSTMENT | BMC-ADG P/E 03/2008-06/2011 | 00000202 | | | 08/02/12 | 374.44 | 374.44 | 374.44 |
| | | | | | | *** FOREIGN ADJUSTMENT | 374.44 | 374.44 |
| AUDIT ADJUSTMENT - E&R Connie Francis vs UM | | 00000202 | | | 07/21/12 | 205,000.00 | 205,000.00 | 205,000.00 |
| | | | | | | *** AUDIT ADJUSTMENT - EARNINGS | 205,000.00 | 205,000.00 |
| EARNINGS | | | | | | | | |
| Domestic DMG | | | | | | *** Domestic DMG | 4,383.61 | 4,383.61 |
| Third Party | | | | | | *** Third Party | 3,938.08 | 3,938.08 |
| Foreign | | | | | | *** Foreign | 15,356.31 | 15,356.31 |
| | | | | | | Net Earnings | 23,678.00 | 23,678.00 |
| | | | | | | Tot Prior Recv | 1,614.00 | 1,614.00 |
| | | | | | | Ending Recv | -2,150.00 | -2,150.00 |

62661 TNA
Processing Company: 1300010 TRACS RG

ASI:
Group: GROUP2200
Payee: G0003393

UMG RECORDINGS, INC.
QC - POLY/ATLAS
Artist Royalty Statement Detail

Page: 20
Period Ended: 06/30/12

RR 15 00020227
ACCOUNT NAME: CONNIE FRANCIS - 1959 CONTRACT
ACCOUNT NUMBER: 101667900

| Source Of Sales/ Product Title | Sales Type | Price Level | Sales Date | Selection Number | Config Code | Contract Cde | Pr Price Rate | Prog Royalty Rate | Royalty % Rate | Effect Rate | Units/ Receipts | Tax Rate | Net Royalty Earnings |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| JEALOUS HEART | | | | | | | | | | | | | |
| | Dwld U-79 TOP | | | USFR23512084 | ID | S-0001 | R | .26 | 5.0000 | 100.00% | 0.01300 | 3 | | 0.04 |
| | Dwld U-79 TOP | | | USFR23512084 | ID | S-0001 | R | .27 | 5.0000 | 100.00% | 0.01350 | 8 | | 0.11 |
| | OTADwld-23 TOP | | | USFR23512084 | ID | S-0001 | R | 1.63 | 5.0000 | 100.00% | 0.08150 | 1 | | 0.08 |
| | PermDwl-38 TOP | | | USFR23512084 | ID | S-0001 | R | .36 | 5.0000 | 100.00% | 0.01800 | 1 | | 0.02 |
| | PermDwl-38 TOP | | | USFR23512084 | ID | S-0001 | R | 1.00 | 5.0000 | 100.00% | 0.05000 | 1 | | 0.05 |
| | PermDwl-38 TOP | | | USFR23512084 | ID | S-0001 | R | .53 | 5.0000 | 100.00% | 0.02650 | 2 | | 0.05 |
| | PermDwl-38 TOP | | | USFR23512084 | ID | S-0001 | R | .52 | 5.0000 | 100.00% | 0.02600 | 4 | | 0.10 |
| | PermDwl-38 TOP | | | USFR23512084 | ID | S-0001 | R | .91 | 5.0000 | 100.00% | 0.04550 | 70 | | 3.18 |
| *** Total for JEALOUS HEART | | | | | | | | | | | 90 | | 3.64 |
| LA NUMERA | | | | | | | | | | | | | |
| | Dwld U-79 TOP | | | USFR23512077 | ID | S-0001 | R | .26 | 5.0000 | 100.00% | 0.01300 | 1 | | 0.01 |
| | Dwld U-79 TOP | | | USFR23512077 | ID | S-0001 | R | .27 | 5.0000 | 100.00% | 0.01350 | 3 | | 0.04 |
| | PermDwl-38 TOP | | | USFR23512077 | ID | S-0001 | R | .91 | 5.0000 | 100.00% | 0.04550 | 4 | | 0.18 |
| *** Total for LA NUMERA | | | | | | | | | | | 8 | | 0.23 |
| LA PALOMA | | | | | | | | | | | | | |
| | Dwld U-79 TOP | | | USFR23312048 | ID | S-0001 | R | .26 | 5.0000 | 100.00% | 0.01300 | 10 | | 0.13 |
| | Dwld U-79 TOP | | | USFR23312048 | ID | S-0001 | R | .27 | 5.0000 | 100.00% | 0.01350 | 32 | | 0.43 |
| | PermDwl-38 TOP | | | USFR23312048 | ID | S-0001 | R | .68 | 5.0000 | 100.00% | 0.03400 | 2 | | 0.07 |
| | PermDwl-38 TOP | | | USFR23312048 | ID | S-0001 | R | .91 | 5.0000 | 100.00% | 0.04550 | 163 | | 7.42 |
| *** Total for LA PALOMA | | | | | | | | | | | 207 | | 8.05 |
| LIPSTICK ON YOUR COLLAR | | | | | | | | | | | | | |
| | Dwld U-79 TOP | | | USFG95925390 | ID | S-0001 | R | .26 | 5.0000 | 100.00% | 0.01300 | 94 | | 1.22 |
| | Dwld U-79 TOP | | | USFG95925390 | ID | S-0001 | R | .27 | 5.0000 | 100.00% | 0.01350 | 211 | | 2.84 |
| | OTADwld-23 TOP | | | USFG95925390 | ID | S-0001 | R | 1.18 | 5.0000 | 100.00% | 0.05900 | 1 | | 0.06 |
| | OTADwld-23 TOP | | | USFG95925390 | ID | S-0001 | R | .91 | 5.0000 | 100.00% | 0.04550 | 1 | | 0.05 |
| | PermDwl-38 TOP | | | USFG95925390 | ID | S-0001 | R | 1.62 | 5.0000 | 100.00% | 0.08100 | 2 | | 0.16 |

Case 2:12-cv-03382-JGB-AGR   Document 90   Filed 11/08/13   Page 130 of 133   Page ID #:1174

UMG RECORDINGS, INC.
OG - POLY/ATLAS
Artist Royalty Statement Detail

Page: 21
Period Ended 06/30/12

ACCOUNT NAME: CONNIE FRANCIS - 1955 CONTRACT
ACCOUNT NUMBER: 10146700

RE 15 00020227

62462 TRA
Processing Company: 13000l0 TRACS #G

A&I:
Group: GROUP2200
Payee: C0003393

| Source Of Sales/ Product Title | Sales Type | Price Level Date | Sales Number | Selection Config Code | Contract Cde | Pr Ct | Price | Pckg Rate | Royalty Rate | % Part | Effect Rate | Units/ Receipts | Tax Rate | Net Royalty Earnings |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ParedDul-38 TOP | US3709592S390 | ID | S-0001 | R | 1.36 | 5.0000 | 100.00% | 0.06800 | 1 | | | | | 0.07 |
| ParedDul-38 TOP | US3709592S390 | ID | S-0001 | R | .36 | 5.0000 | 100.00% | 0.01800 | 1 | | | | | 0.02 |
| ParedDul-38 TOP | US3709592S390 | ID | S-0001 | R | .99 | 5.0000 | 100.00% | 0.04950 | 1 | | | | | 0.05 |
| ParedDul-38 TOP | US3709592S390 | ID | S-0001 | R | .53 | 5.0000 | 100.00% | 0.02650 | 1 | | | | | 0.03 |
| ParedDul-38 TOP | US3709592S390 | ID | S-0001 | R | 1.84 | 5.0000 | 100.00% | 0.09200 | 1 | | | | | 0.09 |
| ParedDul-38 TOP | US3709592S390 | ID | S-0001 | R | .62 | 5.0000 | 100.00% | 0.03100 | 1 | | | | | 0.03 |
| ParedDul-38 TOP | US3709592S390 | ID | S-0001 | R | 1.07 | 5.0000 | 100.00% | 0.05350 | 1 | | | | | 0.05 |
| ParedDul-38 TOP | US3709592S390 | ID | S-0001 | R | 1.10 | 5.0000 | 100.00% | 0.05500 | 1 | | | | | 0.06 |
| ParedDul-38 TOP | US3709592S390 | ID | S-0001 | R | .52 | 5.0000 | 100.00% | 0.02600 | -1 | | | | | -0.03 |
| ParedDul-38 TOP | US3709592S390 | ID | S-0001 | R | .65 | 5.0000 | 100.00% | 0.03250 | -1 | | | | | -0.03 |
| ParedDul-38 TOP | US3709592S390 | ID | S-0001 | R | .95 | 5.0000 | 100.00% | 0.04750 | -1 | | | | | -0.03 |
| ParedDul-38 TOP | US3709592S390 | ID | S-0001 | R | .78 | 5.0000 | 100.00% | 0.03900 | 3 | | | | | 0.14 |
| ParedDul-38 TOP | US3709592S390 | ID | S-0001 | R | .94 | 5.0000 | 100.00% | 0.04700 | 4 | | | | | 0.16 |
| ParedDul-38 TOP | US3709592S390 | ID | S-0001 | R | .91 | 5.0000 | 100.00% | 0.04550 | -6 | | | | | -0.24 |
| ParedDul-38 TOP | US3709592S390 | ID | S-0001 | R | .97 | 5.0000 | 100.00% | 0.03400 | -6 | | | | | -0.27 |
| ParedDul-38 TOP | US3709592S390 | ID | S-0001 | R | .97 | 5.0000 | 100.00% | 0.04850 | 8 | | | | | 0.28 |
| ParedDul-38 TOP | US3709592S390 | ID | S-0001 | R | 1.18 | 5.0000 | 100.00% | 0.05900 | 11 | | | | | 0.53 |
| | | | | | | | | | *** Total for LIPSTICK ON YOUR COLLAR | | | 1,810 | | | 106.78 |
| | | | | | | | | | *** Total for LOVE | | | 2,150 | | | 112.53 |

LOOKING FOR LOVE

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Dwild 0-79 TOP | US3709642S240 | ID | S-0001 | R | .27 | 5.0000 | 100.00% | 0.01350 | 6 | | | | | 0.08 |
| OTADwld-0-23 TOP | US3709642S240 | ID | S-0001 | R | 1.63 | 5.0000 | 100.00% | 0.08150 | 1 | | | | | 0.08 |
| OTADwld-0-23 TOP | US3709642S240 | ID | S-0001 | R | 1.62 | 5.0000 | 100.00% | 0.08100 | 1 | | | | | 0.08 |
| ParedDul-38 TOP | US3709642S240 | ID | S-0001 | R | .36 | 5.0000 | 100.00% | 0.01800 | 1 | | | | | 0.02 |
| ParedDul-38 TOP | US3709642S240 | ID | S-0001 | R | .52 | 5.0000 | 100.00% | 0.02600 | 2 | | | | | 0.05 |
| ParedDul-38 TOP | US3709642S240 | ID | S-0001 | R | .91 | 5.0000 | 100.00% | 0.04550 | 11 | | | | | 0.50 |
| | | | | | | | | | *** Total for LOOKING FOR LOVE | | | 22 | | | 0.81 |

LOVE IS WHERE YOU FIND IT

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ParedDul-38 TOP | US3N1N404413 | ID | S-0001 | R | .91 | 5.0000 | 100.00% | 0.04550 | 1 | | | | | 0.05 |
| | | | | | | | | | *** Total for LOVE IS WHERE YOU FIND IT | | | 1 | | | 0.05 |

LUON CAPRESE

UMG RECORDINGS, INC.
QC - POLY/ATLAS
Artist Royalty Statement Detail

62824 TRA
Processing Company: 1300010 TERAS PG

Page: 183
Period Ended: 06/30/12

ACCOUNT NAME: CONNIE FRANCIS - 1955 CONTRACT
ACCOUNT NUMBER: 10166790          KG 15 00002027

Group: GROUP200
Payer: C0003393

LILI MARLEEN

| Source of Sales / Product Title | Sales Type | Price Level | Sales Date | Selection Number | Config Code | Contract Cod | Pr | Price | Rdsg Rate | Royalty Rate | % Part | Effect Rate | Units/ Receipts | Tax Rate | Net Royalty Earnings |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| GERMANY | PermDnl-38 | TOP | 12/11 | USF036122640 | ID | S-0001 | R | 1.13 | 5.0000 | 100.00% | | 0.05460 | 10 | 5.00% | 0.57 |
| GERMANY | PermDnl-38 | TOP | 03/12 | USF036122640 | ID | S-0001 | R | 1.36 | 5.0000 | 100.00% | | 0.06800 | 8 | 5.00% | 0.54 |
| | | | | | | | | *** Total for LILI MARLEEN | | | | | 18 | | 1.11 |

LIPSTICK ON YOUR COLLAR

| Source of Sales | Sales Type | Price Level | Sales Date | Selection Number | Config Code | Contract Cod | Pr | Price | Rdsg Rate | Royalty Rate | % Part | Effect Rate | Units/ Receipts | Tax Rate | Net Royalty Earnings |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| AUSTRALIA | OThrDnld-23 | TOP | 12/11 | USF095925390 | ID | S-0001 | R | 2.88 | 5.0000 | 100.00% | | 0.14400 | 5 | 5.00% | 0.68 |
| AUSTRALIA | OThrDnld-23 | TOP | 03/12 | USF095925390 | ID | S-0001 | R | 2.79 | 5.0000 | 100.00% | | 0.13950 | 7 | 5.00% | 0.93 |
| AUSTRALIA | PermDnl-38 | TOP | 12/11 | USF095925390 | ID | S-0001 | R | 2.08 | 5.0000 | 100.00% | | 0.10400 | 88 | 5.00% | 9.69 |
| AUSTRALIA | PermDnl-38 | TOP | 03/12 | USF095925390 | ID | S-0001 | R | 1.96 | 5.0000 | 100.00% | | 0.09800 | 82 | 5.00% | 7.64 |
| AUSTRALIA | Stream-39 | TOP | 03/12 | USF095925390 | ID | S-0001 | I | 1.06 | 50.0000 | 100.00% | | 0.05300 | 4.38 | 5.00% | 2.19 |
| CANADA | PermDnl-38 | TOP | 12/11 | USF095925390 | ID | S-0001 | T | .89 | 5.0000 | 100.00% | | 0.04950 | 70 | | 3.47 |
| CANADA | PermDnl-38 | TOP | 03/12 | USF095925390 | ID | S-0001 | T | .97 | 5.0000 | 100.00% | | 0.04850 | 92 | | 4.46 |
| DENMARK | Stream-39 | TOP | 02/12 | USF095925390 | ID | S-0001 | I | | 50.0000 | 100.00% | | 0.04850 | 4.42 | | 2.21 |
| FRANCE | PermSub-12 | TOP | 12/11 | USF095925390 | ID | S-0001 | I | 1.10 | 5.0000 | 100.00% | | 0.05500 | 5.30 | | 2.85 |
| GERMANY | PermDnl-38 | TOP | 12/11 | USF095925390 | ID | S-0001 | R | 1.13 | 5.0000 | 100.00% | | 0.05550 | 15 | | 2.63 |
| GERMANY | PermDnl-38 | TOP | 03/12 | USF095925390 | ID | S-0001 | R | 1.13 | 5.0000 | 100.00% | | 0.05650 | 19 | | 1.07 |
| GERMANY | PermDnl-38 | TOP | 03/12 | USF095925390 | ID | S-0001 | T | .98 | 5.0000 | 100.00% | | 0.04900 | 10 | | 0.49 |
| GERMANY | PermDnl-38 | TOP | 03/12 | USF095925390 | ID | S-0001 | T | 1.09 | 5.0000 | 100.00% | | 0.05450 | 11 | | 0.60 |
| GERMANY | Stream-39 | TOP | 03/12 | USF095925390 | ID | S-0001 | I | | 50.0000 | 100.00% | | | 3.80 | | 1.90 |
| HONG KONG | Stream-39 | TOP | 12/11 | USF095925390 | ID | S-0001 | T | | 50.0000 | 100.00% | | | 6.40 | 4.95% | 3.20 |
| HONG KONG | Stream-39 | TOP | 03/12 | USF095925390 | ID | S-0001 | T | | 50.0000 | 100.00% | | | 5.71 | 4.95% | 2.86 |
| IRELAND | PermDnl-38 | TOP | 03/12 | USF095925390 | ID | S-0001 | R | 1.22 | 5.0000 | 100.00% | | 0.06100 | 9 | | 0.55 |
| JAPAN | OThrDnld-23 | TOP | 13/11 | USF095925390 | ID | S-0001 | I | 4.91 | 5.0000 | 100.00% | | 0.24550 | 2 | | 0.49 |
| JAPAN | OThrDnld-23 | TOP | 03/12 | USF095925390 | ID | S-0001 | I | 5.06 | 5.0000 | 100.00% | | 0.25300 | 6 | | 1.52 |
| JAPAN | PermDnl-38 | TOP | 12/11 | USF095925390 | ID | S-0001 | I | 1.76 | 5.0000 | 100.00% | | 0.08800 | 6 | | 0.54 |
| JAPAN | PermDnl-38 | TOP | 03/12 | USF095925390 | ID | S-0001 | I | 1.82 | 5.0000 | 100.00% | | 0.09100 | 12 | | 1.09 |
| JAPAN | PermSub-12 | TOP | 03/12 | USF095925390 | ID | S-0001 | I | 2.11 | 5.0000 | 100.00% | | 0.10550 | 39 | | 4.11 |
| JAPAN | PermSub-12 | TOP | 03/12 | USF095925390 | ID | S-0001 | I | | 50.0000 | 100.00% | | | 4.99 | | 2.50 |
| JAPAN | Stream-39 | TOP | 12/11 | USF095925390 | ID | S-0001 | I | | 50.0000 | 100.00% | | | 8.59 | | 4.30 |
| JAPAN | Stream-39 | TOP | 03/12 | USF095925390 | ID | S-0001 | I | | 50.0000 | 100.00% | | | 6.11 | | 3.06 |
| KOREA, REPUBLIC | PermSub-12 | TOP | 03/12 | USF095925390 | ID | S-0001 | I | | 50.0000 | 100.00% | | | 4.14 | 11.00% | 1.52 |
| KOREA, REPUBLIC | Stream-39 | TOP | 12/11 | USF095925390 | ID | S-0001 | I | | 50.0000 | 100.00% | | | 3.78 | 11.00% | 1.89 |
| KOREA, REPUBLIC | SubDwnl-43 | TOP | 03/12 | USF095925390 | ID | S-0001 | R | .05 | 5.0000 | 100.00% | | 0.00250 | 228 | 11.00% | 0.51 |
| MEXICO | PermDnl-38 | TOP | 12/11 | USF095925390 | ID | S-0001 | R | .93 | 5.0000 | 100.00% | | 0.04650 | 11 | 10.00% | 0.46 |

62225 TRA
Processing Company: 130010 TRACO PG

UMG RECORDINGS, INC.
QC - POLY/ATLAS
Artist Royalty Statement Detail

Page: 184
Period Ended: 06/30/12

ASI:
Group: GROUP200
Payee: G0003333

ACCOUNT NAME: CONNIE FRANCIS - 1959 CONTRACT
ACCOUNT NUMBER: 101667000
KE 15 00202227

| Source Of Sales/ Product Title | Sales Type | Price Level | Sales Rate | Selection Number | Config Code | Contract Com | Pr Cd | Pckg Price Rate | Royalty Rate | % Part | Effect Rate | Units/ Receipts | Tax Rate | Net Royalty Earnings |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| NETHERLANDS | PermDnl-38 | TOP | 12/11 | USF095952390 | ID | S-0001 | R | 1.06 | 5.0000 | 100.00% | 0.05300 | 12 | | 0.64 |
| NETHERLANDS | PerbSub-12 | TOP | 03/12 | USF095952390 | ID | S-0001 | I | | 50.0000 | 100.00% | | 6.05 | | 3.03 |
| NETHERLANDS | Stream -39 | TOP | 03/12 | USF095952390 | ID | S-0001 | R | | 50.0000 | 100.00% | | 8.05 | | 4.03 |
| NEW ZEALAND | PermDnl-38 | TOP | 12/11 | USF095952390 | ID | S-0001 | R | 1.47 | 5.0000 | 100.00% | 0.07350 | 19 | 5.00% | 1.33 |
| NEW ZEALAND | PermDnl-38 | TOP | 03/12 | USF095952390 | ID | S-0001 | R | 1.31 | 5.0000 | 100.00% | 0.06550 | 24 | 5.00% | 1.49 |
| NORWAY | Stream -39 | TOP | 12/11 | USF095952390 | ID | S-0001 | R | | 50.0000 | 100.00% | | 4.57 | 5.00% | 2.29 |
| NORWAY | PermDnl-38 | TOP | 03/12 | USF095952390 | ID | S-0001 | R | 1.07 | 5.0000 | 100.00% | 0.05350 | 13 | | 0.70 |
| NORWAY | PerbSub-12 | TOP | 03/12 | USF095952390 | ID | S-0001 | I | | 50.0000 | 100.00% | | 6.58 | | 3.29 |
| NORWAY | Stream -39 | TOP | 12/11 | USF095952390 | ID | S-0001 | R | | 50.0000 | 100.00% | | 5.15 | | 2.58 |
| SINGAPORE | PerbSub-12 | TOP | 03/12 | USF095952390 | ID | S-0001 | I | | 50.0000 | 100.00% | | 9.67 | 10.00% | 4.84 |
| SPAIN | PerbSub-12 | TOP | 12/11 | USF095952390 | ID | S-0001 | I | | 50.0000 | 100.00% | | 4.77 | 8.00% | 2.39 |
| SPAIN | Stream -39 | TOP | 03/12 | USF095952390 | ID | S-0001 | R | | 50.0000 | 100.00% | | 4.03 | 8.00% | 2.02 |
| SWEDEN | PermDnl-38 | TOP | 03/12 | USF095952390 | ID | S-0001 | R | 1.11 | 5.0000 | 100.00% | 0.05550 | 10 | | 0.56 |
| SWEDEN | PerbSub-12 | TOP | 12/11 | USF095952390 | ID | S-0001 | I | | 50.0000 | 100.00% | | 21.94 | | 10.97 |
| SWEDEN | PerbSub-12 | TOP | 03/12 | USF095952390 | ID | S-0001 | I | | 50.0000 | 100.00% | | 27.39 | | 13.70 |
| SWEDEN | Stream -39 | TOP | 12/11 | USF095952390 | ID | S-0001 | I | | 50.0000 | 100.00% | | 15.41 | | 7.71 |
| SWEDEN | Stream -39 | TOP | 03/12 | USF095952390 | ID | S-0001 | R | | 50.0000 | 100.00% | | 5.08 | | 2.54 |
| UNITED KINGDOM | PermDnl-38 | TOP | 12/11 | USF095952390 | ID | S-0001 | R | 1.14 | 5.0000 | 100.00% | 0.05700 | 11 | | 0.63 |
| UNITED KINGDOM | PermDnl-38 | TOP | 12/11 | USF095952390 | ID | S-0001 | R | 1.30 | 5.0000 | 100.00% | 0.06500 | 219 | | 14.24 |
| UNITED KINGDOM | PermDnl-38 | TOP | 03/12 | USF095952390 | ID | S-0001 | R | 1.02 | 5.0000 | 100.00% | 0.05100 | 24 | | 1.22 |
| UNITED KINGDOM | PermDnl-38 | TOP | 03/12 | USF095952390 | ID | S-0001 | R | 1.35 | 5.0000 | 100.00% | 0.06750 | 196 | | 13.23 |
| UNITED KINGDOM | PerbSub-12 | TOP | 12/11 | USF095952390 | ID | S-0001 | I | | 50.0000 | 100.00% | | 10.34 | | 5.17 |
| UNITED KINGDOM | PerbSub-12 | TOP | 03/12 | USF095952390 | ID | S-0001 | I | | 50.0000 | 100.00% | | 17.24 | | 8.62 |
| UNITED KINGDOM | Stream -39 | TOP | 12/11 | USF095952390 | ID | S-0001 | I | | 50.0000 | 100.00% | | 26.90 | | 13.46 |
| UNITED KINGDOM | Stream -39 | TOP | 03/12 | USF095952390 | ID | S-0001 | R | 3.61 | 50.0000 | 100.00% | | 24.52 | | 12.28 |
| UNITED KINGDOM | SubDnl-A0 | TOP | 12/11 | USF095952390 | ID | S-0001 | R | | 5.0000 | 100.00% | 0.18050 | 5 | | 0.90 |
| UNITED KINGDOM | SubDnl-A0 | TOP | 03/12 | USF095952390 | ID | S-0001 | R | 2.74 | 5.0000 | 100.00% | 0.13700 | 6 | | 0.82 |

*** Total for LIPSTICK ON YOUR COLLAR      207.14

| AUSTRALIA | PermDnl-38 | TOP | 03/12 | USF096025210 | ID | S-0001 | R | 1.50 | 5.0000 | 100.00% | 0.07500 | 10 | 5.00% | 0.71 |

LOOKING FOR LOVE

| JAPAN | PermDnl-38 | TOP | 03/12 | USF094425240 | ID | S-0001 | R | 1.82 | 5.0000 | 100.00% | 0.09100 | 7 | | 0.64 |

*** Total for LOOKING FOR LOVE      0.64

## PROOF OF SERVICE

I am a resident of California, over the age of eighteen years, and not a party to the within action; my business address is 433 N. Camden Drive, Suite 970, Beverly Hills, Los Angeles County, California 90210, and on the date set forth below, I caused to have served the within document **FOURTH AMENDED COMPLAINT**, by the means described below:

_x_   BY EMAIL:  Copy transmitted by email pursuant to prior practice in this matter.

____   BY PERSONAL DELIVERY:  Causing the document(s) to be personally delivered on the date set forth below.

____   BY OVERNIGHT DELIVERY:  Placing the document(s) in a sealed envelope designated by FedEx or United Parcel Service, with the delivery fees paid or provided for, for delivery the next business day, addressed as set forth below, and depositing the envelope in the box or other facility regularly maintained by such company.

____   BY EXPRESS MAIL:  Placing the document(s) in a sealed envelope, with Express Mail postage fully prepaid, addressed as set forth below, and depositing the envelope for collection today with the United States Postal Service as an Express Mail item in a facility regularly maintained therefor.

____   BY FACSIMILE: Transmission of the document(s) to the fax number addressed as set forth below, by the outgoing facsimile machine phone number (310) 278-2254, with a copy of the transmission report for this service, made by such facsimile machine, and showing the transmission was completed without error, as attached hereto.

Lisa J. Kohn
Jenner & Block LLP
633 West 5th Street, Suite 3600
Los Angeles, CA 90071
Fax (213) 239-2234
lkohn@jenner.com,
jschneider@jenner.com,
jsalazargarcia@jenner.com

Carletta F. Higginson
Jenner & Block LLP
919 Third Avenue
New York, NY 10022-3902
Fax (212) 909-0817
CHigginson@jenner.com

I declare under penalty of perjury under the laws of California and the United States of America that the above is true and correct.

Executed on October 7, 2013 at Beverly Hills, California.

Kimberly Fernandez

19
Fourth Amended Complaint